**16-2313**

IN THE

# United States Court of Appeals

**FOR THE SIXTH CIRCUIT**

JENNIFER MASON; CARL ROGERS, II; TERESA SPRINGER; JEFFREY DUSHANE;
DEBORAH CULVER; TRISTAN HASSELL; ADAM DILL; DAVID YEOMAN
*Plaintiffs-Appellees*,

--- *v.* ---

Lockwood, Andrews & Newnam, P.C., a Michigan corporation;
Lockwood, Andrews & Newnam, Inc., a Texas corporation
*Defendants-Appellants*

*and*

Leo A. Daly Company, a Nebraska corporation
*Defendant*

*On Appeal from the United States District Court*
*For the Eastern District of Michigan*
*Case No. 5:16-cv-10663-JCO-MKM*

# BRIEF OF PLAINTIFFS-APPELLEES

**McALPINE PC**
Mark L. McAlpine (P35583)
Jayson E. Blake (P56128)
Adam T. Schnatz (P72049)
3201 University Drive, Suite 100
Auburn Hills, Michigan 48326
(248) 373-3700
mlmcalpine@mcalpinepc.com
jeblake@mcalpinepc.com
atschnatz@mcalpinepc.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

1.      Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

*No.*

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

*No.*

Respectfully submitted,

**MCALPINE PC**

/s/ Mark L. McAlpine
Mark L. McAlpine (P35583)
Jayson E. Blake (P56128)
Adam T. Schnatz (P72049)
Attorneys for Plaintiffs/Appellees

Dated:  October 18, 2016

ii

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................. iv

Statement in support of oral argument ...................................................... vi

Statement of Jurisdiction ........................................................................... 1

Statement of the Issues .............................................................................. 1

Statement of the Case ................................................................................ 2

   I.   The Flint Water Crisis Is a Uniquely Local Catastrophe ............................ 2

   II.   Plaintiffs and Putative Class Members Are Citizens of Michigan .............. 5

   III.   Proceedings Before The District Court ........................................................ 6

Summary of the Argument .......................................................................... 7

Argument ................................................................................................... 8

   I.   The District Court Correctly Found That The Flint Water Crisis Is Purely a Local Controversy ................................................................................ 8

     A.  Citizenship Is Reviewed for Clear Error ..................................................... 9

     B.  CAFA Did Not Grant Jurisdiction Over Purely Local Controversies Such As the Flint Water Crisis ........................................................................ 10

     C.  The District Court Correctly Determined that at Least Two-Thirds of the Class Members Are Michigan Citizens Residing in Flint ............................... 14

     D.  The District Court Correctly Found that Plaintiffs Met The "Significant Basis" and "Significant Relief" Requirement .......................................... 23

       i.   Local Defendant's Conduct Forms a Significant Basis for the Claims Asserted by Plaintiffs .......................................................................... 25

       ii.  Plaintiffs Seek Significant Relief From A Local Defendant ................... 29

   II.   Conclusion .......................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Allen v. Boeing Co*., 821 F.3d 1111 (9th Cir. 2016) ............................ 24, 26, 27, 29

*Benko v. Quality Loan Serv. Corp.,* 789 F.3d 1111 (9th Cir. 2015) ........... 25, 27, 29

*Caruso v. Allstate Ins. Co.*, 469 F.Supp.2d 364 (E.D. La. 2007) ...........................16

*Coffey v. Freeport McMoran Cooper & Gold*, 581 F.3d 1240 (10th Cir. 2009) .. 11, 12, 29

*Coleman v. Estes Express Lines, Inc.,* 631 F.3d 1010 (9th Cir. 2011) ............. 24, 29

*Eagles Nest, LLC v. Moy Toy, LLC*, 2014 WL 4655277 (M.D. Tenn. Sep. 16, 2014) ..................................................................................................................17

*Ennis v. Smith*, 55 U.S. 400, 14 How. 400, 14 L.Ed. 472 (1852) ...........................19

*Evans v. Walter Indus. Inc.,* 449 F.3d 1159 (11th Cir. 2006) .......................... 25, 28

*Fort Knox Transit v. Humphrey*, 151 F.2d 602 (6th Cir. 1945) ..............................18

*Francis v. Goodman*, 81 F.3d 5 (1st Cir. 1996) .........................................................9

*Hollinger v. Home State Mut. Ins. Co*., 654 F.3d 564 (5th Cir. 2011) ........... passim

*In re Sprint Nextel Corp.,* 593 F.3d 669 (7th Cir. 2010) ........................................23

*Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) ..............14

*Kaufman v. Allstate N.J. Ins. Co.,* 561 F.3d 144 (3d Cir. 2009) .............................25

*MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234 (11th Cir. 2005) ......................9

*Novel v. Zapor*, 2013 WL 1183331, at *5 (S.D. Ohio Mar. 21, 2013) ...................18

*Opelousas Gen. Hosp. Auth. v. FairPay Solutions, Inc*., 655 F.3d 358 (5th Cir. 2011) ..................................................................................................................29

*Pate v. Huntington Nat. Bank*, No. 5:12-cv-1044, 2013 WL 557195, at *6 (N.D. Ohio Feb. 12, 2013) ...........................................................................................30

*Preston v. Tenet Healthsystem Mem. Med. Ctr., Inc.*, 485 F.3d 793 (5th Cir. 2007) .................................................................................................9, 19

*Reece v. AES Corp.,* 638 Fed. Appx. 755 (10th Cir. 2016) .....................................23

*Standard Fire Ins. Co. v. Knowles*, -- U.S. --, 133 S.Ct. 1345, 185 L.Ed.2d 439 (2013)........................................................................................................12

*State Farm Mutual Automobile Ins. Co. v. Dyer*, 19 F.3d 514 (10th Cir. 1994).....19

*United States v. Esquivel*, 88 F.3d 722 (9th Cir. 1996) ...........................................20

*United States v. Wagner*, 382 F.3d 598 (6th Cir. 2004) ..........................................24

*Weimer v. Kurz-Kasch, Inc.*, 773 F.2d 669 (6th Cir. 1985)......................................9

*West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.,* 646 F.3d 169 (4th Cir. 2011)............................................................................................... 11, 12

*Westerfield v. Ind. Processing LLC*, 621 F.3d 819 (8th Cir. 2010)........................25

## Statutes

28 U.S.C. § 1332................................................................................... 11, 13, 24

28 U.S.C. § 1453……………………………………...…………………………….vi

## Other Authorities

S. REP. No. 109-14  (2005) ................................................... 11, 13, 17, 24

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Plaintiffs-Appellees Jennifer Mason, Carl Rogers II, Teresa Springer, Jeffrey Dushane, Deborah Culver, Dr. Tristin Hassell, Adam Dill, and David Yeoman (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, do not contest the Statement in Support of Oral Argument as set forth by Defendants-Appellants Lockwood, Andrews & Newnam, P.C. ("LAN PC") and Lockwood, Andrews & Newnam, Inc. ("LAN Inc.") (collectively, "LAN") in its Brief, of Appellant unless any oral argument requires an extension beyond the 60 day requirement to conclude this appeal, as set forth in 28 U.S.C. § 1453, or otherwise delays the disposition of this appeal.

## STATEMENT OF JURISDICTION

Plaintiffs do not contest the Statement of Jurisdiction as set forth by LAN.

## STATEMENT OF THE ISSUES

1.     Did the Eastern District Court of Michigan ("the District Court") abuse its discretion when it remanded this matter to the Genesee County (MI) Circuit Court under the Local Controversy Exception of the Class Action Fairness Act ("CAFA")?

2.     Was the District Court required to conduct an evidentiary hearing or require proof beyond the pleadings that at least two-thirds of the putative class members were citizens of Michigan when the First Amended Complaint ("FAC") alleged they were residents of and property owners of Flint, they suffered injury in Flint over a limited period of time from a purely local event, the demographics of Flint are such that no significant number of residents are non-citizens of Michigan, and LAN has not alleged a single fact to dispute that residence is prima facie evidence of citizenship?

3.     Did the District Court abuse its discretion when it exercised the Local Controversy Exception where the conduct of LAN PC, the engineer of record and provider of the negligent services, formed a significant basis of the claims, and where Plaintiffs sought significant relief from LAN PC?

## STATEMENT OF THE CASE

### I.    THE FLINT WATER CRISIS IS A UNIQUELY LOCAL CATASTROPHE

This case stems from the Flint Water Crisis, a man-made disaster where nearly 100,000 residents were poisoned by lead in their water supply.  While a catastrophe for those affected, it was thankfully extremely localized, as only the municipal water supply in Flint was affected.  The genesis of the tragedy was in early 2013, when Flint's Emergency Manager signed an agreement to switch Flint's primary drinking water source from the Detroit Water and Sewerage Department to the newly-formed Karegnondi Water Authority ("KWA"), which was scheduled to become operational in 2016.  (R.E. 10-1, FAC at ¶ 24, Page ID# 681.)

Thereafter, Flint entered into a professional services contract with LAN to undertake the design of Flint's new water treatment system.  (R.E. 10-1, FAC at ¶ 27, Page ID# 681.)  This included placing the Flint Water Treatment Plant ("FWTP") into full-time operational use, drawing water from the Flint River as its primary source of water until the completion of the KWA.  (R.E. 10-1, FAC at ¶ 26, Page ID# 681.)   As mandated by Michigan statutory and regulatory requirements, Flint thereafter applied for a permit for the modifications LAN would make to the FWTP, naming LAN as the Michigan Licensed Professional Engineer with overall responsibility for designing and implementing the new water treatment system.  As

such, LAN was responsible for, and did sign and seal, the designs and specifications for the operation of the FWTP.

Prior to the engagement, LAN had actual knowledge that water from the Flint River was highly corrosive.  In 2011, Flint government officials commissioned a study (or studies) by LAN to determine if the Flint River could be safely used as the primary source of drinking water for Flint's residents.  One of those studies, entitled "*Analysis of the Flint River as a Permanent Water Supply for the City of Flint*" (the "2011 Report"), which bore LAN's logo, was published in July 2011.  (R.E. 10-1, FAC at ¶ 22, Page ID# 680.)  This 2011 Report indicated that the water from the Flint River was highly corrosive and could not be used safely without an anti-corrosive agent to prevent lead, copper and other heavy metals from leaching into the water.[1]  (R.E. 10-1, FAC at ¶ 23, Page ID# 681.)

It is undisputed that the FWTP was placed into operation in April 2014 without appropriate anti-corrosion control treatments.  Industry experts have expressed their disbelief that such a disastrous event could have occurred given

---

[1]  As a professional engineering group that has serviced other governmental entities' water distribution centers, LAN should have known to research any history of the water quality from the Flint River.  Such research would have revealed that (1) a 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities as well as petroleum and gasoline cleanups, and (2) in 2004, a technical assessment of the Flint River found it susceptible to contamination.  (R.E. 10-1, FAC at ¶¶ 20-21, Page ID# 680.)

3

widespread industry standards mandating the need to treat Flint's river water with anti-corrosive chemicals[2]. The Flint Water Crisis could not have happened but for the negligence (or possible criminal conduct) of the parties responsible for placing the defective design of the FWTP into operation.

It is also beyond dispute that the corrosive water supplied by LAN's defective design caused lead to leach into the Flint water supply. This fact has been established by direct testing that has conclusively shown that the design of the Flint water treatment system is defective. Once Plaintiffs became aware of the scope of their potential damages and learned of LAN's role in causing the damages, this suit was filed on January 25, 2016 and the FAC was filed on or about February 19, 2016.

The FAC asserts a single cause of action for professional negligence under Michigan law. (R.E. 10-1, FAC at ¶¶ 83-92, Page ID# 691-93.) This negligence claim is based upon a duty of care, established under Michigan law, which was breached by all of the defendants, including the local defendant, LAN PC.

---

[2] In his testimony before the U.S. Congress, Professor Marc Edwards of Virginia Tech expressed his view that the FWTP should never have been allowed to begin distributing "treated" water to Flint's water users, including Plaintiffs, without anti-corrosion controls.

## II.   Plaintiffs and Putative Class Members Are Citizens of Michigan

The FAC alleges that the Plaintiffs are residents of and property owners in the City of Flint, Michigan[3].  (R.E. 10-1, FAC at ¶¶ 1, 2 and 5, Page ID# 677-78.)  The FAC contends that the "residents of Flint, from April 25, 2014 to the present, have experienced and will continue to experience serious personal injury and property damage."  (R.E. 10-1, FAC at ¶ 1, Page ID# 677)  The proposed class is comprised of Flint residents over a relatively limited period of time (beginning in April 2014) who have experienced and will continue to experience serious personal injury and property damage.  This discrete time period and the continuing nature of the alleged injury _experienced in Flint_ demonstrates that the class is concentrated in Michigan. There are no circumstances–such as a large number of college students, military personnel, owners of second homes, or other temporary residents–suggesting that these Flint residents have an intent to return to another domicile or are anything other than citizens of Michigan.  Based upon the rigid contours of the proposed class, the concentration of injury in Flint over a relatively short period of time, and the absence of evidence suggesting otherwise, the District Court found that Plaintiffs had sustained their burden of showing that more than two-thirds of the proposed class are citizens of Michigan.  (R.E. 23, Remand Order at 6-7, Page ID# 1463-64.)

---

[3]  Plaintiffs' Second Amended Complaint, filed on July 26, 2016 before this Court agreed to hear this appeal, alleges that Plaintiffs are "residents and citizens" of the City of Flint and the State of Michigan and lists their street names. (Ex. 1.)

### III.    PROCEEDINGS BEFORE THE DISTRICT COURT

LAN filed its Notice of Removal on February 24, 2016, claiming the federal District Court had original jurisdiction pursuant to CAFA and federal question jurisdiction, claiming that Plaintiffs' state law claim necessarily stated a federal issue.  (R.E. 1, Notice of Removal at 5-11, Page ID# 14-20.)  Plaintiffs timely filed their Motion to Remand on March 24, 2016, asserting that the Local Controversy Exception to CAFA required the District Court to abstain from hearing this matter, and that the state-law negligence claim did not depend upon a violation of federal law.  (R.E. 10, Motion to Remand at 7-21, Page ID# 658-72.)

The District Court understood that this matter is local to Flint, and on May 11, 2016, remanded this litigation (and ultimately many others) to the Genesee County Circuit Court, from where it originated.  The bases for the remand were that (1) there was no substantial federal question, and (2) this matter constituted a purely local controversy.  As to the second basis, the District Court, in reviewing the FAC, the circumstances of this case, and drawing all reasonable inferences therefrom, made factual determinations that at least two-thirds of the putative class members were Michigan citizens residing in Flint, and that LAN PC was a local defendant from which significant relief is sought.  (R.E. 23, Remand Order at 5-12, Page ID# 1462-69.)  LAN appeals from that order.

6

## SUMMARY OF THE ARGUMENT

While the Flint Water Crisis has garnered national attention and press coverage, its effects were strictly felt in and around Flint, Michigan. Located approximately 100 miles from the closest state line, it is not a destination frequented by vacationers and nonresident visitors such as New York City, Los Angeles, or Chicago. Rather, it is a largely blue collar community of hard working men and women whose families have spent generations living in Flint.

LAN seeks reversal of the remand of this matter because it claims Plaintiffs did not "prove" that at least two-thirds of the putative class were Michigan citizens. LAN claims that the District Court improperly placed the burden of disproving citizenship upon LAN, and argues at great length the differences between residency and citizenship. While this discussion may be relevant in some cases, it is not germane to this one, which are almost the textbook example of a local controversy with local citizens as putative class members. The District Court analyzed the case and correctly found that, given the strict limitation of the class to residents of Flint, the demographics of Flint, and the well-established legal principle that residence is prima facie proof of citizenship (subject to rebuttal evidence which LAN never offered), Plaintiffs satisfied the two-thirds requirement under the Local Controversy Exception. Plaintiffs themselves are homeowners, residents of Flint and citizens of Michigan, and seek to represent those that are *similarly situated*, i.e., residents of

Flint.  This is a class that, by the very nature of the actions and locus of injury, are all residents of Flint and predominately citizens of Michigan.  In making this prima facie showing, the burden then shifted to LAN to refute it, but LAN failed to present any evidence to rebut the presumption.

LAN further challenges the remand by disputing the District Court's finding that LAN PC, the local defendant, is not a "significant defendant" from which "significant relief" is sought, even though LAN PC is the entity through which LAN Inc. and Leo A. Daly Company performed their engineering services that damaged the citizens of Flint.  The FAC alleges that LAN PC is equally at fault for the professional negligence that poisoned the citizens of Flint, and that LAN PC could be responsible for all of the class members' damages in the instant matter.  This makes LAN PC a significant defendant from whom significant relief is sought.

## ARGUMENT

### I.  THE DISTRICT COURT CORRECTLY FOUND THAT THE FLINT WATER CRISIS IS PURELY A LOCAL CONTROVERSY

To successfully reverse the Remand Order, LAN must demonstrate that the District Court abused its discretion and committed clear error by finding that (1) at least two-thirds of the putative class members are Michigan citizens that reside in Flint, and (2) LAN PC is a local defendant from which significant relief is sought. LAN cannot meet this exceptionally high burden, as the District Court correctly

made factual findings on these issues and concluded that this is a local controversy. As such, the District Court's ruling should be affirmed.

LAN mistakes the standard of review for this appeal by stating that the entire remand order should be reviewed *de novo*. While legal issues are reviewed *de novo*[4], determinations such as citizenship are factual and reviewed for clear error.

### A.    Citizenship Is Reviewed for Clear Error

A district court's factual findings as to the citizenship of parties are reviewed for clear error. See Hollinger v. Home State Mut. Ins. Co., 654 F.3d 564, 569 (5th Cir. 2011); Preston v. Tenet Healthsystem Mem. Med. Ctr., Inc., 485 F.3d 793, 795 (5th Cir. 2007); MacGinnitie v. Hobbs Group, LLC, 420 F.3d 1234, 1239 (11th Cir. 2005); Francis v. Goodman, 81 F.3d 5, 7 (1st Cir. 1996). "The standard of review is whether the district court clearly erred in making its decisions with respect to the citizenship of the members of the plaintiff class." Hollinger, 654 F.3d at 569; Preston, 485 F.3d at 796. "Clear error exists when 'although there may be evidence to support it, the reviewing court on the entire [record] is left with the definite and firm conviction that a mistake has been committed." Hollinger, 654 F.3d at 569; Preston, 485 F.3d at 796-97.

---

[4] It is well-settled that this Court reviews legal issues *de novo*. Weimer v. Kurz-Kasch, Inc., 773 F.2d 669 (6th Cir. 1985).

Thus to prevail, LAN must do more than present some theoretical argument that Flint— which has no military installations, a limited number of college students, is not near a state border, has no significant undocumented non-citizen population, and is not a popular vacation destination or location for second homes—may nonetheless have more than 1/3 of its residents who are not in fact citizens of Michigan. LAN must leave this Court with a "definite and firm conviction that a mistake has been made." Id. LAN has not shown one shred of evidence or given one cogent reason as to why the Court should believe a substantial number of Flint's residents are not citizens or have a domicile elsewhere. LAN urges the Court to require some undescribed "proof" from Plaintiffs that their factual allegations are true, but doesn't set forth what form such proof should take. To require an evidentiary hearing, or proof of the ownership of each residence in Flint, is unbelievably burdensome, and there is no indication CAFA intended to so burden Plaintiffs. LAN has the high burden to show clear error, and it has not done so.

**B.    CAFA Did Not Grant Jurisdiction Over Purely Local Controversies Such As the Flint Water Crisis**

LAN argues extensively about the purposes and limitations of CAFA. However, its recitation is decidedly one-sided, and a more balanced discussion is in order. CAFA "was enacted to respond to perceived abusive practices by plaintiffs and their attorneys in litigating major class actions *with interstate features* in state

10

courts."[5] <u>Coffey v. Freeport McMoran Cooper & Gold</u>, 581 F.3d 1240, 1243 (10th Cir. 2009) (per curiam) (emphasis added). In enacting CAFA, Congress intended to "expand substantially federal court jurisdiction over class actions." S. REP. No. 109-14, at 43 (2005). As such, CAFA's "provisions should be read broadly, with a strong preference that <u>*interstate class actions should be heard in a federal court*</u> if properly removed by any defendant." <u>Id</u>. (emphasis added). The stated problem which CAFA was intended to address was "interstate" class actions (i.e. class actions filed in numerous states dealing with harms suffered in multiple forums.)

While the preference is to hear these interstate class actions in federal court, CAFA "does not grant [federal] jurisdiction in all cases, providing judges discretionary jurisdiction in some instances, 28 U.S.C. § 1332(d)(3), and barring jurisdiction in others, 28 U.S.C. § 1332(d)(4)," <u>West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.</u>, 646 F.3d 169, 178 (4th Cir. 2011). As <u>McGraw</u> explained:

> To be sure, CAFA does protect important federal interests in addressing state abuses in interstate class actions. It was enacted to prevent States from keeping "cases of national importance out of Federal court" and making "judgments that impose their view of the law on other States and bind the rights of the residents of those states." <u>Id</u>. § 2(a)(4). It thus assures that federal courts decide "interstate cases of national importance." <u>Id</u>. § 2(d) (2). But CAFA is also sensitive to deeply-

---

[5] The Senate Committee on the Judiciary (the "Committee") noted that "[t]he effect of class action abuses in state courts [was] being exacerbated by the trend toward 'nationwide' class actions, which invite one state court to dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles." S. Rep. No. 109-14, at 24 (2005), attached as Exhibit 2.

11

rooted principles of federalism, reserving to the States primarily local matters.  McGraw, 646 F.3d at 178.

CAFA's "primary objective," therefore, is to "ensur[e] Federal court consideration of *interstate cases of national importance*[,]" while abstaining from hearing those cases that belong to the States.  Standard Fire Ins. Co. v. Knowles, -- U.S. --, 133 S.Ct. 1345, 1350, 185 L.Ed.2d 439 (2013) (emphasis added).

McGraw explains some of the policy considerations behind CAFA:   (1) keeping cases of national importance in federal court; (2) avoiding state judgements that impose their review of the law on other states and bind the rights of the residents of those states; and (3) permitting federal courts to decide interstate cases of national importance.  None of these considerations are present here, as the Flint case, while gaining national attention, does not deal with legal issues of national importance.  Further, any state judgment would not be binding residents of other states to any great degree.  Moreover, this is not an interstate case, as the sole claim is for professional negligence under Michigan state law only.

In any event, CAFA reserved to the state courts jurisdiction over primarily local matters.  See Coffey, 581 F.3d at 1243.  To this end, CAFA includes the "Local Controversy Exception."  This provision:

> [I]s intended to respond to concerns that class actions with truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole.  Thus, the

Committee wishes to stress that in assessing whether each of these criteria is satisfied by a particular case, *a federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy—a controversy that uniquely affects a particular locality to the exclusion of all other*s.

S. REP. No. 109-14, at 39 (emphasis added).

Pursuant to CAFA, a district court ***must*** decline to exercise jurisdiction and abstain from hearing a matter where the case presents a "local controversy" as defined under 28 U.S.C. § 1332(d)(4)(A). Pursuant to this exception, a district court shall decline to exercise jurisdiction over a class action in which: (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed; (II) at least one defendant is a defendant from whom significant relief is sought by members of the plaintiff class; whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and who is a citizen of the State in which the action was originally filed; and (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed. 28 U.S.C. § 1332(d)(4)(A)(i).[6] LAN does not contest that the third requirement has been met.

---

[6] Additionally, jurisdiction over a class action shall be declined when, "during the 3–year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons." 28 U.S.C. § 1332 (d)(4)(A)(ii). The necessity of the three year requirement stems from so-called "copycat" class

Since the explicit purpose of the Local Controversy Exception is to "identify a truly local controversy that uniquely affects a particular locality to the exclusion of all others", these elements need not be afforded equal weight.  Rather, it seems clear that district courts have been provided with some discretion to weigh these elements as necessary, while considering the totality of the circumstances, in order to determine whether it is, indeed, a truly local controversy that uniquely affects a particular locality to the exclusion of all others.[7]

### C.    The District Court Correctly Determined that at Least Two-Thirds of the Class Members Are Michigan Citizens Residing in Flint

Given that the composition of the putative class is limited to residents of Flint that, since April 25, 2014, have and will continue to experience serious personal injury and property damage as a result of the contaminated water, the District Court correctly found that "[a]lthough residency is not synonymous with citizenship, '[e]vidence of a persons [sic] place of residence . . . *is prima facie proof of his*

---

actions that sometimes clog the courts and permit forum shopping.  The Committee observed that sometimes these duplicative actions are filed by lawyers engaged in blatant forum shopping—the original class lawyers file similar class actions before different courts in an effort to find a receptive judge who will rapidly certify a class.  S. Rep. No. 109-14, at 23.  The instant case was filed only in Michigan state court, and no other similar cases have been filed by counsel for Plaintiffs.

[7]  As famously stated by Justice Stewart when determining what is and is not obscenity, "I know it when I see it."  Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).  The same should be true of the Local Controversy Exception—a court will know that a matter is a local controversy when they see it.

*domicile*[,]" and "[a]lthough the class Plaintiffs seek to represent is not expressly limited to Michigan citizens, Plaintiffs are Flint residents and property owners who seek to represents those similarly situated." (R.E. 23, Remand Order at 6, Page ID# 1463) (internal citation omitted) (emphasis added.)  The District Court's Opinion was supported by not only the class definition, but by well-established principles regarding residency and citizenship.

The demographics of Flint support the District Court's finding.  Such statistics demonstrate that it is nearly certain that at least two-thirds of the putative class are Michigan citizens.  For example, U.S. Census data shows that, as of April 1, 2010, Flint had a population of 102,434.  The relocation rate out of Flint between April 1, 2010 and July 1, 2015 was estimated to be four percent.  (Ex. 3, U.S. Census Data.)  Additionally, there were 40,509 Flint households and 2.42 persons per household (totaling 98,032 persons in Flint households) between 2010 and 2014; 1.1% of the population being foreign born (totaling 1,127 persons) between 2010 and 2014; and there were 8,712 businesses in 2012.  (Ex. 3.)  Based upon this data, which demonstrates little mobility in the population, the likelihood that more than one-third of the proposed class consists of non-Michigan citizens is extremely low.

Plaintiffs' class definition, together with the information provided by Plaintiffs as it relates to Flint, was sufficient for the District Court to make a factual

determination that the proposed class was rigidly composed and Plaintiffs had met their burden regarding citizenships.[8]

LAN proposes a higher burden, however. It suggests that, in each and every instance, no matter how the class is defined, a plaintiff must put forth "evidence" of citizenship outside of its pleadings. In other words, LAN contends that the requisite proof is of the kind one would present at an evidentiary hearing.[9] While not explicitly stating what it would find acceptable, LAN seems to be arguing that Plaintiffs must present ownership records for each home in Flint, or citizenship papers for each resident, or something equally as onerous. Such a requirement would make the Local Controversy Exception to CAFA a nullity, as no Plaintiff class would be able to meet such a burden at the complaint stage. There is no other provision in

---

[8] The District Court, citing <u>Caruso v. Allstate Ins. Co.</u>, 469 F.Supp.2d 364, 368 (E.D. La. 2007), noted that there may be instances where detailed proof of citizenship is required, but there are also instances where "common sense should prevail in this closed-end class involving people who, as noted, hold an asset that is a measure of domicile, their home." (R.E. 23, Opinion and Order at 6-7, Page ID# 1463-64.) The instant matter is one of those where common sense should prevail.

[9] LAN's continuous questioning of the citizenship of those it injured betrays its ignorance of the community which its actions have devastated. By and large, Flint is not a place where people own vacation homes but actually reside elsewhere. It is not a college or transient town. It does not have a significant number of undocumented immigrants. It is a largely blue collar community of hard working men and women, and Plaintiffs and Class Members who own homes in Flint are both "residents" and "citizens." (R.E. 18, Plaintiffs' Reply Brief in Support of Motion to Remand at 3-4, Page ID# 1379-80.) Yet, without a shred of evidence, LAN continues to request that Plaintiffs provide "actual evidentiary proof of citizenship."

class action law that places such a high burden on not only named Plaintiffs but even unnamed putative class members.

Fortunately, case law, including rulings from within this Circuit and the Fifth Circuit, disagree with LAN's urging of such a stringent test. Various courts have noted that the requisite burden of the Local Controversy Exception should not be exceptionally difficult to bear for any plaintiff. For example, the Middle District of Tennessee recently reviewed the requirements for establishing citizenship under CAFA. See Eagles Nest, LLC v. Moy Toy, LLC, 2014 WL 4655277 (M.D. Tenn. Sep. 16, 2014).[10] It stated that "'the burden of proof placed upon a plaintiff should not be exceptionally difficult to bear,' for a plaintiff seeking to establish a CAFA exception . . . ." Eagles Nest, LLC, at * 5 (internal quotation omitted). In ordering remand, the Middle District of Tennessee found the allegations in the complaint and the county assessor's and homeowners associations' rolls sufficient for establishing citizenship. Eagles Nest, LLC, at *5; see also Hollinger v. Home State Mut. Ins. Co., 654 F.3d, 564, 572 (5th Cir. 2011) ("[t]he evidentiary standard for establishing citizenship and domicile at this preliminary state [in a CAFA case] must be *practical and reasonable*.") (emphasis added); S. Rep. No. 109-14, at 44 (jurisdictional determinations under CAFA "should be made largely on the basis of readily available information.").

---

[10] All unpublished opinions are attached as Ex. 4.

As such, the burden of proof should not be overbearing for the party seeking to establish the citizenship element of the Local Controversy Exception, especially when, as is the situation here, the class definition is limited to residents of a particular city, and the locus of injury is such that it uniquely affects a particular locality (no greater than a single county deep within a single state) to the exclusion of all others. In these situations, extrinsic evidence is unnecessary to make a prima facie showing of citizenship, unless sufficient rebuttal evidence is presented to require such extrinsic evidence from the party seeking to establish the citizenship element.[11] Here, LAN has presented *no* rebuttal evidence whatsoever.

The great weight of authority shows that residence is prima facie evidence of citizenship. Indeed, the Sixth Circuit and district courts within have found that "[t]he place where an individual resides is properly taken to be his domicile, absent a showing to the contrary." Novel v. Zapor, 2013 WL 1183331, at *5 (S.D. Ohio Mar. 21, 2013); see also Fort Knox Transit v. Humphrey, 151 F.2d 602, 602-03 (6th Cir. 1945) ("the plaintiff's residence in Ohio is prima facie evidence of his citizenship in that state and is not overthrown by residence in Kentucky as a member of the Armed Forces of the United States, and there being no substantial evidence of voluntary relinquishment of an Ohio domicile."). This authority is not unique to the Sixth

---

[11]  A district court "has wide, but not unfettered, discretion to determine what evidence to use in making its determination of jurisdiction."  Hollinger, 654 F.3d 564.

Circuit.  See, e.g., Preston v. Tenet Healthsystems Mem. Med. Ctr., 485 F.3d 793, 797-98 (5th Cir. 2007) ("In determining diversity jurisdiction, the state where someone establishes his domicile serves a dual function as his state of citizenship. A person's state of domicile presumptively continues unless rebutted with sufficient evidence of change."); Hollinger, 654 F.3d at 571 ("Evidence of a person's place of residence, however, is prima facie proof of his domicile[,]" and once established, "[a] person's state of domicile presumptively continues unless rebutted with sufficient evidence of change."); State Farm Mutual Automobile Ins. Co. v. Dyer, 19 F.3d 514, 519 (10th Cir. 1994) (allegation that driver was Wyoming resident created presumption of continuing residence in Wyoming and put burden of coming forward with contrary evidence on those seeking to prove that driver resided elsewhere).  Moreover, this premise that—place of residence is prima facie proof of domicile—is long rooted in Supreme Court jurisprudence.  See, e.g., Ennis v. Smith, 55 U.S. 400, 423, 14 How. 400, 14 L.Ed. 472 (1852) ("The result is, that the place of residence is *prima facie* the domicil [sic], unless there be some motive for that residence not inconsistent with a clearly established intention to retain a permanent residence in another place.").

The Fifth Circuit upheld a finding of the citizenship element of the Local Controversy Exception when presented with evidence similar to that presented by the Plaintiffs herein.  In Hollinger, the plaintiffs' complaint defined their proposed

class as: "[a]ll persons who purchased an automobile insurance policy in Texas of [one of the County Mutual insurance companies] and whose policies were in effect on or after August 17, 2007 up to the date of judgment, specifically excluding all federal district and magistrate judges of the Eastern District of Texas and members of their immediate families, Class Counsel and the directors, officers, and the employees of the defendants . . . ." Id. at 568. The plaintiffs filed in federal court, with the district court's original jurisdiction stemming from diversity of citizenship pursuant to CAFA. Id. at 567. The defendants were granted dismissal pursuant to the Local Controversy and Home State Exceptions to CAFA. Id. at 567-68.

The Fifth Circuit affirmed the dismissal. Id. at 568. Utilizing Census data[12], the Fifth Circuit noted that the district court took judicial notice that the relocation rate of American citizens of all ages and races out of Texas was about 5.2% between 2007 and 2009 (the relevant time period), and that a smaller percentage of people move out of Texas than from any other state.[13] Id. at 571-72. Additionally:

> The [defendants] put forth further statistical supporting showing by a preponderance of the evidence—i.e., that it is more likely than not— that greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of Texas and of the United States. For example, more than 99% of the automobiles that the [defendants] insure are located in Texas. Also, only about 11% of Texas residents are not United States citizens. Although the [defendants'] statistics

---

[12] "United States census data is an appropriate and frequent subject of judicial notice." Hollinger, 654 F.3d at 571-72 (citing United States v. Esquivel, 88 F.3d 722, 726-27 (9th Cir. 1996).

[13] Notably, the relocation rate from Flint is 4% (Ex. 3. Census Data.)

20

> about Texas residents are not specific to the [plaintiffs and the class], these statistics are nonetheless probative, particularly in the absence of any contrary showing by the [plaintiffs and the class].

Id. at 572. The anti-discrimination provision of the Texas Insurance Code is the statutory basis for the action, and the proposed class is limited to those who purchased policies in Texas. Id. Moreover, the defendants are Texas citizens and only issue policies in Texas. Id. Thus, based upon the pleadings, the prima facie showing of citizenship through residency, and publicly available Census data, the Fifth Circuit affirmed that this was sufficient to find that the proposed class was domiciled in Texas. Id.

Based upon the FAC, the discrete nature of the class, the locus of injury, and all reasonable inferences drawn from the same, the District Court found:

> Although the class Plaintiffs seek to represent is not expressly limited to Michigan citizens, Plaintiffs are Flint residents and property owners who seek to represent those similarly situated.
>
> Further, the proposed class is comprised of Flint residents over a relatively limited period of time (beginning in April 2014) who have experienced and will continue to experience serious personal injury and property damage. This discrete time period and the continuing nature of the alleged injury–*experienced in Flint*–also demonstrates that the class is concentrated in Michigan. There are no circumstances–such as a large number of college students, military personnel, owners of second homes, or other temporary residents–suggesting that these Flint residents are anything other than citizens of Michigan. Based upon the contours of the proposed class, the concentration of injury in a specific location in Michigan over a relatively short period of time, and the absence of evidence suggesting otherwise, Plaintiffs have sustained their burden of demonstrating that more then [sic] two-thirds of the proposed class are citizens of Michigan.

(R.E. 23, Remand Order at 6-7, Page ID# 1463-64) (emphasis added) (internal citations and quotations omitted). LAN did not present any rebuttal evidence, such as evidence of there being a large number of college students, military personnel, owners of second homes or other temporary residents, undocumented non-citizens living in Flint, or any suggestion that these Flint residents are anything other than citizens of Michigan. LAN has made no showing that more than one-third of the putative class would be comprised of these transient residents. In the absence of such evidence, the District Court correctly found that more than two-thirds of the putative class members are Michigan citizens.

LAN nevertheless contends that residence is never sufficient proof of citizenship and that the District Court improperly placed the burden of proving citizenship upon it rather than Plaintiffs. However, as explained above, it is well-settled that residence *is* prima facie proof of citizenship, and no rebuttal evidence was presented. This is not a situation of judicial guesswork, as LAN suggests, but rather the application of the requisite level of proof in this obvious local controversy.

LAN cites certain cases for the proposition that evidence is required in every instance to demonstrate citizenship. The cases cited by LAN were unique instances where such evidence was required because there was reason to doubt the citizenship of the proposed class members. See Evans, 459 F.3d 1159 (difficulty in ascertaining citizenship at the time of removal when class period extended 85 years); Preston,

485 F.3d 793 (proof of citizenship was necessary due to the mass relocations caused by Hurricane Katrina); In re Sprint Nextel Corp., 593 F.3d 669 (7th Cir. 2010) (alleged Kansas citizenship of putative class members, who had cell phones with Kansas area codes, was suspect due to the close proximity of Kansas City, Missouri, college students attending school in, but not residents of, Kansas, and the general mobility of cell phones); Reece v. AES Corp., 638 Fed. Appx. 755 (10th Cir. 2016) (due to difficulty in determining the number of Oklahoma citizens versus non-Oklahoma citizens, the district court held an evidentiary hearing to make that determination, but the plaintiffs failed to provide any evidence).

### D. The District Court Correctly Found that Plaintiffs Met The "Significant Basis" and "Significant Relief" Requirement

The second element of the Local Controversy exception at issue in this appeal is the "significant basis" element. The District Court found that Plaintiffs "seek direct, significant relief on behalf of all class members against LAN PC. Based upon Plaintiffs' allegations, LAN PC is not a nominal defendant, but is the Michigan licensed professional engineer through with [sic] LAN, Inc. and Leo A. Daly Company operated in Michigan." (R.E. 23, Remand Order at 9-10, Page ID# 1466-67.) LAN's dispute on appeal concerns the factual finding that LAN PC is a local

defendant, the claims against which form a significant basis of the relief sought by the putative class.[14]

The Local Controversy Exception requires that there be at least one real local defendant. "By that, the Committee intends that the local defendant must be a primary focus of the plaintiffs' claims-not just a peripheral defendant." S. REP. No. 109-14, at 40. The local "defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class." Id. However, CAFA itself does not describe the type or character of conduct that would form a "significant basis" of the claims or define the term "significant relief." And the scope of those terms is not apparent from the plain language of the statute, even when read in context. Accordingly, the Sixth Circuit must turn to other sources to find its meaning before determining whether Plaintiffs sufficiently pleaded that they seek direct, significant relief from LAN PC.[15]

---

[14] Courts look to only the complaint when determining the significant basis and significant relief elements. See Allen v. Boeing Co., 821 F.3d 1111, 1117 (9th Cir. 2016) (courts "look only to the complaint to determining whether these criteria [under 28 U.S.C. § 1332(d)(4)(A)(i)(II)(aa) and (bb)] are met."); see also Coleman v. Estes Express Lines, Inc., 631 F.3d 1010, 1015 (9th Cir. 2011) ("We hold that CAFA's language unambiguously directs the district court to look only to the complaint in deciding whether the criteria set forth in § 1332(d)(4)(A)(i)(II)(aa) and (bb) are satisfied.")

[15] Statutory interpretation begins by examining "the language of the statute itself to determine if its meaning is plain." United States v. Wagner, 382 F.3d 598, 607 (6th Cir. 2004) (internal quotations omitted). "Plain meaning is examined by

### i.     Local Defendant's Conduct Forms a Significant Basis for the Claims Asserted by Plaintiffs

The Local Controversy Exception requires that the alleged conduct by the in-state defendant "form[] a significant basis for the claims" asserted by the class. While the Third, Eighth, Ninth and Eleventh Circuits have conducted a comparison between the local defendant's significance and the significance of all the defendants, see Kaufman v. Allstate N.J. Ins. Co., 561 F.3d 144, 156 (3d Cir. 2009); Westerfield v. Ind. Processing LLC, 621 F.3d 819, 825 (8th Cir. 2010); Benko v. Quality Loan Serv. Corp., 789 F.3d 1111, 1118 (9th Cir. 2015); Evans v. Walter Indus. Inc., 449 F.3d 1159 (11th Cir. 2006), little has been articulated as to the level of comparison and precisely what constitutes "significant."

Recently, the Ninth Circuit, after reviewing decisions from sister circuits, analyzed the significant basis test in Benko and Allen v. Boeing Co., 821 F.3d 1111 (9th Cir. 2016).  In Benko, the defendants allegedly engaged in claim collection without satisfying the requirements of Nevada law.  Id.  Only one of the six defendants was domiciled in Nevada.  Id. The litigation was removed to federal court under CAFA; the plaintiffs attempted to remand the matter, but the district court denied the remand request and dismissed the case pursuant to Rule 12(b)(6).  Id.

---

looking at the language and design of the statute as a whole.  Id.  If the statutory language is not clear, a court may examine the relevant legislative history.  Id.

The Ninth Circuit reversed the district court's decision, vacated the judgment, and remanded with instructions to remand the matter to state court. Id. at 1119. Significant to the instant appeal, the Ninth Circuit reviewed the pleadings to determine if the basis for the claims against the local defendant were important or fairly large in amount or quantity. Id. at 1118. The Ninth Circuit noted that the local defendant is "one of just six [d]efendants referred to" in the operative complaint and, in terms of overall class, the plaintiffs alleged "that [local defendant] conducted illegal debt collection agency activities with respect to thousands of files each year, and that [its] activities constituted between 15 to 20% of the total debt collection activities of all the [d]efendants." Id. at 1118-19. The Ninth Circuit concluded that the one Nevada-domiciled defendant was allegedly responsible for between 15-20% of the wrongs, and therefore constituted a significant basis of the claims. Id.

In Allen, plaintiffs alleged that, for several decades, defendant The Boeing Company used materials that it knew to be hazardous to human health and the environment. Allen, 821 F.3d at 1114. In 2002, Boeing contracted with defendant Landau Associates to investigate and remediate the Boeing Auburn Plant. Id. The case was filed in Washington state court, but was removed by Boeing under CAFA.

The district court granted the motion to remand, and the Ninth Circuit affirmed the remand. Id. at 1123-24. Boeing asserted that Landau's involvement, and thus its exposure to liability, was insignificant in comparison to Boeing because

26

it used the hazardous chemicals for nearly forty years before Landau had any involvement. Id. at 1120-21. However, the Ninth Circuit noted that the gravamen of the plaintiffs' claims was not that Boeing used volatile chemicals, but that the chemicals spread beyond Boeing's property. Id. at 1121. Moreover, the plaintiffs asserted separate claims against Boeing and Landau for their failures to investigate, remediate and clean-up the plumes. Id. If the claims against Landau were proven, then Landau's liability could equal Boeing's. Id.

Boeing also claimed that Landau's conduct did not form a significant basis because the plaintiffs had not distinguished Landau's acts from Boeing's acts, that Landau was, at most, an isolated player, and that the plaintiffs failed to establish that Landau's conduct was important relative to Boeing's conduct. Id. After reviewing the appropriate test and holding articulated in Benko, the Ninth Circuit found that "Landau is one of only two defendants and all of the [p]laintiffs have asserted claims against Landau. Following Benko, [p]laintiffs have adequately alleged claims against Landau that are 'important or fairly large in amount of quantity' relative to the claims against Boeing." Id.

Similarly to Benko and Allen, LAN PC is one of three defendants against whom all Plaintiffs and putative class members have asserted a claim.[16] The District

---

[16]     Plaintiffs' Second Amended Complaint added five new defendants, bringing the total number of defendants to eight. Notably, one of the added defendants, Rowe Professional Services Company f/k/a Rowe Engineering, Inc.

Court, in its analysis, compared the allegations against each of the three defendant (contrary to LAN's assertions), and found that Plaintiffs had alleged that LAN Inc. conducted business in Genesee County through LAN PC; it provided engineering services to Flint to upgrade the FWTP, allowing it to draw drinking water from the Flint River; and it failed to ensure that the proper anti-corrosive chemicals were used. (R.E. 23, Opinion and Order at 9, Page ID# 1466.)  The District Court further analyzed that the FAC seeks relief against Leo A. Daly Company primarily based upon its control over LAN and the lack of a legal distinction between the companies. Id.  Stated differently, the District Court correctly noted that, if found liable, LAN PC could be responsible for the entirety of damages sought by Plaintiffs and the putative class.  Its role in the case and potential liability is enormous.

LAN cites Evans and Opelousas Gen. Hosp. Auth. for its contention that LAN PC was, at most, a nominal defendant, but those cases are distinguishable.  In Evans, significant basis was denied because the plaintiffs there had not demonstrated that "a significant number or percentage of putative class members may have claims against [a local defendant]."  Evans, 449 F.3d at 1167.  Here, all putative class

---

("Rowe"), is a Michigan corporation with its principal place of business in Flint, Michigan.  Rowe was the City Engineer for Flint during the relevant time period, participated in the studies that evaluated the viability of using the Flint River as a primary water source for Flint, and worked with LAN in switching the water source over to the Flint River.  Thus Rowe also counts as a local defendant with significant claims against it and Plaintiffs are seeking substantial damages against it.

members have claims against LAN PC. In <u>Opelousas Gen. Hosp. Auth.</u>, the plaintiffs failed to provide any information about the conduct of the local defendants. <u>Opelousas Gen. Hosp. Auth. v. FairPay Solutions, Inc.</u>, 655 F.3d 358, 361-62 (5th Cir. 2011). Here, the FAC clearly pleaded that LAN Inc. provided its services through LAN PC, that together they committed negligence, and that Plaintiffs and all putative class members seek direct liability from LAN PC.

### ii.    Plaintiffs Seek Significant Relief From A Local Defendant

The Local Controversy Exception also requires that the alleged conduct by the local defendant is one from whom "significant relief" is sought. "The amounts sought are sufficient to show that the Plaintiffs claim 'significant relief' from a legal defendant." <u>Benko</u>, 789 F.3d at 1119. Plaintiffs need not specify the division of damages amongst the defendants. <u>See</u> <u>Allen</u>, 821 F.3d at 1119.

This element is also satisfied "where the petition claims that every potential plaintiff is entitled to recover from" the class action defendant or defendants." <u>Coffey v. Freeport McMoran Coppery & Gold</u>, 581 F.3d 1240, 1244 (10th Cir. 2009); <u>see also</u> <u>Coleman</u>, 631 F.3d at 1013 (the plaintiffs sought damages equally from both local and non-local defendants, and that this was sufficient to satisfy the significant relief requirement). Significant relief is found when a particular defendant faces direct liability, as opposed to secondary liability that is often sought through contribution, indemnification, vicarious liability and other such claims. <u>Pate</u>

v. Huntington Nat. Bank, No. 5:12-cv-1044, 2013 WL 557195, at *6 (N.D. Ohio Feb. 12, 2013).  Here, LAN PC, a Michigan corporation, faces direct liability for professional negligence from the entire putative class.

Based on the above, the District Court utilized the proper analysis when it found that "[h]ere, Plaintiffs seek direct, significant relief on behalf of _all class members against LAN P.C_.  Based on Plaintiffs' allegations, LAN P.C. is not a nominal defendant, but is the Michigan licensed professional engineer through with [sic] LAN, Inc. and Leo A. Daly Company operated in Michigan."  (R.E. 23, Remand Order at 9-10, Page ID# 1466-67) (emphasis added).

## II.    CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that this Honorable Court affirm the ruling of the District Court, dismiss Appellant's appeal of the District Court's remand order, and award any other relief this Honorable Court deems appropriate.

Respectfully submitted,

**MCALPINE PC**

/s/ Mark L. McAlpine
Mark L. McAlpine (P35583)
Jayson E. Blake (P56128)
Adam T. Schnatz (P72049)
Attorneys for Plaintiffs/Appellees

Dated:  October 18, 2016

# <u>CERTIFICATE OF COMPLIANCE</u>

STATE OF MICHIGAN          )
                                          )
COUNTY OF OAKLAND      )

MARK L. McALPINE, being first duly sworn, certifies and states the following:

1.     He is the shareholder with the firm McAlpine PC, counsel for Plaintiffs, and is responsible for preparation of this Brief of Plaintiffs-Appellees in the above-captioned cause;

2.     The Brief of Plaintiffs-Appellees complies with the type-volume limitation;

3.     McAlpine PC here relies upon the word count of their word processing system used to prepare this Brief, using Times New Roman numeral size 14 font; and

4.     The world process system counts the number of words in the Brief as 8,758.

/s Mark L. McAlpine_____
MARK L. McALPINE

31

# CERTIFICATE OF SERVICE

Mark L. McAlpine, attorney with the law firm of McAlpine PC, being duly sworn, deposes and says that on the 18th day of October, 2016, he caused a copy of Plaintiffs Brief of Appellees to be served upon all parties of record, and that such service was made electronically upon each counsel of record so registered with the United States Court of Appeals for the Sixth Circuit.

**MCALPINE PC**

/s/ Mark L. McAlpine
Mark L. McAlpine (P35583)
Jayson E. Blake (P56128)
Adam T. Schnatz (P72049)
Attorneys for Plaintiffs/Appellees

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Description of entry no. | Date | Record entry no. | Page ID# |
|---|---|---|---|
| First Amended Class Action Complaint | 2/18/16 | 10-1 | 677-78; 680-681; 691-93 |
| Remand Order | 5/11/16 | 23 | 1463-64; 1466-67 |
| Notice of Removal | 2/23/16 | 1 | 14-20 |
| Motion to Remand | 3/24/16 | 10 | 658-72 |
| Plaintiffs' Reply Brief in Support of Motion to Remand | 4/21/16 | 18 | 1379-80 |

# Exhibit 1

Approved, SCAO

| | | Original - Court | 2nd copy - Plaintiff |
| | | 1st copy - Defendant | 3rd copy - Return |

| **STATE OF MICHIGAN**<br>**JUDICIAL DISTRICT**<br>7th **JUDICIAL CIRCUIT**<br>**COUNTY PROBATE** | **SUMMONS AND COMPLAINT** | **CASE NO.**<br>16-106150-NM |

**Court address**                                                                                                    **Court telephone no.**

900 S. Saginaw Street, Flint, MI 48502                                                    (810) 257-3220

| Plaintiff's name(s), address(es), and telephone no(s).<br>JENNIFER MASON, CARL ROGERS II, TERESA SPRINGER, JEFFREY DUSHANE, DEBORAH CULVER, TRISTIN HASSELL, ADAM DILL AND DAVID YEOMAN on behalf of themselves and a class of all others similarly situated, | v | Defendant's name(s), address(es), and telephone no(s).<br>Rowe Professional Services Company f/k/a Rowe Engineering, Inc.<br>c/o Resident Agent Leanne Panduren<br>540 S. Saginaw St., Ste 200<br>Flint, MI 48502 |
| Plaintiff's attorney, bar no., address, and telephone no.<br>Mark L. McAlpine (P35583) Jayson E. Blake (P<br>3201 University Drive, Ste 100<br>Auburn Hills, MI 48326<br>T: (248) 373-3700 F: (248) 373-3708 | | |

**SUMMONS**    **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
| | | |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT**    *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
| | | |

**General Civil Cases**

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
| | |
| Place where action arose or business conducted | |

07/20/2016
_____
Date                                                    Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (5/15)  **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

Approved, SCAO

| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>7th JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO.<br>16-106150-NM |

**Court address**

900 S. Saginaw Street, Flint, MI 48502                                     Court telephone no.

(810) 257-3220

| Plaintiff's name(s), address(es), and telephone no(s).<br>JENNIFER MASON, CARL ROGERS II, TERESA SPRINGER, JEFFREY DUSHANE, DEBORAH CULVER, TRISTIN HASSELL, ADAM DILL AND DAVID YEOMAN on behalf of themselves and a class of all others similarly situated, | v | Defendant's name(s), address(es), and telephone no(s).<br>Veolia North America, LLC<br>c/o Resident Agent The Corporation Trust Company<br>1209 Orange St.<br>Wilmington, DE 19801 |

Plaintiff's attorney, bar no., address, and telephone no.
Mark L. McAlpine (P35583) Jayson E. Blake (P
3201 University Drive, Ste 100
Auburn Hills, MI 48326
T: (248) 373-3700 F: (248) 373-3708

**SUMMONS**    **NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT**    *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |

**General Civil Cases**
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
| Place where action arose or business conducted | |

07/20/2016
Date                                     Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (5/15)  **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

Approved, SCAO

| | | |
|---|---|---|
| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |

| **STATE OF MICHIGAN**<br>**JUDICIAL DISTRICT**<br>7th **JUDICIAL CIRCUIT**<br>**COUNTY PROBATE** | **SUMMONS AND COMPLAINT** | **CASE NO.**<br>16-106150-NM |
|---|---|---|

Court address
900 S. Saginaw Street, Flint, MI 48502                                        Court telephone no.
                                                                                                                    (810) 257-3220

| Plaintiff's name(s), address(es), and telephone no(s).<br>JENNIFER MASON, CARL ROGERS II, TERESA SPRINGER, JEFFREY DUSHANE, DEBORAH CULVER, TRISTIN HASSELL, ADAM DILL AND DAVID YEOMAN on behalf of themselves and a class of all others similarly situated, | v | Defendant's name(s), address(es), and telephone no(s).<br>Veolia North America, Inc.<br>c/o Resident Agent The Corporation Trust Company<br>1209 Orange St.<br>Wilmington, DE 19801 |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Mark L. McAlpine (P35583) Jayson E. Blake (P<br>3201 University Drive, Ste 100<br>Auburn Hills, MI 48326<br>T: (248) 373-3700 F: (248) 373-3708 | | |

**SUMMONS**    **NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| | | |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT**    *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| | |
| Place where action arose or business conducted | |

07/20/2016
Date                                                        Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (5/15)  **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

Approved, SCAO

| Original - Court | 2nd copy - Plaintiff |
| 1st copy - Defendant | 3rd copy - Return |

| **STATE OF MICHIGAN**<br>**JUDICIAL DISTRICT**<br>**7th JUDICIAL CIRCUIT**<br>**COUNTY PROBATE** | **SUMMONS AND COMPLAINT** | **CASE NO.**<br>16-106150-NM |

**Court address**

900 S. Saginaw Street, Flint, MI 48502     **Court telephone no.**

(810) 257-3220

| Plaintiffs name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
| JENNIFER MASON, CARL ROGERS II, TERESA SPRINGER, JEFFREY DUSHANE, DEBORAH CULVER, TRISTIN HASSELL, ADAM DILL AND DAVID YEOMAN on behalf of themselves and a class of all others similarly situated, | v | Veolia Water North America Operating Services, LLC c/o Resident Agent The Corporation Trust Company 1209 Orange St. Wilmington, DE 19801 |
| Plaintiff's attorney, bar no., address, and telephone no.<br>Mark L. McAlpine (P35583) Jayson E. Blake (P<br>3201 University Drive, Ste 100<br>Auburn Hills, MI 48326<br>T: (248) 373-3700 F: (248) 373-3708 | | |

**SUMMONS**   **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
| | | |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT**   *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
| | | |

**General Civil Cases**

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
| | |
| Place where action arose or business conducted | |

07/20/2016
_____
Date                   Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

**MC 01** (5/15) **SUMMONS AND COMPLAINT**   MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

Approved, SCAO

|  | Original - Court | 2nd copy - Plaintiff |
|  | 1st copy - Defendant | 3rd copy - Return |

| **STATE OF MICHIGAN** | **SUMMONS AND COMPLAINT** | **CASE NO.** |
| JUDICIAL DISTRICT | | 16-106150-NM |
| 7th JUDICIAL CIRCUIT | | |
| COUNTY PROBATE | | |

**Court address**

900 S. Saginaw Street, Flint, MI 48502

**Court telephone no.**

(810) 257-3220

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
| JENNIFER MASON, CARL ROGERS II, TERESA SPRINGER, JEFFREY DUSHANE, DEBORAH CULVER, TRISTIN HASSELL, ADAM DILL AND DAVID YEOMAN on behalf of themselves and a class of all others similarly situated, | v | Veolia Environment, S.A. 36-38 Avenue Kleber 75116 Paris, France |

| Plaintiff's attorney, bar no., address, and telephone no. |
| Mark L. McAlpine (P35583) Jayson E. Blake (P 3201 University Drive, Ste 100 Auburn Hills, MI 48326 T: (248) 373-3700 F: (248) 373-3708 |

**SUMMONS**    **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
| | | |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT**    *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
| | | |

**General Civil Cases**

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
| | |
| Place where action arose or business conducted | |

07/20/2016

Date

Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (5/15)  **SUMMONS AND COMPLAINT**    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

JENNIFER MASON, CARL ROGERS II,
TERESA SPRINGER, JEFFREY
DUSHANE, DEBORAH CULVER, DR.
TRISTIN HASSELL, ADAM DILL, and
DAVID  YEOMAN on behalf of themselves
and a class of all others similarly situated,

       Plaintiffs,

v.

LOCKWOOD, ANDREWS & NEWNAM,
P.C., a Michigan corporation, LOCKWOOD,
ANDREWS & NEWNAM, INC., a Texas
Corporation, LEO A. DALY COMPANY, a
Nebraska corporation, ROWE
PROFESSIONAL SERVICES COMPANY
f/k/a ROWE ENGINEERING, INC., a
Michigan corporation, VEOLIA NORTH
AMERICA, LLC, a Delaware limited
liability company, VEOLIA NORTH
AMERICA, INC., a Delaware corporation,
VEOLIA WATER NORTH AMERICA
OPERATING SERVICES, LLC, a Delaware
limited liability company, and VEOLIA
ENVIRONMENT S.A., a transnational
corporation
       Defendants.

Hon. Richard B. Yuille

Case No. 16-106150-NM

**SECOND AMENDED**
**CLASS ACTION COMPLAINT**

/

| | |
|---|---|
| Mark L. McAlpine (P35583) | Wayne B. Mason (SBOT 13158950) |
| John T. Peters (P40220) | Travis S. Gamble (SBOT 00798195) |
| Jayson E. Blake (P56128) | S. Vance Wittie (SBOT 21832980) |
| Adam T. Schnatz (P72049) | David C. Kent (SBOT 11316400) |
| **MCALPINE PC** | **SEDGWICK LLP** |
| 3201 University Drive, Suite 100 | 1717 Main St., Suite 5400 |
| Auburn Hills, MI 48326 | Dallas, TX 75201 |
| (248) 373-3700 | (469) 227-8200 |
| Attorneys for Plaintiffs | Attorneys for Defendants Lockwood, |
| | Andrews & Newnam, P.C., Lockwood, |
| | Andrews & Newnam, Inc., and Leo A. Daly |
| | Company only |

Philip A. Erickson (P37081)
Robert G. Kamenec (P35283)
David K. Otis (P31627)
**PLUNKETT COONEY**
325 E. Grand River Ave, Suite 250
East Lansing, MI 48823
(517) 324-5608
Attorneys for Defendants Lockwood,
Andrews & Newnam, P.C., Lockwood,
Andrews & Newnam, Inc., and Leo A. Daly
Company only

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jennifer Mason, Carl Rogers II, Teresa Springer, Jeffrey DuShane, Deborah

Culver, Dr. Tristin Hassell, Adam Dill, and David Yeoman (collectively, "Plaintiffs" or "Plaintiff

Class Representatives"), on behalf of themselves and all others similarly-situated (the "Class" or

"Class Members" as defined below), upon personal knowledge as to the facts pertaining to

themselves, upon information and belief as to all other matters, and based upon the investigation

of counsel, bring this Second Amended Complaint for damages against Defendants Lockwood,

Andrews & Newnam, P.C., Lockwood, Andrews & Newnam, Inc., Leo A. Daly Company, Rowe

Professional Services Company f/k/a Rowe Engineering, Inc., Veolia Water North America

Operating Services, LLC, Veolia North America, LLC, Veolia North America, Inc., and Veolia

Environmental S.A., based on the following allegations.

## PARTIES, JURISDICTION AND VENUE

1.     This lawsuit is brought as a proposed class action against Defendants for

professional negligence in connection with their participation in the plan to use water drawn from

the Flint River via the Flint Water Treatment Plant ("FWTP") as the primary source of drinking

water for the City of Flint, Michigan ("Flint").  As a direct and proximate result of Defendants'

1

breaches, the residents of Flint, from April 25, 2014 to the present, have experienced and will continue to experience serious personal injury and property damage.

2.      Plaintiff Jennifer Mason is married and the mother of two children. At all relevant times, Ms. Mason was a resident and citizen of the State of Michigan, a resident and citizen of the City of Flint, and resided in a single family home located on Maxine Street in Flint, Michigan. Ms. Mason has suffered damages as a direct and proximate result of Defendants' conduct described herein.

3.      Plaintiff Carl Rogers II is single. At all relevant times, Mr. Rogers was a resident and citizen of the State of Michigan, a resident and citizen of the City of Flint, and resided in a single family home on Indiana Avenue in Flint, Michigan. Mr. Rogers also owned other real properties located in Flint, Michigan. Mr. Rogers has suffered damages as a direct and proximate result of Defendants' conduct described herein.

4.      Plaintiff Teresa Springer is the mother of three children. At all relevant times, Ms. Springer was a resident and citizen of the State of Michigan, a resident and citizen of the City of Flint, and resided in a single family home on Winthrop Boulevard in Flint, Michigan. Ms. Springer has suffered damages as a direct and proximate result of Defendants' conduct described herein

5.      Plaintiff Jeffrey DuShane is married. At all relevant times, Mr. DuShane was a resident and citizen of the State of Michigan, a resident and citizen of the City of Flint, and resided in a single family home on Burroughs Avenue in Flint, Michigan. Mr. DuShane has suffered damages as a direct and proximate result of Defendants' conduct described herein.

6.      Plaintiff Deborah Culver is a widow, mother, and grandmother. At all relevant times, Ms. Culver was a resident and citizen of the State of Michigan, a resident and citizen of the

City of Flint, and resided in a single family home on Maxine Street in Flint, Michigan. Ms. Culver has suffered damages as a direct and proximate result of Defendants' conduct described herein

7.    Plaintiff Dr. Tristin Hassell is married and the father of one child. At all relevant times, Dr. Hassell was a resident and citizen of the State of Michigan, a resident and citizen of the City of Flint, and resided in a single family home on Kensington Avenue in Flint, Michigan. Dr. Hassell has suffered damages as a direct and proximate result of Defendants' conduct described herein.

8.    Plaintiff Adam Dill is single. At all relevant times, Mr. Dill was a resident and citizen of the State of Michigan, resident and citizen of the City of Flint, and resided in a single family home on Blanchard Avenue in Flint, Michigan. Mr. Dill has suffered damages as a direct and proximate result of Defendants' conduct described herein.

9.    Plaintiff David Yeoman is married and the father of two children. At all relevant times, Mr. Yeoman was a resident and citizen of the State of Michigan, resident and citizen of the City of Flint, and resided with his family in a single family home on Oklahoma Avenue in Flint, Michigan. Mr. Yeoman also owned other real properties located in Flint, Michigan. Mr. Yeoman has suffered damages as a direct and proximate result of Defendants' conduct described herein.

10.    Plaintiffs' representatives, at all relevant times, were residents and citizens of the State of Michigan and residents and citizens of Flint who, as individuals, parents of minors and as property owners, have been and continue to be exposed to highly dangerous conditions created and caused by Defendants' negligent administration of a plan to place the Flint Water Treatment Plant ("FWTP") into full-time operation for drawing water from the Flint River.

11.    Lockwood, Andrews & Newnam, P.C. ("LAN PC") is a Michigan professional corporation with its principal place of business located at 1311 S. Linden Road, Suite B, Flint,

3

Michigan 48532. At that location, LAN PC held itself out to the world as a Leo A. Daly Company. Upon information and belief, LAN PC was incorporated in 2008 by LAN Inc. after it was retained to conduct studies and reports of a new water supply that was being developed for Flint, Genesee County, Lapeer County and Sanilac County. Upon further information and belief, the vast majority of the services provided by LAN PC, at all relevant times, were conducted at LAN Inc.'s Chicago, Illinois location.

12.    Lockwood, Andrews & Newnam, Inc. ("LAN Inc.") is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, LAN Inc. conducted business in Genesee County, Michigan through LAN PC. Pursuant to its website, LAN Inc.'s Michigan office is located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. is a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design.

13.    Leo A. Daly Company ("LAD") is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Per its website, LAD's "services are extended through [LAN Inc.]." LAD is an international architecture/engineering firm, with nearly 800 professionals in 31 offices worldwide and projects in more than 87 countries and all 50 U.S. states. Upon information and belief, LAD is the parent company to LAN Inc. and LAN P.C.

14.    LAN P.C., LAN Inc., and LAD are referred to collectively herein as "LAN."

15.    LAN performed professional engineering services and/or engaged in other conduct in Flint from 2011 through 2016. LAN holds itself out as "a full-service consulting firm offering planning, engineering and program management services" with "firsthand knowledge of the Flint Water Treatment Plant" and its operations.

4

16.     LAN maintains an office in Flint, Michigan, regularly conducts business in Michigan, and has committed torts in Michigan.

17.     Rowe Professional Services Company f/k/a Rowe Engineering, Inc. ("Rowe") is a Michigan corporation with its principal place of business in Flint Michigan.  Per its website, Rowe "has grown to be a leading professional consulting firm, driving infrastructure and development projects for our public, private, governmental, tribal, and not-for-profit client."  Its services include civil engineering, surveying, aerial photography and mapping, landscape architecture, planning, and land development.

18.     Veolia North America, LLC ("Veolia LLC") is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  Veolia LLC designs and provides water, waste and energy management solutions to communities and industries across the country.

19.     Veolia North America, Inc. ("Veolia Inc.") is a Delaware corporation with its principal place of business in Indiana.  Per its website, Veolia Inc. "blend[s] skills in operations, engineering and technology with innovative business models, offering a complete range of environmental solutions to meet the challenges of cities, governments, campuses, businesses, and industries."

20.     Veolia Water North America Operating Services, LLC ("Veolia Water") is a Delaware limited liability company with its principal place of business in Westland, Michigan. Per its website, Veolia Water provides turn-key industrial cleaning and maintenance services.

21.     Veolia Environmental S.A. ("Veolia S.A.") is a French transnational corporation with its principal place of business in Paris, France.  Veolia S.A. is a leading global provider of environmental management services, which include the supply of water, the treatment and recover of municipal or industrial effluent, waste collection, processing and recycling, the supply of

5

heating and cooling services and the optimization of industrial processes.  Upon information and belief, Veolia S.A. is the parent corporation of Veolia N.A.

22.     Veolia LLC, Veolia Inc., Veolia Water and Veolia S.A. are referred to collectively herein as "Veolia."

23.     Veolia performed professional engineering services and/or engaged in other conduct in Flint in 2015.  Veolia holds itself out as a "leading water services provider in [the] North American market, with more projects, operations, resources, expertise and demonstrated success than any other services provider."

24.     Veolia maintains multiple offices in Michigan, regularly conducts business in Michigan, and the acts alleged herein were committed in Michigan.

25.     The amount in dispute is in excess of $25,000.00, exclusive of costs and attorney fees, and all of the parties have, upon information and belief, either resided or transacted business in Genesee County, Michigan, at all times relevant herein such that jurisdiction and venue are properly with this Court.

## CLASS ALLEGATIONS

26.     This action is brought by the named Plaintiffs on behalf of the Class who have been and continue to be exposed to highly dangerous conditions created and caused by Defendants' negligent and/or reckless administration of a plan to place the FWTP into full-time operation using the Flint River as the primary water source, and reckless disregard of the safety and health of the citizens of Flint as well as its own professional duties and obligations.

27.     The number of injured individuals who have been exposed to and injured by the highly dangerous conditions (described more thoroughly throughout this pleading) is in the tens

of thousands. The number of Class Members is sufficiently numerous to make class action the most practical method for Plaintiffs to secure redress for injuries sustained by the Class Members.

28. There are questions of law and fact raised by the claims set forth herein that are common to, and typical of, those raised by the Class Members that Plaintiffs seek to represent.

29. The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class Members.

30. Plaintiff Class Representatives will fairly and adequately protect the interests of the Plaintiff Class Members. Plaintiffs' counsel are unaware of any conflicts of interest between the Plaintiff Class Representatives and absent Class Members with respect to the matters at issue in this litigation; the Plaintiff Class Representatives will vigorously prosecute the suit on behalf of the entire Class; and the Plaintiffs are represented by experienced counsel.

31. Plaintiffs are represented by attorneys with substantial experience and expertise in class action and complex litigation involving engineering firms and the duty of care.

32. Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent the Class.

33. The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class.

34. Defendants has acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating legal relief for the Class, including but not limited to an award of damages to fully compensate the Class for all of the damages it has sustained past, present and future.

## GENERAL ALLEGATIONS

35.     Flint, Michigan is located along the Flint River, approximately 60 miles northwest of Detroit.  Flint sits in Genesee County and is the largest city in that county.  According to the 2010 census, Flint is home to 102,434 residents, 27.3% (approximately 28,000) of whom are under 18 years of age, and 8% (approximately 8,000) of whom are under 5 years of age.  More than half of Flint's residents are African American.  There are more than 50,000 housing units in Flint, Michigan, and approximately 55% of those units are owner-occupied.  According to the most recent census, 41.6% of Flint's citizens live at or below the poverty level.  The median household income in Flint is just $24,679.

36.     Like the residents of any American city, residents of Flint rely on a steady supply of safe and clean water to go about their daily lives.  Flint also has commercial and other non-residential properties whose owners rely upon clean and safe water.

37.     The FWTP was constructed in 1917 to draw water from the Flint River as the source of Flint's drinking water for approximately 50 years until 1964.

38.     As early as 1964, the US Geological Survey noted high levels of chloride in the Flint River.  Due to the concerns regarding the adequacy of the Flint River to provide safe drinking water, Flint evaluated alternatives for a new water supply.  From 1964 to 2014, Flint water users received their water from Lake Huron via the Detroit Water and Sewerage Department ("DWSD").  During this 50-year span, the Flint water users enjoyed safe, clean, fresh water in their homes, businesses, hospitals and other places of public services.  However, since approximately the 1990s, Flint and other local governmental entities had growing concerns over the cost of the DWSD water supply.

39.     Amidst these growing concerns, Flint and the other local governmental entities, which included Genesee County, Lapeer County and Sanilac County, commissioned studies for alternative water supplies.  These studies were completed in 1992.

40.     A 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities as well as petroleum and gasoline cleanups.

41.     In 2004, a technical assessment of the Flint River raised concerns about using the river as a source of drinking water.  One of the key points from the technical assessment, entitled *"Source Water Assessment Report for the City of Flint Water Supply – Flint River Emergency Intake,"* prepared by the U.S. Geological Survey, the Michigan Department of Environmental Quality ("MDEQ") and the Flint Water Utilities Department, was that the Flint River was a highly sensitive drinking water source that was susceptible to contamination.

42.     The Flint City Charter requires that Flint have somebody serving in the capacity of City Engineer.  In order to receive State and Federal funding for projects, it is mandatory for Flint to have a City Engineer to certify and submit required documentation.

43.     Flint issued a notice of Solicitation of Qualifications to secure a professional engineering firm to provide services as Flint's contracted City Engineer, bid proposal number 326. Rowe submitted a bid to provide said services.

44.     In 2007, Rowe was awarded the bid to provide professional engineering services as City Engineer for a five year period.  Rowe provided those services to Flint under City Contract 07-103 under the broad categories of engineering, surveying, and project management / administration (both design and construction) and technical assistance.

45.    Flint and the local governmental entities again commissioned studies for alternative water supplies that were completed in 2006 and 2009.

46.    The 2009 study, prepared by Rowe, LAN and others, evaluated two alternatives for water supply – continue to purchase from DWSD or construct a new pipeline (later known as the Karegnondi Water Authority pipeline) from Lake Huron.

47.    In 2011, Flint's finances reached a critical place:  an audit estimated a $25 million deficit overall and Flint's water supply fund showed a $9 million deficit.

48.    In 2011, Governor Snyder declared Flint to be in a financial emergency, and Flint entered receivership, with responsibility for governance of Flint and operation of its utilities and other services, including its water supply, under the direction of Emergency City Managers who were appointed by the Governor and employed by the State of Michigan.

49.    Also in 2011, Flint government officials commissioned a study (or studies) by LAN and Rowe to determine if the Flint River could be safely used by the city as the primary source of drinking water.  One of those studies, entitled *"Analysis of the Flint River as a Permanent Water Supply for the City of Flint"* (the "2011 Report"), which bore LAN's and Rowe's respective logos, was published in July of 2011.

50.    The 2011 Report stated that chemically treating Flint River water on a continuous basis would be a challenge and more expensive than chemically treating lake water.  It concluded that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron Water . . . .  Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron."  The study further concluded that such treatments to Flint River water could be done if improvements were made to the FWTP.  However, if used as a water supply, the study noted that

10

"a source water protection management plan should be developed to . . . identify potential sources of contamination . . . ."

51.     LAN also prepared an additional analysis, attached to the 2011 Report as an appendix, which detailed over $69 million in improvements that would have to be made to bring the FWTP up to current standards.  This additional analysis specifically projected costs for corrosion control chemicals that would be required to ensure the safety of water to be drawn from the Flint River.

52.     In December of 2012, during a meeting with the State of Michigan Treasury, Flint rejected the Flint River as a source because of the comparatively high costs of preparing the FWTP to treat water drawn from the Flint River to applicable standards.

53.     In January of 2012, Flint Emergency Manager Jerry Ambrose executed a resolution authorizing Flint to enter into Change Order No. 9, which would extend Rowe's contract as City Engineer from January 1, 2012 to June 30, 2013.

54.     In early 2013, Flint Emergency Manager Ed Kurtz (who was appointed to that position in or around August of 2012) signed an agreement to switch Flint's primary drinking water source from the DWSD to the newly formed Karegnondi Water Authority ("KWA"), which was scheduled to become operational sometime in 2016.  Upon information and belief, Flint assumed it would continue to purchase its water from DWSD until the KWA pipeline became operational in 2016.

55.     DWSD protested Flint joining the KWA, and attempted to convince Flint to reconsider switching over to the KWA and continue purchasing its water from the DWSD.  Flint declined.  In April of 2013, DWSD gave Flint notice that their long-standing water agreement would terminate in April of 2014.

56.     On June 10, 2013, LAN submitted a proposal to Flint for upgrading the FWTP entitled "*Flint Water Treatment Plant Rehabilitation – Phase II.*" The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta, Professional Engineer (Senior Project Manager).

57.     LAN claimed in its proposal that its "staff has the knowledge, expertise and the technical professionals to handle all aspects of the projects. Our staff has firsthand knowledge of the [FWTP] . . . ."

58.     The proposal included the following relevant sections:

a.     A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply.

b.     A "Standards of Performance" section where LAN "agree[d] to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification, and ability of LAN.

59.     On or about June 26, 2013, Mr. Kurtz signed a resolution authorizing Flint to enter into a professional services contract with LAN for the administration of placing the FWTP into full-time operational use, which would draw water from the Flint River as its primary source of water until the completion of the KWA.

60.     Flint formally retained LAN as the design engineer for improvements and upgrades to the FWTP, which would ultimately enable the FWTP to operate full-time and provide proper treatment to the water drawn from the Flint River. Stated differently, LAN was hired to prepare the FWTP for the treatment of new water sources, including both the Flint River and the KWA pipeline.

61.     From July of 2013 through April of 2014, LAN provided its professional services, but failed to meet its duty of care and competence. LAN was responsible for providing engineering services to make Flint's inactive water treatment plant sufficient to treat water from each of its new sources. Its actions facilitated the transfer of Flint's water source to river water without proper corrosion control treatment, which was necessary to protect against the poisoning of thousands of Flint residents and damaging thousands of Flint homes, including those owned by Plaintiffs.

62.     According to the Environmental Protection Agency ("EPA"), "it is critical that public water systems, in conjunction with their primary agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives. But LAN did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents and property. Further, LAN did not require corrosion control to ensure that corrosive water was not delivered throughout Flint's aging water system.

63.     LAN, as Flint's independent and regulatory Michigan Licensed Professional Engineer, and Rowe, as City Engineer, had a duty to recognize the need for corrosion control and to ensure that it be implemented, even if that treatment exceeded regulatory minimums.

64.     Rowe had a duty to ensure that the standards it and LAN articulated in the 2011 Report and other requirements of the applicable standards of care were being adhered to by LAN and, later, Veolia.

65.     Upon information and belief, there were no bids submitted by LAN or any other firm for this work, nor were any other firms considered for this work. The contract was awarded without competitive bidding.

13

66.     On June 29, 2013, LAN met with representatives of Flint, representatives of the

Genesee County Drain Commissioners Office and the MDEQ to discuss:

    a.    Using the Flint River as a water source;

    b.    The ability to perform the necessary upgrades to the FWTP;

    c.    The ability to perform quality control;

    d.    The ability for Flint to provide water to Genesee County;

    e.    The ability to meet an April or May 2014 timeline; and

    f.    Developing a cost analysis.

67.     According to incomplete meeting minutes, "the conversation was guided with focus

on engineering, regulatory, and quality aspects . . ." of the items previously referenced, and the

following determinations were made:

    a.    The Flint River would be more difficult to treat, but was viable as a source;

    b.    It was possible to engineer and construct the upgrades needed for the
          treatment process;

    c.    It was possible to perform quality control "with support from LAN
          engineering which works with several water systems around the state,
          quality control could be addressed[;]"

    d.    FWTP did not have the capacity to treat and distribute sufficient water to
          meet the needs of Flint and Genesee County;

    e.    There were many obstacles to overcome, but completion by the April or
          May 2014 timeline was reachable; and

    f.    The next steps were for LAN to present Flint with a proposal that would
          include engineering, procurement, and construction needs for the project
          along with cost estimates.

68.     Upgrading the FWTP would have its challenges.  Since 1965, the FWTP served as

a secondary and backup water supply system to the DWSD.  Typically, a secondary supply for a

public water system is expected to be needed only during emergency situations, and is normally

designed for short term operation such as providing the average daily demand for only a few days.

14

69.    Upon information and belief, the FWTP was previously upgraded in or around 2004 in order to allow it to operate for an extended short-term period (i.e., approximately 6 weeks) because of a perceived high risk that the DWSD supply would fail and remain out of service for an extended duration.

70.    Due to the aforementioned 2013 agreement, the FWTP needed to be upgraded again to operate on a full-time basis, otherwise it would be unable to provide the citizens of Flint with sufficient quantities of water.

71.    In September of 2013, Rowe was re-hired by Flint for professional services for the 2014 fiscal year, wherein Rowe would continue to serve as City Engineer.

72.    In April of 2014, LAN, Flint and DEQ officials addressed and discussed optimization for lead, and they decided that having more data was advisable before implementing an optimization method.

73.    LAN knew, if not recommended, that the FWTP would begin drawing water from the Flint River later that month that would not be treated with anti-corrosive measures.

74.    The improvement and upgrade plans to the FWTP were approved by MDEQ in April of 2014 pursuant to plans and specifications signed and sealed by LAN.

75.    On March 7, 2014, DWSD was told: "[t]he Flint Water Treatment Plant will be fully operational and capable of treating Flint River water prior to the date of termination . . . there will be no need to . . . purchas[e] water to serve [Flint] after April 17, 2014."

76.    Between April 16, 2014 and April 25, 2014, numerous state and city employees expressed discomfort with the switch. One wrote that he was "expecting changes to our Water Quality Monitoring parameters, and . . . our lead & copper monitoring plan . . . . Any information would be appreciated, because it looks as if we will be starting the plant up tomorrow and we are

being pushed to start distributing water as soon as possible." Another employee stated that he would "need time to adequately train . . . staff . . . update our monitoring plans before [the transition]." Despite these concerns, the plans proceeded forward.

77.     On or about April 25, 2014, Flint formally ceased obtaining water from the DWSD and began drawing water from the Flint River through the FWTP.

78.     Since LAN was involved in determining whether the Flint River could be safely used as a water source, it knew or should have known that, without proper anti-corrosive treatment, drawing water from the Flint River and using it as the primary source of drinking water would create a condition dangerous to the health and welfare of the community.

79.     Pursuant to the Federal Safe Drinking Water Lead and Copper Rule (the "LCR"), all large public water systems, including Flint, are required to install and maintain corrosion control treatment for lead and copper water service systems. In the absence of such corrosion control treatment, lead levels in water traveling through a lead and copper-based water system will be present at unacceptable and even dangerous levels.

80.     LAN failed to ensure that the upgraded FWTP would treat the water drawn from the Flint River with the proper anti-corrosive chemicals before it was released for consumption and use into the community, which is contrary to water quality standards, the standard of care of similarly-situated and experienced engineers, and common sense.

81.     At all relevant times, LAN knew or should have known that, as a consequence of any failure to operate the FWTP by using the required and necessary anti-corrosive agents in the water drawn from the Flint River, or failure to report the non-use of these agents to the proper authorities, the Plaintiffs and the entire Class would be exposed to toxic levels of lead and other dangerous and unsafe metals and chemicals.

16

82.     Despite these requirements, corrosion control chemicals were not used when the FWTP began operation and drawing water from the Flint River.

83.     LAN either failed to recommend and/or design for the use of corrosion control treatment chemicals during the full-time operation of the FWTP when it drew water from the Flint River, or it failed to demand or ensure the use of corrosion control treatment chemicals once the upgraded FWTP was placed into full-time operation.

84.     The danger to the public in not using anti-corrosive treatments when using water from the Flint River as the primary source was or should have been well-known to LAN, as such dangers are well-known within the water treatment community.

85.     Moreover, the potential consequences in endangering the public health as a result of not using anti-corrosive treatments when using water from the Flint River as the primary source were or should have been well-known and foreseeable to LAN, an engineering firm that, according to its website, is a "national leader in the heavy civil infrastructure engineering industry," "one of the most respected engineering firms in the United States today," and "a recognized leader in the industry with a rich history of serving a diverse group of heavy civil infrastructure clients across the country."

86.     The potential consequences were seemingly, if not recklessly, ignored or not raised with the appropriate officials by LAN.

87.     It came (or should have come) as no surprise to a highly reputable civil engineering firm that, within days of the switch, Flint officials began receiving complaints from water users that the water was cloudy and discolored in appearance and foul in taste and odor.

88.    Within weeks following the April 25, 2014 switch, water users were reporting to Flint authorities that they were experiencing hair loss, rashes, vomiting and other physical maladies.

89.    Flint water users, having enjoyed decades of safe, clean and fresh water via the DWSD, knew almost immediately after the switch to Flint River water that something was not right about this new water supply.

90.    During the next eight months, Flint water users expressed their concerns about water quality in multiple ways, including letters, e-mails and telephone calls to Flint and MDEQ officials, the media and through well-publicized demonstrations on the streets of Flint.

91.    The residents of Flint – unlike LAN – were unaware of the specific dangers lurking in the water that was being used and distributed by the FWTP.

92.    For example, by August of 2014, Flint water tested positive for E. coli., and several "boil water" advisories were issued by Flint through September of 2014.  As a result, Flint was deemed to have violated the National Primary Drinking Water Regulations Maximum Contaminant Level ("MCL") for E. coli bacteria on at least two separate occasions.

93.    Additionally, unsafe levels of Trihalomethane ("TTHM") were present in the water. Beginning almost immediately after the Flint River became the primary source of water for Flint residents, the MDEQ and Flint officials were aware or should have been aware of elevated and unlawful levels of TTHM.

94.    By virtue of its involvement with the FWTP and its continuous work for Flint, LAN likewise knew or should have known of the elevated and unlawful levels of TTHM.

95.    In October of 2014, it was publicly reported that General Motors had refused to continue using water from the Flint River in its manufacturing facilities due to the highly corrosive

nature of the water that, in turn, was ruining its parts and production machinery. General Motors believed that the corrosive nature of the water was due to high chloride levels when their spokesman, Tom Wickham, said "you don't want the higher chloride water (to result in) corrosion."

96.     In November of 2014, LAN was on actual notice of the need to assess the factors contributing to high TTHM levels following the water source change because LAN was engaged to evaluate this issue by Flint and provide a report of its findings, which it did in August of 2015.

97.     LAN issued a 20-page Operational Evaluation Report on November 26, 2014, intended to address compliance with EPA and MDEQ operations and regulations. LAN entirely failed to address the hazard of lead associated with the corrosive water flowing through the pipes, at least half of which were made of lead.

98.     After about 7 months of elevated TTHM levels, Flint water users belatedly received a notice in January of 2015 stating that their water was not in compliance with the Federal Safe Drinking Water Act because of unlawful levels of TTHM.

99.     The biggest danger was the high level of lead in the water. The residents of Flint, including Plaintiffs and the Class Members, initially had no knowledge that the water contained dangerous levels of lead, even though LAN knew or should have known by virtue of its history and involvement with the FWTP, as well as its vast experience with civil engineering relating to water systems.

100.     In late 2014 or early 2015, a study by the Michigan Department of Health and Human Services ("MDHHS") was published that showed a dramatic spike in elevated blood lead levels in Flint's youngest children. The testing occurred in the Third Quarter of 2014.

101.    This aforementioned spike meant that, by the Third Quarter of 2014, the percent of Flint children with known elevated blood lead level tests rose from 2.5% to about 7%.

102.    This upward spike coincided precisely with the exposure of Flint's children to the toxic water of the untreated Flint River, in their homes, schools and other public locations.

103.    That the aforementioned spike occurred at the time of the exposure to the Flint River water constituted clear and certain notice that a major health emergency confronted the children of Flint.

104.    Furthermore, a dramatic spike in Legionnaires' disease occurred in Flint that, upon information and belief, resulted in 10 deaths in 18 months.  This spike in Legionnaires' disease, upon information and belief, is attributable, in whole or in part, to the presence of harmful chemicals and substances in the drinking water.

105.    LAN and Rowe knew that no optimized corrosion control had been implemented, because none of them required it, and they did not set water quality parameters for the Flint River Water source.

106.    Neither LAN nor Rowe did anything to address what they knew or should have known was a catastrophic public health crisis.

107.    On January 29, 2015, Veolia submitted to Flint its *"Response to Invitation to Bid for Water Quality Consultant"*, Proposal No. 15-573.  Veolia proposed "to address the immediate reliability and operational needs" of Flint's water system.

108.    Flint had requested engineering services:

   a.    To review and evaluate "the City's water treatment process . . . and procedures to maintain and improve water quality";

   b.    To develop and report with recommendations "to maintain compliance with both State of Michigan and federal agencies"; and

   c.    To assist the City in implementing the recommendations.

20

109.    Veolia, however, responded that "addressing the fundamental issues concerning water quality compliance and operational reliability is much more complex than the recommendations study and advisory services outlined [in City of Flint's request]." Veolia proposed to respond to Flint's requested scope of work by:

a.    Calibrating "daily water quality samples with the City's hydraulic model";

b.    Refining "the operational strategies for the plant and distribution system";

c.    Coordinating "daily efforts across plant, operations and maintenance staff"; and

d.    Alleviating "continued concerns from the public communications process".

110.    In February of 2015, Veolia was hired through a resolution that incorporated a standard of performance clause, which stated that "the City is relying upon the professional reputation, experience, certification, and ability of [Veolia]."

111.    Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken. As water treatment professionals, Veolia had an opportunity to catch what LAN and Rowe had missed or refused to warn about – corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

112.    On February 12, 2015, Rob Nicholas, Veolia's Vice President stated: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

113.    Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only 6 days to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. Per the

21

interim report, the only issue not in Veolia's scope of study was "why the change from [Lake Huron water via the Detroit system pipeline] or the history of the utility."

114.    In the interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing." Veolia effectively declared publically that Flint's poisonous water was safe.

115.    Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." It noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

116.    In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water."

117.    On February 27, 2015, LAN prepared a Final Operational Evaluation Report titled "*Trihalomethane Formation Concern.*" Trihalomethane levels continued to violate the Safe Drinking Water Act. LAN recommended additional ferric chloride to address the water quality problems, as adding ferric chloride could "easily be implemented without the need for additional equipment." However, as is widely known in the profession, ferric chloride is highly acidic and would increase the corrosiveness of Flint's water, worsening the corrosion of lead pipes, and the resulting leaching of lead into the water supply.

118.    Veolia issued its final "*Water Quality R*eport" on March 12, 2015.

119.    In the final report, Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claimed that "a review of water quality

records for the time period under our study indicates compliance with State and Federal water quality regulations."

120.    The final report also states that "the public has . . . expressed its frustration of discolored . . . water.  Those aesthetic issues have understandably increased the level of concern about safety of the water.  The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

121.    Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes.  The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water.  Polyphosphate addition will not make discolored water issues go away.  The system has been experiencing a tremendous number of water line breaks the last two winters.  Just last week there were more than 14 in one day.  Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

122.    Therefore, in addition to completely missing the connection between the lack of corrosion control and lead contamination, Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

123.    In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

124.    As a result of Veolia's actions, Flint residents, including Plaintiffs and the Class Members, continued to be exposed to poisonous water beyond February and March of 2015.

125.    As evidence of problems mounted, Rowe, LAN and Veolia denied the dangers facing residents, insisting the water was safe.

126.    Supported by the stated denials from Rowe, LAN and Veolia, Jerry Ambrose, Flint's Emergency Manager at that time, publicly declared that "Flint Water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality . . . water from Detroit is no safer than water from Flint."

127.    In April or May of 2015, EPA representative Miguel Del Toral stated that the sampling procedures skewed lead levels results and did not properly account for the presence of lead service lines. Del Toral issued a memorandum, stating "I wanted to follow up on this because Flint has essentially not been using any corrosion control treatment since April 30, 2014, and they have [lead service lines]. Given the very high lead levels found at one home at the pre-flushing happening in Flint, I'm worried that the whole town may have much higher lead levels than the compliance results indicated, since they are using pre-flushing ahead of their compliance sampling."

128.    The EPA also found that lead levels from the Flint River were twice the limit that would classify Flint River water as hazardous waste.

129.    Del Toral, a national expert in the field, identified the problem, the cause of that problem, and the specific reason it had been missed.

130.    On April 24, 2015, the EPA was finally informed that Flint did not have optimized corrosion control in place, contradicting what had previously been stated.

131.    On or about June 24, 2015, EPA representative Miguel Del Toral wrote a detailed memo entitled "*High Lead Levels in Flint, Michigan-Interim Report*," outlining numerous dangers

and hazards associated with the water being pumped from the Flint River, including unacceptable levels of lead. According to Mr. Del Toral's memo, because there had been a failure to use the same chemical treatments for lead and copper after Flint made the switch in 2014, corroded plumbing was likely leaching lead ("In the absence of any corrosion control treatment, lead levels in drinking water can be expected to increase") and making its way to the water taps found in the homes of Flint's residents, including the homes of the Plaintiffs and the Class Members.

132.     During the spring and summer of 2015, Professor Marc Edwards ("Professor Edwards") and other experts from Virginia Polytechnic Institute and State University (commonly known as "Virginia Tech") tested 277 drinking water samples in Flint and found that 10% of the samples had lead levels of 25 parts per billion (ppb), substantially in excess of the federal action level of 15 ppb.

133.     Professor Edwards was quoted as saying "I have never in my 25-year career seen such outrageously high levels going into another home in the United States."

134.     Professor Edwards also determined that water from the Flint River was 19 times more corrosive than the water pumped from Lake Huron by the DWSD, and that without corrosion control treatment, lead was leaching out from the lead-based service lines at alarming rates and finding its way to the homes of Flint's residents, including but not limited to the homes of the Plaintiffs.

135.     Professor Edwards has stated that the lead leaching into the water was predictable because of the chloride content in the water, but that he "didn't see anything that proper treatment couldn't render potable."

136.     On or about September 2, 2015, Professor Edwards published the results of his studies described above. This report noted starting findings. Amongst those findings:

a.    "FLINT HAS A VERY SERIOUS LEAD IN WATER PROBLEM";

b.    "101 out of 252 water samples from Flint homes had first draw lead more than 5 ppb";

c.    "Flint's 90th percentile lead value is 25 parts per billion . . . over the EPA allowed level of 15 ppb that is applied to high risk homes . . . how is this possible that Flint 'passed' the official EPA Lead and Copper Rule sampling overseen by MDEQ?"; and

d.    "Several samples exceeded 100 ppb and one sample collected after 45 seconds of flushing exceeded 1000 ppb".

137.    Additional findings published by Professor Edwards on September 2, 2015 included that "[o]n average, Detroit water is 12 times (or 12X) less corrosive than the Flint River water currently in use;" and that "even with phosphate, Flint River water has 10 times more lead compared to the same conditions using Detroit water." Available at http://flintwaterstudy.org/2015/09/flint-rivers-water-is-very-corrosive-to-lead-and-causing-lead-contamination-in-homes/ (last visited July 1, 2016).

138.    On September 11, 2015, Professor Edwards updated his September 2, 2015 findings by stating that "[o]n average, Detroit water is 19 times (or 19X) less corrosive than the Flint River water currently in use[,]" and that "even with phosphate, Flint River water has 16 times more lead compared to the same condition using Detroit water." Available at http://flintwaterstudy.org/2015/09/test-update-flint-river-water-19x-more-corrosive-than-detroit-water-for-lead-solder-now-what/ (last visited July 1, 2016).

139.    Therefore, the Flint River water was so corrosive that even the obvious, necessary measure of adding corrosion control may not have been enough to totally make it safe.

140.    This would have been known if the water was treated or studied before the switch.

141.    Professor Edwards predicted that "in the weeks and months ahead MDEQ and Flint will be forced to admit they failed to protect health as required under the Federal Lead and Copper Rule." He was entirely correct.

142.    At around the same time, Dr. Hanna-Attisha, a pediatrician at Hurley Hospital demonstrated and publicly disclosed a dramatic and dangerous spike in elevated blood lead levels in a large cohort of Flint children corresponding with the time of exposure to the highly corrosive Flint River water. She produced her study evidencing these elevated blood lead levels on or about August of 2015.

143.    LAN issued its second Operational Evaluation Report, which was 40 pages, on August 27, 2015, intended to again address compliance with EPA and MDEQ operations and regulations. Once again, LAN neglected to address the hazards of lead in the Flint Water which was poisoning residents of Flint and damaging their property, including Plaintiffs, Class Members and their respective properties.

144.    On or about September 29, 2015, the Genesee County Health Department issued a "Public Health Advisory for People Using the Flint City Water Supply with the Flint River as the Source," which stated in pertinent part: "recent data provided by Hurley Hospital Researchers has indicated that a significant increase in blood lead levels has occurred in children since the switch to Flint River water."

145.    On or about October 8, 2015, Flint's Eisenhower and Freeman Elementary Schools, along with Brownell and Holmes STEM Academies, exceeded 15 ppb for lead – the safety standard set forth by the Federal Government. Students and staff were ordered to drink bottled water only.

146.    On October 16, 2015, Flint reconnected to DWSD. However, the damage had been done and lead has continued to leach from pipes into the water.

27

147.    In November of 2015, LAN's contract with Flint was amended to retain LAN for the purpose of providing engineering services for drawing and servicing water from the KWA pipeline.

148.    On December 5, 2015, Flint declared a state of emergency.

149.    On December 23, 2015, the Michigan Auditor General provided an investigative report on the crisis, finding that corrosion control should have been maintained from the beginning and that improper sample sites had been selected.

150.    On December 29, 2015, a task force appointed by Governor Rick Snyder issued a letter detailing its findings, which states, in part: "The City of Flint's water customers – fellow Michigan citizens – were needlessly and tragically exposed to toxic levels of lead through their drinking water supply."

151.    On January 4, 2016, Genesee County declared its own state of emergency.

152.    On January 12, 2016, the Governor called the National Guard into Flint and requested assistance from FEMA.

153.    On January 16, 2016, President Barack Obama declared a federal state of emergency in Flint.

154.    On February 16, 2016, the State of Michigan hired Rowe, which had already failed miserably as Acting City Engineer to begin the process of locating, removing and eventually replacing lead pipes in the highest risk areas of Flint.

155.    Properties were also heavily impacted. For example, the prolonged exposure of the highly corrosive water without adequate anti-corrosive agents may have irreparably damaged lead and copper plumbing throughout Flint, all of which must now be repaired or replaced.

156.    In February of 2016, the Detroit Free Press reported on the sharp decline in property values as a result of the water crisis in Flint.  According to the article, certain individuals that specialize in property tax matters estimate that the property values in Flint, due to the water crisis, will drop as much as 25%.  In at least one instance, property value(s) were found to be 75% less than pre-exposure levels.

157.    According to this Detroit Free Press article, Eric Dean Morse, the president of Flint-based Allied Real Estate Appraisers, indicated that lenders are "already skittish about lending in Flint . . ." and that "[e]ight months ago [it] was a completely different market than what's going on now."

158.    In February of 2016, Charles "Charlie" LeDuff, an on-air journalist for Detroit Fox affiliate WJBK, published a TV spot relating to LAN's role in the so-called Flint Water Crisis. According to the TV spot, when Mr. LeDuff went to LAN's Flint, Michigan office, it was empty and looked abandoned, even though Flint recently retained LAN for connecting the FWTP to the KWA.

<u>**COUNT I**</u>
<u>**PROFESSIONAL NEGLIGENCE AGAINST LAN**</u>

159.    Plaintiffs incorporate the preceding paragraphs as though fully stated herein.

160.    LAN undertook, for consideration, to render services for Flint, which they did or should have recognized as necessary for the protection of Plaintiffs and Class Members.

161.    LAN undertook to perform a duty owed to Plaintiffs and Class Members by LAN independent of Flint and/or the State of Michigan.

162.    Based on its undertaking, LAN had a duty to Plaintiffs and Class Members to exercise reasonable care.

163.    LAN owed a duty to Plaintiffs, as residents and property owners in the City of Flint, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking.

164.    LAN also owed a duty to Plaintiffs to notify the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking.

165.    LANs' duties to Plaintiffs included, but were not limited to, the duty to properly administer the placing the FWTP into operation using the Flint River as a primary source, to do so in such a manner that would not endanger the health and property of Plaintiffs and Class Members, take other actions consistent with the greater degree of knowledge and skill possessed by design professionals, and/or the duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking.

166.    LAN failed to exercise reasonable care in preparing for and executing the transition from treated DWSD water to untreated Flint River water.

167.    LAN failed to undertake reasonable care and conduct as a professional engineering firm.

168.    LAN failed to exercise reasonable care when it did not ensure that corrosion control measures were implemented in a water supply system that drew water from a highly corrosive water source and that transmitted that water to Plaintiff and Class Members through lead pipes.

169.    LAN failed to exercise reasonable care when it failed to recognize the need for corrosion control in a system containing lead pipes when LAN continued to undertake duties to provide professional engineering services in relation to the Flint Water System on an ongoing basis.

170.    Plaintiffs and Class Members suffered harm resulting from LAN's failures to exercise reasonable care.

171.    LAN's failure to exercise reasonable care caused Plaintiffs and Class Members injuries, which were entirely foreseeable.

172.    LAN is liable to Plaintiffs and Class Members for all harms resulting from LAN's failures to exercise reasonable care.

173.    LAN's liability includes, without limitation, lead poisoning, personal injuries, illnesses, property damages, diminution in property values, and exposure to lead and other toxic substances suffered by Plaintiffs and the Class Members as a result of LAN's failures to exercise reasonable care.

174.    There is also an inference that LAN breached its collective duties to Plaintiffs and the Class Members, since the spike in lead levels does not normally occur unless water is not properly treated, such as the non-use of anti-corrosion treatments in providing finished water drawn from a water source and transported through a pipe system known or should have been known to require the use of such anti-corrosion treatments.

175.    LAN's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that it demonstrated a substantial lack of concern for whether an injury would result.

176.    As a direct result of LAN so negligently, carelessly and/or recklessly administering the placing of the FWTP into operation using the Flint River as a primary source and/or failing to

31

report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking, Plaintiffs and Class Members have experienced serious and in some cases life-threatening and irreversible bodily injury.

177.    Plaintiffs and Class Members have and will also incur substantial economic losses, including but not limited to medical expenses and lost wages.

178.    Plaintiffs and Plaintiff Class Members have also been damaged in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear, sense of insult, indignity, humiliation and mortification, and stress related physical symptoms such as sleeplessness, gastro-intestinal discomfort, neuropathy and similar symptoms.

179.    Additionally, Plaintiffs and Class Members have experienced property damage to the homes and places of business in the nature of diminution of values (due to both the need to repair their property and the loss in market value of their property) and seek damages to remediate the permanent damage caused by the use of corrosive water without proper anti-corrosive treatment.

180.    In addition to the damages alleged above, Plaintiffs and Class Members seek exemplary damages against LAN.

181.    LAN's professional negligence was voluntary conduct that inspired humiliation, outrage and indignity by Plaintiffs and Class Members.

182.    LAN's conduct was malicious, willful and wantonly as to disregard Plaintiffs' and Class Members' rights for the following reasons:

      a.    LAN knew that Plaintiffs and Class Members were relying upon LAN to provide it with safe water;

     b.     LAN knew that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs and Class Members; and/or

     c.     LAN knew that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs and Class Members.

183.    As a result of the foregoing, Plaintiffs and Class Members seek an award of exemplary damages from LAN so as to deter such morally reprehensible conduct by LAN and similarly situated corporations in the future.

184.    There is an amalgamation of interests, activities and the roles of LAN and LAD that blur the legal distinction between the corporations that include, but are not limited to:

     a.     LAD and LAN have interlocking officers and directors.  For example, LAN and LAD share the same executive personnel – Chief Executive Officer Leo A. Daly III and President Dennis W. Petersen – who, upon information and belief, control and direct the companies as one.

     b.     LAD and LAN share offices in Houston, Texas and other locations.

     c.     LAN holds itself out to the world as a LAD company.

     d.     LAD's website homepage contains the LAN logo and a link to the LAN website.

     e.     LAN holds itself out to world as "A Leo A. Daly Company" on LAN's website, reports, and even on the buildings where its offices are located (including its office in Flint).

     f.     The Terms and Conditions of Use, Privacy Statement on the LAD website indicate that it and LAN are not separate and distinct entities by making joint assertions such as their intellectual property rights and warranty disclaimers, which explicitly declare that "'LEO A DALY', 'Lockwood Andrews & Newnam', and 'LAN' are trademarks of Leo A. Daly Company."

     g.     LAD's "services are extended through Lockwood, Andrews & Newnam, Inc. (LAN), a Leo A. Daly Company."

185.    Upon information and belief, LAN is a subsidiary of LAD, which exerts a degree of control over LAD greater than what is normally associated with common ownership and

directorship, such that LAN exists as a separate entity from LAD in name only.  Upon further information and belief, LAN is totally reliant upon LAD for direction with regard to all critical aspects of the issues giving rise to this lawsuit.

186.    Upon information and belief, because LAN does not manifest separate corporate interests from those of LAD and functions solely to achieve the corporate purposes of LAD, retention of their separate corporate personalities and identities would promote injustice in the context of this lawsuit.

187.    Due to this amalgamation of interest, activities and roles, LAD should be held liable for any judgment entered in favor of Plaintiff and Class Members and against LAN.

**COUNT II**
**PROFESSIONAL NEGLIGENCE AGAINST ROWE**

188.    Plaintiffs incorporate the preceding paragraphs as though fully stated herein.

189.    Rowe undertook, for consideration, to render services for Flint, which it should have recognized as necessary for the protection of Plaintiffs and Class Members.

190.    Rowe undertook to perform a duty owed to Plaintiffs and Class Members by Flint and/or the State of Michigan.

191.    Based on its undertaking, Rowe had a duty to Plaintiffs and Class Members to exercise reasonable care.

192.    Rowe failed to exercise reasonable care in overseeing the preparation for and execution of the transition from treated DWSD water to untreated Flint River water.

193.    Rowe failed to undertake reasonable care and conduct as a professional engineering firm.

194.    Rowe failed to exercise reasonable care when it failed to insist upon the implementation of corrosion control chemical in a system containing lead pipes that was

34

transporting highly corrosive water from the Flint River to the FWTP to the residents and citizens of Flint, including Plaintiffs and the Class Members.

195.    Plaintiffs and Class Members suffered harm resulting from Rowe's failure to exercise reasonable care.

196.    Rowe's failure to exercise reasonable care caused Plaintiffs and Class Members injuries, which were entirely foreseeable.

197.    Rowe is liable to Plaintiffs and Class Members for all harms resulting from its failures to exercise reasonable care.

198.    Rowe's liability includes, without limitation, lead poisoning, personal injuries, illnesses, property damages, diminution in property values, and exposure to lead and other toxic substances suffered by Plaintiffs and Class Members as a result of Rowe's failures to exercise reasonable care.

199.    Rowe's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that it demonstrated a substantial lack of concern for whether an injury would result.

200.    As a direct result of Rowe so negligently, carelessly and/or recklessly administering the placing of the FWTP into operation using the Flint River as a primary source and/or failing to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking, Plaintiffs and Class Members have experienced serious and in some cases life-threatening and irreversible bodily injury.

201.    Plaintiffs and Class Members have and will also incur substantial economic losses, including but not limited to medical expenses and lost wages.

202.   Plaintiffs and Class Members also incurred damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear, sense of insult, indignity, humiliation and mortification, and stress related physical symptoms such as sleeplessness, gastro-intestinal discomfort, neuropathy and similar symptoms.

203.   Additionally, Plaintiffs and Class Members have experienced property damage to the homes and places of business in the nature of diminution of values (due to both the need to repair their property and the loss in market value of their property) and seek damages to remediate the permanent damage caused by the use of corrosive water without proper anti-corrosive treatment.

204.   In addition to the damages alleged above, Plaintiffs and Class Members seek exemplary damages against Rowe.

205.   Rowe's professional negligence was voluntary conduct that inspired humiliation, outrage and indignity by Plaintiffs and Class Members.

206.   Rowe's conduct was malicious, willful and wantonly as to disregard Plaintiffs' and Class Members' rights for the following reasons:

a.   Rowe knew that Plaintiffs and Class Members were relying upon Rowe to provide it with safe water;

b.   Rowe knew that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs and Class Members; and/or

c.   Rowe knew that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs and Class Members.

207.   As a result of the foregoing, Plaintiffs and Class Members seek an award of exemplary damages from Rowe so as to deter such morally reprehensible conduct by Rowe and similarly situated corporations in the future.

36

## COUNT III
## PROFESSIONAL NEGLIGENCE AGAINST VEOLIA

208.    Plaintiffs incorporate the preceding paragraphs as though fully stated herein.

209.    Veolia undertook, for consideration, to render services for Flint, which it should have recognized as necessary for the protection of Plaintiffs and Class Members.

210.    Veolia undertook to perform a duty owed to Plaintiffs and Class Members to exercise reasonable care.

211.    Plaintiffs and Class Members relied on Veolia to perform the duty to inspect Flint's water supply to make sure that it was safe.

212.    Veolia failed to exercise reasonable care as a professional engineering firm.

213.    Veolia failed to exercise reasonable care when it declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

214.    Veolia failed to exercise reasonable care when it declared that Flint's drinking water was safe.

215.    Veolia failed to exercise reasonable care when it denied that problems unique to Flint's water supply were causing medical harms and property damage.

216.    Veolia failed to exercise reasonable care when it failed to warn about the dangers of lead leaching into Flint's water system.

217.    Veolia failed to exercise reasonable care when it did not ensure the immediate implementation of corrosion controls for purposes of preventing lead contamination of Flint's water supply.

218.    Plaintiffs and Class Members suffered harm resulting from Veolia's failures to exercise reasonable care.

219.    Veolia's failures to exercise reasonable care proximately caused the Plaintiffs and the Class Members' injuries, which were entirely foreseeable.

220.    Veolia's liabilities include, without limitation, without limitation, lead poisoning, personal injuries, illnesses, property damages, diminution in property value, and exposure to lead and other toxic substances suffered by Plaintiffs and the Class Members as a result of Veolia's failures to exercise reasonable care.

221.    Veolia's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that it demonstrated a substantial lack of concern for whether an injury would result.

222.    Plaintiffs and Class Members have and will also incur substantial economic losses, including but not limited to medical expenses and lost wages.

223.    Plaintiffs and Class Members also incurred damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear, sense of insult, indignity, humiliation and mortification, and stress related physical symptoms such as sleeplessness, gastro-intestinal discomfort, neuropathy and similar symptoms.

224.    Additionally, Plaintiffs and Class Members have experienced property damage to the homes and places of business in the nature of diminution of values (due to both the need to repair their property and the loss in market value of their property) and seek damages to remediate the permanent damage caused by the use of corrosive water without proper anti-corrosive treatment.

225.    In addition to the damages alleged above, Plaintiffs and Class Members seek exemplary damages against Veolia.

226.    Veolia's professional negligence was voluntary conduct that inspired humiliation, outrage and indignity by Plaintiffs and Class Members.

227.    Veolia's conduct was malicious, willful and wantonly as to disregard Plaintiffs' and Class Members' rights for the following reasons:

a.    Veolia knew that Plaintiffs and Class Members were relying upon Veolia to provide it with safe water;

b.    Veolia knew that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs and Class Members; and/or

c.    Veolia knew that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs and Class Members.

228.    As a result of the foregoing, Plaintiffs and Class Members seek an award of exemplary damages from Veolia so as to deter such morally reprehensible conduct by Veolia and similarly situated corporations in the future.

229.    There is an amalgamation of interests, activities and the roles of Veolia LLC, Veolia, Inc., Veolia Water and Veolia S.A. that blur the legal distinction between the entities that include, but are not limited to:

a.    Veolia S.A., a French company, reports income from business activities within the United States and having employees working within the United States, per its filings with the Securities and Exchange Commission;

b.    Veolia S.A. includes Veolia LLC, Veolia Inc. and its subsidiaries in its consolidated financial statements and reporting to the Securities and Exchange Commission;

c.    Veolia S.A. owns and controls 100% of Veolia LLC, Veolia Inc. and its subsidiaries;

d.    Veolia's ethics guide, filed with the Securities and Exchange Commission, holds the Veolia Group out to the public as an international group of related entities provided water services to customers throughout the world;

e.    Veolia website represents to the public that each of the Veolia entities are part of the same international Veolia Group that provides its services, including those relating to private and public water systems, to its customers around the world;

   f.  Veolia website provides no distinction between any of the Veolia entities; and

   g.  Veolia entities share offices around the world;

230. Due to this amalgamation of interest, activities and roles, Veolia S.A., Veolia LLC, Veolia Inc. and Veolia Water should be held liable for any judgment entered in favor of Plaintiffs and Class Members and against any and all of the Veolia entities named herein.

## COUNT IV
## FRAUD AGAINST VEOLIA

231. Plaintiffs incorporate the preceding paragraphs as though fully stated herein.

232. According to the complaint filed by the State of Michigan in this Genesee County Circuit Court (Case No. 16-107175-NM) ("State Complaint"), Veolia made false and material representations regarding the safety of Flint's water, the nature and cause of the water quality problems in Flint, and the risks to the public health.

233. Upon information and belief and in reliance on the allegations of the State Complaint, the false and material representations include, but are not limited to, statements in Veolia's 2015 Interim Report that:

   a.  Flint's water was "safe" and "in compliance with drinking water standards,"

   b.  The observed discoloration was merely aesthetic and not indicative of a water quality of health problems, and

   c.  Medical problems are because "[s]ome people may be sensitive to any water."

234. Upon information and belief and in reliance on the allegations of the State Complaint, these false and material representations were repeated in Veolia's 2015 Report and other public statements.

40

235.    Upon information and belief and in reliance on the allegations of the State Complaint, the material representations and other acts and omissions of Veolia constitute fraud.

236.    Upon information and belief and in reliance on the allegations of the State Complaint, Veolia knew the representations were false, or Veolia's representations were made recklessly without any knowledge of the potential truth.

237.    Upon information and belief and in reliance on the allegations of the State Complaint, Veolia made the representations with the intention that Plaintiffs and the Class Members would act and rely on them, which they did.

238.    As a direct and proximate result, Plaintiffs and the Class Members suffered and continue to suffer injuries and damages.

<b><u>RELIEF REQUESTED</u></b>

Accordingly, Plaintiffs request the following relief from the court:

a.    An order certifying this case as a Class Action;

b.    An order for an award of full compensatory damages for those injuries and damages, including diminution of property values, sustained by Class Representatives and all Class Members;

c.    An order for an award of exemplary damages;

d.    An order for an award of actual reasonable attorneys' fees and litigation expenses;

e.    An order for all such other relief the court deems reasonable, equitable and just under the circumstances.

## JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.

Respectfully submitted,

**MCALPINE PC**

By: _____
Mark L. McAlpine (P35583)
John T. Peters (P40220)
Jayson E. Blake (P56128)
Adam T. Schnatz (P72049)
3201 University Drive, Suite 100
Auburn Hills, Michigan 48326
(248) 373-3700
mlmcalpine@mcalpinepc.com
tpeters@mcalpinepc.com
jeblake@mcalpinepc.com
atschnatz@mcalpinepc.com
Attorneys for Plaintiffs

Dated: July 20, 2016

43

Exhibit 2

S. REP. 109-14, S. Rep. No. 14, 109TH Cong., 1ST Sess. 2005, 2005 WL 627977, 2005 U.S.C.C.A.N. 3 (Leg.Hist.)
P.L. 109-2, THE CLASS ACTION FAIRNESS ACT OF 2005

DATES OF CONSIDERATION AND PASSAGE

House: February 17, 2005
Senate: February 7, 8, 9, 10, 2005
Cong. Record Vol. 151 (2005)

Senate Report (Judiciary Committee)
No. 109-14, February 28, 2005
[To accompany S. 5]

SENATE REPORT NO. 109–14

February 28, 2005

Mr. Specter, from the Committee on the Judiciary, submitted the following

REPORT

[To accompany S. 5]

**\*1 \*\*3** The Committee on the Judiciary, to whom was referred the bill (S. 5) to amend title 28, United States Code, to allow the application of the principles of federal diversity jurisdiction to interstate class actions, having considered the same, reports favorably thereon, without amendments, do pass.

## CONTENTS

Page

I. Legislative History ................................................................................................................. 1

II. Votes of the Committee .......................................................................................................... 3

III. Purposes ................................................................................................................................ 4

IV. Background and Need for the Legislation ........................................................................... 6

V. How It Works: S. 5 and Changes in Existing Law ............................................................. 27

VI. Section-by-Section Analysis ................................................................................................ 29

VII. Critics Contentions and Rebuttals..................................................................................................... 51

VIII. Congressional Budget Office Cost Estimate.................................................................................. 76

IX. Regulatory Impact Statement ............................................................................................................ 78

X. Additional Views................................................................................................................................... 79

XI. Minority Views.................................................................................................................................... 82

XII. Changes in Existing Law................................................................................................................... 96

## I. LEGISLATIVE HISTORY

The Senate began consideration of the Class Action Fairness Act in the 105th Congress when the Senate Judiciary Subcommittee on **2** Administrative Oversight and the Courts convened a hearing on October 30, 1997. John H. Church, Jr., John C. Coffee, Jr., Lewis H. Goldfarb, Paul V. Niemeyer, Martha **4** Preston, and Brian Wolfman testified at the hearing on issues such as unfair class settlements, attorneys' fees, and state court abuses. On September 28, 1998, the Subcommittee on Administrative Oversight and the Courts approved S. 2083, the "Class Action Fairness Act of 1997," introduced by Senators Charles Grassley (R–IA) and Herb Kohl (D–WI), with an amendment in the nature of a substitute. No further action was taken on S. 2083 in the 105th Congress.

On February 3, 1999, S. 353, "The Class Action Fairness Act of 1999," was introduced in the 106th Congress by Senators Charles Grassley (R–IA), Herb Kohl (R–WI), and Strom Thurmond (R–SC). S. 353 was referred to the Senate Committee on the Judiciary. On May 4, 1999, the Judiciary Subcommittee on Administrative Oversight and the Courts held a legislative hearing (S. Hrg. 106–465) on the bill, and received testimony from Eleanor D. Acheson, John H. Beisner, Richard A. Daynard, E. Donald Elliot, John P. Frank, and Stephan G. Morrison.

On June 29, 2000, the Judiciary Committee approved S. 353 with an amendment in the nature of a substitute, offered by Chairman Orrin G. Hatch (R–UT), Senators Charles Grassley and Herb Kohl, by a rollcall vote of 11 years and 7 nays. S. 353 was then ordered favorably by the Committee without additional amendment.

The Senate continued consideration of the Class Action Fairness Act in the 107th Congress when Senator Charles Grassley (R–IA), introduced S. 1712 on November 15, 2001 with Senators Kohl (D–WI), Hatch (R–UT), Carper (D–DE), Thurmond (R–SC), Chafee (R–RI), and Specter (R–PA). While S. 1712 contained similar provisions from its predecessor bills, S. 1712 included some new provisions. On July 30, 2002, the Senate Judiciary Committee, which was then chaired by Senator Leahy (D–VT), held a hearing to discuss class actions generally, during which S. 1712 was discussed at length by Committee members. The Committee received testimony from Paul Bland, Thomas Henderson, former Solicitor General Walter E. Dellinger III, (Insurance) Commissioner Laurence Mirel, Shaneen Wahl and Hilda Bankston. No further action was taken on S. 1712 during the 107th Congress.

On February 4, 2003, Senator Charles Grassley (R–IA) introduced S. 274, the "Class Action Fairness Act of 2003." Senators Herb Kohl (D–WI), Orrin Hatch (R–UT), Thomas Carper (D–DE), Arlen Specter (R–PA), Lincoln Chafee (R–RI), and Zell Miller (D–GA) joined the bill as original cosponsors. On April 11, 2003, the Judiciary Committee reported S. 274 favorably, with amendments, after two days of mark-up. On October 17, 2003, Senator Grassley introduced S. 1751, the "Class Action

Fairness Act of 2003," a compromise version of the bill, with Senators Alexander (R–TN), Allen (R–VA), Carper (D–DE), Chafee (R–RI), Cornyn (R–TX), Hagel (R–NE), Hatch (R–UT), Kohl (D–WI), Lugar (R–ID), Miller (D–GA), Specter (R–PA), Sununu (R–NH) and Voinovich (R–OH). Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 1751 was filed. On October 23, 2003, the Senate failed to invoke cloture by a vote of 59–39. Senators Grassley, Kohl, Hatch and Carper then negotiated key provisions of the bill with Senators Landrieu (D–LA), Schumer (D–NY), and Dodd **\*3** (D–CT). The compromise bill, S. 2062, the "Class Action Fairness Act of 2004," was introduced on February 10, 2004 by Senators Grassley, the original sponsor, and Senators Kohl (D–WI), Hatch (R–UT), Carper (D–DE), Chafee (R–RI), Collins (R–ME), Dodd (R–CT), Hagel (R–NE), Landrieu (D–LA), Lugar (R–ID), Miller (D–GA), Schumer (D–NY) Specter (R–PA) and Voinovich (R–OH) as cosponsors. Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 2062 was filed on July 7,2004. Senator Frist (R–TN) promptly filled the amendment tree and filed a cloture motion. On July 8, 2004, the Senate failed to invoke cloture by a vote of 44–43.

**\*\*5** On January 25, 2005, Senators Charles Grassley (R–IA), Herb Kohl (D–WI), and Orrin Hatch (R–UT) introduced S. 5, the "Class Action Fairness Act of 2005." Senators Alexander (R–TN), Carper (D–DE), Chaffee (R–RI), Collins (R–ME), DeMint (R–SC), DeWine (R–OH), Dodd (D–CT), Ensign (R–NV), Feinstein (D–CA), Frist (R–TN), Hagel (R–NE), Kyl (R–AZ), Landrieu (D–LA), Lieberman (D–CT), Lincoln (D–AR), Lott (R–MS), Lugar (R–IN), Martinez (R–FL), McConnell (R–KY), Santorum (R–PA), Schumer (D–NY), Sessions (R–PA), Snowe (R–ME), Sununu (R–NH), Thune (R–SD), Vitter (R–LA), and Voinovich (R–OH) joined as cosponsors to the bill. On February 3, 2005, the Senate Judiciary Committee reported S. 5 favorably, without amendments.

## II. VOTE ON THE COMMITTEE

Pursuant to paragraph 7 of rule XXVI of the Standing Rules of the Senate, each Committee is to announce the result of rollcall votes taken in any meeting of the Committee on any measure of amendment. The Senate Judiciary Committee, with a quorum present, met on February 3, 2005 to mark up S. 5. The Committee rejected one amendment. The following rollcall votes occurred on S. 5.

A Leahy amendment that would provide for an increase of federal judges' salaries in the amount of 16.5% of their current salaries (rounded to the nearest $100).

| YEAS | NAYS |
|------|------|
| Leahy | Hatch |
| Kennedy (Proxy) | Grassley |
| Biden | Kyl |
| Feingold | DeWine |
| Durbin | Sessions |
| | Graham |
| | Cornyn |

Brownback

Coburn

Kohl

Feinstein

Schumer

Specter

Motion to report favorably S. 5. The motion was approved by 13 yays to 5 nays.

| YEAS | NAYS |
|---|---|
| Hatch | Leahy |
| Grassley | Kennedy (Proxy) |
| Kyl | Biden |
| DeWine | Feingold |
| Sessions | Durbin |
| Graham | |
| Cornyn | |
| Brownback | |
| Coburn | |

Kohl

Feinstein

Schumer

Specter

## III. PURPOSES

By now, there should be little debate about the numerous problems with our current class action system. A mounting stack of evidence reviewed by the Committee demonstrates that abuses are undermining the rights of both plaintiffs and defendants. One key reason for these problems is that most class actions are currently adjudicated in state courts, where the governing rules are applied inconsistently (frequently in a manner that contravenes basic fairness and due process considerations) and where there is inadequate supervision over litigation procedures and proposed settlements. The problem of inconsistent and inadequate judicial involvement is exacerbated in class actions because the lawyers who bring the lawsuits effectively control the litigation; their clients–the injured class members–typically are not consulted about what they wish to achieve in the litigation and how they wish it to proceed. In short, the clients are marginally relevant at best. This stands in stark contrast to the designed purpose of class actions. Class actions were designed to provide a mechanism by which persons, whose injuries are not large enough to make pursuing their individual claims in the court system cost efficient, are able to bind together with persons suffering the same harm and seek redress for their injuries. As such, class actions are a valuable tool in our jurisprudential system. However, they are only beneficial when the class members are kept a priority throughout the process.

To make matters worse, current law enables lawyers to "game" the procedural rules and keep nationwide or multi-state class actions in state courts whose judges have reputations for readily certifying classes and approving settlements without regard to **\*6** class member interests. In this environment, consumers are the big losers: In too many cases, state court judges are readily approving class action settlements that offer little–if any–meaningful recovery to the class members and simply transfer money from corporations to class counsel. Often, the settlement notices in such cases are so confusing that the plaintiff class members do not understand what–if anything–the settlement offers or how they can opt out of it. Multiple class action cases purporting to assert the same claims on behalf of the same people often proceed simultaneously in different state courts, causing judicial inefficiencies and promoting collusive activity. Finally, many state courts freely issue rulings in class action cases that have nationwide ramifications, sometimes overturning well-established laws and policies of other jurisdictions.

**\*5** The Class Action Fairness Act of 2005 is a modest, balanced step that would address some of the most egregious problems in class action practice. The Committee emphasizes, however, that the Act is not intended to be a "panacea" that will correct all class action abuses.

The Act has three key components.

First, S. 5 includes a consumer class action bill of rights, with multiple components. One element prohibits federal courts from approving coupon or "net loss" settlements without making written findings that such settlements benefit the class members. Another element specifies the methods for calculating attorneys' fees in class settlements in which coupons constitute all or part of the relief afforded to claimants to ensure that such fee awards are consistent with the benefits afforded class members or the amount of real work that the class counsel have performed in connection with the litigation. Yet another element of the bill of rights provides an additional mechanism to safeguard plaintiff class members' rights by requiring that notice of class action settlements be sent to appropriate state and federal officials, so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.

Second, S. 5 corrects a flaw in the current diversity jurisdiction statute (28 U.S.C. S 1332) that prevents most interstate class actions from being adjudicated in federal courts. One of the primary historical reasons for diversity jurisdiction "is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court."[1] Because interstate class actions typically involve more people, more money, and more interstate commerce ramifications than any other type of lawsuit, the Committee firmly believes that such cases properly belong in federal court. To that end, this bill (a) amends section 1332 to allow federal courts to hear more interstate class actions on a diversity jurisdiction basis, and (b) modifies the federal removal statutes to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire. Thus, S. 5 makes it harder for plaintiffs' counsel to "game the system" by trying to defeat diversity jurisdiction, creates efficiencies in the judicial system by allowing overlapping and "copycat" cases to be consolidated in a single federal court, places the determination of more interstate class action lawsuits in the proper forum–the federal courts.

Third, S. 5 directs the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations for ensuring that attorneys' fees are determined in a fair and reasonable way. This provision will help address the problem of excessive attorneys' fees and will facilitate legislative oversight of the Judicial Conference's efforts in this area.

## *6 **7 IV. BACKGROUND AND NEED FOR LEGISLATION

As set forth in Article III of the Constitution,[2] the Framers established diversity jurisdiction to ensure fairness for all parties in litigation involving persons from multiple jurisdictions, particularly cases in which defendants from one state are sued in the local courts of another state. Interstate class actions which often involve millions of parties from numerous states–present the precise concerns that diversity jurisdiction was designed to prevent: frequently in such cases, there appears to be state court provincialism against out-of-state defendants or a judicial failure to recognize the interests of other states in the litigation. Yet, because of a technical glitch in the diversity jurisdiction statute (28 U.S.C. S 1332), such cases are usually excluded from federal court. This glitch is not surprising given that class actions as we now know them did not exist when the statute's concept was crafted in the late 1700s.

This Committee believes that the current diversity and removal standards as applied in interstate class actions have facilitated a parade of abuses, and are thwarting the underlying purpose ofthe constitutional requirement of diversity jurisdiction. S. 5 addresses these concerns by establishing "balanced diversity" a rule allowing a larger number of class actions into federal courts, while continuing to preserve primary state court jurisdiction over primarily local matters.

### A. A Brief History of Class Actions

Although class actions have some roots in common law, the general concept was first codified in 1849, when several states adopted the Field Code.[3] To successfully plead and prosecute class actions, the Field Code merely required that numerous parties demonstrate a common interest in law or fact.

Rule 23 of the Federal Rules of Civil Procedure, the rule governing federal court class actions, was initially adopted in 1938.[4] However, the concept of class actions that are a familiar part of today's legal landscape did not arise until 1966, when Rule 23 was substantially amended to expand the availability of the device. Under Rule 23, a class action can be brought in federal court if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition, a proponent must show that the proposed class meets one of three additional requirements set forth in Rule 23(b). For example, for a Rule 23(b)(3) damages class actions to be certified, a proponent must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual *7 **8 members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[5]

As originally envisioned, class action lawsuits were to be primarily a tool for civil rights litigants seeking injunctions in discrimination cases.[6] Prof. John P. Frank, a member of the 1966 Advisory Committee on Civil Rules that proposed

amending Rule 23 to its current form, testified that those who wrote the new class action rule thought it would rarely (if ever) apply to product liability or mass torts cases.[7] In the 1980s, however, some plaintiffs' lawyers successfully persuaded judges to expand class actions to the area of mass torts.[8] These courts began to expand the types of claims they were willing to certify as class actions because they feared that the large number of individual mass tort cases could slow or stop the judicial system.[9] Thus, class actions have evolved from their original primary purpose–to counter civil rights abuses–and have become a common tool for plaintiffs' attorneys bringing personal injury or product liability claims. Yet, while the landscape of class actions has changed dramatically, the procedural rules regarding which courts can hear class actions, and, consequently, which procedural law will apply to such cases, generally have reMained the same since 1966.

B. Federal Diversity Jurisdiction and Removal Provisions

1. The Basics of Diversity Jurisdiction

The Constitution extends federal court jurisdiction to cases of a distinctly federal character–for instance, cases raising issues under the Constitution or federal statutes, or cases involving the federal government as a party–and generally leaves to state courts the adjudication of local questions arising under state law. However, the Constitution specifically extends federal jurisdiction to encompass one category of cases involving issues of state law: "diversity" cases, or suits "between Citizens of different States."[10]

According to the Framers, the primary purpose of diversity jurisdiction was to protect citizens in one state from the injustice that **8 **9 might result if they were forced to litigate in out-of-state courts.[11] Quoting James Madison, Judge Henry Friendly explained that diversity jurisdiction is essential to a strong union because it "may happen that a strong prejudice may arise in some state against the citizens of others, who may have claims against them."[12] Justice Frankfurter expressed a similar understanding of Madison's concerns: "It was believed that, consciously or otherwise, the courts of a state may favor their own citizens. Bias against outsiders may become embedded in a judgment of the state court and yet not be sufficiently apparent to be made the basis of a federal claim."[13]

In addition to protecting individual litigants, diversity jurisdiction has two other important purposes. In testimony several years ago before the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott of the Yale Law School expressed the view that diversity jurisdiction was designed not only to protect against actual discrimination, but also "to shore up confidence in the judicial system by preventing even the appearance of discrimination in favor of local residents."[14] In addition, several legal scholars have noted that the Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce.[15] As former Acting Solicitor General Walter Dellinger testified before the Committee, "diversity jurisdiction has served to guarantee that parties of different state citizenship have a means of resolving their legal differences on a level playing field in a manner that nurtures interstate commerce."[16] Both of these concerns–judicial integrity and interstate commerce–are strongly implicated by class actions.

Over the years since the First Congress enacted provisions in the Judiciary Act of 1789 setting forth the parameters of federal diversity jurisdiction, two statutory limitations on that jurisdiction have been constants. The first is the "amount in controversy" requirement (currently $75,000), which Congress enacted in order to ensure that federal diversity jurisdiction extends only to non-trivial **9 **10 state-law cases.[17] The second is the "complete diversity" requirement, a rule that federal jurisdiction lies only when all plaintiffs are diverse as to all defendants.[18] It is important to recognize that these procedural limitations regarding interstate class actions were policy decisions, not constitutional ones. In fact, the U.S. Supreme Court has repeatedly acknowledged that the complete diversity and minimum amount-in-controversy requirements are political decisions not mandated by the Constitution.[19] Indeed, as Prof. Dellinger noted in testimony before this Committee, class action legislation expanding federal jurisdiction over class actions "would fulfill the intentions of the Framers because the rationales that underlie the diversity jurisdiction concept apply with equal–if not greater–force to interstate class actions."[20] It is therefore the prerogative of Congress to modify these technical requirements as it deems appropriate.

2. Removal: How Diversity Cases Arrive in Federal Court

The concept of "removing" cases from state courts to federal courts is based largely on the same core premise as diversity jurisdiction--i.e., that an out-of-state defendant in a state court proceeding should have access to an even-handed federal forum.[21] The general removal statute, 28 U.S.C. S 1441(a), provides that any civil action brought in a state court may be removed by the defendant(s) to federal court if the claim could have originally been brought in federal court. In other words, so long as a federal district court could exercise original jurisdiction over a claim, a defendant may remove the case to federal court.

Section 1446(b) of Title 28 outlines the procedure for removal. Under this provision, a defendant must file papers seeking removal to federal court within 30 days after receiving a copy of the initial pleading (or service of summons if a pleading has been filed in court and is not required to be served on the defendant). If the original complaint was not removable (or if it could not be determined from the face of the complaint that it was removable), but the plaintiff subsequently amends the pleadings in such a way that removal becomes proper, then the notice of removal must be filed within 30 days of receipt by the defendant of "a copy of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case [is removable]."[22] The Committee notes that the purpose of this provision is to prevent plaintiffs from evading federal jurisdiction by hiding the true nature of their case. Thus, the Committee favors the broad interpretation of "other paper" adopted by some courts to include deposition transcripts, discovery responses, settlement offers and other documents or occurrences that reveal the removability of a case.[23]

**\*10 \*\*11 C. How Diversity Jurisdiction and Removal Statutes Are Abused**

The current rules governing federal jurisdiction have the unintended consequence of keeping most class actions out of federal court, even though most class actions are precisely the type of case for which diversity jurisdiction was created.[24] In addition, current law enables plaintiffs' lawyers who prefer to litigate in state courts to easily "game the system" and avoid removal of large interstate class actions to federal court.

This gaming problem exists for two reasons. The first is the "complete diversity" requirement. Although the Supreme Court has held that only the named plaintiffs' citizenship should be considered for purposes of determining if the parties to a class action are diverse, the "complete" diversity rule still mandates that all named plaintiffs must be citizens of different states from all the defendants.[25] In interstate class actions, plaintiffs' counsel frequently and purposely evade federal jurisdiction by adding named plaintiffs or defendants simply based on their state of citizenship in order to defeat complete diversity. One witness at the Committee's 2002 hearing on class actions testified that her drug store was named as a defendant in "hundreds of lawsuits" so that "the lawyers could keep the case in a place known for its lawsuit-friendly environment."[26] If all it takes to keep a class action in state court is to name one local retailer, it is no surprise that few interstate class actions meet the complete diversity requirement.

The second problem is created by the amount-in-controversy requirement. In interpreting 28 U.S.C. S 1332(a), some federal courts of appeals, relying on a 1974 Supreme Court decision,[27] have held that the amount-in-controversy requirement is normally met in class actions only if each of the proposed class members individually seeks damages in excess of the statutory minimum.[28] That means federal courts can often only hear class actions in which each potential class member claims damages in excess of $75,000.[29] The Committee believes that requiring each plaintiff to reach the $75,000 mark makes little sense in the class action context. After all, class actions frequently involve tens of millions of dollars even though each individual plaintiff's claims are far less than that. Moreover, class action lawyers typically misuse the jurisdictional **\*11 \*\*12** threshold to keep their cases out of federal court. For example, class action complaints often include a provision stating that no class member will seek more than $75,000 in relief, even though they can simply amend their complaints after the removal to seek more relief and even though the class action seeks millions of dollars in the aggregate. Under current law, that is frequently enough to keep a major class action in state court.

This leads to the nonsensical result under which a citizen can bring a "federal case" by claiming $75,001 in damages for a simple slip-and-fall case against a party from another state, while a class action involving 25 million people living in all fifty states and alleging claims against a manufacturer that are collectively worth $15 billion must usually be heard in state court (because each individual class member's claim is for far less than $75,000). Put another way, under the current jurisdictional rules, federal courts can assert diversity jurisdiction over a typical state law claim arising out of an auto accident between a driver from one state and a driver from another, or a typical trespass claim involving a trespasser from one state and a property owner from another, but they cannot assert jurisdiction over claims encompassing large-scale, interstate class

actions involving thousands of plaintiffs from multiple states, defendants from many states, the laws of several states, and hundreds of millions of dollars–cases that have obvious and significant implications for the national economy.

There is a growing chorus of authoritative sources declaring that something is badly amiss with the manner in which federal diversity jurisdictional requirements are applied to class actions:

* The leading federal civil procedure law treatise has noted: "The traditional principles [regarding federal diversity jurisdiction over class actions] have evolved haphazardly and with little reasoning. They serve no apparent purpose."[30]

* In a recent Minnesota state appellate court decision upholding a grant of class certification, a concurring judge noted that the nationwide class action before it was a "poster child for national class action reform. We have here a Minnesota [state] district court, applying a New Jersey consumer fraud statute to a nationwide class of plaintiffs, with few of those plaintiffs residing in New Jersey. And, it is probably a fair assumption that the legislative authors of the New Jersey consumer protection scheme did not have in mind midwestern farmers purchasing agricultural chemicals as the protected class * * * This is not a recipe for uniformity or consistency, it is fair neither to claimants nor defendants and it is long past time for national policy makers to address class action procedures.[31]

* The U.S. Court of Appeals for the Eleventh Circuit apologized for sending an interstate class action back to state court, noting that "an important historical justification for diversity jurisdiction is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court." Observing that the out-of-state defendant in that case was confronting "a state court system [prone to] produce[] gigantic awards against out-of-state corporate defendants," the court stated that **12** "[o]ne would think that this case is exactly what those who espouse the historical justification for [diversity jurisdiction] would have in mind * * *"[32]

**13** * In that same case, Judge John Nangle, the former chairman of the Judicial Panel for Multidistrict Litigation, concurred: "Plaintiffs' attorneys are increasingly filing nationwide class actions in various state courts, carefully crafting language * * * to avoid * * * the federal courts. Existing federal precedent * * * [permits] this practice * * *, although most of these cases * * * will be disposed of through 'coupon' or 'paper' settlements * * * virtually always accompanied by munificent grants of or requests for attorneys' fees for class counsel * * * [T]his judge is of the opinion that the present [jurisdictional rules] do[] not accommodate the reality of modern class litigation and settlements."[33]

In another case, Judge Anthony Scirica (formerly the chair of the Judicial Conference's Standing Committee on Rules and Procedure and now the Chief Judge of the U.S. Court of Appeals for the Third Circuit) observed that although "national (interstate) class actions are the paradigm for federal diversity jurisdiction because * * * they implicate interstate commerce, foreclose discrimination by a local state, and tend to guard against any bias against interstate enterprises, * * * the current jurisdictional statutes [put] such class actions * * * beyond the reach of the federal courts."[34]

* And even though the Judicial Conference of the United States has historically opposed any expansion of federal jurisdiction over class actions, the Conference has more recently signaled a significant shift in position. In a March 26, 2003 letter to the Committee,[35] the Conference acknowledged "current problems with class action litigation."[36] Further, in that letter, the Conference for the first time "recognize[d] that the use of [expanded] diversity jurisdiction may be appropriate to the maintenance of significant multi-state class action litigation in the federal courts."[37]

The Committee notes that several congressional hearing witnesses (including former Carter Administration Attorney General Griffin Bell and Clinton Administration Solicitor General Walter E. Dellinger) and other legal experts agree that if Congress were to draft an entirely new federal diversity jurisdiction statute and start over in deciding which cases should be subject to federal diversity jurisdiction Congress likely would conclude that interstate class actions are among the cases that most warrant access to the federal courts because they involve the most people, put the most money in controversy, and have the greatest implications for interstate commerce.[38] As Prof. Dellinger noted in his testimony before this Committee, "the rationales that underlie the diversity jurisdiction concept apply with equal–if not greater–force to interstate class actions."[39]

**13** D. Other Abuses of the Class Action Rules

The ability of plaintiffs' lawyers to evade federal diversity jurisdiction has helped spur a dramatic increase in the number of

class actions litigated in state courts–an increase that is stretching the resources of the state court systems. In testimony to the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott pointed out that the flood of class actions in our state courts is too well documented to warrant significant discussion, much less debate.[40] According to studies, federal class action **14 filings over the past ten years have increased by more than 300 percent. At the same time, class action filings in state courts have grown more than three times faster–by more than 1,000 percent.[41]

Notably, many of these cases are being filed in improbable jurisdictions. A study conducted in three venues with reputations as hotbeds for class action activity found exponential increases in the numbers of class actions filed in recent years. For example, in the Circuit Court of Madison County, Illinois, a mostly rural county that covers 725 square miles and is home to less than one percent of the U.S. population, the number of class actions filed annually grew from 2 in 1998 to 39 in 2000–an increase of 3,650 percent.[42] A follow-up study found that the number of class actions filed in the county continued to grow dramatically in 2001 and 2002.[43] And in 2003, class action filings there catapulted to 106, up more than 5,000 percent since 1998.[44] According to the president of the Illinois Trial Lawyers Association (an association representing plaintiffs' lawyers), the reason for the 2003 jump in filings was an effort to beat this legislation; plaintiffs' lawyers were "playing it safe" and rushing to get suits filed in case the legislation was enacted in 2004.[45] The same studies also found that most of the class actions brought in Madison County and other magnet courts had little–if anything–to do with the venues where they were brought.[46]

The reason for this dramatic increase in state court class actions cannot be found in variations in class action rules; after all, the rules governing the decision whether cases may proceed as class actions are basically the same in federal and state courts–and of course, they are the same within states, i.e., the same in "magnet" jurisdictions such as Madison County and St. Clair County, Illinois, as they are in more easily accessible jurisdictions such as Cook County, Illinois. In fact, thirty-six states have adopted the basic federal class action rule (Rule 23), sometimes with minor revisions. Of the remaining states, most have rules that are guided by federal court class action policy and contain similar requirements. (Two states, Mississippi and West Virginia, do not have rules or statutes **14 authorizing class actions.) Thus, there are no wide variations between federal and state court class action policies.

The Committee finds, however, that one reason for the dramatic explosion of class actions in state courts is that some state court judges are less careful than their federal court counterparts about applying the procedural requirements that govern class actions. In particular, many state court judges are lax about following the strict requirements of Rule 23 (or the state's parallel governing rule), which are intended to protect the due process rights of both unnamed class members and defendants. In contrast, federal courts generally scrutinize proposed settlements much more carefully and pay closer attention to the procedural requirements for certifying a matter for class treatment.[47]

**15 Another problem is that a large number of state courts lack the necessary resources to supervise proposed class settlements properly.[48] Many state judges do not have law clerks, and the explosion of state court class actions has simply overwhelmed their dockets. Not surprisingly, abuses are much more likely to occur when state court judges are unable to give class action cases and settlements the attention they need. Federal judges, in contrast, have access to magistrates and can appoint special masters when they are faced with complex litigation like class actions. Moreover, the average state court judge is assigned 1,568 new cases each year, compared to federal judges, who are assigned, on average, fewer than 500.[49]

The lack of a federal forum for most interstate class actions and the inconsistent administration of class actions in state courts have led to several forms of abuse. First, lawyers, not plaintiffs, may benefit most from settlements. Second, corporate defendants are forced to settle frivolous claims to avoid expensive litigation, thus driving up consumer prices. Third, constitutional due process rights are often ignored in class actions. Fourth, expensive and predatory copy-cat cases force defendants to litigate the same case in multiple jurisdictions, driving up consumer costs.

1. Lawyers receive disproportionate shares of settlements

The first such abuse involves settlements in which the attorneys receive excessive attorneys' fees with little or no recovery for the class members themselves. In the now infamous Bank of Boston class action settlement,[50] or example, the defendant bank was accused of over-collecting escrow monies from homeowners and profiting from the interest. The settlement, approved by an Alabama state court, awarded up to $8.76 each to individual class members, while the class counsel got more than $8.5 million in fees. To make matters worse, the fees were simply debited directly from individual class members'

escrow accounts leaving many of them worse off than they were before the suit. In testimony before the Subcommittee on Administrative Oversight and the Courts, class member Martha Preston recounted how she received $4 from the settlement, **15** but was charged a mysterious $80 "miscellaneous deduction," which she later learned was an expense used to pay the class lawyers' $8.5 million settlement fee. Ms. Preston expressed her disbelief over how "people who were supposed to be my lawyers, representing my interests, took my money and got away with it."[51]

A few years ago, the National Law Journal reported on another similarly troubling state court case:

> When 75-year-old Olga Heaven received some legal papers in the mail a few weeks ago, she asked her daughter, a lawyer, to look them over. A good thing, too. If Ms. Heaven had misunderstood the notice or simply thrown it away, her daughter says, she might have been required to sell her house and property as part of a recent class action settlement. * * * Ms. Heaven [was] **16** one of 60 class action plantiff homeowners–many of them unwitting parties to the litigation–who received a notice that a property damage suit against a local oil refinery had settled. * * * The unusual deal requires settling plaintiffs to sell their homes to [the defendant refinery owner] for two times their tax-assessed value. In addition, the plaintiffs are required to withdraw from the lawsuit * * * and release any property damage or personal injury claims against [the defendant], which was accused of polluting the area. The settlement was set up [as] a so-called opt-out class, meaning that homeowners would be included in the deal [and required to sell their homes] unless they sent in responses to the notice within 30 days. * * * The total payout by [the defendant] could be as much as $1.1 million. Plaintiffs' lawyers could earn as much as $200,000, depending on how many plaintiffs participate in the deal.[52]

Through several hearings over the past several years, the Committee has become aware of numerous class action settlements approved by state courts in which most–if not all–of the monetary benefits went to the class counsel, rather than the class members those attorneys were supposed to be representing. These settlements include many so-called "coupon settlements" in which class members receive nothing more than promotional coupons to purchase more products from the defendants. For example:

* A recent lawsuit involved customers who had Firestone tires that were among those that the National Highway Traffic Safety Administration investigated or recalled, but who did not suffer any personal injury or property damage. After a federal appeals court rejected class certification, plaintiffs' counsel and Firestone negotiated a settlement, which has now been approved by a Texas state court. Under the settlement, the company has agreed to redesign certain tires (a move already underway irrespective of the suit) and to develop a three-year consumer education and awareness camp, **16** but the members of the class received nothing. The lawyers will receive $19 million.[53]

* In another state court class action settlement, in which a cruise line was accused of collecting "port charges" that exceeded the amount actually paid by the defendant. Under the terms of the settlement, the class members received $30 to $40 discounts from another cruise line on its two- and three-night cruises out of Port Canaveral, Florida because Premier was no longer in business.[54] In other words, a company that had not even been sued and had absolutely no risk of liability agreed to offer coupons–no doubt because they recognize that such coupons are a promotional opportunity and not a penalty. Attorney for the plaintiffs received $887,000 in fees, costs, and expenses.[55]

* Microsoft has settled antitrust class actions in ten states in which plaintiffs alleged that Microsoft used its monopoly to gouge consumers. Based on the terms of the settlement, consumers who bought Microsoft software will receive a $5 to $10 voucher **17** good for future purchases of particular computer hardware or software products. To receive the voucher, consumers must download a form from www.microsoftproductsettlement.com/Kansas and then mail it in. To redeem the voucher, consumers must mail in the voucher, a photocopy of an original receipt, and an original UPC code. Half of the unclaimed settlement money will be used to donate Microsoft products to schools. A federal judge rejected a similar settlement in part on the ground that the school donations were intended to inflict further injury on Apple. Attorneys in these cases have sought hundreds of millions of dollars in fees.[56]

* Consumers in a state court class action alleged that the beer goblets served at a Chicago restaurant chain were misrepresented to be 12 ounces, when they held only 10.6 ounces. In settlement, the company will give away 50,000 coupons for $1 off every subsequent $5 purchase at its 22 Chicago-area restaurants.[57] All cash from the settlement goes to the lawyers.

* To settle a state court class action alleging deceptive pricing practices on certain products, KB Toys agreed to hold a sale.[58]

Under the settlement agreement, the toy retailer offered a 30 percent discount on selected products between October 8 and October 14, 2003. According to an independent analyst, "KB Toys will benefit from the settlement," because "they're driving traffic."[59] The **17 attorneys benefited too: they received all the cash–fees and costs of $1 million.[60]

* In a recent class action where consumers alleged that a company was selling cribs that were unsafe for use by infants, the class members received either a crib repair kit or a coupon for $55 which could be used toward the future purchase of a Dorel Juvenile Group Product.[61] Of course, the coupon is only valuable for consumers who plan to have another baby and still trust the company.

* Another recent suit involved allegations that Poland Spring water does not really come from a spring deep in the woods of Maine. The settlement calls for discounts or free water to Poland Spring customers over five years and contributions of $2.75 million to charities. In addition, the named plaintiff will receive $12,000. Plaintiffs' lawyers received $1.35 million.[62]

* Plaintiffs alleged that GameStop Corp. misrepresented some of the video games it was selling as new, when they had actually been previously purchased and returned.[63] Under the settlement, GameStop agreed to post notices in stores stating: "All software for **18 video game consoles may have been used and returned in accordance with (the store's) return policy." Further, anyone who bought a game from particular stores on specified dates, and can produce their receipt, will receive a coupon for 5 percent off the price of any one game. In other words, customers would receive $1.25 off a $25 dollar game–as long as they kept receipts. The coupon can be redeemed at retail locations, but not on the defendant's website.[64] Lawyers for the plaintiffs were paid $125,000 in fees and costs.[65]

* Plaintiffs alleged that Register.com delayed in switching purchased domains over to their customers and continued to display the company's "Coming Soon" page which promotes the company and its advertisers. Under the settlement, class members receive coupons to use with Register.com (assuming they ever plan to register one of the company's domains again). The lawyers for the class get $642,500.[66]

* In a case involving customers who alleged that they were charged excessive late fees by Blockbuster, the class members received $1 off coupons for rentals–at the same time, their attorneys divided up a $9.25 million fee award. Experts have predicted that at most, only 20 percent of the class members will redeem the coupons. The settlement allows Blockbuster to continue its practice of charging customers for a new rental period when they return a **18 tape late.[67] In this settlement approved by a Texas state court, only the lawyers got cash.

* To settle an Illinois state court class action in which it was accused of improperly including asbestos in its crayons, a manufacturer agreed to issue class members 75-cent coupons toward the purchase of new crayons. The attorneys got $600,000 in fees.

* In another recent case, Food Lion settled a state court class action filed by a consumer group by offering 28-cent coupons to customers who held an MVP discount card between 1995 and 1998. The plaintiff class alleged that Food Lion charged too much sales tax on discounted products purchased with the discount card.[68] Only the lawyers got money.

* A manufacturer offered consumers who bought a dozen Pinnacle golf balls free golf gloves. When the manufacturer ran out of the golf gloves and substituted a set of three free golf balls, it was hit with a class action. The settlement provided that the manufacturer would send each class member three more free golf balls. Meanwhile, by order of a state court, the attorneys who brought the lawsuit received $100,000 in fees and the persons who served as class representatives each received $2,500.[69]

* Under the settlement in this state court case, which resulted from allegations regarding changes in the American Airlines frequent flyer program, members of the program received vouchers good for $25 to $75 off the price of future travel, or a similarly valued reduction in the number of miles required for an award. American also agreed to pay the lawyers up to $25 million in fees. One news article about the settlement **19 quoted travel experts saying that "the practical value of those discounts will be modest," and "American could end up generating enough extra revenue to more than offset the cost of the offer."[70]

* A class action alleged that certain "zip drives" contained a defect that sometimes caused the failure of the drives or the zip

disks. The plaintiffs' attorneys received $4.7 million in fees, while the estimated 28 million purchasers of an Iomega Zip drive between 1995 and March 19, 2001 received coupons for rebate of between $5 and $40 on future purchases of Iomega products. In addition, the settlement called for the defendant to donate $1 million of its products to schools.[71] Virtually all of the cash paid in this state court-approved settlement went to lawyers.

* In a suit involving port charges, a sea cruise line agreed to give vouchers for a future cruise worth $25 to $55 off a future cruise to 4.5 million people who sailed on its cruises between April 19, 1992 and June 4, 1997. The vouchers can be used for a future cruise or redeemed for cash at 15 percent or 20 percent of face value.[72] In this state court class action settlement, only the lawyers received cash payments.

* In a case alleging flawed television sets, Thomson Consumer Electronics agreed to reimburse customers who had receipts documenting **19** repairs, to provide $50 rebates on the purchase of future products for consumers who did not repair their problems or did not have receipts, and to provide $25 rebates on future products to consumers who did not experience a problem. Under the terms of the settlement approved by an Illinois state court, the lawyers reportedly received $22 million in fees and costs.[73] According to news reports, more than 2,640 people opted out of the settlement; some said they opted out because the form was complicated and others said they opted out because the attorneys' fees were so high.[74]

* In the settlement of a state court class action involving allegations of overly aggressive fees and rates by a Minnesota credit card company, class members received discount coupons with a retail value of $19.95, an $8 dollar donation in their name to the Boys and Girls Clubs of America and the right to apply for a 9.9 percent interest credit card and to join a promotional travel discount club. They also had the potential to receive between $10 and $70 in cash. The company agreed to change its practices, and the lawyers received $5.6 million in fees.[75]

* In one state court class action involving faulty pipes, lawyers for a group of Alabama plaintiffs received more than $38.4 million in fees, and lawyers for a class of Tennessee plaintiffs received $45 million, or the equivalent of about $2,000 an hour. In contrast, the homeowners only received 8 percent rebates toward new plumbing–and to get those rebates, they had to first prove that they had suffered leaks and then go out and buy a new system.[76] The money in the settlement flowed primarily to class counsel.

**20** * In March 1995, a computer manufacturer settled multiple state court class actions alleging a chip flaw that would arise only once in 27,000 years for the average spreadsheet user. It essentially agreed to do what it was already doing: offer free replacements, maintain service centers, operate toll-free phone numbers, and provide diagnostic computer programs. Meanwhile, counsel received $4.27 million in fees.[77]

* In a group of state court class actions settled in 2002, class members alleging that they were not fully advised of "energy surcharges" applied when they checked into hotels during California's electricity crisis were given $10 coupons.[78] Only the lawyers are receiving cash.

* In another case, an Illinois state court approved a coupon settlement of a class action filed against Southwestern Bell Mobile Systems, Inc., alleging that the company failed to fully disclose the fact that it rounded up customer calls to the next minute. Under the state court settlement, the class members received $15 vouchers **20** toward Cellular One products, while the lawyers took home more than $1 million in fees.[79]

* In a state court class action alleging that Coca-Cola improperly added sweeteners to apple juice, defendant agreed to distribute 50-cent coupons toward the purchase of apple juice. Meanwhile, class counsel received $1.5 million.[80]

* The Chicago Tribune reported that in a state court class action against a record company to recover the prices paid for albums by the group Milli Vanilli (that contained the voices of other performers), class members were given a settlement of $1 to $3 each. The Illinois state court awarded the lawyers $675,000, but the lawyers turned around and petitioned the court for an increase to $1.9 million.

* In a state court action alleging that General Mills treated oats with a nonapproved-pesticide, class members were offered coupons; the attorneys received $1.75 million.[81]

* In a settlement of a state court class action against Packard Bell alleging a product defect, class members were offered a six-month extended service contract for which they were each required to pay $25. Only the lawyers got cash.

* To settle a state court class action alleging collusion to fix cellular phone prices, wireless phone service providers agreed to provide coupons and discounts to customers in several California counties.[82] The lawyers, however, received cash.

* In a settlement of a similar state court antitrust class action involving cellular service in a different area, coupons and small service credits were offered. But counsel obtained agreement to be paid up to $9.5 million.[83] Virtually all the cash paid in the settlement went to lawyers.

* In another case, class action plaintiffs alleged that discount stores overstated the value of software bundles that came with computers. In a class settlement approved by a state court, consumers received coupons worth the lesser of a 7% or $25 discount off the future purchases of products from defendants' stores. The attorneys received $890,000 in fees.[84]

**21 2. Judicial blackmail forces settlement of frivolous cases

* A second common abuse in state court class actions is the use of the class device as "judicial blackmail" in cases that border on frivolous. Because class actions are such a powerful tool, they can give a class attorney unbounded leverage, particularly in jurisdictions that are considered plaintiff-friendly. Such leverage can essentially force corporate defendants to pay ransom to class attorneys by settling–rather than litigating–frivolous lawsuits. This is a particularly alarming abuse because the class action device is intended to be a procedural tool and not a mechanism that affects the substantive outcome of a lawsuit. Nonetheless, state court judges often are inclined to certify cases for class action treatment **21 not because they believe a class trial would be more efficient than an individual trial, but because they believe class certification will simply induce the defendant to settle the case without trial.[85] As Judge Richard Posner of the U.S. Court of Appeals for the Seventh Circuit has explained, "certification of a class action, even one lacking merit, forces defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability. * * * [Defendants] may not wish to roll these dice. That is putting it mildly. They will be under intense pressure to settle."[86] Hence, when plaintiffs seek hundreds of millions of dollars in damages, basic economics can force a corporation to settle the suit, even if it is meritless and has only a five percent chance of success.

Not surprisingly, the ability to exercise unbounded leverage over a defendant corporation and the lure of huge attorneys' fees have led to the filing of many frivolous class actions.

As District of Columbia Insurance Commissioner Lawrence Mirel has testified before the Committee, insurance companies are often forced to settle lawsuits even though the challenged actions were fully in accordance with state law–or encouraged by state policies.[87] For example, two automobile insurance companies, worried about mounting legal expenses and negative publicity, settled a lawsuit over a long-standing industry-wide practice of rounding insurance premiums up to the nearest dollar for nearly $36 million, even though the premiums were calculated according to specific instructions from the Texas Department of Insurance.[88]

Other brow-raising examples of frivolous suits are common. One such case was brought against Ford Motor Company in New York state court by the Milberg Weiss firm, one of the better known plaintiffs' class action firms in the country. The case involved an inadvertent mistake made by Ford–it had put a slightly overstated price on the window stickers on certain vehicles. As soon as Ford discovered the mistake, the company began sending letters to the affected customers apologizing for the error and enclosing checks that more than compensated them. Nonetheless, fully knowing that this refund program was already well underway, the Milberg Weiss law firm filed a class action lawsuit charging that Ford had committed fraud. Even worse, it asked the court immediately to enjoin Ford from continuing its refund efforts–presumably so that the lawyers could get a cut of the refund money. In this case, the court properly dismissed the **22 action; nonetheless, Ford was required to waste time and corporate resources on a lawsuit that clearly served no legitimate purpose.[89]

3. Current class action rules can ignore due process rights

A third type of class action abuse occurs when state courts ignore the due process rights of out-of-state defendants by denying

them **22 the opportunity to contest the plaintiffs' claims against them. One witness who testified before the Subcommittee on Administrative Oversight and the Courts blamed this phenomenon on a "laissez faire" attitude of some state courts.[90] The most egregious examples of this are the so-called "drive-by class certification" cases, in which a class is certified before the defendant has a chance to respond to the complaint, or in some cases, has even received the complaint. In one lawsuit filed against an auto manufacturer in a Tennessee state court, for example, the complaint was filed on July 10, 1996. Plaintiffs filed several inches of documents with their complaint. Amazingly, by the time the court closed that same day, the judge had entered a nine-page order granting certification of a nationwide class of 23 million members. The defendant was not even notified about the lawsuit before the certification and thus had no opportunity to tell its side of the story.[91] And upon checking, the defendant discovered that a group of record companies had the same experience with the same judge in an antitrust class action filed several days earlier.[92] Similarly, in one of the cases to develop out of the Firestone tire controversy, a Tennessee state court certified a nationwide class just four days after the defendants were served with the complaint (and obviously without benefit of any input from defendants).[93] And in another case, a Kentucky state court ordered injunctive relief in favor of the class before the defendant was even notified of the lawsuit.[94]

4. Some magnet state courts easily certify national class actions

A fourth type of class action abuse that is prevalent in state courts in some localities is the "I never met a class action I didn't like" approach to class certification.[95] Some state courts with this permissive attitude have even certified classes that federal courts had already found uncertifiable. In one case, for example, a state court judge certified a nationwide class of persons who claimed that the house siding they had purchased was defective. Later, a federal district court judge presented with the same case rejected any prospect of certifying a class in that manner, finding that affording class treatment in that case would clearly violate the due process rights of the defendants and the purported class members.[96]

**23 Another example of this phenomenon is a spate of class actions against automobile manufacturers alleging that the paint on 20-year-old vehicles was discoloring or peeling. Federal and state courts across the country, including the Texas Supreme Court, have consistently rejected attempts to certify classes in these cases, recognizing that each claimant's facts vary such that a jury would have to consider separately the claims of each of the thousands of class members.[97] Most recently, on August 14, 2003, the Texas **23 Court of Appeals rejected a proposed class, finding that a class trial would give a jury "the unmanageable task of separately examining numerous paint systems, assessing their different failure rates and making separate determinations about which combination of processes, if any, is defective."[98] Astoundingly, just one month after the most recent Texas court ruling, a Madison County, Illinois judge certified an even broader, more complex nationwide class asserting identical paint claims against Ford regarding vehicles in service for almost 25 years.[99]

5. Copy cat class actions clog the courts and permit forum shopping

Yet another common abuse is the filing of "copy cat" class actions (i.e., duplicative class actions asserting similar claims on behalf of essentially the same people). Sometimes these duplicative actions are filed by lawyers who hope to wrest the potentially lucrative lead role away from the original lawyers. In other instances, the "copy cat" class actions are blatant forum shopping–the original class lawyers file similar class actions before different courts in an effort to find a receptive judge who will rapidly certify a class. When these similar, overlapping class actions are filed in State courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The "competing" class actions must be litigated separately in an uncoordinated, redundant fashion because there is no state court mechanism for consolidating state court cases. The result is enormous waste–multiple judges of different courts must spend considerable time adjudicating precisely the same claims asserted on behalf of precisely the same people.[100] As a result, state courts and class counsel may "compete" to control the cases, often harming all the parties involved. In contrast, when overlapping cases are pending in different federal courts, they can be consolidated under one single judge to promote judicial efficiency and ensure consistent treatment of the legal issues involved.

**24 E. National Class Actions Belong in Federal Court Under Traditional Notions of Federalism

Many of the abuses taking place in state courts are magnified by the growing trend among plaintiffs' attorneys to bring huge class actions on behalf of hundreds of thousands or even millions of consumers. These cases, which generally involve overly

broad claims, put any class members with real injuries at risk. The incentive for class lawyers to gather the largest class possible is clear: why sue on behalf of just 1,000 people when you can sue for 1 million claimants *24 and increase your intake? The problem with such broad claims, however, is that the entire lawsuit proceeds on a lowest common denominator basis. As a result, persons with legitimate injuries will be lumped in with the "average," often meritless claims and will not be given individual attention for their grievances.[101]

The effect of class action abuses in state courts is being exacerbated by the trend toward "nationwide" class actions, which invite one state court to dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles.[102] A recent study found that 77 percent of class actions brought in 2001 in a rural Illinois county known for its heavy class action docket sought to certify nationwide classes.[103] These cases challenged matters as diverse as MTBE in wells; telephone billing practices; chicken processing procedures; and insurance reimbursement policies. Clearly, a system that allows state court judges to dictate national policy on these and numerous other issues from the local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism. In one case, for example, plaintiffs filed suit in an Alabama county court on behalf of more than 20 million people alleging that the design of federally mandated airbags is faulty.[104] From the standpoint of federalism, this suit defies logic. Why should an Alabama state court tell 20 million people in all 50 states what kind of airbags they can have in their cars?

The most egregious of such cases are those in which one state court issues nationwide rulings that actually contradict the laws of other states. This problem is particularly prevalent in insurance cases, which are being filed in increasingly greater number. As District of Columbia Insurance Commissioner Lawrence Mirel has testified before this Committee, class actions "frequently go[] around or simply ignore[] the role of state regulators."[105]

One case reported in the New York Times, for example, involved a longstanding practice of the State Farm Insurance Companies (shared by other insurers) of using non-original equipment manufacturer (OEM) parts to repair cars.[106] The practice was fully disclosed to policyholders, and the majority of states expressly permit insurers to specify non-OEM parts. Indeed, two states, Hawaii and Massachusetts, actually require the specification of non-OEM parts. Nonetheless, plaintiffs brought suit in Illinois state court claiming that all non-OEM parts used by policyholders were inferior to OEM parts, and that State Farm had breached its contractual obligation to policyholders and committed fraud **25 each time it specified such parts. Even though the plaintiffs eventually dropped their claim that all non-OEM parts were inferior, and conceded that this could only be determined on a part-by-part basis, the trial court still permitted the jury to reach a group judgment on the class action. The court was not even deterred by the fact that the plaintiffs in the class came from states throughout the nation with *25 widely varying laws regarding the use of non-OEM parts, including the two states–Hawaii and Massachusetts–that strongly embraced the very practice condemned by plaintiffs.[107] Indeed, in affirming a $1.3 billion verdict against State Farm in this case, an Illinois state appellate court acknowledged that it had disregarded "state insurance commissioners [w]ho testified that the laws of many of our sister states permit and in some cases * * * [even] encourage" usage of non-OEM parts.[108]

The State Farm case is not unique. This state court interference with the laws of other jurisdictions is becoming disturbingly common. For example:

* An appellate court in Illinois recently affirmed the certification of a class consisting of Illinois residents and residents of 16 other states. The plaintiffs alleged the defendant telecommunications company had collected, on behalf of municipalities, taxes from customers located in unincorporated areas in violation of the Illinois consumer protection law. The court noted that because "50-state class actions are not uncommon in Illinois" it was not problematic that "the laws of 17 states are potentially implicated here."[109] Similarly, a year earlier another Illinois appellate court affirmed the certification of a nationwide class of consumers alleging violations of the same Illinois law with no regard for the laws of the other states involved.[110]

* The Supreme Court of Oklahoma recently affirmed the certification of a nationwide product liability class action, applying the laws of a single state to transactions that occurred in all 50 states.[111] Thus, in this case, a state court has decided effectively to override whatever policy determinations another state's legislature or courts may have made on warranty or product liability policy to protect their own residents.

* Another recent class action filed in Oklahoma involved allegations that the defendants failed to account for slop oil in

monthly accountings rendered to certain oil producers. The lawsuit sounded in tort and contract, involved "millions of dollars," and transactions that occurred in "more than twenty states."[112] The Supreme Court of Oklahoma affirmed the certification of a nationwide class, ignoring the fact that the case would require resolution of the laws of twenty states.

The Minnesota Court of Appeals and the Minnesota Supreme Court recently affirmed a nationwide class action, applying the laws of a single state to transactions that occurred in many different jurisdictions (and virtually none of which occurred in the state whose laws were applied)[113] One judge who decided the case openly acknowledged that the court was engaging in the "false federalism" that has become part of the state court class action game.[114]

**\*26 \*\*26** A few years ago, a state trial court in Minnesota approved for class treatment a case involving millions of claimants from 44 states that would have had the effect of dictating the commercial codes of all those states.[115] The specific issue in the case was whether individuals have a state law right to recover interest on refundable deposits paid to secure an automobile lease. In certifying a class in that case, the court adopted an understanding of Minnesota's version of the Uniform Commercial Code that was contrary to the interpretation of every other state to have considered the issue under their own versions of the UCC. And by certifying the class, the court decided that its unprecedented interpretation of the UCC would bind the remaining 43 states that had yet to decide the question (even though the " Uniform Commercial Code is not uniform" and is interpreted differently in different states[116] ). In essence, the action of the Minnesota court proposed to dictate the interpretation of 43 other states' UCC provisions even though the other states might well have reached a different conclusion in applying their own state's laws.

The sentiment reflected in these cases flies in the face of basic federalism principles by embracing the view that other states should abide by a deciding court's law whenever it decides that its own laws are preferable to other states' contrary policy choices. Indeed, such examples of judicial usurpation, in which one state's courts try to dictate its laws to 49 other jurisdictions, have been duly criticized by some congressional witnesses as "false federalism."[117] Moreover, they have posed serious problems for the courts of other states. For example, the Vermont Supreme Court recently Bified the settlement in the Bank of Boston case, holding that the Alabama court that approved the settlement failed to provide due process to the Vermont class members in that case, who ended up paying $30,000 in attorneys' fees.[118] In contrast, a Connecticut court recently found that a woman who had been part of an Alabama class action settlement on roofing shingles could not have her day in court because she was bound by the settlement she knew nothing about.[119]

Given the range and severity of class action abuse, it is not surprising that defendants find it necessary to remove actions against them to a federal forum–a forum where the threat of prejudice is significantly lower. Under current law, however, plaintiffs' lawyers can easily manipulate their pleadings to ensure that their cases remain at the state level. As noted above, the two most common tactics employed by plaintiffs' attorneys in order to guarantee a state court tribunal are: adding parties to destroy diversity and shaving off parties with claims for more than $75,000. It is not rare to see complaints in which plaintiffs sue several major corporations and then add one local supplier or dealer as a defendant merely to defeat diversity.[120] Other complaints seek $74,999 in damages on behalf **\*27** of each plaintiff or explicitly exclude from the proposed class anybody who has suffered $75,000 or more in damages.[121]

**\*\*27** The Committee believes that the federal courts are the appropriate forum to decide most interstate class actions because these cases usually involve large amounts of money and many plaintiffs, and have significant implications for interstate commerce and national policy. By enabling federal courts to hear more class actions, this bill will help minimize the class action abuses taking place in state courts and ensure that these cases can be litigated in a proper forum.

## V. HOW S. 5 WORKS

S. 5 is a modest attempt to address a number of the problems and abuses in the current class action system. First, S. 5 implements a consumer bill of rights that requires greater scrutiny of both coupon and net loss settlements, regulates attorneys' fee awards in coupon settlements, prohibits extra compensation to class members who are geographically located near the court, and requires notice of proposed class settlements to appropriate state and federal officials.

Second, S. 5 includes a narrowly-tailored expansion of federal diversity jurisdiction to ensure that class actions that are truly interstate in character can be heard in federal court. S. 5 also includes modest amendments to current removal provisions that will make it harder for counsel to "game the system" and keep class actions in state court by naming local defendants who are

not real parties to the controversy or by amending their pleadings after the deadline for removal. These provisions will create efficiencies in the judicial system by enabling overlapping and "copycat" cases to be consolidated in a single federal court, rather than proceeding simultaneously in numerous state courts under the current system.

At the same time, however, S. 5 leaves in state court: (1) class actions in which all the plaintiffs and defendants are residents of the same state; (2) class actions with fewer than 100 plaintiffs; (3) class actions involving less than $5 million; (4) class actions in which a state government entity is the primary defendant; (5) class actions brought against a company in its home state, in which 2/3 or more of the class members are also residents; and (6) class actions involving certain local controversies.

Finally, S. 5 addresses the problem of unfair settlements and excessive attorneys' fees by directing the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations to improve the system.

## CONSUMER BILL OF RIGHTS

S. 5 requires greater scrutiny of coupon settlements; such settlements are prohibited absent written findings by the court that they benefit the class members. In addition, S. 5 regulates attorneys' fees in class settlements in which coupons constitute all or part of the remedy provided to class members. S. 5 also prohibits extra compensation to members of a class simply because they live closer to the court. These provisions are intended to prevent some of the **28** more abusive class action settlement practices that came to the Committee's attention during hearings on class action abuses.

S. 5 would also amend the class action rules by requiring that class counsel serve appropriate state and federal officials with notice of a proposed settlement. This notice must occur no later than 10 days after the proposed settlement is filed in federal court.

The notice to the appropriate officials would include: (1) A copy of the complaint and amended complaints, unless those materials are available through the Internet and the **28** notice includes directions on how to access the materials on-line; (2) notice of any scheduled judicial hearing in the class action; (3) proposed or final notification to class members of the right to be excluded from the class; (4) any proposed or final class action settlement; (5) any settlement made between class counsel and defendants' counsel; (6) any final judgment or notice of dismissal; and (7) the names of the class members who reside in each respective state and the proportionate claims of such members. The designated officials would then have at least 90 days to review the proposed settlement before the court gives final settlement approval.

Nothing in this section creates an affirmative duty for either the state or federal officials to take any action in response to a class action settlement. Moreover, nothing in this section expands the current authority of the state or federal officials.

## DIVERSITY JURISDICTION AND REMOVAL

S. 5 would amend the diversity jurisdiction and removal statutes applicable to larger interstate class actions by modifying 28 U.S.C. 1332 to incorporate the concept of balanced diversity. The bill grants the federal courts original jurisdiction to hear interstate class action cases where (a) any member of the proposed class is a citizen of a different state from any defendant; and (b) the amount in controversy exceeds $5 million (aggregating claims of all purported class members, exclusive of interest and costs).

The bill, however, includes several provisions ensuring that where appropriate, state courts can adjudicate certain class actions that have a truly local focus. The first is the "Home State" exception. Under this provision, if two-thirds or more of the class members are from the defendant's home state, the case would not be subject to federal jurisdiction. Conversely, class actions filed in the home state of the primary defendant would automatically be subject to federal jurisdiction (assuming the other prerequisites are met) if less than one-third of the proposed class members are citizens of that state. For cases brought in a defendant's home state in which between one-third and two-thirds of the class members were citizens of that state, federal jurisdiction would also exist; however, a federal judge would have the discretion, in the interests of justice, to decline to exercise that jurisdiction based on consideration of six factors designed to help assess whether the claims at issue are indeed local in nature.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

In addition, S. 5 contains a "Local Controversy Exception" intended to ensure that state courts can continue to adjudicate truly local controversies in which some of the defendants are out-of-state corporations. In order to fall within the Local Controversy Exception, a class action must meet the following four criteria: (1) The class must be primarily local, meaning that more than two-thirds **29** of class members must be residents of the state in which the action was filed; (2) at least one real defendant (whose alleged conduct is central to the class's claims and from whom the class seeks significant relief) must also be local; (3) the "principal injuries" caused by the defendants" conduct must have occurred in the state where the suit was brought; and (4) no other similar class actions have been filed against any of the defendants (by the same or other proposed classes) in the preceding three years. If all of these four criteria are satisfied, the case will not be subject to federal jurisdiction under the bill.

S. 5 also excludes from its federal jurisdiction grant: (1) Class actions involving fewer than 100 plaintiff class members; (2) class actions in which the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; (3) any securities class actions covered by the Securities Litigation Reform Act; and (4) corporate governance cases.

In order to enable more class actions to be removed to federal court, S. 5 would also **29** create three new rules regarding the removal of class actions filed in state court. First, any defendant would be able to remove a class action to federal court without the consent of any other defendant. Second, any defendant would be able to remove a class action to federal court, even if that defendant is a citizen of the state in which the action was brought. And third, the current ban on removal of a class action to federal court after one year would be eliminated, although the current requirement that removal occur within 30 days of notice of grounds for removal would be retained.

## REPORT ON CLASS ACTION SETTLEMENTS

S. 5 would direct the Judicial Conference of the United States, with the assistance of the Federal Judicial Center and Administrative Office of the United States Courts, to prepare a report on class action settlements to be transmitted to the House and Senate Judiciary Committees. The report will include (1) recommendations on best practices to ensure the fairness of settlements for class members and to ensure the appropriateness of attorneys' fees and expenses, and (2) a discussion of any actions taken or planned by the Judicial Conference to implement the report recommendations.

## VI. SECTION-BY-SECTION ANALYSIS

Section 1.–Section 1 establishes the "Class Action Fairness Act of 2005" as the short title of the bill.

Section 2.–Section 2 sets forth findings and purposes. The Committee is concerned that there have been abuses of the class action device over the last decade that have hurt consumers, adversely affected interstate commerce, and undermined public respect for our judicial system. In particular, the Committee is concerned about class actions that do little to benefit–and sometimes actually harm–the class members who are supposed to be the beneficiaries of such cases, while enriching their lawyers. The Committee is also concerned that this problem is exacerbated by confusing notices that make it difficult for class members to understand and effectively exercise their rights. Taken together, the Committee believes **30** that such abuses hurt consumers by resulting in higher prices and less innovation, and that they undermine the principles of diversity jurisdiction, which were established by the Framers to promote interstate commerce.

The purposes of the Act are therefore to assure fair and prompt recoveries for class members with legitimate claims; to restore the intent of the Framers by expanding federal jurisdiction over interstate class actions; and to benefit society by encouraging innovation and lowering consumer prices.

Section 3.–Section 3 sets forth a "Consumer Class Action Bill of Rights" to help ensure that class actions do not hurt their intended beneficiaries. This section is intended to address a number of common abuses that were discussed by witnesses at class action hearings and have been reported on in the press–and to encourage greater judicial scrutiny of proposed class action settlements.

New section 28 U.S.C. 1711 defines the term "class action" to include representative actions filed in federal district court under Rule 23 of the Federal Rules of Civil Procedure, as well as actions filed under similar rules in state courts that have been removed to federal court. It also defines the following terms: class counsel, class members, plaintiff class action and proposed settlement.

New section 28 U.S.C. 1712 is aimed at situations in which plaintiffs' lawyers negotiate settlements under which class members receive nothing but essentially **30 valueless coupons, while the class counsel receive substantial attorneys' fees. For example, in a recent settlement of a class action against a video rental chain, customers received coupons toward video rentals and purchases, while the plaintiffs' class counsel were paid $9.25 million in fees and expenses. One commentator observed that "the real winners in the settlement are the lawyers who sued the company," who will be paid "in cash, not coupons."[122]

In order to address such inequities, Section 1712(a) states that in class action settlements in which it is proposed that an attorney fee award be based solely on the purported value of the coupons awarded to class members, the fee award should be based on the demonstrated value of coupons actually redeemed by the class members. Thus, if a settlement agreement promises the issuance of $5 million in coupons to the putative class members, but only 1/5 of potential class members actually redeem the coupons at issue, then the lawyer's contingency fee should be based on a recovery of $1 million–not a recovery of $5 million.

In some cases, the proponents of a class settlement involving coupons may decline to propose that attorney's fees be based on the value of the coupon-based relief provided by the settlement. Instead, the settlement proponents may propose that counsel fees be based upon the amount of time class counsel reasonably expended working on the action. Section 1712(b) confirms the appropriateness of determining attorneys' fees on this basis in connection with a settlement based in part on coupon relief. As is stated on its face, nothing in this section should be construed to prohibit using the "lodestar with multiplier" method of calculating attorney's fees. By the same token, nothing in this section expands the authorization **31 for the use of a multiplier; a multiplier may be used only to the extent authorized by existing law.

In some class action settlements, the terms may be a combination of coupon relief, plus some form of equitable relief, including an injunction. In such circumstances, the settlement may also include fees for obtaining the equitable relief. Thus, if a proposed settlement provides for both coupons and equitable relief, then the portion of the award that is a contingent fee based on the value of the coupons must be calculated based on the value of redeemed coupons, and the portion not based on the value of the coupons should be based on the time spent by class counsel on the case.

The Committee wishes to make clear that nothing in Section 1712 is intended to change current law regarding the circumstances under which an award of attorneys' fees is appropriate. In particular, the Committee stresses that this section is not intended to change in any respect current law governing the circumstances under which fee shifting is permitted in cases that are resolved through full litigation (that is, cases that are not settled). Moreover, the Committee wishes to make clear that it does not intend to change current law in any respect regarding the circumstances under which the parties may justifiably agree to fee awards in connection with settlements. Section 1712 is intended solely to regulate the manner in which fees otherwise authorized by existing law should be calculated.

Section 1712( d) allows a court to hear expert testimony from a witness on the actual value of redeemed coupons to assist the court in determining the proper contingent fee. This provision addresses the situation where the actual value of the coupons differs from their face value. For example, a coupon for $250 off a vehicle purchase may not really be worth $250.

**31 Section 1712(e) provides that a federal judge may not approve a coupon settlement without first conducting a hearing and determining that the settlement terms are fair, reasonable, and adequate for class members. In making that determination, the judge should consider, among other things, the real monetary value and likely utilization rate of the coupons provided by the settlement. The section further provides that a federal court may, in its discretion, require that a proposed settlement provide for the distribution of a portion of the value of unclaimed coupons to a charitable organization or governmental entity; however, any such distribution shall not be used as the basis for the award of any attorneys' fees. So, for example, if a proposed settlement provided for the distribution of one million $1 coupons, but only 250,000 were claimed and used, the federal court supervising the settlement could require that 500,000 of the unclaimed coupons be made available to the U.S. Army for distribution to enlisted personnel serving in the military. However, in determining an appropriate fee award for

class counsel, counsel would be able to rely only on the value of the 250,000 coupons actually redeemed by class members. The fee award could not be based on the value of the 250,000 unused coupons or the 500,000 coupons that might be used by military personnel.

The Committee wishes to make clear that it does not intend to forbid all non-cash settlements. Such settlements may be appropriate where they provide real benefits to consumer class members **32** (e.g., where coupons entitle class members to receive something of actual value free of charge) or where the claims being resolved appear to be of marginal merit. However, where such settlements are used, the fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members. In adopting this provision, it is the intent of the Committee to incorporate that line of recent federal court precedents in which proposed settlements have been wholly or partially rejected because the compensation proposed to be paid to the class counsel was disproportionate to the real benefits to be provided to class members.[123]

New section 28 U.S.C. 1713 prohibits federal courts from approving a proposed settlement under which class members would be required to pay class counsel a sum of money that results in a net loss (as occurred in the Bank of Boston case, discussed above), unless the court makes a written finding that nonmonetary benefits to the class members substantially outweigh the monetary loss.

New section 28 U.S.C. 1714 prohibits federal courts from approving proposed settlements that provide for payment of greater sums to certain class members based on where they reside. The Committee wishes to emphasize that this provision is intended solely to prohibit circumstances in which the preferential payments have no legitimate legal basis. For example, it may be perfectly appropriate for a settlement of an environmental class action to differentiate settlement payment amounts based on a claimant's proximity to an alleged chemical spill, if it appears that those persons in closer proximity have suffered greater injury. This provision is not intended to affect such a determination. But where putative class members' claims are legally and factually indistinguishable, it is inappropriate to give one class member extra settlement benefits merely because he or she resides in (or closer to) the county where the court sits.

**32** New section 28 U.S.C. 1715 sets forth requirements for notification to appropriate federal and state officials of proposed class action settlements. New section 1715 is designed to ensure that a responsible state and/or federal official receives information about proposed class action settlements and is in a position to react if the settlement appears unfair to some or all class members or inconsistent with applicable regulatory policies. Section 1715 requires each defendant, within 10 days after a proposed class action settlement is filed in federal court, to provide notice of the proposed settlement to: (1) the U.S. Attorney General (or for banks and thrifts, the entity with primary regulatory or supervisory responsibility over the defendant); and (2) the state official that has primary regulatory or supervisory responsibility over the defendant or who licenses or otherwise authorizes the defendant to conduct business in the state (or for state depository institutions, the state bank supervisor in the state in which the defendant is incorporated or chartered). If there is no state official that meets the requirements **33** set forth in the Act, notice must be provided to the state attorney general. The notice must include: (1) a copy of the complaint and attached materials; (2) the date and time of any scheduled judicial hearing; (3) proposed or final notification to the class members; (4) the proposed settlement; (5) any other agreement between class counsel and the defendant; (6) any final judgment or notice of dismissal; (7) the names of class members who reside in each state and their proportional share of the settlement, or if that is not feasible, a reasonable estimate of the number of class members in the state and their share of the settlement; and (8) any written judicial opinion related to the proposed settlement. A federal court cannot issue a final order approving a settlement until 90 days after the appropriate federal and state officials are served. If the defendants do not comply with this provision, a class member can refuse to comply with–or be bound by–the settlement agreement.

The Act also clarifies that it should not be construed to impose any obligations, duties or responsibilities on the federal and state officials who receive notice of a class action settlement pursuant to this provision. Thus, federal and state officials will be notified about proposed settlements and have an opportunity to get involved if they think it is appropriate but will not be required to do so.

Abusive class action settlements in which plaintiffs receive promotional coupons or other nominal damages while class counsel receive large fees are all too commonplace. The risk of such abusive practices is particularly pronounced in the class action context because these suits often involve numerous plaintiffs, each of whom has only a small financial stake in the

litigation. As a result, few (if any) plaintiffs closely monitor the progress of the case or settlement negotiations, and these cases become "clientless litigation," in which the plaintiff attorneys and the defendants have "powerful financial incentives" to settle the "litigation as early and as cheaply as possible, with the least publicity."[124] These financial incentives create inequitable outcomes. "For class counsel, the rewards are fees disproportionate to the effort they actually invested in the case.* * * For society, however, there are substantial costs: lost opportunities for deterrence (if class counsel settled too quickly and too cheaply), wasted resources (if defendants settled simply to get rid of the lawsuit at an attractive price, rather than because the case was meritorious), and–over the long run–increasing amounts of frivolous litigation as the attraction of such lawsuits becomes apparent to an ever-increasing number of plaintiff lawyers."[125]

**33** New 28 U.S.C. 1715 requires defendants to provide notice of proposed settlements to the appropriate federal official and to the appropriate state official of each state in which a class member resides. Under new section 1715(a), the appropriate federal official is the Attorney General of the United States, or in the case of depository institutions and other banks, the person who has primary federal regulatory supervisory responsibility over the defendant if some or all of the matters at issue in the litigation are subject to regulation or supervision by that person. Thus, for example, if a national bank were sued over its lending practices, notice would **34** have to be provided to the Comptroller of the Currency. If it were sued in a nationwide lawsuit regarding the food in its cafeterias, notice would be provided to the Attorney General.

Under new section 28 U.S.C. 1715(a), the appropriate state official is defined as the person in the state who has primary regulatory or supervisory responsibility with respect to the defendant or licenses the defendant, if some or all of the matters alleged in the class action are subject to regulation by that person. If no such regulatory or licensing authority exists, or the matters are not subject to regulation by that person, then notice should be given to the state attorney general. Thus, for example, in a case against an insurance company involving insurance practices, such as how premiums are calculated, notice would be required to the state insurance commissioner in each state where the company is licensed and where class members reside. If some class members reside in states where the company does not do business and therefore is not subject to regulation, then notice would be given to those states' attorneys general. Similarly, if the company at issue were a toy manufacturer, which is not licensed by a particular regulatory body, then notice would have to be given to the state attorney general of each state where plaintiffs reside.

New section 1715(c) clarifies that in the case of federal depository institutions and other non-state depository institutions, the notice requirements are satisfied by notifying the person who has primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person. No notice is required to state officials in these circumstances. Thus, for example, if a national bank were sued over its depository or lending practices, notice would have to be given to the Comptroller of the Currency, who has regulatory authority over the institution. However, no notice would be required to state officials.

With regard to state depository institutions, the notice requirements are satisfied by notifying the state banking supervisor in the state where the defendant is incorporated, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate federal official. Thus, no notice is required to state officials in other states even if some class members reside in those states.

This provision is intended to combat the "clientless litigation" problem by adding a layer of independent oversight to prohibit inequitable settlements. Under Section 1715(b), class counsel must provide the notice within 10 days after the proposed settlement is filed in court. Such notice must include, according to 28 U.S.C. 1715(b)(1)(8): a copy of the complaint; any scheduled judicial hearings; any final judgment or notice of settlement; any proposed or final notice to the class; and the names of class members who reside in each state, if feasible. The notice would also include any written judicial decision related to settlement, a final judgment, or notice of dismissal. If disagreement arises over the feasibility of providing the names of class members and their proportional share of the proposed settlement under 28 U.S.C. 1715(b), it is the intent of the Committee that class counsel bear the burden of proving that it is not feasible to provide any of this required information.

**35 **34** Once the appropriate state and federal officials have received notice under 28 U.S.C. 1715(b), they would then have at least 90 days to review the proposed settlement and decide what (if any) action to take to protect the interests of the plaintiff class. The state and federal officials are not required to take any affirmative action once they receive the proposed settlement according to new section 28 U.S.C. 1715(f); nor does this section expand their current authority in any respect.

Section 28 U.S.C. 1715(e)(1) instructs that in cases where the appropriate state and federal officials are not provided notice of the potential settlement, plaintiffs can choose not be bound by that settlement. The Committee wishes to make clear that this provision is intended to address situations in which defendants have simply defaulted on their notification obligations under this provision; it is not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance (e.g., notification of the wrong person, failure of the official to receive notice that was sent), particularly where good faith efforts to comply occurred. In particular, the Committee wishes to note that where the appropriate officials received notification of a proposed settlement from at least one defendant, section 1715(e) should not be operative. New subsection 1715(e)(2) specifically states that a class member may not refuse to comply with a settlement if the notice was directed to the appropriate federal official and to the state attorney general or the primary licensing authority. This provision reflects the overall intent of section 1715 that a settlement should not be undermined because of a defendant's innocent error about which federal or state official should have received the required notice in a particular case.

The Committee believes that notifying appropriate state and federal officials of proposed class action settlements will provide a check against inequitable settlements in these cases. Notice will also deter collusion between class counsel and defendants to craft settlements that do not benefit the injured parties.

Section 4.–Section 4 amends 28 U.S.C. S 1332 to re-designate current subsection 1332(d) as subsection (e) and create a new subsection 1332(d).

The definitional provisions of Section 4–as reflected in the new section 1332(d)(1)–are self-explanatory. However, the Committee notes that as with the other elements of section 1332(d), the overall intent of these provisions is to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications. In that regard, the Committee further notes that the definition of "class action" is to be interpreted liberally. Its application should not be confined solely to lawsuits that are labeled "class actions" by the named plaintiff or the state rulemaking authority. Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions.

The new subsection 1332(d)(2) gives the federal courts original jurisdiction over class action lawsuits in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and either (a) any member of a class of plaintiffs is a citizen of a different state from any defendant; (b) any member of a class of plaintiffs is **36** a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a state; or (c) any member of a class of plaintiffs is a citizen of a state and any defendant is a foreign state or a citizen or subject of a foreign state.

The Committee notes that for purposes of the citizenship element of this analysis, S. 5 does not alter current law regarding how the citizenship of a person is determined, including the provisions of 28 U.S.C. S 1332(c) specifying that "a corporation shall be **35** deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

While the core concept of the bill is that class actions filed against defendants outside their home state are subject to federal jurisdiction if citizens from different states are on opposing sides and more than $5 million is at issue, new subsections 1332(d)(3) and (d)(4)(B) address the jurisdictional principles that will apply to class actions filed against a defendant in its home state, dividing such cases into three categories.

First, for cases in which two-thirds or more of the members of the plaintiff class and the primary defendants are citizens of the state in which the suit was filed, subsection 1332(d)(4)(B) states that federal jurisdiction will not be extended by S. 5. Such cases will remain in state courts under the terms of S. 5, since virtually all of the parties in such cases (both plaintiffs and defendants) would be local, and local interests therefore presumably would predominate.

Second, cases in which more than two-thirds of the members of the plaintiff class or one or more of the primary defendants are not citizens of the state in which the action was filed will be subject to federal jurisdiction, pursuant to the provisions of subsection 1332(d)(2). Federal courts should be able to hear such lawsuits because they have a predominantly interstate component–they affect people in many jurisdictions, and the laws of many states may be at issue.

Finally, there is a middle category of class actions in which more than one-third but fewer than two-thirds of the members of the plaintiff class and the primary defendants are all citizens of the state in which the action was filed. In such cases, the

numbers alone may not always confirm that the litigation is more fairly characterized as predominantly interstate in character. New subsection 1332(d)(3) therefore gives federal courts discretion, in the "interests of justice," to decline to exercise jurisdiction over such cases based on the consideration of six factors:

* Whether the claims asserted are of "significant national or interstate interest".–If a case presents issues of national or interstate significance, that argues in favor of the matter being handled in federal court. For example, if a nationally distributed pharmaceutical product is alleged to have caused injurious side-effects and class actions on the subject are filed, those cases presumably should be heard in federal court because of the nationwide ramifications of the dispute and the probable interface with federal drug laws (even if claims are not directly filed under such laws). Under this factor, the federal court should inquire whether the case does present issues of national or interstate significance of this sort. If such issues are identified, that point favors the exercise of federal jurisdiction. If such issues are not identified and the matter appears *37 to be more of a local (or intrastate) controversy, that point would tip in favor of allowing a state court to handle the matter.

* Whether the claims asserted will be governed by laws other than those of the forum state.–As noted previously, the Committee believes that one of the significant problems posed by multi-state state court class actions is the tendency of some state courts to be less than respectful of the laws of other jurisdictions, applying the law of one state to an entire nationwide controversy and thereby ignoring the distinct, varying state laws that should apply to various claims included in the class depending on where they arose. Under this factor, if the federal court determines that multiple state laws will apply to aspects of the class action, that determination would favor having the matter heard in the federal court system, which has a record of being more respectful of the laws of the various states in the class action context. Conversely, if the court concludes that the laws of the state in which the action was filed will apply to the entire controversy, that factor will favor allowing the state court to handle the matter.

**36 * Whether the class action has been pleaded in a manner that seeks to avoid federal jurisdiction.–The purpose of this inquiry is to determine whether the plaintiffs have proposed a "natural" class–a class that encompasses all of the people and claims that one would expect to include in a class action, as opposed to proposing a class that appears to be gerrymandered solely to avoid federal jurisdiction by leaving out certain potential class members or claims. If the federal court concludes evasive pleading is involved, that factor would favor the exercise of federal jurisdiction. On the other hand, if the class definition and claims appear to follow a "natural" pattern, that consideration would favor allowing the matter to be handled by a state court.

* Whether there is a "distinct" nexus between: (a) the forum where the action was brought, and (b) the class members, the alleged harm, or the defendants.–This factor is intended to take account of a major concern that led to this legislation–the filing of lawsuits in out-of-the-way "magnet" state courts that have no real relationship to the controversy at hand. Thus, for example, if the majority of proposed class members and the defendant reside in the county where the suit is brought, the court might find distinct nexus exists. The key to this factor is the notion of there being a distinct nexus. If the selected forum's nexus to the controversy is shared by many other forums (e.g., some allegedly injured parties live in the locality, just as allegedly injured parties live in many other localities), the nexus is not distinct, and this factor would in that circumstance weigh heavily in favor of the exercise of federal jurisdiction over the matter.

* Whether the number of citizens of the forum state in the proposed plaintiff class(es) is substantially larger than the number of citizens from any other state, and the citizenship of the other members of the proposed class(es) is dispersed among a substantial number of states.–This factor is intended to look at the geographic distribution of class members in an effort to gauge the forum state's interest in handling the litigation. To be subject to this inquiry, between one-third and two-thirds of the class members are citizens of the state in which the class action was filed and all of the primary defendants are also citizens of that state. If all of the *38 other class members (that is, the class members who do not reside in the state where the action was filed) are widely dispersed among many other states (e.g., no other state accounted for more than five percent of the class members), that point would suggest that the interests of the forum state in litigating the controversy are preeminent (versus the interests of any other state). The Committee intends that such a conclusion would favor allowing the state court in which the action was originally filed to handle the litigation. However, if a court finds that the citizenship of the other class members is not widely dispersed, the opposite balance would be indicated. A federal forum would be favored in such a case because several states other than the forum state would have a strong interest in the controversy.

* Whether one or more class actions asserting the same or similar claims on behalf of the same or other persons have been

filed in the last three years.–The purpose of this factor is efficiency and fairness: to determine whether a matter should be subject to federal jurisdiction so that it can be coordinated with other overlapping or parallel class actions. If other class actions on the same subject have been (or are likely to be) filed elsewhere, the Committee intends that this consideration would strongly favor the exercise of federal jurisdiction so that the claims of all proposed classes could be handled efficiently on a coordinated basis pursuant to the federal courts' multidistrict litigation process as established by 28 U.S.C. S 1407. Under that process, it is likely that all class actions filed on an issue will be handled by a single tribunal that will, in any event, be facing the challenge of interpreting the varying state laws and assessing how they should be applied to the purported class claims. Thus, allowing a case to remain in federal court **37 so that it may become part of that coordinated multi district litigation proceeding makes good sense. On the other hand, if other courts are unlikely to have to undertake the burden of handling the class claims and the state court appears positioned to handle the case in a manner that is respectful of state law variations, that consideration would favor remand of the matter to state court.

It is the Committee's intention that this factor be interpreted liberally and that plaintiffs not be able to plead around it with creative legal theories. If a plaintiff brings a product liability suit alleging consumer fraud or unjust enrichment, and another suit was previously brought against some of the same defendants alleging negligence with regard to the same product, this factor would favor the exercise of federal jurisdiction over the later-filed claim.

The following examples are intended to be illustrative of how these factors would work.

* If a California state court class action were filed against a California pharmaceutical drug company on behalf of a proposed class of 60% California residents and 40% Nevada residents alleging harmful side effects attributable to a drug sold nationwide, it would make sense to leave the matter in federal court. The state laws that would apply in all of these cases would vary depending on where the drug was prescribed and purchased, such that allowing a single court to sort out such issues and handle the balance of the litigation would make sense both from an efficiency and federalism standpoint. These concerns would be even greater and the *39 arguments for asserting jurisdiction stronger if another class action alleging similar side-effects has been filed in the last three years.

* On the other hand, if a checking account fee disclosure class action were filed in a Nevada state court against a Nevada bank located in a border city and the class consisted of 65% Nevada residents and 35% California residents (who crossed the border to conduct transactions in the Nevada bank), it might make sense to allow that matter to proceed in state court. It is likely that Nevada banking law would apply to all claims (even those of the California residents), since all of the transactions occurred in Nevada. And there is less likelihood that multiple actions will be filed around the country on the same subject, so as to give rise to a coordinating federal multidistrict litigation proceeding. Thus, the federalism concerns would be substantially diminished.

In sum, the Committee intends that these factors would permit a federal court, in its discretion, to allow a class action asserting primarily local claims under local law for what is primarily a local group of claimants to proceed in state court, particularly where the action has not been pleaded manipulatively to avoid federal jurisdiction and the case is not likely to become an "orphan" that cannot be coordinated with similar class actions that are or, in the future, may be pending in federal court.

New subsection 1332(d)(4)(A) is the "Local Controversy Exception" to the foregoing provisions that otherwise expand federal diversity jurisdiction over class actions. This subsection requires that federal diversity jurisdiction over a class action under the foregoing provisions be declined if the proponents of that view clearly demonstrate that each and every of the following criteria are satisfied in the case at issue: (1) more than $2/3$ of class members are citizens of forum state; (2) there is at least one in-state defendant from whom significant relief is sought by members of the class and whose conduct forms a significant basis of plaintiffs' claims; (3) the principal injuries resulting from the alleged conduct, or related conduct, of each defendant were incurred in the state where the action was originally filed; and (4) no other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons has been filed during the preceding three years.

**38 This provision is intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole. Thus, the

Committee wishes to stress that in assessing whether each of these criteria is satisfied by a particular case, a federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy–a controversy that uniquely affects a particular locality to the exclusion of all others.

* The first criterion–that greater than two-thirds of all class members in the aggregate are citizens of the State in which the action was originally filed–is a critical inquiry for determining whether the matter is a local controversy. The proponents of applying the exception thus must demonstrate that a supermajority of **40 the class members are local in the sense that they all reside in the forum state.

* Under the second criterion, there must be at least one real local defendant. By that, the Committee intends that the local defendant must be a primary focus of the plaintiffs' claims–not just a peripheral defendant. The defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class. For example, in a consumer fraud case alleging that an insurance company incorporated and based in another state misrepresented its policies, a local agent of the company named as a defendant presumably would not fit this criteria. He or she probably would have had contact with only some of the purported class members and thus would not be a person from whom significant relief would be sought by the plaintiff class viewed as a whole. Obviously, from a relief standpoint, the real demand of the full class in terms of seeking significant relief would be on the insurance company itself. Similarly, the agent presumably would not be a person whose alleged conduct forms a significant basis for the claims asserted. At most, that agent would have been an isolated role player in the alleged scheme implemented by the insurance company.[126] In this instance, the real target in this action (both in terms of relief and alleged conduct) is the insurance company, and if that company is not local, this criterion would not be met.

* The third criterion is that the principal injuries resulting from the actions of all the defendants must have occurred in the state where the suit was filed. By this criterion, the Committee means that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought. The purpose of this criterion is to ensure that this exception is used only where the impact of the misconduct alleged by the purported class is localized. For example, a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion, provided that the property damage was limited to residents in the vicinity of the plant. However, if the defendants engaged in conduct that could be alleged to have injured consumers throughout the country or broadly throughout several states, the case would not qualify for this exception, even if it were brought only as a single-state class action.

**39 * The fourth and final criterion is that no other class action involving similar allegations has been filed against any of the defendants over the last three years on behalf of the same or other persons. In other words, if a controversy results in the filing of multiple class actions, it is a strong signal that those cases may not be of the variety that this exception is intended to address. As such, it is a test for assessing whether a controversy is localized. The Committee wishes to stress that another purpose of this criterion **41 is to ensure that overlapping or competing class actions or class actions making similar factual allegations against the same defendant that would benefit from coordination are not excluded from federal court by the Local Controversy Exception and thus placed beyond the coordinating authority of the Judicial Panel on Multidistrict Litigation. The Committee also wishes to stress that the inquiry under this criterion should not be whether identical (or nearly identical) class actions have been filed. The inquiry is whether similar factual allegations have been made against the defendant in multiple class actions, regardless of whether the same causes of actions were asserted or whether the purported plaintiff classes were the same (or even overlapped in significant respects).

The following two examples are intended to illustrate how the Committee intends this provision to work:

* A class action is brought in Florida state court against a Florida funeral home regarding alleged wrongdoing in burial practices. Nearly all the plaintiffs live in Florida (about 90 percent). The suit is brought against the cemetery, a Florida corporation, and an out-of-state parent company that was involved in supervising the cemetery. No other class action suits have been filed against the cemetery. This is precisely the type of case for which the Local Controversy Exception was developed. Although there is one out-of-state defendant (the parent company), the controversy is at its core a local one, and the Florida state court where it was brought has a strong interest in resolving the dispute. Thus, this case would remain in state court.

\* A class action is brought in Florida against an out-of-state automobile manufacturer and a few in-state dealers, alleging that a certain vehicle model is unsafe because of an allegedly defective transmission. The vehicle model was sold in all fifty states but the class action is only brought on behalf of Floridians. This case would not fall within the Local Controversy Exception for two reasons. First, the automobile dealers are not defendants whose alleged conduct forms a significant basis of the claims or from whom significant relief is sought by the class. Even if the plaintiffs are truly seeking relief from the dealers, that relief is just small change compared to what they are seeking from the manufacturer. Moreover, the main allegation is that the vehicles were defective. In product liability cases, the conduct of a retailer such as an automobile dealer does not form a significant basis for the claims of the class members. Second, the case falls outside the Local Controversy Exception because the "principal injuries resulting from the alleged conduct,"–i.e., selling a vehicle with a defective transmission–were incurred in all fifty states. The fact that the suit was brought as a single-state class action does not mean that the principal injuries were local. In other words, this provision looks at where the principal injuries were suffered by everyone who was affected by the alleged conduct–not just where the proposed class members were injured. Thus, any defendant could remove this case to federal court.

New subsection 1332(d)(5)(A) and (B) specify, respectively, that S. 5 does not extend federal diversity jurisdiction to class actions in which (a) the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief ("state action" cases) or (b) the **40 number **42 of members of all proposed plaintiff classes in the aggregate is fewer than 100 class members ("limited scope" cases). The purpose of the "state action" cases provision is to prevent states, state officials, or other governmental entities from dodging legitimate claims by removing class actions to federal court and then arguing that the federal courts are constitutionally prohibited from granting the requested relief. This provision will ensure that cases in which such entities are the primary targets will be heard in state courts that do not face the same constitutional impediments to granting relief. The "limited scope" cases provision is intended to allow class actions with relatively few claimants to remain in state courts.[127]

Federal courts should proceed cautiously before declining federal jurisdiction under the subsection 1332(d)(5)(A) "state action" case exception, and do so only when it is clear that the primary defendants are indeed states, state officials, or other governmental entities against whom the "court may be foreclosed from ordering relief." In making such a finding, courts should apply the guidance regarding the term "primary defendants" discussed below. The Committee wishes to stress that this provision should not become a subterfuge for avoiding federal jurisdiction. In particular, plaintiffs should not be permitted to name state entities as defendants as a mechanism to avoid federal jurisdiction over class actions that largely target non-governmental defendants. Similarly, the subsection 1332(d)(5)(B) exception for "limited scope" cases (actions in which there are fewer than 100 class members) should also be interpreted narrowly. For example, in cases in which it is unclear whether "the number of members of all proposed plaintiff classes in the aggregate is less than 100," a federal court should err in favor of exercising jurisdiction over the matter.

Pursuant to new subsection 1332(d)(6), the claims of the individual class members in any class action shall be aggregated to determine whether the amount in controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs). The Committee intends this subsection to be interpreted expansively. If a purported class action is removed pursuant to these jurisdictional provisions, the named plaintiff(s) should bear the burden of demonstrating that the removal was improvident (i.e., that the applicable jurisdictional requirements are not satisfied). And if a federal court is uncertain about whether "all matters in controversy" in a purported class action "do not in the aggregate exceed the sum or value of $5,000,000," the court should err in favor of exercising jurisdiction over the case.

By the same token, the Committee intends that a matter be subject to federal jurisdiction under this provision if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief). The Committee is aware that some courts, especially in the class action context, have declined to exercise federal jurisdiction over cases on the ground that the amount in controversy in those cases exceeded the jurisdictional threshold only when assessed **43 from the viewpoint of the defendant. For example, a class action seeking an injunction that would require a defendant to restructure its business in some fundamental way might "cost" a defendant well in excess of $75,000 under current law, but might **41 have substantially less "value" to a class of plaintiffs. Some courts have held that jurisdiction does not exist in this scenario under present law, because they have reasoned that assessing the amount in controversy from the defendant's perspective was tantamount to aggregating damages. Because S. 5 explicitly allows aggregation for purposes of determining the amount in

controversy in class actions, that concern is no longer relevant.

The Committee also notes that in assessing the jurisdictional amount in declaratory relief cases, the federal court should include in its assessment the value of all relief and benefits that would logically flow from the granting of the declaratory relief sought by the claimants. For example, a declaration that a defendant's conduct is unlawful or fraudulent will carry certain consequences, such as the need to cease and desist from that conduct, that will often "cost" the defendant in excess of $5,000,000. Or a declaration that a standardized product sold throughout the nation is "defective" might well put a case over the $5,000,000 threshold, even if the class complaint did not affirmatively seek a determination that each class member was injured by the product.

Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.

As noted above, it is the intent of the Committee that the named plaintiff(s) should bear the burden of demonstrating that a case should be remanded to state court (e.g., the burden of demonstrating that more than two-thirds of the proposed class members are citizens of the forum state). Allocating the burden in this manner is important to ensure that the named plaintiffs will not be able to evade federal jurisdiction with vague class definitions or other efforts to obscure the citizenship of class members. The law is clear that, once a federal court properly has jurisdiction over a case removed to federal court, subsequent events generally cannot "oust" the federal court of jurisdiction.[128] While plaintiffs undoubtedly possess some power to seek to avoid federal jurisdiction by defining a proposed class in particular ways, they lose that power once a defendant has properly removed a class action to federal court.

For purposes of class actions that are subject to subsections 1332(d)(3) and (d)(5)(A), the Committee intends that "primary defendents" be interpreted to reach those defendants who are the real "targets" of the lawsuit–i.e., the defendants that would be expected to incur most of the loss if liability is found. Thus, the term "primary defendants" should include any person who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a few individual class members).

**44** It is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption. Thus, if a plaintiff seeks to have a class action remanded under section 1332(d)(4)(A) on the ground that the primary defendants and two-thirds or more of the class members are citizens of the home state, that plaintiff shall have the burden of demonstrating that these criteria are met by the lawsuit. Similarly, if a plaintiff seeks to have a purported class action remanded for lack of federal diversity jurisdiction under subsection 1332(d)(5)(B) ("limited scope" class actions), that plaintiff should have the burden of demonstrating that "all matters in controversy" do not "in the aggregate exceed **42** the sum or value of $5,000,000, exclusive of interest and costs" or that "the number of all proposed plaintiff classes in the aggregate is less than 100."

The Committee understands that in assessing the various criteria established in all these new jurisdictional provisions, a federal court may have to engage in some fact-finding, not unlike what is necessitated by the existing jurisdictional statutes. The Committee further understands that in some instances, limited discovery may be necessary to make these determinations. However, the Committee cautions that these jurisdictional determinations should be made largely on the basis of readily available information. Allowing substantial, burdensome discovery on jurisdictional issues would be contrary to the intent of these provisions to encourage the exercise of federal jurisdiction over class actions. For example, in assessing the citizenship of the various members of a proposed class, it would in most cases be improper for the named plaintiffs to request that the defendant produce a list of all class members (or detailed information that would allow the construction of such a list), in many instances a massive, burdensome undertaking that will not be necessary unless a proposed class is certified. Less burdensome means (e.g., factual stipulations) should be used in creating a record upon which the jurisdictional determinations can be made.

New subsection 1332(d)(7) clarifies that the citizenship of members of proposed classes would be determined as of the date the action was filed. Thus, questions about whether two-thirds of the members of a proposed class were citizens of a particular state would be determined as of that date. The only exception is where the original complaint does not indicate the existence of federal jurisdiction and plaintiffs later serve paper (particularly an amended complaint) that creates such

citizenship or makes it evident. Then, consistent with the approach in existing section 1446(b), the "snapshot" of class membership citizenship is taken as of the date on which that new paper is served.

New subsection 1332(d)(8) clarifies that the diversity jurisdiction provisions of this section shall apply to any class action before or after the entry of a class certification order by the court. The purpose of this provision is to confirm that both pre- and post-certification class actions shall be subject to the jurisdictional and removal provisions of S. 5. The Committee wishes to make clear that this provision is not intended to alter the deadlines for removal in the current Judicial Code or as are established by this legislation. This section is merely intended to indicate that the status of a **45** class action (certified or uncertified) should not affect the removability of a case as otherwise permitted by the applicable removal statutes.

Pursuant to new subsection 1332(d)(9), the Act excepts from new subsection 1332(d)(2)'s grant of original jurisdiction those class actions that solely involve claims that relate to matters of corporate governance arising out of state law. The purpose of this provision is to avoid disturbing in any way the federal vs. state court jurisdictional lines already drawn in the securities litigation class action context by the enactment of the Securities Litigation Uniform Standards Act of 1998 (P.L. 105–353).

The Committee intends that this exemption be narrowly construed. By corporate governance litigation, the Committee means only litigation based solely on (a) state statutory law regulating the organization and governance of business enterprises such as corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and business trusts; (b) state common law regarding the duties owed between and among owners and managers of business enterprises; and (c) the rights arising out of the terms of the securities issued by business enterprises.

This exemption would apply to a class action relating to a corporate governance claim filed in the court of any state. Consequently, it would apply to a corporate governance class action regardless of the forum in which it may be filed, and regardless of whether the law to be applied is that of the State in which the claim is filed.

**43** For purposes of this exemption, the phrase "the internal affairs or governance of a corporation or other form of business enterprise" is intended to refer to the internal affairs doctrine defined by the U.S. Supreme Court as "matters peculiar to the relationships among or between the corporation and its current officers, directors and shareholders. * * *"[129] The phrase "other form of business enterprise" is intended to include forms of business entities other than corporations, including, but not limited to, limited liability companies, limited liability partnerships, business trusts, partnerships and limited partnerships.

The subsection 1332(d)(9) exemption to new section 1332( d) jurisdiction is also intended to cover disputes over the meaning of the terms of a security, which is generally spelled out in some formative document of the business enterprise, such as a certificate of incorporation or a certificate of designations. The reference to the Securities Act of 1933 contained in new subsection 1332(d)(8)(A) is for definitional purposes only. Since that law contains an already well-defined concept of a "security," this provision simply imports the definition contained in the Securities Act.

New subsection 1332(d)(10) provides that for purposes of this new section and section 1453 of title 28, an unincorporated association shall be deemed to be a citizen of a state where it has its principal place of business and the state under whose laws it is organized. This provision is added to ensure that unincorporated associations **46** receive the same treatment as corporations for purposes of diversity jurisdiction. The U.S. Supreme Court has held that "[f]or purposes of diversity jurisdiction, the citizenship of an unincorporated association is the citizenship of the individual members of the association."[130] This rule "has been frequently criticized because often * * * an unincorporated association is, as a practical matter, indistinguishable from a corporation in the same business."[131] Some insurance companies, for example, are "inter-insurance exchanges" or "reciprocal insurance associations." For that reason, federal courts have treated them as unincorporated associations for diversity jurisdiction purposes. Since such companies are nationwide companies, they are deemed to be citizens of any state in which they have insured customers.[132] Consequently, these companies can never be completely or even minimally diverse in any case. It makes no sense to treat an unincorporated insurance company differently from, say, an incorporated manufacturer for purposes of diversity jurisdiction. New subsection 1332(d)(10) corrects this anomaly.

New subsection 1332(d)(11) expands federal jurisdiction over mass actions–suits that are brought on behalf of numerous named plaintiffs who claim that their suits present common questions of law or fact that should be tried together even though they do not seek class certification status. Mass action cases function very much like class actions and are subject to many of

the same abuses.

**44 Under subsection 1332(d)(11), any civil action in which 100 or more named parties seek to try their claims for monetary relief together will be treated as a class action for jurisdictional purposes. Thus, if such a civil action met the other diversity jurisdictional prerequisites set forth for class actions in this legislation, that civil action would be subject to federal jurisdiction, subject to several exceptions. A mass action meeting the other applicable federal diversity jurisdiction criteria would not be eligible for federal jurisdiction if any of the following criteria are satisfied by the action:

* All the claims asserted in the action arise out of an event or occurrence in the state where the suit is filed and the injuries were incurred in that state and contiguous states (e.g., a toxic spill case);

* The defendants (not the plaintiffs) sought to join the claims;

* The claims are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a state statute specifically authorizing such an action; or

* The claims have been consolidated or coordinated solely for pretrial purposes.

Subsection 1332(d)(11)(B)(i) includes a statement indicating that jurisdiction exists only over those plaintiffs whose claims in a mass **47 action satisfy the jurisdictional amount requirements under section 1332(a). The Committee notes that the intent of this proviso is as follows. If a mass action satisfies the criteria set forth in the section (that is, it involves the monetary relief claims of 100 or more persons that are proposed to be tried jointly on the ground that the claims involve common questions of law or fact and it meets the tests for federal diversity jurisdiction otherwise established by the legislation), it may be removed to a federal court, which is authorized to exercise jurisdiction over the action. Under the proviso, however, it is the Committee's intent that any claims that are included in the mass action that standing alone do not satisfy the jurisdictional amount requirements of Section 1332(a) (currently $75,000), would be remanded to state court. Subsequent remands of individual claims not meeting the section 1332 jurisdictional amount requirement may take the action below the 100-plaintiff jurisdictional threshold or the $5 million aggregated jurisdictional amount requirement. However, so long as the mass action met the various jurisdictional requirements at the time of removal, it is the Committee's view that those subsequent remands should not extinguish federal diversity jurisdictional over the action.

Under subsections 1332(d)(11)(C) and (D), respectively, a mass action removed to a federal court under this provision may not be transferred to another federal court under the MDL statute (28 U.S.C. S 1407) unless a majority of the plaintiffs request such a transfer, and the statute of limitations for any claims that are part of a mass action will be tolled while the mass action is pending in federal court.

The Committee find that mass actions are simply class actions in disguise. They involve a lot of people who want their claims adjudicated together and they often result in the same abuses as class actions. In fact, sometimes the abuses are even worse because the lawyers seek to join claims that have little to do with each other and confuse a jury into awarding millions of dollars to individuals who have suffered no real injury.

For these reasons, it is the Committee's intent that the exceptions to this provision be interpreted strictly by federal courts. The first exception would apply only to a truly local single event with no substantial interstate effects. The purpose of this exception was to allow cases involving environmental torts such as a chemical spill to remain in state court if both the event and the injuries were truly local, even though there are some out-of-state defendants. By contrast, this exception would not apply to a product liability or insurance case. The sale of a product to different people does not qualify as an event. And the alleged injuries in such a case would be spread out over more than one state (or **45 contiguous states)–even if all the plaintiffs in the particular case come from one state.

The third exception addresses a very narrow situation, specifically a law like the California Unfair Competition Law, which allows individuals to bring a suit on behalf of the general public. Such a suit would not qualify as a mass action. However, the vast majority of cases brought under other states' consumer fraud laws, which do not have a parallel provision, could qualify as removable mass actions.

**\*48** The final exception would apply to claims that are consolidated or coordinated solely for pretrial proceedings. If a number of individually filed cases are consolidated solely for pretrial proceedings–and not for trial–those cases have not truly been merged in a way that makes them mass actions warranting removal to federal court. On the other hand, if those same cases are consolidated exclusively for trial, or for pretrial and trial purposes, and the result is that 100 or more persons' claims will be tried jointly, those cases have been sufficiently merged to warrant removal of such a mass action to federal court.

In addition, this provision is in no way intended to abrogate 28 U.S.C. 1367 or to narrow current jurisdictional rules in any way. Thus, if a federal court believed it to be appropriate, the court could apply supplemental jurisdiction in the mass action context as well.

The following example is intended to illustrate how this provision would work.

\* Two hundred people jointly file a mass action in West Virginia against a Pennsylvania drug manufacturer and also name a local drugstore. Three of them assert claims for $1 million each, and the rest assert claims of $20,000. The federal court would have jurisdiction over the mass action because there are more than 100 plaintiffs, there is minimal diversity, the total amount in controversy exceeds $5 million and a product liability case does not qualify for the "local" occurrence exception in the provision. The Committee then intends for the judge to consider closely which claims meet the $75,000 minimum, noting that plaintiffs often seek to minimize what they are seeking in a complaint so they can stay in state court. For example, sometimes plaintiffs leave their claim for punitive damages off the original complaint to make it seem like their claims are smaller than they really are. It is the Committee's expectation that a federal judge would read a complaint very carefully, and only remand claims that clearly do not meet the amount-in-controversy threshold. If it is likely that a plaintiff is going to turn around in a month and add a claim for punitive damages, the federal court should obviously assert jurisdiction over that individual's claims.

Section 5.–Section 5 establishes the procedures for removal of interstate class actions over which the federal court is granted original jurisdiction in new section 1332(d).

The general removal provisions currently contained in Chapter 89 of Title 28 would continue to apply to class actions, except where they are inconsistent with the provisions of the Act. For example, like other removed actions, matters removable under this bill may be removed only "to the district court of the United States for the district and division embracing the place where such action is pending."[133] However, the general requirement contained in section 1441(b) that an action be removable only if none of the defendants is a citizen of the state in which the action is brought would not apply to the removal of class actions under the jurisdictional provisions of section 1332(d). Imposing such a restriction on removal of class actions would subvert the intent of the Act because it would essentially allow a plaintiff to defeat removal jurisdiction **\*49 \*\*46** by suing both in-state and out-of-state defendants. Such a restriction on removal of class actions would perpetuate the current " complete diversity" rule for class actions that new section 1332(d) rejects. The Act does not, however, disturb the general rule that a case can only be removed to the district court of the United States for the district and division embracing the place where the action is pending.[134] In addition, the Act does not change the application of the Erie Doctrine, which requires federal courts to apply the substantive law dictated by applicable choice-of-law principles in actions arising under diversity jurisdiction.[135]

New subsection 1453(b) provides that removal may occur without the consent of any other defendant. This revision to the removal rules will prevent a plaintiffs' attorney from recruiting a "friendly" defendant (e.g., a local retailer) who could refuse to join in a removal to federal court and thereby thwart the legitimate efforts of the primary corporate defendant to seek a federal forum in which to litigate the pending claims. By this provision, it is the Committee's intent to overrule caselaw developed by the federal courts requiring the consent of all parties,[136] to the extent that such precedents might be applied to class actions subject to the expanded jurisdictional and removal provisions of S. 5.

New subsection 1453(c) provides that an order remanding a class action to state court is reviewable by appeal at the discretion of the reviewing court. The purpose of this provision is to develop a body of appellate law interpreting the legislation without unduly delaying the litigation of class actions. As a general matter, appellate review of orders remanding cases to state court is not permitted, as specified by 28 U.S.C. 1447(d). New subsection 1453(c) provides discretionary appellate review of remand orders under this legislation but also imposes time limits. Specifically, parties must file a notice

of appeal within seven days after entry of a remand order. In addition, the appeals court must issue a final decision on appeal within 60 days. However, the parties may agree to give the court more time, and the court may, on its own, avail itself of one ten-day extension.

The Committee notes that the current prohibition on remand order review was added to section 1447 after the federal diversity jurisdictional statutes and the related removal statutes had been subject to appellate review for many years and were the subject of considerable appellate level interpretive law. The Committee believes it is important to create a similar body of clear and consistent guidance for district courts that will be interpreting this legislation and would particularly encourage appellate courts to review cases that raise jurisdictional issues likely to arise in future cases.

In order to be consistent with the exceptions to federal diversity jurisdiction granted under new section 1332(d), new subsection 1453(d) provides that the class action removal provisions shall not apply to claims involving covered securities or corporate governance litigation. In addition, claims concerning a covered security, as defined in section 16(f)(3) of the Securities Act of 1933 or section **50 28(f)(5)(E) of the Securities Exchange Act of 1934, are excepted from the class action removal rule as well. These are essentially claims against the officers of a corporation for a precipitous drop in the value of its stock, based on fraud. Because Congress has previously enacted legislation governing the adjudication of these claims,[137] it is the **47 Committee's intent not to disturb the carefully crafted framework for litigating in this context. Thus, claims involving covered securities are excluded from the new section 1332(b) jurisdiction. The parameters of this subsection are intended to be conterminous with new subsection 1332(d)(9).

Section 5 also amends Section 1446(b) to clarify that the provisions in that section prohibiting the removal of cases more than one year after their commencement do not apply to class actions. Thus, removals taken under these revised provisions for class actions may be taken more than one year after commencement of the action at issue. This change is intended to prevent attorneys from engaging in the type of gaming that occurs under the current class action system. In the most extreme example, a plaintiffs' attorney could file suit under current law against a friendly defendant, triggering the start of the one-year limitation after which removal may not be sought under any condition. One year and one day after filing suit, the plaintiff's attorney could then serve an amended complaint on an additional defendant, at which time it would be too late for that new defendant to remove the case to federal court–regardless of whether diversity jurisdiction exists and irrespective of the practical merits of the case. The same unfair result would also occur if plaintiffs' counsel dismisses non-diverse parties or increases the amount of damages being pled after the one-year deadline. By allowing class actions to be removed at any time when changes are made to the pleadings that bring the case within section 1332(d)'s requirements for federal jurisdiction, this provision will ensure that such fraudulent pleading practices can no longer be used to thwart federal jurisdiction. It is not the intention of the Committee to change section 1446(b)'s requirements that an action must be removed within thirty days of being served with the initial pleading or thirty days after receipt of an amended pleading, motion, order or other paper from which it may be ascertained that the case is one which is or has become removable.

Section 6.–Section 6 directs the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, to prepare and transmit to the Committees on the Judiciary of the Senate and House of Representatives a report on class action settlements. The report shall contain recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the class members that these settlements are supposed to benefit. In addition, the report shall contain recommendations on the best practices that courts can use to ensure that fees and expenses awarded to attorneys in connection with a class action settlement appropriately reflect the extent to which counsel obtained full redress for the injuries alleged in the complaint, and the time, expense and risk devoted **51 to the litigation. Finally, the report shall identify the actions that the Judicial Conference has taken and intends to take toward having the federal judiciary implement the recommendations in the report.

Section 6 contains a provision stating that nothing in the Act shall be construed to alter the authority of the federal courts to supervise the award of attorneys' fees. It is the Committee's intent not to disrupt the federal courts' broad discretion to approve attorneys' fees based on fairness determinations, notwithstanding contractual arrangements between attorneys and their clients.

Section 7.–Section 7 provides that the enactments of the Judicial Conference recommendations shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first. This provision is a relic from an earlier version of this legislation and is of no effect since the recommendations have already been enacted.

**\*\*48** Section 8.–Section 8 clarifies that nothing in the bill restricts the authority of the Judicial Conference and Supreme Court to implement new rules relating to class actions. Section 8 is intended to ensure that the bill not be interpreted as restricting in any way the ongoing efforts of the federal Judicial Conference's Advisory Committee on Civil Rules and Standing Committee on Rules and Procedure to promulgate improved rules governing class actions.

Section 9.–Section 9 provides that the amendments made by the Act shall apply to any civil action commenced on or after the date of enactment.

## VII. CRITICS CONTENTIONS AND REBUTTALS

Critics' Contention No. 1: S. 5 would transfer nearly every class action from state to federal court and would add to the overwhelming workload faced by our federal courts.

Response:

During Committee debate on previous versions of this bill, the most frequently expressed concern was that its jurisdictional provisions would overload the federal judiciary. That argument, however, ignores three key facts. First, the bill will not move most class actions to federal court. Second, many state courts, where the critics apparently would like to confine all interstate class actions, are more burdened than the federal courts, and are less equipped to deal with complex cases like class actions. Indeed, many state courts have comparatively crushing caseloads. Third, federal courts can handle duplicative class actions more efficiently through multidistrict litigation proceedings.

First, a recent study debunked the myth promoted by some of the bill's critics that S. 5 will move nearly all class actions to federal court.[138] The study looked at the only six states that had data readily available on on-line databases and found that more than 50 percent of the class actions for which there were rulings during a five-year period would not be removable to federal court under the **\*52** Class Action Fairness Act.[139] By contrast, the study found that in Madison County, Illinois, more than 85 percent of the cases would be removable to federal court under the bill.[140] Put simply, the study found that The Class Action Fairness Act is a narrowly tailored bill that will not overwhelm the federal judiciary. Rather, the bill leaves most legitimately local disputes in state court, while ensuring that large, interstate class actions like those typically brought in Madison and St. Clair counties and other magnet courts can be heard in federal court.

Second, contrary to critics' contentions, the average state court judge is assigned three times as many cases as his or her federal counterparts. State court judges are assigned (on average) 1,568 new cases each year.[141] For example, in California, the average judge was assigned 1,546 cases in 2003. In Florida, the average was 2,206. In New Jersey, the average was 2,810 cases. And in Texas, it was 1,701 cases. In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003.[142]

**\*\*49** Critics of the bill also ignore the fact that many state courts are tribunals of general jurisdiction–they hear all sorts of cases, including divorce matters, custody disputes, name change petitions, traffic violations, small claims contract disputes, minor misdemeanors, and major felonies. Thus, when a class action is filed before those courts, it diminishes the court's ability to provide a broad array of very basic legal services for the local community. The judges presiding over those state courts have far fewer resources for dealing with huge, complex cases, like class actions.

Federal court judges usually have two or three law clerks; state court judges often have none. And federal court judges usually can delegate aspects of their cases (e.g., discovery issues) to magistrate judges or special masters; state court judges typically lack such resources.

Third, critics also overlook the fact that even if both court systems were similarly burdened, federal courts could still deal with class actions more efficiently for two reasons. First, federal courts can coordinate "copy cat" or overlapping class actions. The record before the Committee indicates that it is not uncommon to see twenty, thirty, or even 100 class actions filed on the same subject matter. Sometimes, competing lawyers file these cases; other times, they are filed by the same

lawyers who are simply forum-shopping for the most receptive judge. When these similar, overlapping class actions are filed in state courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The result is enormous waste, to say nothing of the unfairness. Defendants are forced to defend the same case in many different courts. And class members are harmed because the various class counsel compete with each other to achieve the best settlement for the lawyers. In contrast, if overlapping or similar class actions are filed against the same defendant in two or more different federal courts, the multidistrict litigation process (established by 28 U.S.C. S 1407) permits the transfer and consolidation of those cases to a single judge. The **53** federal court multidistrict litigation system regularly consolidates multiple overlapping class actions in this manner, preventing the waste that occurs in state courts.

Finally, critics who focus on the federal courts' workload are missing the point–class actions are precisely the kind of cases that should be heard in federal court. Class actions usually involve the most people, most money, and most interstate commerce issues. They also usually involve issues of nationwide implications. Interstate class actions are certainly no less deserving of a federal forum than the 2,525 cases heard in federal court each year to recover a few thousand dollars in defaulted student loans, or the 17,952 federal personal injury cases (e.g., single person medical malpractice cases).[143] Ultimately, regardless of the impact on the federal court caseload, large interstate class actions belong in federal court.

Critics' Contention No. 2: Abuses of class actions exist in both federal and state courts, and allowing more interstate class actions to be heard in federal court thus will not solve any problems.

Response:

At congressional hearings on the subject of class actions, witness after witness provided compelling evidence that serious abuses of the class device are occurring primarily in state courts.[144]

**\*\*50** Moreover, several studies also indicate that the class action abuse problem, particularly with respect to class settlements, is primarily a state court issue. For example, a detailed Federal Judicial Center study concluded that "[i]n most [class actions handled by federal courts subject to the study], net monetary distributions to the class exceeded attorneys' fees by substantial margins."[145] In stark contrast, an Institute for Civil Justice/RAND study indicated that in state court consumer class action settlements not involving personal injuries, class counsel typically walk off with more money than all of the class members combined.[146] The ICJ/RAND study offered three compelling rationales for allowing more interstate class actions to be heard by federal courts:

(1) "federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;"

(2) "state judges may not have adequate resources to oversee and manage class actions with a national scope;" and

(3) "if a single judge is to be charged with deciding what law will apply in a multi state class action, it is more appropriate that this take place in federal court than in a state court."[147]

While some abuses do occur in federal court, the extent to which they take place in no way even approaches the level of abuse evidencing **\*54** itself in state court. Indeed, it is interesting that while few state court systems have attempted to address class action abuses, the federal court system, which has far less of a problem in the first place, has invested considerable effort in developing new rules reflecting best practices that courts should follow in handling class litigation, particularly in the settlement context. Those revisions, enacted last year,[148] will dovetail with the "consumer bill of rights" provisions in S. 5 to bolster federal court safeguards in the proper handling of class action cases.

Critics' Contention No. 3: To date, the only mechanism that has been successful in imposing liability on some industries, such as the tobacco or firearms industries, has been class action lawsuits. Allowing removal of state class actions to federal court will destroy the impact that class actions are having on these socially irresponsible businesses. Therefore, we should exempt certain industries from the diversity and removal provisions of S. 5.

Response:

Opponents of S. 5 would prohibit federal courts from exercising jurisdiction over those class actions brought against certain industries, including HMOs, tobacco companies, nursing homes, and firearms manufacturers. In addition, opponents have suggested that claims arising from state consumer protection statutes or state environmental protection laws should be exempt from the bill as well.

However, industry-specific exemptions from federal jurisdiction make no sense. Like bills of attainder, such exemptions irrationally single out a specific industry and slam the federal courthouse door in its face. The proposal to carve out certain legitimate, yet presently unpopular, industries contradicts the constitutional purposes of federal diversity jurisdiction–to allow interstate businesses to have claims against them heard in federal **51 court under diversity so as to avoid local biases and to promote and enhance, rather than hamper, interstate commerce. The notion that certain industries are less entitled to federal court protection is utterly inconsistent with the purpose and goals of diversity jurisdiction. Simply put, there should not be one set of rules for one category of defendants and another for another group of defendants.

Moreover, there is no evidence that plaintiffs will be less successful in litigating their class action claims in federal court.[149] Class *55 actions against unpopular corporate defendants, such as the firearms and tobacco industry have successfully proceeded in Federal court, and have resulted in beneficial judgments and settlements for the plaintiff classes. For example, the class action that is touted as the **52 only real success the class counsel have had against the firearms industry[150] turns out to be a federal court class action.[151] Assuming that a case is a meritorious class action asserting meritorious claims, there is no reason to believe such a case heard by a federal court would have an outcome different from a state court case, particularly given that the federal court normally would apply the same state substantive law as a state court considering the same case.

Critics' Contention No. 4: S. 5 should exclude civil rights cases, in order to ensure that civil rights plaintiffs have maximum access to our courts.

Response:

Critics who would exclude civil rights cases from the scope of S. 5 have it backwards.

First, an amendment that would affirmatively exclude civil rights cases from federal jurisdiction would be contrary to a long tradition of encouraging the availability of our federal courts to address civil rights claims. Indeed, Congress has already enacted several statutes that are intended to ensure that civil rights cases can be heard in federal courts. For example, one statute permits removal **56 to federal court of a broad range of civil rights actions.[152] And more importantly, one general jurisdiction statute–28 U.S.C. S 1343–provides broad federal jurisdiction over a whole host of civil rights claims (e.g., any action "for injury to person or property or because of the deprivation of any right or privilege of a citizen of the United States," any action "to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights"). Indeed, that section provides original federal jurisdiction over any action "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens."

Second, the assumption of the amendment that federal courts are clogged and unable to handle civil rights cases has no basis. Indeed, as discussed above, the federal court workload issue is overblown, ignoring the burdens that class actions place on ill equipped state courts. Several of our federal judicial districts may need additional resources. Wherever that need has been confirmed, additional resources should be provided (as they were in 1999 and again in 2002, when new permanent and temporary federal district court judgeships were added). But those spot shortages are no excuse for continuing to deny both consumers and corporations their due process rights by keeping interstate class actions a state court monopoly.

Third, federal courts have a long record of certifying discrimination class actions and approving hefty settlements in such cases. The most generous racial discrimination class action settlements in recent years–like the Home Depot gender discrimination case settlement (which paid class members about $65 million) and the $192 million Coca-Cola race discrimination settlement (in which each class member was guaranteed a recovery of at least $38,000)–were achieved in and approved by federal courts. These cases stand in stark contrast to the typical state court class action, in which consumers are

lucky if they get a $5 coupon.

**\*\*53** Finally, civil rights litigants have nothing to fear from federal judges. Federal judges, under Article III of the Constitution, are appointed for life. One reason the Framers designed the federal judiciary that way was to protect federal judges from political pressure and ensure that they would provide equal treatment to minority groups with less political power. It is thus no accident that federal courts have issued decisions like Brown v. Board of Education that, although unpopular at the time, paved the way for future civil rights laws like Title VII and Section 1983.

Critics' Contention No. 5: S. 5 would unfairly tilt the playing field by providing an advantage to defendant corporations at the expense of consumers.

Response:

This concern mischaracterizes the content and intent of the bill. S. 5 is court reform–not tort reform. It would simply allow federal courts to handle more interstate class actions. It makes no changes in substantive law whatsoever. Critics of S. 5 erroneously argue **\*57** that the bill would reverse the ordinary presumption that a plaintiff chooses his or her own court. Yet, in this context, there is no such presumption. In fact, the whole purpose of diversity jurisdiction is to preclude any such presumption by allowing state-law based claims to be removed from local courts to federal courts, so as to ensure that all parties can litigate on a level playing field and thereby protect interstate commerce interests.[153]

Article III of the Constitution ensures that there will be a fair, uniform, and efficient forum (a federal court) for adjudicating interstate commercial disputes, so as to nurture interstate commerce. Some scholars have persuasively argued that diversity jurisdiction, of all the powers exercised under the Constitution, has had the greatest influence in melding the United States into a single nation, by fostering interstate commerce, communication and the uninterrupted flow of capital for investment into various parts of the Union, and sustaining the public credit and the sanctity of private contracts.[154]

S. 5 promotes these important constitutional norms. The statutory "gatekeeper" for federal diversity jurisdiction–28 U.S.C. S 1332–generally allows federal courts to hear cases that are large (that is, cases with large "amounts in controversy") and that have interstate implications (that is, cases involving citizens from multiple jurisdictions). These requirements were intended to ensure that diversity jurisdiction is preserved for those cases with significant interstate and economic impacts. Class actions would normally satisfy these requirements because they usually involve big dollar amounts and parties from multiple jurisdictions. Yet, because section 1332 was enacted prior to the existence of the modern-day class action, it does not take into account the unique circumstances presented by class actions. Consequently, section 1332, as presently drafted, tends to exclude the overwhelming majority of class actions from federal courts, while inviting into federal courts much smaller single-plaintiff cases having few (if any) interstate ramifications. Such a result is inconsistent with the federal judiciary's proper jurisdictional role. S. 5 would correct this technical problem and thereby promote the underlying goals of diversity jurisdiction.

**\*\*54** As former Clinton Administration Acting Solicitor General Walter Dellinger has testified in congressional hearings, if Congress were to now re-write the federal diversity jurisdiction statute, interstate class actions undoubtedly would be one of the first categories of cases to be included within the scope of the statute.[155] This makes plain sense insofar as class action lawsuits typically involve more people, more money, and more interstate commerce issues than any other type of case. S. 5 will simply fix the technical problem in section 1332 and judicial interpretation of the diversity requirements that keep most class actions in state court.

**\*58** Critics' Contention No. 6: S. 5 will limit the capacity to use class actions as private attorneys general actions to deter corporate wrongdoing.

Response:

During past Committee debates, some members have opposed expanding federal jurisdiction over class actions on the ground that doing so would limit the use of class actions as private attorney general actions–as a deterrent to corporate wrongdoing.

WESTLAW     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

As one member stated, the purpose of a class action is to "dissuade. It is the same reason that we have treble damages."[156] In the view of that member, "the most important function that class actions serve is to allow private attorneys general to step forward and hold corporations accountable for decisions that affect the public safety."[157]

The problem with this argument is that for all of the reasons discussed above, S. 5 will not limit the legitimate use of class actions at all. But more fundamentally, there is no historical basis for the assertion that class actions were intended to create this private attorney general device.

Although a few courts have over the years referred to the deterrent effects of class actions, the promulgation history of the current Rule 23 of the Federal Rules of Civil Procedure reflects no intent to create a private attorney general device. In recent years, members of the Advisory Committee on Civil Rules that developed the current version of the rule have testified that Rule 23 was not intended to serve that purpose. In testimony before the Advisory Committee on Civil Rules in 1996, the Hon. William T. Coleman, Jr., specifically denounced the proposition that "a purpose of Rule 23 is to hand a private attorney general's badge to any counsel who wants it."[158] He also stated that

> back in 1966, that was not the intended purpose of Rule 23(b)(3). If there is interest in deputizing all attorneys everywhere to enforce our laws, that's a matter that should be decided by Congress, not through the class action provisions in the Federal Rules of Civil Procedure. The courts' tolerance for this vigilante-style use of class actions is a root cause of the abuses that must be correct.[159]

In congressional testimony several years ago, Prof. John P. Frank, another 1966 Advisory Committee member, sounded similar sentiments:

> **55 What I wish to call to your attention is what I think is a serious problem here: that the class action rule, wholly without regard to its original purpose, has become something of a device for social administration, which should never have been the product of the rules at all. These are matters which should be handled by the Congress and by administrative agencies, and not attempted efforts to govern various parts of the economy by lawsuits which give **59 more to the counsel * * * that they do to those who should benefit from them.
>
> I particularly adopt the statement of the chair of the [Advisory Committee on Civil Rules] at the present time, Judge Paul Niemeyer * * * in which he says: "I believe that Rule 23 was never intended to be a rule to enhance enforcement of substantive claims. Such legitimization should, in my judgment, be effected by Congress, and congress might well conclude * * * that it is too anarchical to authorize private attorneys to self-appoint themselves as enforcers of law without adequate accountability to the lawmakers or the public."[160]

Even if the critics were correct that deterrence was an intended purpose of class actions, that assertion is self-defeating because, in the Committee's view, the concept of class actions serving a "private attorney general" or other enforcement purpose is illegal. If the intended purpose of Rule 23 was to empower private attorneys to act as "attorneys general," the rule plainly bestows substantive rights not otherwise available under common or statutory law. Interpreted in this way, the rule runs afoul of the Rules Enabling Act,[161] which forbids federal courts from adopting "rules of practice and procedure" that may "abridge, enlarge or modify any substantive right." To the extent that class actions are characterized as having a private attorney general purpose, there are strong arguments that Rule 23 is simply B and void.[162]

Critics' Contention No.7: S. 5 will result in delays for injured consumers.

Response:

This criticism stems from baseless concerns about the federal courts' caseload and the possible impact of this legislation on the ability of the federal courts to resolve these cases in a timely manner. However, as noted above, the average state court judge is assigned three times as many cases as his or her federal counterpart. Thus, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. For all of the reasons set forth previously, there is no basis for arguing that S. 5 would overwhelm the federal courts with class action cases and thereby adversely affect the ability of consumers to find timely redress for their injuries in federal court.

**\*60 \*\*56** Notably, the evidence available shows that federal courts move more quickly than state courts. A study conducted last year by the Federal Judicial Center found that state courts are far more likely than federal courts to let class actions linger without ruling on class certification.[163] (The study also found that federal courts certify classes at approximately the same rate as state courts.) Moreover, the median time for final disposition of a civil claim filed in federal court is just 9.3 months, and the median time to trial in a civil matter in federal court is 22.5 months.[164] There is no evidence that on average, state courts proceed more quickly, even though most state court cases are less complicated than federal court cases.

In addition, there is no basis for the claim that the bill's appeal provision would slow down litigation. To the contrary, the bill includes strict time limits to ensure that appeals of remand orders will not meaningfully delay litigation of class actions.

Finally, as noted above, federal courts can also resolve duplicative class actions more efficiently by consolidating them. Plaintiffs' lawyers frequently file copycat class actions in various state courts around the country, clogging judges' dockets and forcing judges to duplicate each other's work. Unlike state courts, federal courts can take advantage of multi-district consolidation procedures that enable one judge to consolidate dozens of class actions and resolve them far more efficiently. This is yet another way in which The Class Action Fairness Act will speed up justice–not slow it down.

In sum, there simply is no basis to the claims that consumers will be worse off in federal court, or that the resolution of class actions will be delayed because of the federal judiciary's workload.

Critics' Contention No. 8: S. 5 will trample on the rights of states to manage their legal systems, thus undermining the principles of federalism that our system of government is built upon.

Response:

While some critics have alleged that this bill will somehow undermine federalism principles, exactly the opposite is true. S. 5 has been carefully crafted to correct a problem in the current system that does not promote traditional concepts of federalism. In fact, it is the current system and the wave of state court class actions that has trampled on the rights of states to manage their legal systems by allowing state court judges to interpret and apply the laws of multiple jurisdictions. When state courts preside over class actions involving claims of residents of more than one state, they frequently dictate the substantive laws of other states, sometimes over the protests of those other jurisdictions (as discussed previously). When that happens, there is little those other jurisdictions can do, since the judgment of a court in one state is not reviewable by the state court of another jurisdiction.

It is far more appropriate for a federal court to interpret the laws of various states (a task inherent in the constitutional concept of diversity jurisdiction), than for one state court to dictate to other **\*61** states what their laws mean or, even worse, to impose its own state law on a nationwide case. Why should a state court judge elected by the several thousand residents of a small **\*\*57** county in Alabama tell New York or California the meaning of their laws? Why should an Illinois state court judge interpret decisions by Virginia or Wisconsin courts? Why should a state court judge be able to overrule other state laws and policies? Why should state courts be setting national policy?

S. 5 simply allows more class action cases filed in state court to be removed to federal court. S. 5 does not change substantive law–it is, in effect, a procedural provision only. As such, class action decisions rendered in federal court should be the same as if they were decided in state court–under the Erie doctrine, federal courts must apply state substantive law in diversity cases. Moreover, if federal court judges are not familiar with state law on a particular issue, they have the authority to ask a state court to "certify" a question of law e.g., to advise them how a state's laws should be applied in an uncharted situation. This procedure allows the federal courts to apply state law appropriately and gives states the ability to manage their legal systems without becoming bound by other states' interpretations of their laws.

In short, contrary to critics' contentions, the real harm to federalism is the status quo–leaving the bulk of class action cases in state court. Federal courts are the appropriate forum to decide interstate class actions involving large amounts of money, many plaintiffs and interstate commerce disputes, and these matters of interstate comity are more appropriately handled by federal judges appointed by the President and confirmed by the Senate. S. 5 simply restores this proper balance by resolving

an anomaly of diversity jurisdiction. True to the concept of federalism, S. 5 appropriately leaves certain "intrastate" class actions in state court: cases involving small amounts in controversy; cases with a class of 100 plaintiffs or less; cases involving plaintiffs, defendants and governing law all from the same state; cases against states and state officials; and certain securities and corporate governance cases. As such, S. 5 promotes the concept of federalism and protects the ability of states to determine their own laws and policies for their citizens.

Critics' Contention No. 9: S. 5 assumes that federal courts will not engage in the same "false federalism" that state courts are accused of fostering. There really is no evidence that in the class action context, federal courts will intrude less on the states' rights to interpret their own laws than have state courts.

Response:

A principal purpose of the Class Action Fairness Act is to correct what former Acting Solicitor General Walter Dellinger has labeled a wave of "false federalism." As he testified before the Senate Judiciary Committee last July, the problem is that "many state courts faced with interstate class actions have undertaken to dictate the substantive laws of other states by applying their own laws to * * * other states, resulting in a breach of federalism principles. * * *"

**\*62** As discussed previously, a prime example of this situation is the Avery case,[165] in which defendant State Farm allegedly breached auto insurance policies nationwide by requiring the use of less expensive non-original equipment manufacturer parts ("non-OEM parts") in repairing accident-damaged vehicles. The Illinois state court certified a nationwide class, and at trial, a jury rendered a $1.3 billion verdict against State Farm.

The case is noteworthy on the "false federalism" issue because the court applied Illinois consumer protection law to all class claims in the case. It did so even though Illinois law on this subject contravened the laws and policies of other states in which some class members lived—laws and policies encouraging (or even requiring) insurers to use less expensive, non-OEM parts in making accident repairs as a means of containing auto insurance costs. In affirming the verdict, an Illinois state appellate court acknowledged that it had disregarded "state insurance commissioners [who] testified that the laws in many of our sister states permit and in some cases * * * [even] encourage" usage of non-OEM parts.[166] The New York Times reported that the decision effectively "overturn[ed] insurance regulations * * * in New York, Massachusetts, and Hawaii, among other places" establishing "what amounts to a national rule on insurance."[167] As discussed previously, Avery is not an isolated occurrence. Numerous state courts have trampled on these federalism principles, all in an effort to certify classes that should not be certified.[168]

A premise of the Class Action Fairness Act is that this problem can be corrected by expanding federal jurisdiction over interstate class actions, the theory being that federal courts will not engage in "false federalism" games. But what proof is there that the federal courts will not similarly botch these critical choice-of-law issues?

In reality, there is ample evidence that the federal courts will not engage in the "false federalism" that is so rampant in state court class actions. To start, it should be noted that the lead federal court—the U.S. Supreme Court—has repeatedly warned that courts should not attempt to apply the laws of one state to behaviors that occurred in other jurisdictions:

* "Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of the other States." Huntington v. Attrill, 146 U.S. 657,669 (1892).

* "[I]t would be impossible to permit the statutes of [one State] to operate beyond the jurisdiction of that State * * * without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends." New York Life Ins. Co. v. Head, 234 U.S. 149, 161 (1914).

**\*63** * "A state does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that state." Bigelow v. Virginia, 421 U.S. 809, 824 (1975).

* States should not apply their own laws to matters with which they have no significant contact. Phillips Petroleum Co. v.

Shutts, 472 U.S. 797, 821–22 (1985).

And on April 7, 2003, the U.S. Supreme Court again warned state courts on this issue, striking down one state's effort to apply its laws to conduct that occurred elsewhere: "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." State Farm Mut. Auto. Ins. Co. v. Campbell, 2003 WL 1791206 (U.S. Apr. 7, 2003).

Unlike many state courts, federal courts have consistently heeded the Supreme Court's admonitions. The record shows that in the class action context, federal courts have **59 been extremely respectful of the interests of each state in having its laws applied (as appropriate) to its own residents, particularly in recognizing the substantial variations of those laws in the class action context.

In recent years, numerous federal courts (applying the choice-of-law doctrines of various jurisdictions) have considered which laws should apply in proposed nationwide class actions asserting state law-based claims. Those courts have consistently concluded that in a nationwide or multi-state class action, the choice-of-law rules of the state in which the action was originally filed must be applied.[169] Further, they have consistently concluded that those choice-of-law rules must be applied to "each plaintiffs claims."[170] Based on those principles, federal courts have consistently concluded that the laws of all states where purported class members were defrauded, injured, or purchased the challenged product or service must come into play.[171] And in those very few instances in which a federal district court has toyed with the idea of engaging in "false federalism" (i.e., applying a single state's law to all asserted claims), that notion has been reversed on appeal almost immediately.[172]

*64 The bottom line is that over the past ten years, the federal court system has not produced any final decisions–not even one–applying the law of a single state to all claims in a nationwide or multi-state class action. And there are hundreds of federal court decisions (examples of which are set forth above) flatly rejecting arguments to use such a "false federalism" choice-of-law approach–applying the laws of a single state to all claims in a multi-state case. That's the record that confirms that the passage of the Class Action Fairness Act will end the "false federalism" game that is occurring in the state court class action arena.

Critics' Contention No. 10: S. 5 could deny plaintiff class members any meaningful ability to recover damages for their injuries.

Response:

* In arguing that this bill would hurt consumers, some opponents have gone so far as to list several state court class actions which supposedly have served consumers well, inferring that removal of such cases to federal court is tantamount to a denial of justice. **60 This argument assumes that the federal courts are inferior to state courts–that a federal court cannot arrive at a just outcome. If the cases cited by S. 5's opponents would not have had the same outcome in federal court as they did in state court, it is because the federal courts may have been more careful to avoid the abuses of the system that occur in state courts. The only thing that would be denied when an interstate class action is removed to federal court is the plaintiffs' lawyers' ability to strike it rich on class actions that should not be certified by any court because they do not meet the requirements of a proper class.

Moreover, the claim that federal courts never certify class actions is unfounded. A study last year by the Federal Judicial Center found that federal courts certify classes at approximately the same rate as state courts. According to the study, class actions were "almost equally likely to be certified" in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time.[173] The study also found that consumers fare better in federal court class actions. According to the report, the average recovery per class member was higher in federal court: $517 vs. $350.[174]

In fact, federal courts invented class actions and have led the way in using the device to redress grievances, particularly in the civil rights and consumer protection context. Federal courts certify numerous class actions for a broad range of claims including securities fraud, antitrust violations, and discrimination every year.[175] In addition, many of the cases in which

federal courts certify classes involve state law claims (even though relatively few state law-based class actions can make it into federal court under current jurisdictional law.[176] For example:

**\*65 \*** Recently a federal court in New York certified a class of New York residents and a nationwide class of plaintiffs who alleged that they were overcharged when they used their credit cards abroad.[177] Plaintiffs' claims were based on violations of New York law and common law fraud.

\* A federal district court in Massachusetts certified a class consisting of Massachusetts plaintiffs who were employed as auto damage appraisers.[178] The plaintiffs alleged that they were not properly paid for overtime and sought recovery under Massachusetts law.

\* A federal district court in Texas certified a product liability class of plaintiffs whose infants had been administered the drug E-Ferol and alleged that they should have been warned of the risk of death associated with the drug.[179] Plaintiffs also alleged that the testing and approval process for the drug was flawed.

\* A federal district court in New York recently certified a statewide class of plaintiffs alleging violations of New York's consumer protection law in a case involving diamond pricing.[180]

**\*\*61 \*** A federal court certified a class of Tennessee residents who claimed defendants had violated various state consumer protection laws by failing to properly disclose the requirements for obtaining benefits under a long-term care insurance policy.[181]

\* The federal court in this case certified a class of commercial lobstermen from New York and Connecticut who brought claims under various state laws, alleging that the use of certain insecticides by defendants caused massive lobster die-off.[182]

\* A federal court recently certified a class of parking lot customers in Washington state who asserted claims against a collection agency under federal and state law.[183]

\* A federal court in Florida certified a class of consumers who entered into sales contracts with a funeral home. The class members alleged claims under federal and state law.[184]

\* A federal court in Minnesota certified a nationwide class of plaintiffs who sought medical monitoring under various state laws for their allegedly defective heart valves.[185]

\* A federal court certified a class of Montanans who alleged that their automobile insurer acted in bad faith.[186]

\* In Massachusetts, a federal court certified a six-state class action on behalf of homeowners who alleged their heating systems were defective.[187]

\* The federal district court for Rhode Island certified a nationwide class action brought on behalf of credit cardholders alleging that Fleet Bank violated federal and state laws in the manner in **\*66** which it set payment due dates and posted payments to credit cards.[188]

\* In Michigan, a federal court certified a nationwide class of consumer borrowers alleging that Central Clearing's "payday loan" transactions violated federal and state laws.[189]

\* A federal district court certified a class of automobile insurance policy holders in the District of Columbia alleging violations of federal and state law.[190]

\* A federal court certified a class of Pennsylvanians in a case brought on behalf of consumer debt holders alleging that the defendant sent out false and deceptive debt collection letters. The complaint alleged violations of federal and state laws.[191]

\* A federal court certified a class action brought on behalf of former employees at a Pennsylvania plant, alleging that Tyson Foods failed to fully pay its employees. The complaint alleged violations of federal and state laws.[192]

**\*\*62** While opponents of the bill cite cases that allegedly achieved greater justice in state court than they would have received if they had been removed to federal court, it is clear that this is pure speculation. In fact, federal courts have certified hundreds of cases for class treatment in recent years, and the rules governing the decision of whether cases may proceed as class actions are basically the same in federal and state courts. Further, under the Erie doctrine, federal courts apply state substantive law in diversity cases. Consequently, a removed class action should have the same substantive law applied to it, regardless of whether it is in federal or state court.

Additionally, strict analysis by courts in deciding whether a group of plaintiffs can proceed on a class basis should be encouraged, rather than discouraged. The purpose of the current requirements in Rule 23 and similar state court class action rules is to protect the due process rights of both plaintiffs and defendants. When judges indiscriminately certify class actions, unnamed plaintiffs lose important legal rights and can be denied appropriate awards for their injuries, and defendants become more vulnerable to frivolous and unjustifiably magnified class actions.

Allowing individual states to certify classes for their own citizens on particular issues could result in a denial of relief for the citizens of other states, particularly given the limited resources available to some defendants to satisfy all pending claims. For example. some hailed the now reversed punitive damages verdict in the Engle tobacco class action that continues to proceed in Florida Supreme Court. There, a Florida jury awarded $135 billion in punitive damages to a class of Florida residents. But if that verdict were upheld, citizens of other states might be denied any relief whatsoever on their claims against tobacco companies because the Florida residents (through their single state class action) would have taken all available money to pay their punitive damages claims. In short, Florida residents would have been paid billions of dollars in excess of what they claim for their real personal injury damages, while **\*67** residents of all other states would not have even received what they claim to be owed for the basic personal injuries that they allege. As one commentator has noted.

> This is what fuels the [state court class action] litigation lottery. If you are the first in line to demand punitive damages, you may receive awards in the billions. Injured parties in later [class actions] are likely to receive less. * * * They may receive nothing if the first award killed the company or the industry. None of this makes much sense. There is no reason why one group of litigants should, solely on the basis of residency in a particular state, receive the lion's share of damages to the deprivation of hundreds of thousands of other injured parties. Moreover, there is no reason why one state should be able to impose this result on other states when a problem and its victims are shared by the nation as a whole.[193]

Of course, this situation would not arise if S. 5 were passed, since all qualifying interstate class actions on a particular subject could be removed to federal court and consolidated before a single federal court judge under the multidistrict litigation mechanism described previously. That judge would be able to manage the proceeding to ensure that no group of litigants gained advantage over the others by virtue of their residency (or any other irrelevant factor).

**\*\*63** A large quantity of class actions in state court, like the Broin tobacco case in Florida, results in millions of dollars for plaintiffs' counsel but nothing of any value for plaintiffs. An Institute for Civil Justice/RAND study has confirmed this pattern, finding that class counsel in state court consumer class action settlements, typically walk off with more money than all of the class members combined.[194] The ICJ/RAND study provides three compelling rationales for allowing more interstate class actions to be heard by federal courts: (1) "federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;" (2) "state judges may not have adequate resources to oversee and manage class actions with a national scope;" and (3) " if a single judge is to be charged with deciding what law will apply in a multistate class action, it is more appropriate that this take place in federal court than in a state court."[195] S. 5 would help assure fairer settlements by allowing the federal courts to review more class action lawsuits, as well as by providing notice to state Attorneys General so they can better protect their citizens against unfair settlement agreements.

Moreover, in contrast to many state courts, which have demonstrated a willingness to approve class action settlements where the bulk (if not all) of the benefits go to the lawyers, federal courts have certified numerous settlement classes in cases that involved alleged violations of state law. These cases typically result in real relief for the class members. Following are a few examples:

**\*68** * A federal district court in Texas certified a nationwide settlement class alleging violations of federal lending law and

state consumer protection law.[196] The court approved a class settlement in which the defendants agreed to forgive $52 million in debt incurred by class members and establish a settlement fund totaling $11 million for monetary payments to plaintiffs who had repaid their loans. In addition, the defendants agreed to substantial restrictions on future lending activities.

* A federal district court in Ohio approved a nationwide settlement class in a products liability suit involving allegedly defective orthopedic implants.[197] The settlement fund, which provided for medical monitoring and research, totaled more than $1 billion.

* In another case, a federal district court in Pennsylvania certified a nationwide settlement class of plaintiffs alleging consumer fraud and personal injuries related to two prescription diet drugs, fenfluramine and dexfenfluramine.[198] The settlement provided $3.75 billion for personal injury claims, medical monitoring and research. The class counsel agreed to limit their fees to about 9 percent of that.

Critics' Contention No. 11: S. 5 will cause delay and mass confusion because of (a) the difficulty of assessing compliance with jurisdictional requirements at the outset and (b) the potential that class membership and definitions will change over time.

Response

The contention that S. 5 (particularly its differing treatment of categories of cases when a suit is filed in the defendant's home state) would complicate and delay the final **64 resolution of jurisdictional inquiries is absolutely groundless. In reality, the jurisdictional standards in S. 5 will simplify–not complicate–a court's jurisdictional inquiries. The critics forget that under the current standards, many (and possibly most) newly-filed state court class actions are removed to federal court to test whether the class counsel's efforts to evade federal jurisdiction have been successful (even though those removal attempts normally fail and the cases are remanded to state court). Those inquiries are often quite complicated and can create significant delays.

For example, as noted previously, counsel often include in their complaint extraneous parties in order to prevent the complaint from complying with the current "complete diversity" requirement. Our federal courts have ruled that those arguably extraneous parties can be ignored in the jurisdictional analysis if their claims are meritless,[199] and quite frequently, the claims of those parties are **69 challenged in class actions as part of the jurisdictional analysis, requiring the court to take time to engage in the complicated process of assessing the merits of their claims. Under current law, this time-consuming "fraudulent joinder" issue arises in many purported class actions that are removed to federal court.[200]

Similarly, the process of assessing whether a class action complies with the current jurisdictional amount requirement is also often "an expensive and time consuming process,"[201] requiring discovery on the nature and value of the named plaintiffs' claims. As noted previously, in some federal Circuits, the jurisdictional amount requirement in a class action is satisfied by showing that any member of the proposed class is asserting damages in excess of $75,000, and in other Circuits, the question is whether each and every member of the putative class has individually an amount in controversy exceeding $75,000."[202] Again, this time-consuming issue, often requiring significant amounts of **65 record review and fact-finding, is litigated very frequently in the many class actions that are removed to federal court under current law.[203]

In sum, S. 5 will make the resolution of class action jurisdictional issues easier–not harder. The need to deal with the bona fides of counsel's efforts to use dubious parties to avoid diversity will evaporate. In short, it will be much easier to figure out whether any class member is diverse as to any defendant (the "minimal diversity" inquiry established by S. 5) than resolving the fraudulent joinder issues regularly presented under the current rule ("complete **70 diversity"). Likewise, it will be much easier to determine whether the amount in controversy presented by a purported class as a whole (that is, in the aggregate) exceeds $5 million than it is to assess the value of the claim presented by each and every individual class member, as is required by the current diversity jurisdictional statute.

The critics' concerns that events might occur after a complaint is filed or removed that would either create federal jurisdiction in a way never intended or would remove federal jurisdiction in an arbitrary manner are similarly unfounded. While questions regarding events occurring after a complaint is filed or removed to federal court will, of course, arise under S. 5, those same (or, at least, very similar) questions arise in current practice on jurisdictional issues. Well-established law exists to

resolve these questions, and S. 5 does not change–or even complicate–the answers to these questions. In short, the "rules of the road" on such issues are already established, and S. 5 does not change them.

Under existing law (which S. 5 would not change), "diversity" of citizenship between the parties must exist both at the time a complaint is filed and at the time a complaint is removed to federal court.[204] For this reason, the federal court would generally only need to measure the diversity of the parties at the outset of the litigation. For example, in a case filed on behalf of a class of California citizens against a California company, there would be no minimal diversity when the case was filed–and thus the case could not be removed simply because one named plaintiff or class member later moved to Nevada. Similarly, if a class action against a California company were filed in California and more than 66% of the class members were California citizens at the time the case was **66 filed, changes in those class members' residences would not alter the jurisdictional analysis. In other words, no court would be required to engage in a residency play-by-play after the time the complaint was filed.

If, however, the plaintiff in the above example of her or her own volition filed an amended complaint in state court that added Nevada plaintiffs (or that brought the percentage of Nevada plaintiffs above 33% in a suit in the defendant's home state), jurisdiction would exist at the time that complaint was filed. Accordingly, as dictated by current law, the defendant could remove the case to federal court.[205]

Current law (that S. 5 does not alter) is also clear that, once a complaint is properly removed to federal court, the federal court's jurisdiction cannot be "ousted" by later events. Thus, for example, changes in the amount in controversy after the complaint has been removed would not subject a lawsuit to be remanded to state court. The Supreme Court established this principle in St. Paul Mercury Indem. Co. v. Red Cab Co.,[206] stating that "events occurring subsequent to removal which reduce the amount recoverable, whether **71 beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached." The same would be true if a case was removed to federal court because minimal diversity existed at the time and, because of a later event, minimal diversity was eliminated. This would occur if, for example, the federal court dismissed the claims of out-of-state plaintiffs, leaving only the claims of in-state plaintiffs against an in-state defendant intact. "It uniformly has been held that in a suit properly begun in federal court the change of citizenship does not oust the jurisdiction. The same rule governs a suit brought in a state court and removed to federal court."[207]

Sound policy reasons support this rule. If a federal court's jurisdiction could be ousted by events occurring after a case was removed, plaintiffs who believed the tide was turning against them could simply always amend their complaint months (or even years) into the litigation to require remand to state court. "If the plaintiff could, no matter how bona fide his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice. The claim, whether well or ill founded in fact, fixes the right of the defendant to remove, and the plaintiff ought not to be able to defeat that right and bring the cause back to the state court at his election.[208] Similarly, a defendant prevailing on the merits always shows that the amount in controversy, at the end of the day, is zero. Thus, if subsequent events could unravel a federal court's jurisdiction, a defendant could prevail on the merits, only to have the federal court conclude that it lacks jurisdiction to enter a judgment.[209]

**67 It is also clear under existing law that even if a case is not originally removable, it can become removable because of subsequent events (other than changes in the citizenship of the original parties, which, as noted above, do not effect jurisdiction). Thus, as applied under S. 5, if a plaintiff, through amendment or otherwise, increased the amount in controversy, created minimal diversity, or changed the class definition in a case filed in the defendant's home state to include more than 33% of out-of-state plaintiffs, a complaint filed in state court–and previously not subject to federal jurisdiction–could properly be removed.[210] Otherwise, the plaintiff could simply file a complaint not subject to removal and then later amend it, thereby circumventing federal jurisdiction. Similarly, if a plaintiff defines a class so as to allow diverse parties to become members of a class as the case proceeds, removal may be appropriate if diverse parties actually enter the class. For example, if a class action is filed in state court against an Indiana company on behalf of all persons affected by a chemical spill and it is initially thought that all class members are Indiana citizens, the case may become removable later in the litigation if it emerges that citizens of other states fall within the class definition or have become members of the class as the effects of the chemical spill spread. If this *72 were not the rule, major interstate controversies could evade federal jurisdiction because counsel filed a class action before the parameters of the controversy were fully developed. Any alternative rule would allow class counsel to urge rejection of federal jurisdiction on the grounds that only non-diverse Indiana citizens were in the class and then turn around months later and purport to represent thousands of persons residing

outside of Indiana. It should be noted that class counsel can limit the potential for removal as the case proceeds by defining the class to encompass only parties that were injured as of the date on which the action was filed or only parties who are citizens of a certain state.

Critics' Contention No. 12.: S. 5's provisions expanding federal jurisdiction over class actions are invalid because they exceed the jurisdictional authorization of Article III of the Constitution.

Response:

This concern is groundless. As viewed by many Circuits, a federal court may exercise diversity jurisdiction over a purported class action only if none of the plaintiffs named in the complaint share state citizenship with any defendant. In other words, no named plaintiff may be a citizen of the same state as any defendant. This so-called "complete diversity" prerequisite for federal jurisdiction is wholly a policy creation of Congress, establishing a scope of federal diversity jurisdiction narrower than what is authorized by Article III.[211] Broader definitions of diversity jurisdiction would be wholly consistent with Article III. "[I]n a variety of contexts, [federal courts] have concluded that Article III poses no obstacle to the legislative extension of federal [diversity] jurisdiction * * * so long as any two adverse parties are not co-citizens."[212]

**68** Critics suggest that S. 5 is constitutionally suspect because it would authorize federal jurisdiction over purported class actions in which there is "minimal (but not complete) diversity"–that is, cases in which any member of the purported class (whether or not explicitly named in the caption of the complaint) has state citizenship that differs from any defendant (using the definitions already in 28 U.S.C. S 1332). Citing no precedents whatsoever, the critics allege that there is an absolute bar on considering unnamed class members to be "parties" to a purported class action. They contend that those unnamed persons must be ignored completely in determining whether the two sides meet the applicable diversity requirement.

But the premise of this challenge–that unnamed class members cannot be deemed parties to an action–is flatly inconsistent with the fact that in a variety of contexts over the years, federal court have treated unnamed class members as parties to class actions. For example:

* In Zahn v. International Paper Co.,[213] the U.S. Supreme Court considered whether federal diversity jurisdiction existed over a purported Rule 23(b)(3) class that had not been certified. The district **73** court declined to exercise federal jurisdiction (or to allow the matter to proceed as a class action) because even though "[t]he claim of each of the named plaintiffs was found to satisfy the * * * jurisdictional amount," "not every individual owner in the class has suffered * * * damages in excess of" the amount-in-controversy threshold.[214] The Supreme Court concurred, holding that in determining whether the amount-in-controversy prerequisite for diversity jurisdiction is satisfied, a trial court is obliged to look at whether each purported claimant, even if unnamed, meets the $75,000 jurisdictional amount requirement.[215] Thus, in this respect, the federal courts have for many years treated unnamed class members as "parties."

* Similarly, in Devlin v. Scardelletti,[216] the Supreme Court recently held that unnamed class members are considered "parties" for purposes of mounting an appeal. Thus, Devlin rejects the contention that unnamed class members cannot be considered "parties" to the litigation.

* Earlier, the Supreme Court ruled that normally, the filing of a class action immediately tolls the statute of limitations as to all unnamed class members.[217] In short, all unnamed class members are treated as parties–treated as if they had filed the litigation themselves. Significantly the American Pipe Court declared that "the claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue.")[218]

* Along these same lines, many courts have held that under Fed. R. Civ. P. 23(e), a court must ensure that unnamed class members' interests are protected if class claims are dismissed.[219] In other words, the court is obliged (at least at some level) to treat the unnamed class members as parties to the litigation.

**69** S. 5 proposes that Congress declare unnamed class members to be " parties" to the litigation for purposes of the "minimal diversity" jurisdictional requirement. As evidenced by the foregoing examples, such a congressional determination about who is a class action "party" would be wholly consistent with long-standing practice. For years, Congress and the

courts have made practical determinations about how various categories of parties should be treated in assessing compliance with diversity jurisdiction prerequisites and specifically about the circumstances in which unnamed class members should be treated as parties to a lawsuit. The enactment of the "minimal diversity" provisions of S. 5 would be merely another such practical determination a determination that for purposes of the "minimal diversity" jurisdictional inquiry established by the legislation, unnamed class members (as well as any named class members) shall be considered "parties." Congress is certainly empowered to establish such a definition in this instance.

The critics are also wrong to suggest that The Class Action Fairness Act "dictate[s] * * * state court [rules of civil] procedure" and **74 thus impinges upon the sovereignty of the state.[220] Critics quote Prof. Larry Tribe as saying that "for Congress directly, regulate the procedures used by state courts in adjudicating state-law tort claims * * * would raise serious questions under the Tenth Amendment and principles of Federalism."[221] Of course, when Professor Tribe made that statement, he was not referring to The Class Action Fairness Act. That is because The Class Action Fairness Act does not regulate the procedures "used by state courts" at all. Rather, it simply changes the federal jurisdiction statute to expand the diversity jurisdiction of federal courts to encompass more class action.

If cases subject to that broader jurisdictional grant are removed to federal court (or brought there in the first place), it is of course permissible for Congress to regulate the procedures by federal courts to resolve such cases. Indeed, if Congress cannot specify laws and procedures to be used by federal courts, then all of the federal rules of civil procedure (which are transmitted to Congress for final approval) would be unconstitutional.

The critics' contention that The Class Action Fairness Act "overstep [s] [Congress's] specific constitutional power to regulate interstate commerce"[222] is equally baseless. This final "serious" constitutional argument is another red herring. In the first place, it is difficult to imagine why The Class Action Fairness Act–which by its text regulates only very large interstate class actions involving at least two (and sometimes up to 50) states–could be unconstitutional when there is no debate that a $75,001 slip and fall case involving citizens of only two states can appropriately be heard by a federal court.

Thus, the critics would have to concede that their view of the Commerce Clause abolishes all diversity jurisdiction, in direct contravention of Article III, Supreme Court precedent, and Congressional authority exercised literally since the year of our nation's founding.

Even if the critics' attack on the Commerce Clause were not so obviously misguided given the separate authority Congress has to regulate federal courts, The Class Action Fairness Act targets activity with substantial effects on interstate commerce. It targets **70 only those lawsuits involving parties from different states, is limited to very large lawsuits involving at least $5 million, and regulates economic activity (the transfer of resources through litigation) that collectively has substantial effects on interstate commerce. As the legislative history makes abundantly clear, abusive state court class action practices exact a staggering toll on interstate commerce. The Class Action Fairness Act is thus not only constitutional, it is necessary as a matter of public policy.

In sum, the Committee notes that the exercise of this expanded jurisdiction can be grounded on a Commerce Clause rationale as well. In that regard, the Committee notes that the legislation contains findings that the state court class action abuses identified in the record before the Committee are having a serious adverse effect on interstate commerce and that the legislation (particularly its jurisdictional **75 provisions) is intended to ameliorate those adverse effects.

Critics' Contention No. 13: S. 5 will make it harder for consumers to bring class action lawsuits against pharmaceutical manufacturers and should be amended to exclude drug cases.

S. 5 poses no barrier for consumers seeking to bring suits against pharmaceutical manufacturers. All the bill does is move certain class actions to federal court. Moreover, an industry-specific exemption from federal jurisdiction, such as the carve-out proposed by this critique, makes no sense, since it irrationally slams the federal courthouse door on one industry–the very kind of treatment that the Framers sought to avoid by creating diversity jurisdiction. Such an approach is ill-advised for several reasons.

First, such an amendment would unfairly single out the pharmaceutical industry and deny defendants a fair, even-handed federal court forum. Moreover, this contention is inconsistent with what the Framers had in mind in establishing diversity

jurisdiction in Article III of the Constitution. They wanted to allow interstate businesses to have claims against them heard in federal court so as to avoid local biases. Nowhere in this concept is the idea that certain industries should be exempted from this right–i.e., that certain kinds of businesses are less entitled to federal court protection. In short, such an exclusion would fly in the face of the Constitution, as well as the basic purpose of the bill.

Second, the flood of litigation surrounding recent drug withdrawals demonstrates the need for class action reform. Under the current system, plaintiffs' lawyers frequently file hundreds of overlapping class action lawsuits in various state court jurisdictions around the country. And since we have 50 different state court systems, these cases cannot be coordinated or consolidated before one judge. As a result, both sides have to engage in duplicative discovery, the judges end up duplicating each others' work, and different courts often reach different decisions on the same pretrial issues. To make matters worse, the current system encourages plaintiffs' lawyers to compete against each other–vying to achieve the first nationwide settlement that will eviscerate the remaining class actions involving similar claims.

In contrast, when numerous duplicative class actions are brought in federal court, the federal multi district litigation (MDL) mechanism allows all the cases to be coordinated for pretrial proceedings in one federal court. That means all the parties in all the cases typically set up one document depository, the court issues consistent rulings on discovery issues and summary judgment motions, and the court can preside over settlement negotiations that address the concerns of all the plaintiffs in all the cases–rather than just strike a deal with one group of plaintiffs' lawyers. Put simply, MDL proceedings are fairer, more efficient, and less expensive.

Third, federal courts have demonstrated their effectiveness in handling nationwide class actions against pharmaceutical companies. Federal court proceedings have resulted **71 in numerous pro-consumer settlements in pharmaceutical cases. For example, the settlement in In re Diet Drugs (Fen-Phen) provided $3.75 billion for *76 personal injury claims, medical monitoring and research.[223] Similarly, in In re: Copley Pharmaceutical Inc., Albuterol Products Liability Litigation, an MDL court approved a $150 million settlement for consumers.[224] And in Bowling v. Pfizer,, the federal court approved a settlement providing approximately $200 million in medical monitoring for plaintiffs who had received allegedly defective heart valves.[225]

Fourth, regulatory decisions regarding which pharmaceutical drugs are available to the American public should not be shifted away from the Food and Drug Administration into the hands of plaintiffs' lawyers, judges and juries. Many class actions against pharmaceutical manufacturers are filed in spite of the fact that the FDA has investigated an alleged problem and concluded that the drug should remain on the market. Class action lawyers borrow from the factual work undertaken by the agency and use the class action vehicle as a way to relitigate the agency's decisions. The authority to decide whether consumers should have access to pharmaceuticals should remain with the FDA. And if there are problems with FDA, the solution is to fix the agency–not to transfer its power to self-interested class action lawyers.

Finally, the claims of some critics that it is more difficult to have a class certified in federal court than in state court have been disproved. As noted previously, a study by the Federal Judicial Center found that class actions were "almost equally likely to be certified" in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time.[226] The study also debunked another myth often repeated by opponents of The Class Action Fairness Act–that state courts move more quickly than federal courts. According to the study, federal courts are much more speedy in resolving class action issues: state courts, in contrast, are more likely to let class actions linger without ruling on class certification. Finally, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. State court judges are assigned (on average) 1,568 new cases each year.[227] In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003.[228]

## VIII. CBO COST ESTIMATE

S. 5 would expand the types of class-action lawsuits that would be initially heard in federal district courts and would provide guidelines for the award of attorney's fees in certain types of settlements. CBO estimates that implementing the bill would cost the federal district courts about $7 million a year, subject to appropriation of the necessary funds. Enacting the bill would not affect direct spending or revenues. S. 5 contains no intergovernmental mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would impose no costs on state, local, or tribal **72 governments. *77 S. 5 would impose

private-sector mandates, as defined in UMRA, but CBO estimates that the direct cost of those mandates would fall below the annual threshold established by UMRA ($123 million in 2005, adjusted annually for inflation).

Under S. 5, most class-action lawsuits would be heard in a federal district court rather than a state court. Therefore, CBO estimates that the bill would impose additional costs on the federal district court system. While the number of cases that would be filed in federal court under this bill is uncertain, CBO expects that a few hundred additional cases would be heard in federal court each year. According to the Administrative Office of the United States Courts, class-action lawsuits tried in federal court cost the government, on average, about $23,000. That figure includes salaries and benefits for clerks, rent, utilities, and associated overhead expenses but excludes the costs of the salaries and benefits of judges. CBO estimates that implementing S. 5 would cost about $7 million annually.

CBO also estimates that enacting this bill could increase the need for additional district judges. Because the salaries and benefits of district court judges are considered mandatory, adding more judges would increase direct spending. However, S. 5 would not–by itself–affect direct spending because separate legislation would be necessary to authorize an increase in the number of district judges. In any event, CBO expects that enacting the bill would not require a significant increase in the number of federal judges, so that any potential increase in direct spending from subsequent legislation would probably be less than $500,000 a year.

S. 5 would require the Judicial Conference of the United States to transmit a report on class-action settlements to the Congress no later than one year after the bill's enactment. CBO estimates that this provision would cost less than $500,000 in 2005.

S. 5 would impose a private-sector mandate by possibly limiting the size of awards that attorneys could receive in certain class-action settlements. If a proposed class-action settlement provides coupons to a class member, the bill would require the attorneys' fees to be based on the value of the coupons that are redeemed or on the amount of time reasonably expended working on the case by class counsel. In current practice, the attorney's fee is sometimes based on the total value of the settlement. According to information from industry representatives and academic studies, settlements with coupons account only for about 10 percent of all class-action settlements. Moreover, according to those sources, attorneys' fees correlate very closely with the amount of time spent on such cases by class counsel. Therefore, because attorneys' fees would still be negotiated as part of any settlement, CBO estimates that the direct cost of the mandate, as measured by loss of income for attorneys in class-action settlements, would be small, if any.

In addition, S. 5 would impose a private-sector mandate on defendants participating in a proposed class-action settlement. The bill would require defendants to make certain notifications and disclosures to the appropriate state official of each state in which a class member resides and the appropriate federal official within 10 days after a proposed settlement is filed in court. The bill defines a proposed settlement as an agreement regarding a class action that is subject to court approval and would be binding on the class. **78 The required notices and disclosures would include a copy of the suit, a copy of the proposed settlement, a statement of class members' rights, and certain other materials. In effect, the defendants would have to provide copies of documents and materials related to information that they usually already possess about the case. Further, the provision would **73 allow for the use of the Internet in making such disclosures. Thus, CBO estimates that the costs of complying with this mandate would be small.

The CBO staff contacts for this estimate are Gregory Waring (for federal costs), and Paige Piper/Bach (for the private-sector impact). This estimate was approved by Peter H. Fontaine, Deputy Assistant Director for Budget Analysis.

## IX. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, the Committee, after due consideration, concludes that S. 5 will not have a significant regulatory impact.

## *79 X. ADDITIONAL VIEWS OF SENATOR PATRICK LEAHY

The circulation and filing of this report occurred after passage of the legislation for Senate consideration of the underlying

bill. Indeed, it was filed after the House of Representatives passed this legislation and on the same day that the President signed the measure into law. Committee reports, like Committee consideration of measures, are intended to assist the Senate in its consideration of the matter. Committees tend to have Members with expertise and experience that help shape legislation for Senate consideration. In this case, that did not occur. Instead, at the insistence of the Republican leadership, this bill was rushed through the Judiciary Committee and then forced through the Senate without amendment.

The Republican leadership's timetable was so short that there was no opportunity to prepare a Committee report before final passage. There was no time for Senators to review a cost estimate from the Congressional Budget Office. There was no evaluation of the regulatory impact of the bill. That this report is being filed after Senate consideration means that it did not serve the principal purpose for which Committee reports are intended.

Several days ago, the Senate had pending before it for a few days the so-called "Class Action Fairness Act." In lockstep mode, bill supporters rejected every effort to clarify or improve the bill. During the few days it was pending, a few modest amendments were offered to clarify some ambiguous provisions and to respond to serious concerns raised by the National Conference of State Legislatures, the National Association of State Attorneys General, prominent legal scholars, consumer and environmental groups and civil rights organizations. All these efforts were rejected. Anyone who watched the Senate on C–SPAN or reviews the Congressional Record will see ample evidence that the "fix was in". Thus, despite legitimate concerns acknowledged by some of this legislation's sponsors and supporters, the bill was not improved in any regard on its short journey through the Senate.

I am disappointed that the Senate has been reduced to taking its marching orders on major legislation from corporate special interests and the White House. The Senate could have made limited but important improvements to the bill but, instead, the majority of Senators refused to even consider minor improvements let alone the major flaws in this legislation.

This legislation will make it harder for American citizens to protect themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these cases out of local state courts. Aside from being convenient, state courts have experience with the legal and factual issues involved in these important cases. This bill will sweep these cases into federal courts **80 **74 and, thereby, erect new barriers to lawsuits and place new burdens on plaintiffs.

The biggest concern raised by legal scholars and agreed to by several Senate sponsors of the bill would have addressed the recent trend in the federal courts not to certify class actions if multi-state laws are involved. Given this development, what this bill may result in doing is removing class actions to federal court where they will likely be dismissed for involving multiple state laws and where they will not be considered on the merits because the federal court will choose not to consider a case involving the laws of the states. Cynics might even speculate that is what the business groups behind this purported "procedural" change are really seeking, the dismissal of meritorious cases on procedural grounds by the federal courts.

Many Senators understand that this bill could deny justice to consumers and others in class actions who band together to seek relief in state court. Senator Feinstein and Senator Bingaman worked together on an amendment to alleviate this legal Catch–22. It is unfortunate that the wisdom of their common-sense solution was rejected.

Anyone who reads this bill will notice that despite its title, it affects more than just class actions. Individual actions, consolidated by state courts for efficiency purposes, are not class actions. Despite the fact that a similar provision was unanimously struck from the bill during the last Congress, mass actions reappeared in this bill this Congress. Federalizing these individual cases will no doubt delay, and possibly deny, justice for victims suffering real injuries. Senator Durbin's amendment would have clarified the bill's effect on these cases but it was not adopted.

Prominent civil rights organizations and labor advocates requested that the bill be modified to acknowledge the fact that many of our states have their own protective civil rights and employment laws. Senator Kennedy's amendment to exempt civil rights and wage and hour cases from this bill was a sensible solution. I was proud to cosponsor it and regret that this amendment was also rejected.

This class action legislation has also been criticized by nearly all of the state Attorneys General in this country. They expressed a specific concern that S. 5 could limit their official powers to investigate and bring actions in their state courts

against defendants who have caused harm to their citizens because in certain instances they file suit as the class representative for the consumers of their state. Not even this minor clarification, requested by nearly every state's highest law enforcement officer, was acceptable to the bill's supporters as they to adopt Senator Pryor's amendment.

It is disappointing to me that the Senate has refused to listen to the wise counsel of our state legislatures, our state law enforcement officers, our state judges and even the views expressed by our federal judiciary. They serve in the institutions that we are affecting by enacting this legislation.

This bill contains language to reduce the delay parties can experience when a case is removed to federal court by setting a time limit for appeals of remand orders. However, no measure is included in the bill that would set a timeline for the district court **\*81** to rule on the actual remand motion. This means that plaintiffs' claims may be removed from state court, just to languish on the federal docket for years, without any recourse. Senator Feingold offered a modest amendment to set a reasonable time limit for the district court to rule on remand orders. This solution received praise from one of the sponsors of the legislation, yet the amendment was rejected.

I predict this legislation will be manipulated by well-paid corporate defense lawyers to create complex, expensive and lengthy litigation over the criteria and factors in the bill and whether they apply to a particular case. Unfortunately, one of the great boons–or **\*\*75** more properly boondoggles–of this legislation, to the extent it does not simply deter meritorious class actions that would otherwise have been brought by consumers, is that it will make them more costly, burdensome and complicated.

The so-called Class Action Fairness Act falls short of the expectation set by its title. It will leave many injured parties who have valid claims with no avenue for relief, and that is anything but fair to the ordinary Americans who look to us to represent them in the United States Senate.

Patrick Leahy.

**\*82** XI. MINORITY VIEWS OF SENATORS LEAHY, KENNEDY, BIDEN, FEINGOLD, AND DURBIN

I. INTRODUCTION

We strongly oppose S. 5, the "Class Action Fairness Act of 2005." Although the legislation is described by some of its proponents as a "modest bill" not effecting "a substantive change in the law", in reality it will cause a radical revision of the class action rules and diversity jurisdiction requirements. We believe it would bar most state class actions from being heard in state courts and prevent many nationwide class actions from being heard in either state or federal court.

This legislation and previous versions have been opposed by the federal[1] and state[2] judiciaries, as well as, state legislatures.[3] S. 5 is also opposed by dozens of civil rights, consumer, environmental **\*83** and public interest advocates[4] and **\*\*76** several state Attorneys General.[5]

By providing plaintiffs access to the courts in cases where a defendant may have caused small injuries to a large number of persons, class action procedures have traditionally offered a valuable mechanism for aggregating small claims that otherwise might not warrant individual litigation. This legislation will undercut that important principle by making it far more burdensome, expensive, and time-consuming for groups of injured persons to obtain access to justice. Thus, it would be more difficult for citizens to seek redress for violations of civil rights, employment discrimination, and consumer health, safety and environmental laws, to name but a few important laws. The legislation will prevent state courts from considering class action cases which involve solely violations of state laws, such as state consumer protection laws.

"The Class Action Fairness Act of 2005" will force most state class action cases into federal courts. It will provide automatically for both original jurisdiction and the removal of state class action claims to federal court at the request of either party in cases involving violations of state law if any member of the plaintiff class and at least one primary defendant are citizens of different states.[6]

**\*84** As part of the expanded diversity jurisdiction, the bill also provides for the removal of state class actions to federal court

at the request of either party if fewer than one-third of the plaintiff class members are citizens of a different state than any primary defendant, even if the primary defendant conducts substantial business in that state.[7] The legislation would allow removal of a class action to federal court in cases where between one-third and two-thirds of the plaintiffs are citizens of the same state as the primary defendants.[8]

**\*\*77** Under the legislation, federal courts are directed to abstain from hearing a class action only where (1) more than two-thirds of the plaintiffs are citizens of the same state as at least one of the primary defendants; (2) the principal injuries occurred in that state; (3) the matters in controversy are less than \$5,000,000 or the membership of the proposed class is less than 100; or (4) the primary defendants are states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief.[9]

In the context of the "Local Controversy Exception", the Committee Report erroneously conflates the concepts of citizenship and residence.[10] Contrary to the Committee report, the legislation provides that the touchstone for this exception is citizenship not residence. This more narrow exception will no doubt result in many more class actions being removed to federal court.

This bill contains a "Consumer Class Action Bill of Rights." This section includes some safeguards that we agree will improve class action litigation for all parties, such as protection against a proposed settlement that would result in a net loss to a class member and protection against discrimination based on geographic location.[11] We also recognize that improvements were made to the bill in the last Congress such as: restricting use of coupon settlements; allowing civil rights and consumer plaintiffs to be compensated for the particular hardships they endure as a result of initiating and pursuing litigation as named plaintiffs; eliminating the notification burden; prohibiting retroactivity and providing for greater judicial discretion.[12]

We object to the fact that S. 5 is written to favor corporate defendants at the expense of victims. Before even considering S. 5, the Committee and the full Senate should have insisted on receiving objective and comprehensive data justifying such a dramatic intrusion into state court prerogatives. Nothing in the way of such information now exists. Before the Committee considered this bill, a hearing on class action litigation would have helped the Committee **\*85** develop consensus reforms to better serve both defendants and plaintiffs before the Committee proceeded to a markup on S. 5.

We had hoped that the Committee would undertake a deliberate and careful review of information from parties actually involved in class action litigation to provide a realistic picture of the benefits and problems with class actions. But, instead, the Committee has simply decided that the time is now for federalizing nearly all class actions where most of plaintiffs' claims will take longer and be more expensive.

We recognize that there are some genuine problems with some class action litigation that should be addressed by federal legislation for the benefit of both defendants and plaintiffs. This legislation, however, is heavily biased in favor of defendants. Rather than address the system's real failings, S. 5 will make it more difficult for the vast majority of legitimate, well-intentioned class actions to move forward, by placing cumbersome restrictions on citizens' rights to seek redress for their injuries.

**\*\*78** In short, we agree with the position of the National Conference of State Legislatures when they urged us "to remember that state policy choices should not be overridden without a showing of compelling national need. We should await evidence demonstrating that states have broadly overreached or are unable to address the problems themselves. There must be evidence of harm to interests of national scope that require a federal response, and even with such evidence, federal preemption should be limited to remedying specific problems with tailored solutions, something that S. 5 does not do."[13]

For these and other reasons set forth herein, we strongly oppose S. 5.

## II. S. 5 WILL HURT CONSUMERS, VICTIMS, AND THE ENVIRONMENT

Proponents of this legislation claim that S. 5 will protect consumers while remedying the worst abuses of the class action system, yet consumer advocates overwhelmingly oppose these alleged "reforms."[14]

A. Federal courts' refusal to certify class actions will leave victims in limbo

There can be little doubt that S. 5 will have a serious adverse impact on the ability of consumers and victims to obtain compensation in cases involving widespread harm. At a minimum, the legislation will force most state class action claims into federal courts where it is generally more expensive for plaintiffs to litigate cases and where defendants could force plaintiffs to travel long distances to attend proceedings. It is also typically more difficult and time consuming to certify a class action in federal court. By pushing cases from state to federal court, S. 5 creates more problems than it solves.

**\*86** Fourteen states, representing nearly one-third of the nation's population,[15] have adopted different criteria for class action rules than Rule 23 of the Federal Rules of Civil Procedure.[16] In addition, with respect to those states which have enacted an analog to Rule 23, the federal courts are likely to represent a more difficult forum for class certification to occur. This ratcheting up of the standard is the result of a series of several federal cases, such as Castano v. American Tobacco Co.[17], In re Rhone-Poulenc Rorer, **\*\*79** Inc.,[18] In re American Medical Systems, Inc.,[19] Georgine v. Amchem Products, Inc.,[20] Broussard v. Meineke Discount Mufflers,[21] and Ortiz v. Fibreboard,[22] which have made it more difficult to establish the 'predominance requirement' necessary to establish a class action under the federal rules.

Plaintiffs removed to Federal courts are subject to the Federal Rules of Civil Procedure. In accordance with Rule 23(b)(3), their cases will not be certified by the Federal court if they cannot show that a common question of law predominates. As this rule has been interpreted by many Circuit[23] and District Courts,[24] Federal courts are not certifying class actions involving the laws of multiple states. In fact, six Circuit Courts and 26 District Courts have consistently denied certification of multi-state consumer cases. Only **\*87** one court has granted certification of these cases and even that case, from the Third Circuit, has been distinguished on its facts. [add footnote: See In re School Asbestos Litig., 789 F.2d 996, 1011 (3d Cir. 1986)]

Not only are the courts concerned with the federalism implications of such action, but recognize that by doing so, cases become simply unmanageable as courts try to apply the laws of each plaintiff's state to the plaintiff. Scholars who track multi-state class action suits have found that if a case involves too many state laws, then Federal court judges can and do dismiss the case.[25] In fact, the U.S. Chamber of Commerce has recognized this stating, "federal courts have consistently refused to certify nationwide class actions in product defect cases because the need to apply the laws of many different states would make such a sprawling class action unmanageable."[26]

Federalizing class action cases creates an incentive for violators to break the laws of multiple states, as any collective action to hold them accountable will likely be dismissed. And, consumers, workers and victims will be prevented from having many important multi-state class actions heard in either the state or Federal courts. As a result, we will likely begin to see fewer dangerous and ineffective products and devices removed from the marketplace.

**\*\*80** Consumers pay the price when Federal courts dismiss a case. When this occurs, "[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the potential to overwhelm state courts."[27]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation "will slow–and in some cases thwart–the continual interpretation of state law."[28]

To solve this significant problem, S. 5 should be amended to ensure that cases which are removed from state courts are at least not immediately dismissed by the Federal judge on choice of law grounds. One solution to this loophole in the legislation is the subject of Senator Bingaman's amendment. Quite simply, a Federal judge presented with a case that involves a choice of law issue should be able to apply the state law that has a sufficient connection to the case. In this way, not only are citizens' rights and access to the courts preserved, but the Federalism concerns that removal creates are undercut because state laws are being enforced.[29] This sensible solution to a glaring deficiency in the bill also had the support of Chairman Specter, as he noted during the Committee's markup.

**\*88** B. One-sided delays of justice must be avoided

Last Congress, Senators Dodd, Schumer and Landrieu were able to improve the legislation by adding a provision to the class action bill to require that any appeal of a motion to remand be ruled on by the court of appeals within 60 days. However,

before a motion to remand can be appealed it first needs to be ruled on by the lower district court. S. 5 overlooks this step and creates another loophole which defendants can exploit to delay trials. The bill contains no deadline on how long district courts can take to rule on a motion to remand. By simply removing all class actions to Federal court, defendants can exploit this lack of a statutory deadline; and therefore benefit from the delay, which inevitably increases the costs of trials and leaves the plaintiffs in limbo.

Since the bill already addressed the need for speedy resolution of remand appeals, it should similarly require speedy resolution for motions to remand at the district court level. Senator Feingold proposed an amendment that would have simply required district courts to work within the same timeframe as the appeals courts. Under his proposal, any motion for remand to a state court would need to be decided by a district court within 60 days, which tracks the 60 days timeframe afforded to the appeals court. Sen. Feingold's amendment, which he withdrew at the request of Chairman Specter, also provided an automatic additional 10 days for review of the remand motion, and the ability to seek more time for review, if necessary.

C. Barriers to justice for consumers and victims of mass torts

This legislation will also severely limit the ability of consumers to pursue class action in state court, even when state consumer protection laws are implicated. Consumers pay the price when Federal courts dismiss a case. When this occurs, "[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the **81 potential to overwhelm state courts."[30]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation "will slow–and in some cases thwart–the continual interpretation of state law."[31]

As the American Bar Association Task Force on Class Action Legislation's recent report noted, "any expansion [of Federal court jurisdiction] should preserve a balance between legitimate state-court interests and Federal-court jurisdictional benefits."[32] The current legislation clearly fails this test.

Proponents of S. 5 argue that while many class actions will be removed to federal courts, plaintiffs can still bring their individualized claims in state courts. This is not an adequate solution because **82 state judges often consolidate cases to ease their dockets. This procedure allows cases with similar questions of law and fact to be consolidated for all or part of the proceedings. Consolidation does not make the case a class action. However, S. 5 reaches not only class actions, but these consolidated cases as well, through a new term of art called "mass actions."[33] For example, the plaintiffs who have brought individual claims against Merck for injuries sustained by Vioxx have had their actions consolidated in the courts. Federalizing these cases would seriously delay not only the victims' compensation but would also prevent victims from holding the drug companies accountable. S. 5 places state court judges in a considerable Catch–22: either do not consolidate the cases and be overloaded with work, or consolidate and cede control of an issue relating to their state laws to the federal courts.

Senator Durbin proposed an amendment to rectify this Catch–22 by narrowing the scope of mass tort cases that would be affected by S. 5. Despite the fact that a similar provision was unanimously struck from the bill during the mark-up of class actions legislation in the Judiciary Committee in the last Congress, mass torts are again included in S. 5.

The net result of these various changes is that under the proposed legislation, it will be far more difficult for consumers and other injured individuals to obtain justice in class action cases at the state or Federal level.

D. Special punishment for the environment and civil rights

By removing many important environmental class actions from state to federal court, S. 5 not only denies to state courts the opportunity to interpret their own state's environmental protection laws, it hampers and deters plaintiffs from pursuing important environmental litigation. The well-documented backlog in the federal courts and the need for attorneys to engage in choice of law debates will significantly increase the time and cost of environmental litigation. Ultimately, environmental

class actions may not get litigated and the incentive polluters have to keep our environment clean will be reduced.

**\*\*82** Moreover, by failing to carve out an exception in S. 5 to protect the environment, the majority ignores the advice of the Judicial Conference of the United States, chaired by Chief Justice Rehnquist. In its March 26, 2003, letter, the Judicial Conference noted that even if the Congress adopts class action removal legislation, there should be certain exceptions such as "a class action in which plaintiff class members suffered personal injury or physical property damage within the state, as in the case of a serious environmental disaster."[34]

Just as S. 5 turns a blind eye toward the environment and to the advice of Chief Justice Rehnquist, the proposed legislation will make it much more difficult to use class actions as a means of protecting civil rights.[35] Class actions are the most effective means to **\*90** change a policy of discrimination and to bring claims for small amounts of individual wage loss. State laws offer more extensive protections for low wage workers and for many members of minority groups, as well as for the disabled. Several civil rights organizations have argued that S. 5 and its "additional, substantial and costly noticing requirements and built-in delays are not a matter of due process, but are overly burdensome and improperly assume that federal and state officials have proper interest in, and a capacity to respond to, each and every class action."[36]

Indeed, class action litigation has been essential to vindicating basic civil rights through our courts. For example, the landmark Supreme Court decision in Brown v. Board of Education was the culmination of appeals from four class action cases, three from federal court decisions in Kansas, South Carolina and Virginia and one from a decision by the Supreme Court of Delaware. Only the Supreme Court of Delaware, the state court, got the case right by deciding for the African-American plaintiffs. The state court justices understood that they were constrained by the existing Supreme Court law, but nonetheless held that the segregated schools of Delaware violated the Fourteenth Amendment. Before any federal court did so, a state court rejected separate and unequal schools.

S. 5 sets up several new hurdles for plaintiffs who file class actions. These requirements will be especially burdensome for many civil rights claimants.

The bill's requirement to provide "notice" to state officials, such as a state attorney general, will certainly lead to delays in the proceedings. As a result, some of the critical evidence of malice or discriminatory intent required to prevail in civil rights and discrimination cases could be lost while this additional step is taken. In addition, this added hurdle will likely be redundant because many of these plaintiffs will have already gone through an administrative proceeding before being allowed to file a discrimination claim.

**\*\*83** As a consequence of the assault that S. 5 would launch on the defense of civil liberties, many civil rights advocates—including the Lawyers' Committee for Civil Rights Under Law, the Leadership Conference on Civil Rights, the Mexican American Legal Defense and Education Fund, and the National Asian Pacific Legal Consortium—have concluded that this legislation "would discourage civil rights class actions, impose substantial barriers to settling class actions and render Federal courts unable to provide swift and effective administration of justice."[37]

This legislation would have been greatly improved if amended by a carve-out proposed by Senator Kennedy for civil rights and employment law cases. The bill indiscriminately applies to all multi-state class action suits, without pausing to consider the implications on important civil rights abuse challenges. States have **\*91** strengthened their civil rights laws after years of federal encouragement to do so, but now S. 5 will take away the states' means of enforcing those laws. If violators are allowed to side-step these protections by removing cases to the federal courts, those efforts will have been for naught.

Even if Federal courts take up the claims, state judicial interpretations of civil rights laws will be full of holes due to a lack of state-level adjudication of issues. The bill's additional notice requirement will not only lead to significant delays affecting plaintiffs' ability to gain critical evidence of malice or discriminatory intent, but also would likely be redundant as most plaintiffs already have gone through an administrative proceeding. Taken together, these barriers will certainly result in worthy claimants being discouraged from filing class action suits and civil rights violators going unpunished.

We all agree that some reform is needed to improve the efficiency and fairness of our nation's class action procedures. At the same time, many state legislatures have worked hard to develop a system of laws that defend and protect all citizens' civil rights so it is unfortunate that this bill seeks to gut those efforts through a clumsy reform effort. Senator Kennedy proposed a

refined approach that would have enabled victims of civil rights violations to have their day in court. This amendment would have exempted civil rights, as well as wage and hour state law cases, from S. 5 and therefore maintain the status quo for these claims.

### E. Improvements made on coupon settlements

This class action bill makes an improvement on the use of worthless coupon settlements, which provide little or no tangible benefits to class action plaintiffs. Typically, these settlements involve an agreement by plaintiffs' and defendants' counsel that fully pay for the attorney fees and expenses of the plaintiffs' counsel while class members are left holding coupons to buy the defendants' products. For example, in a federal class action case alleging a price-fixing conspiracy between major airlines, class members were awarded $400 million in flight coupons. However, the coupons were restricted to certain dates and small increments of travel making them virtually unusable to consumers.[38]

This version of the class action bill creates incentives for class members' attorneys to seek a remedy for their clients by tying the attorneys' compensation to the value of coupons which are actually redeemed.[39] To help the court make a determination of this value, the judge may hear from expert witnesses.[40] If the coupons are not used to determine counsel's compensation, then the award fee must at least be "based upon the **84 amount of time class counsel reasonably expended working on the action," subject to approval by the court.[41] If the plaintiffs' attorneys secure a mixed award, i.e. coupons and an injunction, then part of their fee will be based on the coupons redeemed and part will be based on the reasonable expenditure *92 of time.[42] Any settlement based on coupons will be subject to a hearing before the judge who will determine if the proposed settlement if "fair, reasonable and adequate."[43]

### III. S. 5 WILL DAMAGE THE FEDERAL AND STATE COURT SYSTEMS

By expanding federal class action jurisdiction to include almost all state class actions, S. 5 will inevitably result in a significant increase in the federal courts' workload. In its letter to the Judiciary Committee concerning a prior version of this bill, the Judicial Conference warned that:

[T]he effect of the class action provisions of [S. 353] would be to move virtually all class action litigation into the Federal courts, thereby offending well-established principles of Federalism [and] * * * hold[ing] the potential for increasing significantly the number of [class action] cases currently being litigated in the Federal system.[44]

In addition to overwhelming the federal courts with new time-intensive class actions, S. 5 will undermine state courts' independent authority. State Attorneys General recently wrote to Senate leaders objecting to this "federalizing" of most class actions under this legislation:

S. 5 would vastly expand federal diversity jurisdiction, and thereby would result in most class actions being filed in or removed to federal court. This transfer of jurisdiction in cases raising questions of state law will inappropriately usurp the primary role of state courts in developing their own state tort and contract laws, and will impair their ability to establish consistent interpretations of those laws.[45]

Even more troublesome than these potential workload problems, S. 5 raises serious constitutional issues by challenging the vision of our founders and the intent of the Constitution. This legislation undermines James Madison's vision of a federal government "limited to certain enumerated objects, which concern all the members of the republic."[46]

This bill does not merely operate to preempt state laws; rather, it unilaterally strips the state courts of their ability to use the class action procedural device to resolve state law disputes. As the Lawyers' Committee for Civil Rights Under Law observes, citing Bank of the United States v. Deveaux:

**85 For over 200 years, Federal diversity jurisdiction has been exercised with care and hesitation, demonstrating that Congress believed, with few exceptions "tribunals of *93 the state * * * administer justice as impartially as those of the nation, to parties of every description."[47]

The courts have previously found that efforts by Congress to dictate such state court procedures implicate important Tenth Amendment Federalism concerns and should be avoided. For example, in Fielder v. Casey the Supreme Court observed that it is an "unassailable proposition * * * that States may establish the rules of procedure governing litigation in their own courts."[48]

Similarly, in Johnson v. Fankell, the Court reiterated what it termed "the general rule bottomed deeply in belief in the importance of State control of State judicial procedure * * * that Federal law takes State courts as it finds them"[49] and observed that judicial respect for the principal of Federalism "is at its apex when we confront a claim that Federal law requires a State to undertake something as fundamental as restructuring the operation of its courts" and "it is a matter for each State to decide how to structure its judicial system."[50]

These same constitutional concerns were highlighted by Professor Laurence Tribe in his testimony regarding the constitutionality of a proposed federal class action rule applicable to state courts included in tobacco legislation proposed during the 105th Congress. Professor Tribe observed: "[f]or Congress directly to regulate the procedures used by state courts in adjudicating state-law tort claims–to forbid them, for example, from applying their generally applicable class action procedures in cases involving tobacco suits–would raise serious questions under the Tenth Amendment and principles of Federalism."[51]

The Supreme Court's most recent decisions further indicate that S. 5 is an unacceptable infringement upon state sovereignty. In United States v. Morrison,[52] the Court invalidated parts of the Violence Against Women Act, claiming that Congress overstepped its specific constitutional power to regulate interstate commerce. Despite vast quantities of data illustrating the effects that violence against women has on interstate commerce, the Court essentially warned Congress not to extend its constitutional authority to "completely obliterate the Constitution's distinction between national and local authority." S. 5, introduced and considered in Committee without a hearing and without any convincing data, ignores the **94 **86 Court's admonitions and subverts the federal system by hindering the states' ability to adjudicate class actions involving important and evolving questions of state law. S. 5 not only obliterates the distinction between national and local authority, it effectively annihilates local authority over state class actions.

Responding to these significant constitutional concerns, proponents of this legislation argue that state courts will not give fair hearings to out-of-state defendants, but support for their assertion is bereft of evidence. First, the Supreme Court has already made clear that the state courts are constitutionally required to provide due process and other fairness protections to the parties in class action cases. In Phillips Petroleum Co. v. Shutts,[53] the Supreme Court held that in class action cases, state courts must ensure that: (1) the defendant receives notice plus an opportunity to be heard and participate in the litigation;[54] (2) an absent plaintiff must be provided with an opportunity to remove himself or herself from the class; (3) the named plaintiff must at all times adequately represent the interests of the absent class members; and (4) the forum state must have a significant relationship to the claims asserted by each member of the plaintiff class.[55]

Secondly, as fears of local court prejudice have subsided and concerns about diverting federal courts from their core responsibilities have increased, the policy trend in recent years has been towards limiting Federal diversity jurisdiction.[56] For example, Congress enacted the Federal Courts Improvement Act of 1996,[57] which increased the amount in controversy requirement needed to remove a diversity case to federal court from $50,000 to $75,000. This statutory change was based on the Judicial Conference's determination that fear of local prejudice by state courts was no longer relevant[58] and that it was important to keep the federal judiciary's efforts focused on federal issues.[59]

## IV. CONCLUSION

Contrary to its supporters' assertions, S. 5's provisions are much broader than merely prohibiting nationwide class actions from being pursued in state court. In fact, this bill will override the current state laws governing class actions in the fifty states. And, in practice, it will bar many, if not most, state class actions filed solely on behalf of residents of a single state, solely involving matters of that state's law from being heard in that state court, so long as one plaintiff or one primary defendant is a citizen of a different **95 **87 state. This is clearly an extreme and distorted change to the diversity jurisdiction standards in our court system.

As a result, these drastic changes to longstanding federal procedural rules will make it harder for citizens to protect

themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these class action cases out of convenient state courts into federal courts, with significant new barriers and burdens on plaintiffs.

For these reasons, and until we reach consensus on improvements to class action litigation for the benefit of defendants and plaintiffs, we remain strongly opposed to S. 5.

Patrick J. Leahy.

Edward M. Kennedy.

Joseph R. Biden.

Russell D. Feingold.

Richard J. Durbin.

### *96 **0 XII. CHANGES IN EXISTING LAW

The Committee has determined that it is necessary, in order to expedite the business of the Senate, to dispense with the requirements of rule XXVI, paragraph 12, of the Standing Rules of the Senate, with respect to comparing the proposed changes and existing provisions of the United States Code.

1 Davis v. Carl Cannon Chevrolet-Olds, Inc. 182. F.3d 792, 797 (11th Cir. 1999).

2 In the words of Article III, "[t]he judicial power shall extend to * * * controversies in between citizens of different states."

3 See Newberg on Class Actions 3d S S 13–14 to 13–17 (1997).

4 For a more comprehensive history of Rule 23 see e.g., The Class Action Fairness Act of 1999: Hearings on S. 353 Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 106th Cong. (1999) (hereinafter "Hearings on S. 353"), Prepared Statement of John P. Frank.

5 Fed. R. Civ. P. 23(b)(3). Alternatively for a Rule 23(b)(1) class, the class proponent must show that the prosecution of separate actions by or against individual members of the class would create a risk of either (i) inconsistent or varying adjudication which would establish incompatible standards of conduct for the party opposing the class or (ii) adjudications which, as a practical matter, would be dispositive of the interests of the other members not parties to the adjudications or which would substantially impair or impede their ability to protect their ability to protect their interests. To obtain certification of a Rule 23(b)(2) class, the proponent is required to show that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

6 See Hearings on S. 353, Prepared Statement of John P. Frank ("If there was a single, undoubted goal of the committee, the energizing force which motivated the whole rule, it was the firm determination to create a class action system which could deal with civil rights and, explicitly, segregation.").

7 Administrative Office of the U.S. Courts, Working Papers of the Advisory Committee on Civil Rules on Proposed Amendments to Civil Rule 23 (Vol. 2) ("Advisory Committee Working Papers"), at 260 (1997). Prof. Frank passed away late in 2002. The only surviving member of the 1966 Advisory Committee–Hon. William T. Coleman, Jr.–has testified to a similar effect Id. (Vol. 3), 11/22/96 Public Hearing Tr. at 204 ("I assure you that what the courts have done with respect to Rule 23(b)(3) is far beyond what we * * * ever intended. To the extent that there's difficulty [with class actions, it] is not because of anything that was drafted in 1966, but [because] of how the rule has been handled since that time.").

8 See John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1358 (1995).

9 Id. at 1356–58, 1363–64.

10 U.S. Const. art. III, sec. 2.

11 See Pease v. Peck, 59 U.S. (18 How) 518, 520 (1856) ("The theory upon which jurisdiction is conferred on the court of the United States, in controversies between citizens of different States, has its foundation in the supposition that, possibly, the State tribunal might not be impartial between their own citizens and foreigners."); see also Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 347 (1816); Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87 (1809); Barrow S.S. Co. v. Kane, 170 U.S. 100, 111 (1898) ("The object of the provisions of the constitution and statutes of the United States in conferring upon the circuit courts of the United States jurisdiction of controversies between citizens of different States of the Union * * * was to secure a tribunal presumed to be more impartial than a court of the state in which one litigant resides."); The Federalist No. 80, at 537–38 (Alexander Hamilton) (Jacob E. Cooke, ed. 1961) ("In order to [ensure] the inviolable maintenance of that equality of privileges and immunities to which citizens of the union will be entitled, the national judiciary ought to preside in all cases in which one state or its citizens are opposed to another state or its citizens. To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal which, having no local attachments, will be likely to be impartial between the different states and their citizens, and which, owing its official existence to the union, will never be likely to feel any bias inauspicious to the principles on which it is founded.")

12 H. J. Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv. L. Rev. 483, 492–93 (1928).

13 Burford v. Sun Oil Co., 319 U.S. 315, 326 (1943) (Frankfurter, J., dissenting).

14 Hearings on S. 353, Prepared Statement of E. Donald Elliott; see also, Adrienne J. Marsh, Diversity Jurisdiction: Scapegoat of Overcrowded Federal Courts, 48 Brooklyn L. Rev. 197, 201 (1989).

15 See generally John P. Frank, Historical Bases of the Federal Judicial System, 13 Law & Contemp. Probs. 3, 22–28 (1948); Friendly, supra n. 12.

16 See Class Action Litigation: Hearing on Class Actions Before the Senate Comm. on the Judiciary, 107th Cong. (2002) (hereinafter "Hearing on Class Actions"), Prepared Statement of Walter E. Dellinger, III.

17 See 28 U.S.C. S 1332(a).

18 See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806).

19 See, e.g., Newman-Green Inc. v. Alfonzo-Larrain, 490 U.S. 826, 829 n.1 (1989) (noting that "[t]he complete diversity requirement is based on the diversity statute, not Article III of the Constitution."); Owen Equip. & Co. v. Kroger, 437 U.S. 365, 373 n. 13 (1978) (to the same effect).

20 See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger, III.

21 See David P. Currie, Federal Jurisdiction 140 (3d ed. 1990).

22 28 U.S.C. S 1446(b).

23 A broad interpretation of "other paper" is "consistent with the purpose of the removal statute to encourage prompt resort to federal court when a defendant first learns that the plaintiff is alleging a federal claim * * * [and] discourages disingenuous pleading by plaintiffs in state court to avoid removal." Addo v. Globe Life & Accident Ins. Co., 230 F.3d 759, 762 (5th Cir. 2000) (holding a post-complaint settlement letter qualifies as "other paper" under 28 U.S.C. 1446(b)). See also S.W.S. Erectors v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996) (holding that deposition testimony qualifies as "other paper" under 28 U.S.C. 1446(b)).

24 See generally, Victor E. Schwartz, Mark A. Behrens & Leah Lorber, Federal Courts Should Decide Interstate Class Actions: A Call for Federal Class Action Diversity Jurisdiction Reform, 37 Harv. J. Legis. 485 (Summer 2000).

25 See Snyder v. Harris, 394 U.S. 332 (1969).

26 See Hearing on Class Actions, Prepared Statement of Hilda Bankston.

27 See Zahn v. International Paper Co., 414 U.S. 291 (1973).

28 See Trimble v. Asarco, Inc., 232 F.3d 946 (8th Cir. 2000); Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214 (3d Cir. 1999); Leonhardt v. Western Sugar Co., 160 F.3d 631 (10th Cir. 1998).

29 Other federal courts of appeals have held that for a class action to be heard in federal court only one or more named plaintiffs must have claims exceeding $75,000. See, e.g., Rosmer v. Pfizer, Inc., 263 F.3d 110 (4th Cir. 2001); Gibson v. Chrysler Corp., 261 F. 3d 927 (9th Cir. 2001); Stromberg Metal Works Inc. v. Press Mechanical Inc., 77 F.3d 928 (7th Cir. 2000); In re Abbott Labs., Inc., 51 F.3d 524 (5th Cir. 1995), aff'd by an equally divided Court, 529 U.S. 333 (2000); Allapattah Servs. v. Exxon Corp., 333 F.3d 1248 (11th Cir. 2003), cert. granted, 125 S. Ct. 317 (2004). In the view of these courts, the value of the claims of the other class members is irrelevant–they are deemed to be part of the class as a matter of supplemental jurisdiction. The Committee stresses, however, that even in those Circuits following this rule, relatively few class actions find their way into federal court because plaintiffs offer named plaintiffs who do not have $75,000 claims or name a non-diverse plaintiff or defendant in order to prevent removal of the case to federal court.

30 14B Charles A. Wright, et al., Federal Practice and Procedure S 3704, at 127 (3d ed. 1998).

31 Peterson v. BASF Corp., 657 N.W.2d 853, 875 (Minn. Ct. App. 2003), aff'd, 675 N.W. 2d 57 (Minn. 2004).

32 Davis v. Cannon Chevrolet-Olds, Inc., 182 F.3d 792, 797 (11th Cir. 1999).

33 Id. at 798.

34 In re Prudential Ins. Co. America Sales Practice Litig., 148 F.3d 283, 305 (3d Cir. 1998).

35 Letter to then Chairman Orrin G. Hatch, Comm. on the Judiciary, U.S. Senate, from Leonidas Ralph Mecham, Secretary, Judicial Conference of the United States (dated March 26, 2003).

36 Id. at 2.

37 Id.

38 See generally Hearing on Class Actions; Hearings on S. 353; Hearing on H.R. 1875.

39 See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger III.

40 Hearings on S. 353, Prepared Statement of E. Donald Elliott.

41 See Analysis: Class Action Litigation–A Federalist Society Survey, Class Action Watch at 5 (Vol. 1, No. 1 1998); Deborah Hensler, et al., Preliminary Results of the RAND Study of Class Action Litigation 15 (May 15, 1997); see also Advisory Committee Working Papers (Vol. 1) at ix–x (May 1, 1997) (memorandum of Judge Paul V. Niemeyer to members of the Advisory Committee on Civil Rules).

42 See John H. Beisner and Jessica Davidson Miller, They're Making A Federal Case Out Of It * * * In State Court, 25 Harv. J. L. & Pub. Pol'y 1 (2001) ("Federal Case").

43 See John H. Beisner and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).

44 Trisha L. Howard, Class Actions Set Record Last Year In Madison County/ Possible Change In Law Prompted Rush In Filing, St. Louis Post Dispatch, Jan. 11, 2004.

45 Id.

46 See generally Federal Case.

47 See Hearings on S. 353, Oral Statement of Senator Charles E. Grassley.

48 See Hearings on S. 353, Prepared Statement of Stephen G. Morrison ("I think it is clear that the explosion of class action filings can only be attributed to the fact that certain members of the plaintiffs' bar have discovered that some of our state courts can be a fertile playing field for class litigation.").

49 Compare B. Ostrom, et al., Examining the Work of State Courts 12 (Court Statistics Project 2003) ("Examining the Work of State Courts"), with Administrative Office of U.S. Courts, 2003 Federal Court Management Statistics (2004) ("Federal Court Management").

50 Kamilewicz v. Bank of Boston, 92 F.3d 506 (7th Cir. 1996).

51 Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees: Hearings Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 105th Cong. (1997), Prepared Statement of Martha Preston.

52 Kansas Case In Class By Itself, National Law Journal, Mar. 15, 1999. This settlement ultimately did not proceed, but only because the attorney daughter of one of the settlement class members happened to read her mother's mail, as noted in the article.

53 Shields et al. v. Bridgestone/Firestone Inc. et al. (No. E–0167637, Jefferson County, Texas, 2003); Miles Moor, BFS Settles Nationwide Class Action Suit; Tire Maker to Modify Certain Models, Launch Education Program, Rubber & Plastics News, August 4, 2003.

54 Premier Cruise Lines, (No. 96–06932 CA–FN, Fla. Cir. Ct., Brevard County, Florida, 2003); The Law Offices of Douglas Bowdoin, for Plaintiffs, and Todd Pittenger of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., for Defendant, Announce a Proposed Class Action Settlement, Business Wire, Inc., July 2, 2003.

55 Premier Cruise Line Reaches Settlement, Mealey's Litigation Report: Class Actions, July 17, 2003.

56 In Re Microsoft Litigation Settlement (No. 99 CV 17089, Johnson County, Kansas, 2003); Dan Voorhis, Here's How to Claim Your Share of Microsoft Settlement, The Wichita Eagle, December 28, 2003.

57 Ross and Lambert v. Portillo's Restaurant Group, Inc. (00 Ch 13612, Circuit Court of Cook County, Illinois, Chancery Division, 2003); Judge Approves Portillo's Class Action Settlement Over Mislabeled Beer, PR Newswire, Nov. 26, 2003.

58 DeGradi v. KB Holdings, Inc. (No. 02 CH 15838, Circuit Court of Cook County, Illinois, Chancery Division, 2003).

59 Betty Lin-Fisher, Shoppers Win In Suit; Customers Get a Jump on Holidays, Akron Beacon Journal, Oct. 14, 2003.

60 Stephanie Zimmerman, KB Toys Settles Lawsuit Over "Low" Prices By Offering Discount, Chicago Sun-Times, Oct. 11,2003.

61 Dorel Juvenile Group, Inc. (2003); Dorel Juvenile Group Settles Class Action Lawsuit, PR Newswire, Oct. 6, 2003.

62 Ramsey v. Nestle Waters North America, Inc. d/b/a Poland Spring Water Co. (No. 03 CHK 817, Kane County, Illinois, 2003); Edward D. Murphy, et al., Conflict and Change; Maine's Employment and Price Levels ReMained Stable Last Year, but its Economy Experienced Plenty of Turmoil, Portland Press Herald, January 4, 2004; see also www.noticeclass.com/springwatersettlement/LongFormNoticev2.pdf

63 Chavez v. GameStop Corp. (No. CGC–02–406658, San Francisco Superior Court, California, 2003).

64 Big Class Action: Settlements and Verdicts: Consumer Goods, available at http://www.bigclassaction.com/settlements/consumer.html.

65 http://www.gamestop.com/gs/help/classaction.asp.

66 Zurakov v. Register.com. Inc. (No. 2301, N.Y. Sup. Ct., App. Div., 2003); Tom Perrotta Panel Revives Case Over Domain Name Registry, Internet Newsletter, May 14, 2003.

67 Scott v. Blockbuster Inc. (No. DI62–535, Jefferson County, Texas, 2001); Judge OKs Blockbuster Plan On Fees, Associated Press, Jan. 11, 2002.

68 Attention Shoppers: Food Lion Rebate Due, Greensboro News & Record, Feb. 25, 2002.

69 Enough Already With the Lawsuits, Kansas City Star, July 10, 1999.

70 American Airlines Settles Lawsuits Over Frequent Flier Program, Fort Worth Star-Telegram, June 22, 2000.

71 Rinaldi v. Iomega Corp. (No. 98C–09–064–RRC, Delaware); Utah-Based Tech Company Settles Lawsuit With Rebate Offer, Standard-Examiner, Apr. 14, 2001.

72 Carnival Cruise Settles Lawsuit, Florida Today, Mar. 16, 2001.

73 Thomson Antes Up $100 Million Settlement, Mar. 12, 2001.

74 Baird v. Thomson Consumer Electronics, Inc. (No. 00–L–00761, Madison County, Illinois); 2,640 Television Owners Tune Out Class Action Suit, Belleville (Ill.) News-Democrat, Aug. 19, 2001.

75 Fischl v. Direct Merchants Credit Card Bank, N.A. (CT 00–007129, Hennepin County, Minnesota); Soft Firm: Too Often, The SF Law Firm Of Lieff, Cabraser, Heimann & Bernstein Strikes Settlements That Give The Firm Millions Of Dollars In Legal Fees–And Its Class Action Clients Too Little, SF Weekly, May 29, 2002.

76 See Richard B. Schmitt, Leaky System: Suits Over Plastic Pipe Finally Bring Relief, Especially for Lawyers, Wall St. J., Nov. 20, 1995, at A1.

77 See The (San Francisco) Recorder, Jan. 4, 1996.

78 Hotel Chains Settle Class-Action Suit Over Energy Surcharges, San Diego Union-Tribune, July 4, 2002.

79 See Michelle Singletary, Coupon Settlements Fall Short, Wash. Post, Sept. 12, 1999, at 1. For more examples of coupon settlements, see Hearings on S. 353, Prepared Testimony of Stephan G. Morrison.

80 Lawyers Get $1.5 Million, Clients Get 50 Cents Off, Fulton County Daily Report, Nov. 21, 1997.

81 Cereal Plan Called Soggy, National Law Journal, May 22, 1995.

82 Cellular Carriers Settle Price-Fixing Allegations, Seattle Times, July 26, 1997.

83 Judge OK's Plan For Class Members, The Recorder, Feb. 24, 1998.

84 Los Angeles Times, June 8, 1998, at D3.

85 See E. Donald Elliott Managerial Judging and the Evolution of Procedure, 53 U. Chi. I. Rev. 306, 323–24 (1986).

86 In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293,1299 (7th Cir. 1995). See also Blair v. Equifax Check Servs. Inc., 181 F.3d 832, 834 (7th Cir. 1999) ("a grant of class status can put considerable pressure on the defendant to settle, even when the plaintiffs probability of success on the merits is slight").

87 See Hearing on Class Actions, Statement of Lawrence Mirel.

88 Id.

89 See Faden-Bayes Corp. v. Ford Motor Co., Index No. 97–601076 (N.Y. Sup. Ct. County of New York) (filed Feb. 28,

1997).

90 See Hearings on S. 353, Prepared Statement of John H. Beisner.

91 Hearings on S. 353, Prepared Statement of Stephen G. Morrison.

92 Id.

93 See Order of National Class Certification, Davison v. Bridgestone/Firestone, Inc., Case No. 00C2298 (Eighth Cir. Ct., 20th Jud. Dist., Nashville, Tenn.) (dated Aug. 18, 2000).

94 See Order, Farkas v. Bridgestone/Firestone, Inc., Case No. 00–CI–5263 (Cir. Ct., Jefferson County, KY) (dated Aug. 18, 2000).

95 See Hearings on S. 353, Prepared Statement of Stephen Morrison.

96 Compare Naef v. Masonite Corp., No. CV–94–4033 (Cir. Court, Mobile County, Alabama), with In re Masonite Hardboard Siding Prods. Litig., 170 F.R.D. 417, 424 (E.D. La. 1997).

97 See, e.g., In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214 (E.D. La. 1998); Sanneman v. Chrysler Corp, 191 F.R.D. 441 (E.D. Pa. 2000); Ford Motor Co. v. Sheldon, 22 S.W. 3d 444 (Tex. 2000); Schurk v. DaimlerChrysler Corp., No. 97-2–04113–9 (Wash. Sup. Ct., Feb. 24, 2000).

98 See Ford Motor Co. v. Sheldon, 113 S.W. 3d 839 (Tex. App. 2003).

99 Phillips v. Ford Motor Co., No. 99–L–1041 (Cir. Ct., Madison County, Illinois Sept. 15, 2003).

100 For example, in the litigation concerning Firestone tires, approximately 100 virtually identical class actions seeking to represent the same purported class members were filed in courts all over the country. And in the recently publicized HMO cases, multiple overlapping class actions were filed against each of the major health insurance companies. No less than 17 class actions have been filed against Humana, most of which assert similar allegations and claims on behalf of similarly defined nationwide classes. In the Humana situation, the federal cases were consolidated for pretrial proceedings before a single judge. See In re Humana Inc. Managed Care Litig., 2000 U.S. Dist. LEXIS 5099 (J.P.M.L. Apr. 13, 2000). There is no parallel methodology for consolidating state court class actions. In the 12 months ending September 30, 2002, over 7,000 cases were centralized for pretrial proceedings through the MDL process. See http://www.uscourts.gov/judbus2002/tables/s19sep02.pdf.

101 See Hearings on S. 353, Prepared Statement of John H. Beisner.

102 See Hearings on S. 353, Prepared Statement of John H. Beisner.

103 See John H. Beisner, and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).

104 See Smith v. General Motors Corp., et al., Civ. A. No. 97–39 (Cir. Ct. Coosa County, AL).

105 See Hearing on Class Actions, Prepared Statement of Lawrence Mirel.

106 Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, at 29.

107 See Snider v. State Farm Mutual Automobile Insurance Co., Cir. Ct. for Williamson City, IL, Docket No. 97–L–114 (1999).

108 Avery v. State Farm Mut. Auto. Ins. Co., 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).

109 PJ's Concrete Pumping Serv. v. Nextel W. Corp., 803 N.E.2d 1020, 1030 (Ill. Ct. App. 2004), appeal denied, 813 NE.2d 223 (Ill. 2004), cert. denied, 125 S. Ct. 410 (2004).

110 Clark v. TAP Pharm. Prods., Inc., 798 N.E.2d 123 (Ill. Ct. App. 2003).

111 Ysbrand v. DaimlerChrysler Corp., 81 P.3d 618 (Okla. 2003).

112 Black Hawk Oil Co. v. Exxon Corp., 1998 Okla. LEXIS 82 (Okla. 1998).

113 Peterson v. BASF Corp., 657 N.W. 2d 853 (Minn. Ct. App. 2003), aff'd., 675 N.W. 2d 57 (Minn. 2004).

114 Id. at 875.

115 Rosen v. PRIMUS Automotive Fin. Servs., Inc., No. CT 98–2733 (Minn. D. Ct., 4th Jud. Dist., May 4, 1999).

116 Walsh v. Ford Motor Co., 807 F.2d 1000, 1016–17 (D.C. Cir. 1986).

117 See Interstate Class Action Jurisdiction Act of 1999: Hearing on H.R. 1875 Before the House Comm. on the Judiciary, 106th Cong. (1999) (hereinafter "Hearing on H.R. 1875), Prepared Statement of Walter E. Dellinger III.

118 See State of Vermont v. Homeside Lending, Inc. and Bank Boston Corporation, 826 A.2d 997 (Vt. 2003).

119 Rigat v. GAF Materials Corp., 2002 Conn. Super. LEXIS 272 (Conn. Super. Jan 25, 2002).

120 See Hearings on S. 353, Prepared Statement of Stephen G. Morrison.

121 Id.

122 Scott v. Blockbuster Inc., (No, DI62–535, Jefferson County, Texas, 2001); Judge OKs Blockbuster Plan On Fees, Associated Press, Jan. 11, 2002.

123 See, e.g., Cope v. Duggins, 2001 WL 333102 (E.D. La. 2001) (rejecting proposed class settlement because attorneys' fees were disproportionate to class benefits); Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) (same); Sheppard v. Consolidated Edison Co., 2000 WL 33313540 (E.D.N.Y. 2000) (same); Polar Int'l Brokerage Corp. v. Reeve, 187 F.R.D. 108 (S.D.N.Y. 1999) (same).

124 Deborah Hensler, et al., Class Action Dilemmas, Pursuing Public Goals for Private Gain ("Class Action Dilemmas"), at 10 (1999) (executive summary).

125 Id.

126 The Committee wishes to stress that the presence of conspiracy allegations should not alter this inquiry. For example, if in the hypothetical discussed here, the class alleges that the agent conspired with the insurance company with respect to the alleged scheme, it theoretically would expose the agent to potential liability to the entire class. But that would not change the relatively minor role that the agent played in the overall misconduct that is alleged and would not change the fact that the agent is not the real target of the litigation, which is the inquiry contemplated by this criterion.

127 Under federal law, a purported class action may involve as few as 21 class members. See, e.g., Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (l1th Cir. 1986) (noting that classes encompassing fewer than 21 persons normally are not subject to class certification); Tietz v. Bowen, 695 F. Supp. 441,445 (C.D. Cal. 1987) (certifying class with 27 class members).

128 See, e.g., St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 293 (1938).

129 Edgar v. MITE Corp., 457 U.S. 624, 645 (1982). See also Draper v. Paul N. Gardner Defined Plan Trust, 625 A.2d 859, 865–66 (Del. 1993); McDermott, Inc. v. Lewis, 531 A.2d 206, 214–15 (Del. 1987); Ellis v. Mutual Life Ins. Co., 187 So. 434 (Ala. 1939); Amberjack Ltd. Inc. v. Thompson, 1997 WL 613676 (Tenn. App. 1997); NAACP v. Golding, 679 A.2d 554,559 (Ct. App. Md. 1996); Hart v. General Motors Corp., 517 N.Y.S.2d 490, 493 (App. Div. 1987).

130 United Steelworkers of America v. R.H. Bouligny, Inc., 382 U.S. 145 (1965).

131 See, e.g., 14 A.L.R. Fed. 849 (2004) (noting dissatisfaction with the prevailing rule and citing one leading authority that commented that "many unincorporated associations bear functional resemblances to corporations * * * [and] the diversity citizenship status of such associations [i]s 'anomalous' in view of the fictional citizenship accorded to corporations and in view of the fact that many states treat these associations as juridical entities, and has emphatically called upon Congress to provide that where unincorporated associations have entity status under state law, they should be treated analogously to corporations for purposes of diversity jurisdiction").

132 See Tuck v. United Services Automobile Ass'n, 859 F.2d 842 (10th Cir. 1988); Baer v. United Services Automobile Ass'n, 503 F.2d 393 (2d Cir. 1974); Truck Insurance Exchange v. The Dow Chemical Co., 331 F. Supp. 323 (W.D. Mo. 1971).

133 See 28 U.S.C. S 1441(a).

134 Id.

135 See Erie Railroad Co. v. Thompkins, 304 U.S. 64 (1938).

136 See e.g., Hewitt v. City of Stanton, 798 F.2d 1230 (9th Cir. 1986); Mitchell v. Kentucky-American Water Co., 178 F.R.D. 140, 142 (E.D. Ky. 1997).

137 See Public Law 104–67, the "Private Securities Litigation Reform Act of 1995," and Public Law 105–353, the "Securities Litigation Uniform Standards Act of 1998."

138 John H. Beisner & Jessica Davidson Miller, There will be no Exodus: An Empirical Study of S. 2062's Effects on Class Actions, Mealey's Tort Reform Update (April 2004).

139 Id. at 16.

140 Id. at 20.

141 Examining the Work of State Courts at 12.

142 See Federal Court Management.

143 See Administrative office of the U.S. Courts, Judicial Business of the United States Courts 2003 (2004) ("Judicial Business"), at 129–31.

144 See generally Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees, Hearings Before the Subcommittee on Administrative Oversight and the Courts of the Senate Committee on the Judiciary, 105th Cong. (1997); Hearings on Mass Torts and Class Actions Before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong. (1998), Hearing on H.R. 1875, The Class Action Jurisdiction Act of 1999 Before the House Committee on the Judiciary, 106th Cong. (1999).

145 Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts 68–69 (1996).

146 Class Action Dilemmas, at 19.

147 Id. at 28.

148 See Amendments to Federal Procedural Rules, 71 U.S.L.W. 4253, 4254–55 (U.S. Apr. 1, 2003) (Supreme Court order amending rules pursuant to Rules Enabling Act).

149 Indeed, there is no evidence that plaintiffs' counsel believe that they must file in state court in order to succeed. Tobacco class actions prove this point. Of the purported class actions on tobacco issues initiated in recent years, many were originally filed in federal courts. Moreover, there is no evidence that classes are more likely to be certified in state courts. The reality is that the vast majority of courts–both federal and state courts–that have considered the issue have denied certification of proposed tobacco classes. The state court certification denials include: In re Tobacco Cases II, No. JCCP–4042, slip op. (Md.

Ct. App. May 16, 2000); Reed v. Philip Morris, Inc., No. 96–5070, slip op. (D.C. Super. Ct. July 23, 1999); Philip Morris, Inc. v. Angeletti, No. 961450501 CE212596, slip op. (Md. Ct. App. May 16, 2000); Taylor v. American Tobacco Co., No. 97715975, slip op. (Mich. Cir. Ct. Jan. 20, 2000); Constentino v. Philip Morris, Inc., No. MID–L–5135–97, slip op. (N.J. Super. Ct. Oct. 26, 1998); Small v. Lorilard Tobacco Co., 6791 N.Y.S.2d 593 (App. Div. 1998), aff'd, 698 N.Y.S.2d 615 (1999); and Geizer v. American Tobacco Co., 696 N.Y.S.2d 345 (1999). At least three federal courts have certified tobacco-related classes: In re Simon II Litig., 212 F. Supp. 2d 57 (E.D.N.Y. 2002) (certifying nationwide punitive damages class of smokers' claims against tobacco companies) (appeal pending); Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc., 182 F.R.D. 523 (N.D. Ohio 1998); Northwest Laborers-Employers Health & Security Trust Fund v. Philip Morris Inc., 1997 U.S. Dist. LEXIS 21299 (W.D. Wash. Dec. 24, 1997). In addition, a U.S. Magistrate Judge recommended certification of a class in Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc., 188 F.R.D. 365 (D. Or. 1998), but that recommendation was never acted upon by the district court judge. Three state courts (two in Florida and one in Louisiana) have certified tobacco-related classes: R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39 (Fla. Ct. App. 1996) (affirming the trial court's certification of tobacco class); Broin v. Philip Morris Cos., 641 So. 2d 888 (Fla. Ct. App. 1996) (ordering trial court to certify tobacco class); Scott v. American Tobacco Co., 725 So. 2d 10 (La. Ct. App. 1998) (affirming trial court certification of tobacco class). However, a Florida appeals court has decertified the Engle classe see Liggett Group, Inc. v. Engle, 853 So. 2d 434 (Fla. Ct. App. 2003), and the matter is under review by the Florida Supreme Court, see 873 So. 2d 1222 (Fla. 2004). Thus, the scorecard is basically even; there is no evidence that class members will be treated differently in state court.

While critics have pointed to the two Florida tobacco class actions as evidence that state courts will somehow be tougher on the tobacco industry, there is no real support for this contention. In the first tobacco class action to reach conclusion after a class was certified and the matter was tried (Broin, a Florida state court case), the matter ultimately settled. But the class members received no money at all. Under the terms of settlement, they obtained only a "right to sue" individually. Meanwhile, the class counsel were awarded $49 million (on the basis of a medical research contribution made by defendants). Counsel for one of the class members who protested the settlement reportedly commented: "It's mind-boggling that a court would permit this kind of settlement to go ahead. What is the class getting out of this? Nothing." The Legal Intelligencer, Sept. 22, 1999, at 4. The second case, Engle v. R.J. Reynolds Tobacco Co., received a lot of publicity because the jury awarded a $145 billion verdict to the class of Florida smokers. However, as noted above, the verdict was vacated after an appeals court found that trying the plaintiffs' claims on a classwide basis was improper. Engle, 853 So. 2d 434 (Fla. Ct. App. 2003), review granted, 873 So. 2d 1222 (Fla 2004).

Moreover, there is no evidence that tobacco cases would be tried more quickly in state courts. It took six years to get the first tobacco class action to trial in state court; the second took more than four years. The average time to trial in federal court civil cases is shorter.

Finally, it is clear that certain opponents of the bill are trying to single-out certain unpopular industries, such as the firearms industry, because they are unpopular. But that is exactly what the Framers of the Constitution were trying to avoid. They were trying to ensure a fair, even-handed federal court forum for defendants that may otherwise be haled into a local court less concerned about protecting the rights of an out-of-state company.

150 145 Congo Rec. H8577 (Sept. 23, 1999 (floor debate on H.R. 1789) (Rep. Nadler asserting that a "1995 class action against Remington Arms * * * settled for $31.5 million * * * [and] led to the implementation of greater safety protections or owners of shotguns").

151 See Garza v. Sporting Goods Properties, Inc., 1996 U.S. Dist. LEXIS 2009 (W.D. Tex. Feb. 6, 1996) (approving class settlement).

152 28 U.S.C. S 1443.

153 See, e.g., Peaset v. Peck, 59 U.S. (18 How.) 518, 520 (1856).

154 See John J. Parker, The Federal Constitution and Recent Attacks Upon It, 18 A.B.A. J. 433, 437 (1932).

155 See Hearings on H.R. 1875, statement of Walter E. Dellinger.

156 See transcript of markup, Senate Judiciary Committee on S. 353, p. 19:2–17 (June 29, 2000) (statement of Joseph R. Biden, Jr., U.S. Senate).

157 Id.

158 Advisory Committee Working Papers (vol. 4), at 456.

159 Id.

160 Mass Torts and Class Action Lawsuits: Hearing before the Subcom. On Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong., 2d Sess. 20–21 (March 5, 1998) (statement of John P. Frank, Esq.).

161 28 U.S.C. S 2072(b).

162 The federal courts have frequently rejected efforts to use the Federal Rules of Civil Procedure to expand substantive rights. See e.g., In re Baldwin-United Corp. 770 F.2d 328, 335 (2d Cir. 1985) (rejecting arguments that Fed. R. Civ. P. 23 could be used as authorizing issuance of an injunction to protect class members); Synanon Church v. United States, 557 F. Supp. 1329, 1330 n.2 (D.D.C. 1983) (rejecting argument that Fed. R. Civ. P. 57 creates right to jury trials in declaratory judgment actions). Cf. Douglas v. NCNB Nat'l Bank, 979 F.2d 1128, 1130 & n.2 (5th Cir. 1992) (declining to apply Fed. R. Civ. P. 13(a) where doing so would "abridge as lender's substantive rights and enlarge the debtor's substantive rights"). Similar views have been expressed by state courts. See, e.g., Southwestern Refinery Co. v. Bernal, 22 S.W. 3d 425, 432 (Tex. 2000) ("[C]lass actions do not exist in some sort of alternative universe outside our normal jurisprudence. Our procedural rules provide otherwise: the form of an action under the rules must not 'enlarge or diminish any substantive rights or obligations of any parties to any civil action.'") (quoting Tex. R. Civ. P. 815).

163 Federal Judicial Center, The Impact of Amchem and Ortiz on Choice of a Federal or State Forum in Class Action Litigation: A Report to the Advisory Committee on Civil Rules Regarding a Case-Based Survey of Attorneys (April 2004) (2004 Federal Judicial Center Study).

164 See Judicial Business.

165 Avery v. State Farm Mut. Auto Insurance Co., 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).

166 Id. at 1254.

167 See Matthew J. Wald, Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, S 1, at 29.

168 See, e.g., Ysbrand v. DaimlerChrysler Corp., 81 P. 3d 618 (Okla. 2003) (affirming certification of nationwide product liability class, applying the law of one state to all claims); Peterson v. BASF Corp., 657 N.W.2d 853 (Minn. Ct. App. 2003), aff'd, 675 N.W.2d 57 (Minn. 2004) (affirming nationwide consumer protection act case, applying the law of one state to all claims).

169 See, e.g., In re Bridgestone/Firestone, Inc. Prods. Liab. Litig., 288 F.3d 1012 (7th Cir. 2002), cert. denied sub nom. Gustafon v. Bridgestone/Firestone, Inc., 537 U.S. 1105 (2003).

170 See, e.g., Georgine v. Amchem Prods., 83 F.3d 610, 627 (3d Cir. 1996), aff'd sub nom. Amchem Prods. v. Windsor, 521 U.S. 591 (1997).

171 See, e.g., Georgine, 83 F.3d at 627; Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187–90 (9th Cir. 2001); Zapka v. Coca-Cola Co., No. 99 CV 8238, 2000 U.S. Dist. LEXIS 16552, at *11–13 (N.D. Ill. Oct. 26, 2000); Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365, 369 (N.D. Ill. 1998); Dhamer v. Bristol-Myers Squibb Co., 183 F.R.D. 520, 532–34 (N.D. Ill. 1998); Jones v. Allercare, Inc., 203 F.R.D. 290, 307 (N.D. Ohio 2001); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 346–54 (D.N.J. 1997); Marascalco v. Int'l Computerized Orthokeratology Soc'y, Inc., 181 F.R.D. 331, 338–39 (N.D. Miss. 1998); In re Ford Motor Co. Bronco II Prods. Liab. Litig., 177 F.R.D. 360, 369–71 (E.D. La. 1997); In re Stucco Litig., 175 F.R.D. 210, 214, 215–217 (E.D.N.C. 1997); Ilhardt v. A.O. Smith Corp., 168 F.R.D. 613, 619–20 (S.D. Ohio 1996); Harding v. Tambrands Inc., 165 F.R.D. 623, 629–30, 631–32 (D. Kan. 1996); Walsh v. Ford Motor Co., 130 F.R.D. 260, 271–75 (D.D.C. 1990); Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595, 608 (S.D.N.Y 1982).

172 See, e.g., In re Bridgestone/Firestone, Inc., 288 F.3d at 1024; Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 674–75 (7th Cir. 2001); Spenc v. Glock, GES.m.b.H., 227 F.3d 308, 313–15 (5th Cir. 2000); In re AM. Med. Sys., 75 F.3d 1069,

1085 (6th Cir. 1996); Castano v. American Tobacco Co.. 84 F.3d 734, 741–43, 739–50 (5th Cir. 1995); In re Rhome-Poulenc Rorer, Inc., 51 F.3d 1293, 1302 (7th Cir. 1995); Walsh v. Ford Motor Co., 807 F.2d 1000, 1017–19 (D.C. Cir. 1990).

173 See 2004 Federal Judicial Center Study.

174 Id.

175 See Responses To Written Questions From Senators Orrin G. Hatch and Charles E. Grassley to Walter Dellinger, Attachment A (list of exemplar cases in which federal courts have certified classes since 2001).

176 Under current law, a purely state law-based class action normally can be heard in federal court only if each and every class members demands at least $75,000 in damages and none of the named plaintiffs have the same state citizenship of any of the named defendants. Since at least some class members in nearly all class actions seek less than $75,000 per class member or sue at least one non-diverse defendant, there are currently very few class action cases in federal court that involve exclusively state law claims.

177 In re Currency Conversion Fee Antitrust Littg., 2004 U.S. Dist. LEXIS 24134 (S.D.N.Y. Dec. 2, 2004).

178 McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304 (D. Mass. 2004).

179 Klein v. O'Neal, Inc. 222 F.R.D. 564 (N.D. Tex. 2004).

180 Leider v. Ralfe, 2004 U.S. Dist. LEXIS 15345 (S.D.N.Y. 2004).

181 Bradbery v. John Hancock Mutual Life Insurance Co., 217 F.R.D. 408 (W.D. Tenn. 2003).

182 Fox v. Cheminova, Inc., 213 F.R.D. 113 (E.D.N.Y. 2003).

183 Hansen v. Ticket Track, Inc., 213 F.R.D. 412 (W.D. Wash. 2003).

184 Brown v. Funeral Services of Florida, Inc., 212 F.R.D. 602 (S.D. Fla. 2003).

185 In Re St. Jude Medical Inc. Silzone Heart Valves Products Liability Litigation, 2003 U.S. Dist. LEXIS 5188 (D. Minn. March 27, 2003).

186 Burton v. Mountain West Farm Bureau Mutual Insurance Co., 2003 WL 1740461 (D. Mont. March 31, 2003).

187 Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21 (D. Mass. 2003).

188 Bond v. Fleet Bank (RI) N.A., 2002 U.S. Dist. LEXIS 22324 (D.R.I. October 10, 2002).

189 Gilkey v. Central Clearing, 202 F.R.D. 515 (E.D. Mich. 2001).

190 Wells v. Allstate Insurance Company, 210 F.R.D. 1 (D.D.C. 2002).

191 Oslan v. Collection Bureau of Hudson Valley, 206 F.R.D. 109 (E.D. Pa. 2002).

192 DeAsencio v. Tyson Foods, 2002 U.S. Dist. LEXIS 13038 (E.D. Pa. July 17, 2002).

193 Jonathan Turley, A Crisis of Faith: Tobacco and the Madisonian Democracy, 37 Harv. J. on Legis. 433, 475 (2000).

194 See Class Action Dilemmas, at 23.

195 Id. at 28.

196 Purdie v. Ace Cash Express, Inc., 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. 2003).

197 In Re: Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation, 2002 U.S. Dist. LEXIS 21693 (N.D. Ohio 2002).

198 In re Diet Drugs (Fen-Phen), 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).

199 See, e.g., Whitaker v. American Telecasting, Inc., 261 F.3d 196, 207 (2d Cir. 2001) ("'In order to show that naming a non-diverse defendant is a "fraudulent joinder" effected to defeat diversity [jurisdiction], the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that the plaintiff can state a cause of action against the non-diverse defendant in state court.'") (citations omitted); Morris v. Princess Cruises, Inc., 236 F.3d 1061,1067 (9th Cir. 2001) ("Joinder of a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is ignored for purposes of determining diversity, '[i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state.'") (citations omitted); Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1305 (11th Cir. 2001) ("it is appropriate for a federal court to dismiss * * * [nondiverse] defendant and retain diversity jurisdiction if the complaint shows that there's no possibility that the plaintiff can establish any cause of action against [the] defendant"); Heritage Bank v. Redcom Laboratories, Inc., 250 F.3d 319 (5th Cir. 2001) (to similar effect).

200 In recent years, many federal courts have been required to address fraudulent joinder issues in the context of class actions removed to federal court. See, e.g., Jamison v. Purdue Pharma CO., 251 F. Supp. 1315 (S.D. Miss. 2003) (mass action matter); Hardy v. Ducote, 246 F. Supp. 2d 509 (E.D. La. Jan. 20, 2003) Burns v. Friedli, 241 F. Supp. 2d 519 (D. Md. 2003); Moore v. Wyeth-Ayerst Labs., 236 F. Supp. 2d 509 (D. Md. 2002); Shields v. Bridgestone/Firestone, Inc., 232 F. Supp. 2d 715 (E.D. Tex. 2002); Little v. Purdue Pharma, L.P., 227 F. Supp. 2d 838 (S.D. Ohio 2002) In re Diet Drugs Prods. Liab. Litig., 220 F. Supp. 2d 414 (E.D. Pa. 2002); Doherty v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 9596 (N.D. Cal. May 15, 2002); Garcia v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 15122 (W.D. Wash. Apr. 22, 2002); Ohler v. Purdue Pharma L.P., 2002 U.S. Dist. LEXIS 2368 (E.D. La. Jan. 22, 2002); Mead v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 25645 (D. Or. Jan. 7, 2002).

201 See C.A. Wright, A.R. Miller et aI., Federal Practice and Procedure S 3707, at 225 (1998).

202 Id. S 3705, at 65 (2003 Supp.).

203 In recent years, many feral courts have had to resolve jurisdictional amount issues in resolving motions to remand class actions. See, e.g., In re Bridgestone/Firestone lnc Tires Prods. Liab. Litig., 256 F. Supp. 2d 884 (S.D. Ind. 2003); Adans v. Nationwide Mutual Ins. Co., 2003 U.S. Dist. LEXIS 4973 (N.D. Tex. Mar. 31, 2003); Kary v. Exxon/Mobil Corp., 2003 U.S. Dist. LEXIS 4599 (D.N.D. Mar. 19, 2003); Faircloth v. National Home Loan Corp., 313 F. Supp. 2d 544 (M.D.N.C 2003), aff'd, 2004 US. App. LEXIS 1039 (4th Cir. 2004) Carric v. Sears, Roebuck and Co., 252 F. Supp. 2d 116 (M.D. Pa. 2003); Dash v. FirstPlus Home Loan Trust, 248 F. Supp. 2d 489(M.D.N.C. Mar. 6, 2003); Harris v. Physicians Mut. Ins. Co., 240 F. Supp. 3d 715 (N.D. Ohio 2003); Radlo v. Rhone-Poulenc, S.A., 241 F. Supp. 2d 61 (D. Mass. 2002); Shields v. Bridgestone/Fireston, Inc., 232 F. Supp. 2d 715 (E.D. Tex. 2002); Tremblay v. Philip Morris, Inc., 231 F. Supp. 2d 411 (D.N.H. 2002); Mentzel v. Comcast Cable Communications, 222 F. Supp. 2d 923 (E.D. Mich. 2002); Trapazzo v. Prudential Property & Casualty Ins. Co., 220 F. Supp. 2d 628 (E.D. Tex. 2002); Perotti v. Black & Decker, Inc., 205 F. Supp. 2d 813 (N.D. Ohio 2002); Perry v. Hartford Ins. Co. of the Midwest, 198 F. Supp. 2d 836 (E.D. Tex. 2002); City of University City, Missouri v. AT&T Wireless Services, Inc., 229 F. Supp. 2d 927 (E.D. Mo. 2002); Mehlenbacher v. Akzo Nobel Salt, Inc., 207 F. Supp. 2d 71 (W.D.N.Y. 2002); Perry v. Hartford Ins. Co. of the Midwest, 198 F. Supp. 2d 836 (E.D. Tex. 2002); Gavriles v. Verizon Wireless, 194 F. Supp. 2d 674 (E.D. Mich. 2002); Bethea v. St. Paul Guardian Ins. Co., 2002 U.S. Dist. LEXIS 15780 (E.D. La. Aug. 21, 2002); Nabal v. BJ's Wholesale Club, Inc., 2002 U.S. Dist. LEXIS 15106 (E.D. Pa. Aug. 1, 2002); Pope v. Independent Order of Foresters, 2002 U.S. Dist. LEXIS 13550 (W.D. Ky. July 23, 2002); Post v. General Motors Corp., 2002 U.S. Dist. LEXIS 9968 (S.D.N.Y. May 31, 2002); Sylvester v. Daimler Chrysler Corp., 2002 U.S. Dist. LEXIS 17989 (N.D. Ohio May 30, 2002); Green v. Party City Corp., 2002 U.S. Dlst. LEXIS 7750 (C.D. Cal. Apr. 9, 2002); Cigna Healthcare of St Louis Inc., v. Kaiser, 181 F. Supp. 2d 914 (N.D. Ill. 2002) aff'd and modified in part, 294 F.3d 849 (7th Cir. 2002).

204 Coury v. Prot, 85 F.3d 244, 249 (5th Cir. 1996); Kanzelberger v. Kanzelberger, 782 F.2d 774, 776 (7th Cir. 1986).

205 See Caterpillar, Inc. v. Lewis, 519 U.S. 61 69 (1996) ("In a case not originally removable, a defendant who received a pleading or other paper indicating the postcommencement satisfaction of federal jurisdictional requirements–for example, by reason of the dismissal of a nondiverse party–may remove the case to federal court within 30 days of receiving such information.").

206 303 U.S. 283, 293 (1938).

207 Id. at 294–95.

208 Id. at 294.

209 Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1121 (7th Cir. 1998) (holding that the jurisdictional test is "not whether the plaintiff is actually entitled" to $75,000, "[o]therwise every diversity case that a plaintiff lost on the merits would be dismissed for lack of federal jurisdiction").

210 See Caterpillar, Inc., 519 U.S. at 69.

211 See Strawbridge v. Curtiss, 3 Cranch 267 (1806) (complete diversity requirement derives from "[t]he words of the act of Congress," not the Constitution).

212 State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 530–31 (1967) (citing Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 10 n.3 (1951); Wichita R. & Light Co. v. Pub. Util. Comm'n 260 U.S. 48 (1922); Barney v. Latham, 103 U.S. 205, 213 (1881)).

213 414 U.S. 291 (1973).

214 Zahn v. International Paper Co., 53 F.R.D. 430 (D. Vt. 1971).

215 Zahn v. International Paper Co., 414 U.S. at 301 ("Each plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case–'one plaintiff may not ride in on another's coattails.'").

216 536 U.S. 1 (2002).

217 See, e.g., American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974).

218 Id. at 550 (emphasis added).

219 See Diaz v. Trust Territory of Pacific Islands, 876 F.2d 1401, 1408 (9th Cir. 1989); Glidden v. Chromalloy American Corp., 808 F.2d 621, 626–28 (7th Cir. 1986).

220 S. Rep. 108–123, at 77–78 (2002) (Minority views).

221 S. Rep. 108-123, at 77–78 (2003) (Minority views).

222 Id.

223 In re Diet Drugs (Fen-Phen), 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).

224 In re: Copley Pharmaceutical Inc., Albuterol Products Liability Litigation, 1 F. Supp. 2d 1407 (D. Wyo. 1998).

225 Bowling v. Pfizer Inc., 922 F. Supp. 1261 (S.D. Ohio 1996).

226 See 2004 Federal Judicial Center Study.

227 Examining the Work of State Courts at 12–13.

228 See Federal Court Management.

1 See Letter from Ralph Mecham, Secretary, Judicial Conference of the United States (Mar. 26, 2003) (in 2003, the Conference voted to oppose the jurisdictional provisions that remain in S. 5 because the provisions "would add substantially to the work of the Federal courts and are inconsistent with principles of Federalism").

2 See Letter from Annice M. Wagner, President, Conference of Chief Justices (Mar. 28, 2002) ("Absent hard evidence of the

inability of the state judicial systems to hear and decide fairly class actions brought in state courts, we do not believe that such a procedure is warranted.").

3 See Letter from Sen. Michael Balboni, Chair, National Conference of State Legislatures (Feb. 2, 2005) ("The effect of S.5 on state legislatures is that state laws in the areas of consumer protection and antitrust which were passed to protect citizens of a particular state against fraudulent or illegal activities will almost never be heard in state courts.").

4 See Letters to Committee Members in opposition to similar class action measures from the AARP, ADA Watch/National Coalition for Disability Rights, AFL–CIO, Alliance for Healthy Homes, Alliance for Justice, Alliance for Retired Americans, American Association of People with Disabilities, American Association of University Women, American Cancer Society, American Heart Association, American Federation of Government Employees, American Federation of State, County and Municipal Employees, American Lung Association, American-Arab Anti-Discrimination Committee, Americans for Democratic Action, Bazelon Center for Mental Health Law, Brady Campaign to Prevent Gun Violence, United with the Million Mom March, Campaign For Tobacco-Free Kids, Center for Disability and Health, Center for Justice and Democracy, Center for Responsible Lending, Center for Women Policy Studies, Civil Justice, Inc., Clean Water Action, Coalition to Stop Gun Violence, Commission on Social Action of Reform Judaism, Communication Workers of America, Consumer Federation of America, Consumers for Auto Reliability and Safety, Consumers Union, Disability Rights Education Fund, Earthjustice, Education Law Center, Environmental Working Group, Epilepsy Foundation, Families USA, Federally Employed Women, Friends of the Earth, Gray Panthers, Greenpeace, Homeowners Against Deficient Dwellings, Jewish Labor Committee, Lawyers' Committee For Civil Rights Under Law, Leadership Conference on Civil Rights, Mexican American Legal Defense and Educational Fund, Mineral Policy Center, NAACP Legal Defense and Education Fund, National Alliance of Postal and Federal Employees, National Asian Pacific American Legal Consortium, National Association for the Advancement of Colored People, National Association for Equal Opportunity in Higher Education, National Association of Consumer Advocates, National Association of Consumer Agency Administrators, National Association of the Deaf, National Association of Protection and Advocacy Systems, National Bar Association, National Campaign for Hearing Health, National Center on Poverty Law, National Coalition on Black Civic Participation, National Committee on Pay Equity, National Consumer Law Center, National Consumers Coalition, National Consumers League, National Council of La Raza, National Employment Lawyers Association, National Fair Housing Alliance, National Gay and Lesbian Task Force, National Law Center on Homeless & Poverty, National Legal Aid and Defender Association, National Organization for Women, National Partnership for Women and Families, National Resources Defense Council, National Workrights Institute, National Women's Health Network, National Women's Law Center, North Carolina Justice Center, NOW Legal Defense Fund, People for the American Way, Pride at Work, Project Equality, Public Citizen, Religious Coalition for Reproductive Choice, Sargent Shriver National Center of Poverty Law, Service Employees International Union, Sierra Club, Tobacco Control Resource Center, Tobacco Products Liability Project, UNITE!, United Food and Commercial Workers International Union, United Policyholders, United Steelworkers of America, USAction, U.S. Public Interest Research Group, Violence Policy Center, and Women Employed (May 21, 2004).

5 See Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).

6 See The Class Action Fairness Act of 2005, S. 5, 109th Cong. S 4(a)(2) (2005) (adding 28 U.S.C. S 1332(d)(2)). Current law requires complete diversity before a state law case is eligible for removal to Federal court, meaning all of the defendants must be citizens residing in different states than the plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806). In Snyder v. Harris, 394 U.S. 332 (1969), the Supreme Court held that the court should only consider the citizenship of named plaintiffs for diversity purposes, and not the citizenship of absent class members.

7 Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(3)).

8 Id.

9 Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(4)). The legislation also excludes securities-related and corporate governance class actions from coverage and makes a number of other procedural changes, such as easing the procedural requirements for removing a class action to Federal court (i.e., permitting removal to be sought by any plaintiff or defendant and eliminating the one-year deadline for filing removal actions) and tolling the statute of limitation periods for dismissed

class actions. See Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(9)).

10 See Committee Report at p. 44.

11 Senate Bill 5 S 3.

12 Id.

13 National Conference of State Legislatures Letter, supra note 3.

14 See Letter in Opposition to S. 274 from the Consumer Federation of America, Consumers Union, and U.S. Public Interest Research Group (Feb. 5, 2003).

15 Three states still use their common law rules, rather than statutes, to permit class actions (Mississippi, New Hampshire, and Virginia); four states use Field Code-based rules based on the "community of interest" test (California, Nebraska, South Carolina, and Wisconsin); and seven states use class action rules modeled on the original Federal Rule 23 (1938) which creates a distinction among class members which depends on the substantive character of the right asserted (Alaska, Georgia, Louisiana, New Mexico, North Carolina, Rhode Island, and West Virginia). See 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions S 13.04 (3d ed. 1992 & Supp. 1997).

16 Fed. R. Civ. P. 23(a) (stating four factual prerequisites that must be met before a court will certify the lawsuit as a class action: (1) size–the class must be so large that joinder of all of its members is not feasible; (2) common questions–there must be questions of law or fact common to the class; (3) typical claims–the claims or defenses of the representatives must be "typical" of those of the class; and (4) representation–the representatives must fairly and adequately represent the interests of the class).

17 84 F.3d 734 (5th Cir. 1996) (preventing the certification of a nationwide class action brought by cigarette smokers and their families for nicotine addiction where there was found to be too wide a disparity between the various state tort and fraud laws for the class action vehicle to be superior to individual case adjudication).

18 51 F.3d 1293 (7th Cir. 1995) (decertifying, under the Erie doctrine, a nationwide negligence class action brought on behalf of hemophiliacs infected with the AIDS virus through use of defendants' blood clotting products because of diversity of state laws).

19 75 F.3d 1069 (6th Cir. 1996) (decertifying a proposed plaintiff settlement class comprising all U.S. residents implanted with defective or malfunctioning inflatable penile prostheses that were manufactured, developed, or sold by defendant company because common questions of law or fact did not predominate the action to such an extent that warranted class certification).

20 521 U.S. 591 (1997) (overturning consensual settlement between a class of workers injured by asbestos and a coalition of former asbestos manufacturers because of disparate levels of the class members' knowledge of their injuries and class members' large amount at stake in the litigation).

21 155 F.3d 331 (4th Cir. 1998) (rejecting class certification brought by Meineke franchisees alleging violations of franchise, tort, unfair trade, and other laws).

22 527 U.S. 815 (1999) (finding mandatory limited fund class treatment under Rule 23(b)(1)(B) is not appropriate unless the maximum funds available are clearly inadequate to pay all claims).

23 See, e.g., Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996) (refusing to certify a nationwide asbestos suit because the laws of multiple states would have to be applied), Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000) (reversing the district court's certification because "it erred in its choice of law analysis"), In re American Medical Systems, Inc., 75 F.3d 1069 (6th Cir. 1996) (denying class certification due to variances in state laws), In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002) (refusing certification because the district court would have to apply the laws of several states according to Indiana's choice of law rules), and Zinser v. Accufix Research Inst., 253 F.3d 1180 (9th Cir. 2001) (holding the plaintiffs with pacemakers made of lead had not demonstrated which state's laws apply under California choice

of law rules).

24 See, e.g., Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998), In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 170 F.R.D. 417 (E.D. La. 1997), Lyon v. Caterpillar, Inc., 194 F.R.D. 206 (E.D. Pa. 2000).

25 Letter from Arthur R. Miller, Bruce Bromley Professor of Law, Harvard Law School (Jun. 17, 2004).

26 Id. (quoting Brief of the Chamber of Commerce of the United States as Amicus Curiae in Support of Appellants, In re Simon II Litigation, No. 03–7141 (2nd Cir. June 3, 2003).

27 See Letter from the Consumer Federation of America, Consumers Union, and U.S. PIRG (Feb. 5, 2003).

28 Id.

29 See id.

30 See Letter from the Consumer Federation of America, Consumers Union, and U.S. PIRG (Feb. 5, 2003).

31 Id.

32 ABA Task Force on Class Action Legislation, Report of the ABA Task Force on Class Action Legislation at 3 (Feb. 2003). See also Letter in Opposition to S. 274, The Class Action Fairness Act of 2003, from the Consumers Union (Apr. 2, 2003).

33 Senate Bill 5 S 4(a)(2) (adding 28 U.S.C. S 1332(d)(11)).

34 See Judicial Conference Letter, supra note 1.

35 See Letter in Opposition to S. 5 from the Leadership Conference on Civil Rights, AFL–CIO, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal Defense and Educational Fund, National Asian Pacific American Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, Women Employed and others (Feb. 2, 2005).

36 See Letter in Opposition to S. 274 from the Leadership Conference on Civil Rights, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal Defense and Educational Fund, National Asian Pacific Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, and Women Employed (Mar. 20, 2003).

37 Id.

38 See In re Domestic Air Transportation Antitrust Litigation, 137 F.R.D. 677 (N.D. Ga. 1991).

39 Senate Bill 5 S 3 (adding 28 U.S.C. 1712 (a)).

40 Id. (adding 28 U.S.C. 1712 (d)).

41 Id. (adding 28 U.S.C. 1712 (b) (1–2)).

42 Id. (adding 28 U.S.C. 1712 (c)).

43 Id. (adding 28 U.S.C. 1712 (e)).

44 See Letters from Judicial Conference (Jul. 26, 1999 and Aug. 23, 1999).

45 Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).

46 The Federalist No. 14 (James Madison).

47 See Letter from Lawyers' Committee for Civil Rights Under Law (Apr. 9, 2003) (quoting Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87 (1809)); see also City of Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 76 (1941).

48 487 U.S. 131, 138 (1988) (finding Wisconsin notice-of-claim statute to be preempted by 42 U.S.C. S 1983, which holds anyone acting under color of law liable for violating constitutional rights of others).

49 520 U.S. 911, 919 (1997) (holding that Idaho procedural rules concerning appealability of orders are not preempted by 42 U.S.C. Sec. 1983) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 508 (1954)).

50 Id. at 922. See also Howlett v. Rose, 296 U.S. 356, 372 (1990) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev 489, 508 (1954) for the proposition that Federal law should not alter the operation of the state courts); New York v. United States, 505 U.S. 144, 161 (1992) (stating that a law may be struck down on Federalism grounds if it "commandeer[s] the legislative processes of the States by directly compelling them to enact and enforce a Federal regulatory program").

51 The Global Tobacco Settlement: Hearings Before the Senate Comm. on the Judiciary, 105th Cong. (1997) (statement of Laurence H. Tribe, Tyler Professor of Law, Harvard Law School). Indeed, Former-Chairman Hatch praised Professor Tribe at the Committee's June 4, 2003, hearing on asbestos litigation as "known here and throughout the country as one of the most respected constitutional scholars and practitioners."

52 529 U.S. 598 (2000).

53 472 U.S. 797 (1985).

54 Id. at 812 (stating that the notice must be the "best practicable, reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections") (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314–315 (1950)).

55 Id. at 806–810. These findings were reiterated by the Supreme Court in 1995 in Matsushita Elec. Indust. Co. v. Epstein, 516 U.S. 367 (1995) (holding that state class actions are entitled to full faith and credit so long as, inter alia: the settlement was fair, reasonable, adequate and in the best interests of the settlement class; notice to the class was in full compliance with due process; and the class representatives fairly and adequately represented class interests).

56 Ironically, during the 104th Congress, the Republican Party was extolling the virtues of state courts in the context of their efforts to limit habeas corpus rights, which permit individuals to challenge unconstitutional state law convictions in Federal court.

57 28 U.S.C 1332(a) (West Supp. 1998).

58 See Judicial Conference of the United States, Long Range Plan for the Federal Courts, Recommendation 7 at 30 (1995).

59 See id.

S. REP. 109-14, S. Rep. No. 14, 109TH Cong., 1ST Sess. 2005, 2005 WL 627977, 2005 U.S.C.C.A.N. 3 (Leg.Hist.)

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 3



/www.census.gov/en.html)

Search

U.S. Census Quick Facts

## QuickFacts
### Flint city, Michigan

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more*.

| All Topics ▼ | FLINT CITY, MICHIGAN |
|---|---|
| **People** | |
| **Population** | |
| Population estimates, July 1, 2015, (V2015) | 98,310 |
| Population estimates base, April 1, 2010, (V2015) | 102,400 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2015, (V2015) | -4.0% |
| Population, Census, April 1, 2010 | 102,434 |
| **Age and Sex** | |
| Persons under 5 years, percent, July 1, 2015, (V2015) | X |
| Persons under 5 years, percent, April 1, 2010 | 8.0% |
| Persons under 18 years, percent, July 1, 2015, (V2015) | X |
| Persons under 18 years, percent, April 1, 2010 | 27.3% |
| Persons 65 years and over, percent, July 1, 2015, (V2015) | X |
| Persons 65 years and over, percent, April 1, 2010 | 10.7% |
| Female persons, percent, July 1, 2015, (V2015) | X |
| Female persons, percent, April 1, 2010 | 52.0% |
| **Race and Hispanic Origin** | |
| White alone, percent, July 1, 2015, (V2015) (a) | X |
| White alone, percent, April 1, 2010 (a) | 37.4% |
| Black or African American alone, percent, July 1, 2015, (V2015) (a) | X |
| Black or African American alone, percent, April 1, 2010 (a) | 56.6% |
| American Indian and Alaska Native alone, percent, July 1, 2015, (V2015) (a) | X |
| American Indian and Alaska Native alone, percent, April 1, 2010 (a) | 0.5% |
| Asian alone, percent, July 1, 2015, (V2015) (a) | X |
| Asian alone, percent, April 1, 2010 (a) | 0.5% |
| Native Hawaiian and Other Pacific Islander alone, percent, July 1, 2015, (V2015) (a) | X |
| Native Hawaiian and Other Pacific Islander alone, percent, April 1, 2010 (a) | Z |
| Two or More Races, percent, July 1, 2015, (V2015) | X |
| Two or More Races, percent, April 1, 2010 | 3.9% |
| Hispanic or Latino, percent, July 1, 2015, (V2015) (b) | X |
| Hispanic or Latino, percent, April 1, 2010 (b) | 3.9% |
| White alone, not Hispanic or Latino, percent, July 1, 2015, (V2015) | X |
| White alone, not Hispanic or Latino, percent, April 1, 2010 | 35.7% |
| **Population Characteristics** | |
| Veterans, 2010-2014 | 5,294 |
| Foreign born persons, percent, 2010-2014 | 1.1% |
| **Housing** | |
| Housing units, July 1, 2015, (V2015) | X |
| Housing units, April 1, 2010 | 51,321 |
| Owner-occupied housing unit rate, 2010-2014 | 55.5% |
| Median value of owner-occupied housing units, 2010-2014 | $36,700 |
| Median selected monthly owner costs -with a mortgage, 2010-2014 | $921 |
| Median selected monthly owner costs -without a mortgage, 2010-2014 | $396 |
| Median gross rent, 2010-2014 | $684 |
| Building permits, 2015 | X |
| **Families and Living Arrangements** | |
| Households, 2010-2014 | 40,509 |
| Persons per household, 2010-2014 | 2.42 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2010-2014 | 77.7% |
| Language other than English spoken at home, percent of persons age 5 years+, 2010-2014 | 2.8% |
| **Education** | |
| High school graduate or higher, percent of persons age 25 years+, 2010-2014 | 82.6% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2010-2014 | 11.3% |
| **Health** | |
| With a disability, under age 65 years, percent, 2010-2014 | 17.4% |
| Persons without health insurance, under age 65 years, percent | ⚠ 14.1% |
| **Economy** | |
| In civilian labor force, total, percent of population age 16 years+, 2010-2014 | 50.2% |

| | |
|---|---|
| In civilian labor force, female, percent of population age 16 years+, 2010-2014 | 49.1% |
| Total accommodation and food services sales, 2012 ($1,000) (c) | 102,215 |
| Total health care and social assistance receipts/revenue, 2012 ($1,000) (c) | 1,190,315 |
| Total manufacturers shipments, 2012 ($1,000) (c) | D |
| Total merchant wholesaler sales, 2012 ($1,000) (c) | 587,769 |
| Total retail sales, 2012 ($1,000) (c) | 740,210 |
| Total retail sales per capita, 2012 (c) | $7,364 |

### Transportation

| | |
|---|---|
| Mean travel time to work (minutes), workers age 16 years+, 2010-2014 | 22.3 |

### Income and Poverty

| | |
|---|---|
| Median household income (in 2014 dollars), 2010-2014 | $24,679 |
| Per capita income in past 12 months (in 2014 dollars), 2010-2014 | $14,527 |
| Persons in poverty, percent | ⚠ 41.6% |

#### Businesses

| | |
|---|---|
| Total employer establishments, 2014 | X |
| Total employment, 2014 | X |
| Total annual payroll, 2014 | X |
| Total employment, percent change, 2013-2014 | X |
| Total nonemployer establishments, 2014 | X |
| All firms, 2012 | 8,712 |
| Men-owned firms, 2012 | 2,933 |
| Women-owned firms, 2012 | 5,303 |
| Minority-owned firms, 2012 | 5,305 |
| Nonminority-owned firms, 2012 | 3,036 |
| Veteran-owned firms, 2012 | 784 |
| Nonveteran-owned firms, 2012 | 7,559 |

#### Geography

| | |
|---|---|
| Population per square mile, 2010 | 3,065.4 |
| Land area in square miles, 2010 | 33.42 |
| FIPS Code | 2629000 |

⚠ This geographic level of poverty and health estimates are not comparable to other geographic levels of these estimates

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info 🛈 icon to the left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2015) refers to the final year of the series (2010 thru 2015). Different vintage years of estimates are not comparable.

**(a)** Includes persons reporting only one race
**(b)** Hispanics may be of any race, so also are included in applicable race categories
**(c)** Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**D** Suppressed to avoid disclosure of confidential information
**F** Fewer than 25 firms
**FN** Footnote on this item in place of data
**NA** Not available
**S** Suppressed; does not meet publication standards
**X** Not applicable
**Z** Value greater than zero but less than half unit of measure shown

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

**ABOUT US** (//www.census.gov/about.html)

Are You in a Survey? (//www.census.gov/programs-surveys/are-you-in-a-survey.html)
FAQs (//ask.census.gov/)
Director's Corner (//www.census.gov/about/leadership.html)
Regional Offices (//www.census.gov/about/regions.html)
History (//www.census.gov/about/history.html)
Research (//www.census.gov/about/our-research.html)
Scientific Integrity (//www.census.gov/about/policies/quality/integrity.html)
Census Careers (//www.census.gov/about/census-careers.html)
Diversity @ Census (//www.census.gov/about/diversity-networks.html)
Business Opportunities (//www.census.gov/about/business-opportunities.html)
Congressional and Intergovernmental (//www.census.gov/about/cong-gov-affairs.html)

**FIND DATA**

QuickFacts (//www.census.gov/data/data-tools/quickfacts.html)
American FactFinder (//www.census.gov/data/data-tools/american-factfinder.html)
Population Finder (//www.census.gov/data-tools/interactive-population-map.html)
2010 Census (//www.census.gov/programs-surveys/decennial-census/2010-census.html)
Economic Census (//www.census.gov/programs-surveys/economic-census.html)
Interactive Maps (//www.census.gov/geography/interactive-maps.html)
Training & Workshops (//www.census.gov/data/training-workshops.html)
Data Tools (//www.census.gov/data/data-tools.html)
Developers (//www.census.gov/developers/)

**BUSINESS & INDUSTRY**

Help With Your Forms (//www.census.gov/topics/business/help.html)
Economic Indicators (//www.census.gov/topics/economy/economic-indicators.html)
Economic Census (//www.census.gov/programs-surveys/econ_census.html)
E-Stats (//www.census.gov/programs-surveys/e-stats.html)
International Trade (//www.census.gov/topics/international-trade.html)
Export Codes (//www.census.gov/topics/international-trade/schedule-b.html)
NAICS (//www.census.gov/topics/economy/naics/codes.html)
Governments (//www.census.gov/topics/public-sector.html)
Local Employment Dynamics (//www.census.gov/topics/employment.html)
Survey of Business Owners (//www.census.gov/programs-surveys/sbo.html)

**PEOPLE & HOUSEHOLDS**

2020 Census (//www.census.gov/2020census/)
2010 Census (//www.census.gov/programs-surveys/decennial-census/2010-census.html)
American Community Survey (//www.census.gov/programs-surveys/acs/)
Income (//www.census.gov/topics/income-poverty/income.html)
Poverty (//www.census.gov/topics/income-poverty/poverty.html)
Population Estimates (//www.census.gov/topics/population/population-estimates.html)
Population Projections (//www.census.gov/topics/population/population-projections.html)
Health Insurance (//www.census.gov/topics/health/health-insurance.html)
Housing (//www.census.gov/topics/housing.html)
International (//www.census.gov/topics/population/international.html)

**SPECIAL TOPICS**

Advisors, Centers and Research Programs (//www.census.gov/about/partners.html)
Statistics in Schools (//www.census.gov/schools/)
Tribal Resources (AIAN) (//www.census.gov/about/cong-gov-affairs/intergovernmental-affairs/tribal-affairs/tribal-resources.html)
Emergency Preparedness (//www.census.gov/topics/preparedness.html)
Statistical Abstract (//www.census.gov/library/publications/time-series/statistical_abstracts.html)
Special Census Program (//www.census.gov/programs-surveys/specialcensus.html)
Data Linkage Infrastructure (//www.census.gov/about/adrm/linkage/data-linkage.html)
Fraudulent Activity & Scams (//www.census.gov/about/policies/privacy/data_protection/our-activities-are-you-in-a-survey/fraudulent-activity-and-scams.html)
USA.gov (//www.usa.gov/)
BusinessUSA.gov (//business.usa.gov/)

**NEWSROOM** (//www.census.gov/newsroom.html)

News Releases (//www.census.gov/newsroom/press-releases.html)
Release Schedule (//www.censuswiz.com/calendars/calendars/calendars/calendar/cal?cd=cens1sample&cid[]=31793)
Facts for Features (//www.census.gov/newsroom/facts-for-features.html)
Stats for Stories (//www.census.gov/newsroom/stories.html)
Blogs (//www.census.gov/about/contact-us/social_media.html)

**CONNECT WITH US**

(//www.census.gov/about/contact-us/social_media.html)
(//twitter.com/uscensusbureau)

Flint city, Michigan

Contact Us
(//www.census.gov/about/contact-
us.html)

Catalogs
(//www.census.gov/data/product-
catalog.html)

Publications
(//www.census.gov/library/publications.html)

Genealogy
(//www.census.gov/topics/population/genealogy.html)

(//www.facebook.com/uscensusbureau)

(//www.youtube.com/user/uscensusbureau)

(//public.govdelivery.com/accounts/USCENSUS/subscriber/new)

Accessibility (//www.census.gov/about/policies/privacy/privacy-policy.html#par_textimage_1) | Information Quality (//www.census.gov/quality/) |
FOIA (//www.census.gov/foia/) | Data Protection and Privacy Policy (//www.census.gov/privacy/) | U.S. Department of Commerce
(//www.commerce.gov/)

Exhibit 4

2014 WL 4655277
Only the Westlaw citation is currently available.
United States District Court,
M.D. Tennessee,
Northeastern Division.

EAGLES NEST, LLC; Beverly Bauer; and Cortez
Investments Group, Inc ., Individually and on
Behalf of All Others Similarly Situated, Plaintiffs,
v.
MOY TOY, LLC, and Standing Rock, LLC,
Defendants.

No. 2:14–00010.
|
Filed Sept. 16, 2014.

**Attorneys and Law Firms**

David T. Black, Melanie E. Davis, Kizer & Black, PLLC,
Maryville, TN, for Plaintiffs.

Gregory C. Logue, Sr., Lindy Degnan Harris, Woolf,
McClane, Bright, Allen & Carpenter, PLLC, Knoxville,
TN, for Defendants.

### *MEMORANDUM*

KEVIN H. SHARP, District Judge.

**\*1** In this action that was removed from state court
pursuant to the Class Action Fairness Act, 28 U.S.C. §§
1332(d)(2) & 1453, Plaintiffs have filed a Motion to
Remand. That Motion has been fully briefed by the
parties and, for the reasons that follow, will be granted.

### I.

The relevant allegations from the Complaint are as
follows:

Plaintiffs, Eagle Nest LLC, a Nevada corporation, Cortez
Investments Group, Inc., a Florida corporation, and
Beverly Bauer, a citizen and resident of Louisiana, own
multiple lots in the Renegade Resort community in

Cumberland County, Tennessee. Defendant, Moy Toy,
Inc., a Tennessee limited liability company, is the
"purported developer of Renegade Resort" (Docket No.
1–2, Complaint ¶ 9), Defendant Terra Mountain Holdings,
LLC, a Georgia limited liability company, obtained a
large tract of land adjacent to Renegade Resort from Moy
Toy, and Defendant Standing Rock, LLC, also a
Tennessee limited liability corporation, owns the golf
course property in Renegade Resort.

The lots in Renegade Resort are subject to restrictions
recorded in the Cumberland County Register of Deeds.
The original restrictions ("1972 Restrictions") envisioned

> the developer in Renegade Resort
> developing the lands as part of a
> common master plan of
> development intending to add other
> lands to the development and
> creating thereon a residential and
> commercial resort with streets,
> water and sewer systems,
> recreation facilities of various
> types, and other common facilities
> for the use and benefit of the
> owners of said properties.

(*Id.* ¶ 33). The 1972 Restrictions further "state[d] an
intention to bind adjacent properties to the common
scheme of development and to add them and protect them
over time." (*Id.* ¶ 35).

The 1972 Restrictions also provided for amendment upon
an affirmative vote of a majority of the owners'
association members, and adoption by the developer.
Nevertheless, amendments were made to the restrictions
in 1987 and 2005 that "were improperly recorded and
improperly executed without membership approval by
vote and without valid developer approval as required"
and were improperly recorded in an "attempt to increase
the power for the purported developer while
simultaneously taking vested property rights from existing
property owners." (*Id.* ¶ 25).

Plaintiffs, on behalf of a class that "would include
approximately 551 owners and 1,351 lots and living units
less those owned by Defendants[,] ... require clarification
as to their property rights" and "a uniform decision as to
which restrictions govern Renegade Resort inasmuch as
multiple amended restrictions have been recorded under
questionable circumstances" that "purport to bind all
owners in Renegade Resort." (*Id.* ¶¶ 12 & 15). They also
request a decision as to how the lands adjacent to

Eagles Nest, LLC v. Moy Toy, LLC, Slip Copy (2014)

Renegade Resort may be utilized. (*Id.* ¶ 16).

Plaintiffs challenge Moy Toy's "claims to have developer control" by "virtue of purported superior voting rights in the Community Club" because "[d]eveloper rights were never properly and completely conveyed by and through Moy Toy, LLC's predecessors in title." (*Id.* at 28).[1] They also assert that Terra Mountain Holdings "is seeking to place a conservation easement on it property which forms part of the master planned community," but that such "a conservation easement would be markedly inconsistent with and different from those uses contained in and provided for in the 1972 Restrictions, the master plan of development, and multiple repeated representations of Terra Mountain Holdings, LLC's predecessor in title." (*Id.* ¶ 30).[2] As to Defendant Standing Rock, Plaintiffs claim that it intends to "put a conservation easement" on the property where the golf course was located that contravenes the 1972 Restrictions, which provided that a golf course would be constructed as "common property for the use and benefit of those in Renegade Resort." (*Id.* ¶ 46).

**\*2** Plaintiffs filed suit in the Chancery Court for Cumberland County seeking declaratory and injunctive relief. They make no specific claim for money damages.

## II.

The CAFA "provides that a federal district court has jurisdiction in a civil action where there is diversity, 28 U.S.C. § 1332(d)(2)(A), the amount in controversy exceeds $5 million, § 1332(d), and the proposed class includes at least one hundred members, § 1332(d)(5)(B)." *Salling v. Budget Rent–A–Car Systems, Inc.,* 672 F.3d 442, 443 (6th Cir.2012). "Such a class action may be removed to a federal district court as provided by 'section 1446 (except that the 1–year limitation under section 1446(b) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants.' " *In re Mortgage Electronic Registration Sys., Inc.* 680 F.3d 849, 853 (6th Cir.2012) (quoting 28 U.S.C. § 1453(b)). "[A] defendant seeking removal must prove, by a preponderance of the evidence, that jurisdictional requirements have been met." *Salling,* 672 F.3d at 443.

In seeking to remand this case, Plaintiffs argue Defendants have not established that removal was proper because (1) Defendants claim the jurisdictional threshold has been met, even though Plaintiffs seek only injunctive

and declaratory relief their Complaint; (2) Defendants' assertion of the amount in controversy is based upon nothing but speculation and guesswork; and (3) Defendants' allegations as to the citizenship of the parties is deficient. Plaintiffs also argue that, even if Defendants have sufficiently established this Court's jurisdiction, the action should be remanded pursuant to the discretionary exception identified in the CAFA. The Court agrees with the last argument and will remand this case to the Chancery Court on that basis.

## III.

While the "CAFA greatly expands federal jurisdiction over certain class actions," *Lemy v. Direct Gen. Fin. Co.,* 559 F. App'x 796, 798 (11th Cir.2014), it "does not grant jurisdiction in all cases, providing judges discretionary jurisdiction in some instances, 28 U.S.C. § 1332(d)(3), and barring jurisdiction in others, 28 U.S.C. § 1332(d)(4)," *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.,* 646 F.3d 169, 178 (4th Cir.2011). As the court in *McGraw* explained:

> To be sure, CAFA does protect important federal interests in addressing state abuses in interstate class actions. It was enacted to prevent States from keeping "cases of national importance out of Federal court" and making "judgments that impose their view of the law on other States and bind the rights of the residents of those states." *Id.* § 2(a)(4). It thus assures that federal courts decide "interstate cases of national importance." *Id.* § 2(d) (2). But CAFA is also sensitive to deeply-rooted principles of federalism, reserving to the States primarily local matters.

**\*3** 646 F.3d at 178.

CAFA's discretionary jurisdiction provision provides:

> (3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of—
>
> (A) whether the claims asserted involve matters of national or interstate interest;
>
> (B) whether the claims asserted will be governed by laws of the State in which the action was originally

filed or by the laws of other States;

(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

(F) whether, during the 3–year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

28 U.S.C. § 1332(d)(3).

### A.

Defendants argue that the Court cannot even consider the foregoing factors for two reasons: Plaintiffs have not shown that more than one-third of the proposed class are Tennessee citizens or that either of the remaining Defendants are citizens of this state. The Court disagrees.

With regard to the first point, Defendants argue that Plaintiffs, in their moving papers, seek to "satisf[y] the citizenship requirement set forth in § 1332(d)(3) with nothing more than an approximated guess that the requisite percentage of the Plaintiff class are Tennessee citizens." Instead, Plaintiffs merely state that "approximately forty-six percent (46%) of the member of the class are believed to be citizens of Tennessee." (Docket No. 20 at 17).

Although the statute is unclear as to who carries the burden, its seems that the party asking a court to decline to exercise jurisdiction under CAFA should carry the burden of persuasion. There is authority for that proposition. *See Myrick v. WellPoint, Inc.,* 2014 WL 4073065, at \*2 (7th Cir. Aug.14, 2014) (stating that statute is "not clear," but placing the burden of production on party seeking remand); *Wurtz v. Rawlings Co., LLC,* 761 F.3d 232, 2014 WL 3746801, at \*3 (2nd Cir. July 31, 2014) ("The Second Circuit has declined to reach the issue of who bears the burden with regard to CAFA

exceptions"); *Vodenichar v. Halcon Energy Properties, Inc.,* 733 F.3d 497, 503 (3rd Cir.2013) ("The party seeking to invoke an exception bears the burden of proving by a preponderance of the evidence that the exception applies"). Regardless, the citizenship of the members of a proposed class cannot be based on "guesswork"; "there must ordinarily be at least some facts in evidence" regarding citizenship. *Mondragon v. Capital One Auto Finance,* 736 F.3d 880, 884 (9th Cir.2013).

**\*4** In conjunction with their reply, Plaintiffs supplemented the record with the Affidavit of John Moore, President and Assistance to the Secretary of the Renegade Mountain Community Club. In his Affidavit, Mr. Moore asserts that he retrieved an "Assessment Roll Database" printout from the Tax Assessor's office for the "location code G01" and compared that 169–page printout with the master database for Renegade Resort. (Docket No. 29–2, Moore Aff. ¶¶ 5–6). His comparison of the record showed that "of the 546 owners of record (536 without dual residency status), owning lots and/or living units within the Renegade Resort, 263 (48.17%) owners show an official Tennessee address of record." (*Id.* ¶ 8).

Residency, perforce, does not equate to citizenship, *Walker v. Iverson,* 509 F. App'x 394, 395 n. 1 (6th Cir.2012), but various cases "undeniably incorporate language amenable to an argument that the court may determine citizenship based solely on evidence of residency[,]" *Preston v. Tenet Healthsystem Mem. Med. Ctr., Inc.,* 485 F.3d 793, 800 (5th Cir.2007) (collecting numerous cases, including the Sixth Circuit decision in *Fort Knox Transit v. Humphrey,* 151 F.2d 602, 602 (6th Cir.1945)). In the CAFA arena, utilizing residency to establish citizens for purposes of the Act's exception has met with mixed results:

Some courts ... have found that mailing addresses used for sending payments or bills are insufficient to prove the class citizenship element under a CAFA exception. *See, e.g., In re Sprint Nextel Corp.,* 593 F.3d at 674 (class definition of cell phone users with Kansas number and billing address was insufficient by itself to satisfy plaintiffs' burden of proof [and] expressing unwillingness to rely on "[s]ensible guesswork," although court was "inclined to think that at least two-thirds of those who have Kansas cell phone numbers and use Kansas mailing addresses are probably Kansas citizens"); *Reece,* 2013 WL 1342379, at \*4 n. 7 (noting that, even if plaintiffs had presented proper evidence that putative class members' royalty payments were sent to Oklahoma addresses, this would have been "less than conclusive on the citizenship issue"); *HMB Interests, LLC v. Chesapeake Louisiana LP,* No. 12–2344–cv, 2010 WL 3604008, at \*3

(W.D.La.Sept.18, 2013) ("The fact that a majority of the lessors list a Louisiana mailing address is not sufficient for the Plaintiffs to meet their burden of proof as to the citizenship requirement."). In contrast, other courts have found that mailing addresses are sufficient to raise a presumption of continuing domicile and citizenship. *See, e.g., Preston II,* 485 F.3d at 821–22 (where the defined class was a finite group of persons who were hospitalized by the defendant following Hurricane Katrina, mailing addresses in hospital records allowed district court to make a "credible estimate that at least one-third of the class were citizens of Louisiana" when the complaint was filed); *Commisso,* 2012 WL 3070217, at * 5 (holding that class citizenship element was satisfied based on class definition that limited plaintiffs to individuals who worked in New York office and defendants' evidence that 67.4% of the putative class members had a New York address) ("This data is more than sufficient to create a presumption that more than one third of the putative class members are New York citizens, and Commisso has not attempted to rebut this presumption."); *Bey,* 904 F.Supp.2d at 1105 (relying on defendants' evidence that 90% of putative class members, which were employees at an Oregon corporation, had an Oregon address and had therefore presented prima facie evidence of citizenship in Oregon).

**\*5** *Jeter v. Wild West Gas, LLC,* 2014 WL 3890308, at \*10 (N.D.Okla. Aug.7, 2014).

Because "the burden of proof placed upon a plaintiff should not be exceptionally difficult to bear," for a plaintiff seeking to establish a CAFA exception, *Mondragon,* 736 F.3d at 884, the Court finds Plaintiffs' evidence sufficient. This case involves a defined class of Tennessee property owners, and an indicia of domicile is property ownership. *See e.g. Kyung Park v. Holder,* 572 F.3d 619, 624 (9th Cir.2009); *Caffey v. Home Depot,* 2014 WL 1681705, at \*2 (M.D.Tenn. April 28, 2014). This is not to suggest that each of the 263 owners that comprise almost half of the class are necessarily Tennessee residents, but it is reasonable to conclude that more than 1/3 of the lot owners are Tennessee citizens when both the county assessor's and homeowners' associations rolls show that their address of record is in Tennessee. *See Williams v. Homeland Ins. Co.,* 657 F.3d 287, 291 (5th Cir.2011) (citation omitted) ("The district court may make 'a reasonable assumption' of CAFA's citizenship requirements from evidence that indicates the 'probable citizenship of the proposed class' "); *Hollinger v. Home State Mut. Ins. Co.,* 654 F.3d 564, 572 (5th Cir.2011) ("The evidentiary standard for establishing citizenship and domicile at this preliminary stage [in a

CAFA case] must be practical and reasonable.").

Turning to the second point, Defendants argue that Plaintiffs have not, and cannot, show that either of the primary Defendants is a citizen of Tennessee. This is because both Moy Toy and Standing Rock are limited liability companies comprised of Florida members.

"The general rule is that all unincorporated entities—of which a limited liability company is one—have the citizenship of each partner or member." *Delay v. Rosenthal Collins Grp., LLC,* 585 F.3d 1003, 1005 (6th Cir.2009) (citing, *Carden v. Arkoma Assocs.,* 494 U.S. 185, 187–92, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). However, "CAFA itself evinces an intent that suits by unincorporated associations be treated like suits by corporations in that the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members." *Erie Ins. Exchange v. Erie Indem. Co.,* 722 F.3d 154, 161 (3rd Cir.2013). Specifically, the Act provides:

> (10) For purposes of this subsection and section 1435, an unicorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

28 U.S.C. § 1332(d)(10). Thus, "[f]or qualifying class actions .. CAFA abrogates the traditional rule that an unincorporated association shares the citizenship of each of its members for diversity purposes[.]" *Davis v. HSBC Bank Nevada, N.A.,* 557 F.3d 1026, 1032 n. 13 (9th Cir.2009); *see also Harvey v. Grey Wolf Drilling Co.,* 542 F.3d 1077, 1080 (5th Cir.2008) (in Section 1332(d)(10) "Congress has created a statutory exception to" the general rule of citizenship for unincorporated associations).

**\*6** Defendants concede that both Moy Toy and Standing Rock are Tennessee limited liability companies. For purposes of CAFA, they are Tennessee citizens. *See, Ferrell v. Express Check Advance of SC LLC,* 591 F.3d 698, 700 (4th Cir.2010) (holding that a Tennessee limited liability company "is an 'unincorporated association' as that term is used in 28 U.S.C. § 1332(d)(10)" and a citizen of Tennessee).

**B.**

In determining whether it is "in the interest of justice" to decline jurisdiction, the Court is to look at the "totality of the circumstance" and consider the six factors listed in Section 1332(d). Four of those factors clearly support declining jurisdiction in this case.

CAFA was intended to "restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate case of national importance under diversity jurisdiction." Pub.L. 109–2 § 2, 118 Stat. 4 (2005). In response to Plaintiffs' Motion to Remand, Defendants argue that this is a case of national or interstate concern because it "involves issues of contract law and property law that could impact countless developments and the effect of countless recorded documents." (Docket No. 20 at 18). This argument is not further developed, and the Court does not understand how this case will impact countless developments and documents. See, Preston, 485 F.3d at 822 (in CAFA case involving New Orleans hospital's actions during Hurricane Katrina, "broad statement" about evacuation of medical facilities during disasters being a national concern "could swallow the rule" because "many events isolated to one area at any particular time may reoccur in another geographic location in the future").

Whether the case is heard by this Court or the Chancery Court, the decision will be limited to, and potentially affect the rights of, the owners of property and developer(s) of Renegade Resort. It involves the interpretation of restrictions relating to property in a portion of a single county, in a single state, and will be governed by the laws of the state of Tennessee. The first two factors, Sections 1332(d)(3)(A) and (B) favor remand. See Foley v. Cordillera Golf Club LLC, 2012 WL 114856, at * 6 (D. Colo. April 5, 2012) (declining to exercise discretionary jurisdiction under CAFA where claim involved membership rights in golf course and a restaurant in county in Colorado and matter involved contract claims that would likely be governed by Colorado law).

The third and fourth factors also favor remand. While "CAFA was clearly designed to prevent plaintiffs from artificially structuring their suits to avoid federal jurisdiction," Freeman v. Blue Ridge Paper Products, Inc. 551 F.3d 405, 407 (6th Cir.2008), there is no indication that the Complaint was pled in such a was so as to avoid this Court's jurisdiction. The case involves real property right that are traditionally within the purview of state courts. United States v. Real Property & All Furnishings Known As Bridwell's Grocery, 195 F.3d 819, 821 (6th Cir.1999). It was filed in the most logical forum for that dispute—the Chancery Court for the county in which the

property is located—and in a court that has a "distinct nexus with the class member, the alleged harm, [and] the defendants[.]" 28 U.S.C. 1332(d)(3)(D).

**\*7** With regard to the fifth factor, Plaintiffs assert that "the number of members of the Plaintiff class that are citizens of Tennessee is substantially larger than the number of class members from any other state." (Docket No. 18 at 10). Defendants do not challenge that assertion. While it seems logical that Tennessee lot owners would substantially outnumber the owners from any other state (particularly since nearly half of the putative class has a Tennessee address), the Court does not consider this a factor in its decision to decline jurisdiction.

With regard to the sixth and final factor, there was a previously-filed putative class action that raised at least some claims similar to the ones presented in this litigation. However, this does not strongly favor retaining jurisdiction because the class action status in that case was denied by the Chancery Court. See, Buck v. Metro–Goldwyn–Mayer Studios Inc., 2014 WL 3510151, at *5 (C.D.Cal. July 24, 2014) ("Th[e] final factor's purpose is efficiency and fairness," with the intent being to insure that class action litigation "be handled efficiently on a coordinated basis pursuant to ... 28 U.S.C. § 1407").

In short, "CAFA's primary objective" is to "ensur[e] Federal court consideration of interstate cases of national importance." Standard Fire Ins. Co. v. Knowles, — U.S. ——, ——, 133 S.Ct. 1345, 1350, 185 L.Ed.2d 439 (2013). The totality of the circumstances indicate that this simply is not such a case.

### C.

As a part of their Motion to Remand, Plaintiffs request attorney's fees and costs under the removal statute.

So far as relevant, that statute provides: "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). Even though a district court has "considerable discretion to award or deny costs and attorney fees" under the statute, "the Supreme Court has instructed that fee awards are inappropriate unless 'the removing party lacked an objectively reasonable basis for seeking removal.' " Powers v. Cottrell, Inc. ., 728 F.3d 509, 515 (6th Cir.2013) (quoting Martin v. Franklin Capital Corp., 546 U.S. 132, 141, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005)).

Defendants' removal of this case was not objectively unreasonable, and Plaintiffs do not argue otherwise. Their request for attorney's fees and costs will be denied.

### VI.

On the basis for the foregoing, Plaintiffs' Motion to Remand will be granted and this case will be remanded to Chancery Court. Plaintiffs' request for attorney's fees will

be denied.

An appropriate Order will be entered.

**All Citations**

Slip Copy, 2014 WL 4655277

Footnotes

1   The Renegade Mountain Community Club is the property owners' association for Renegade Resorts. Under the 1972 Restrictions, the owner with developer rights is entitled to ten votes per lot. (*Id*. ¶ 11).

2   After suit was filed, but before the case was removed to this Court, Plaintiffs filed a Notice of Voluntary Dismissal as to Terra Mountain Holdings. (Docket No. 1–5).

**End of Document**                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1183331
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

Sur G. NOVEL, Plaintiff,
v.
Jeffery A. ZAPOR, et al., Defendants.

No. 2:12–cv–737.
|
March 21, 2013.

**Attorneys and Law Firms**

Sur G. Novel, Yannawa, Bangkok, pro se.

Jeffery A. Zapor, Royal Oak, MI, pro se.

Jason D. Winter, Courtney Jean Trimacco, Reminger Co.,
LPA, Cleveland, OH, Douglas R. Jennings, Carlile
Patchen & Murphy LLP, Columbus, OH, for Defendant.

**OPINION AND ORDER**

JAMES L. GRAHAM, District Judge.

**\*1** Plaintiff Sur G. Novel, Esq. initiated this action *pro se,*
alleging that Defendants Jeffery A. Zapor, David C.
Morrison, Esq., and Fred W. Mankins engaged in a
scheme to defraud Plaintiff Novel and deprive him of his
interest in real property located in Walhonding, Ohio.

This matter is now before the Court on a factual challenge
to its subject matter jurisdiction over Plaintiff's claims.
Defendant Mankins moved to dismiss the complaint on
the grounds that Plaintiff, despite being a United States
citizen, cannot demonstrate that he is a citizen of a state
for purposes of diversity jurisdiction under 28 U.S.C. §
1332(a)(1). After Plaintiff failed to timely respond to the
motion to dismiss, the Court ordered him to show cause
why this action should not be dismissed for lack of
subject matter jurisdiction. Plaintiff responded by
submitting evidentiary materials which he believes prove
that he is domiciled in New York.

For the reasons that follow, the Court finds that it does not

have diversity jurisdiction because the evidence
establishes that Plaintiff is domiciled in Thailand and not
in New York.

**I. Factual and Procedural History**

**A.** *Background*
The real property located at 29300 Front Royal Road,
Walhonding, Ohio is the subject of this lawsuit. *See* Doc.
No. 1, Compl. ¶ 6. The property was owned by Carrie
Gallwitz, Plaintiff Novel's grandmother, who passed
away on August 20, 2007. *Id.* ¶¶ 6, 9. After her death, a
dispute arose between Plaintiff Novel and Glen Gallwitz
as to who owned the property. Glen Gallwitz was married
to Carrie Gallwitz at the time of her passing and believed
he was the fee simple owner of the property. *Id.* ¶¶ 11–12.
Plaintiff Novel asserted the property belonged to the
Carrie Gallwitz Living Trust. *Id.* ¶¶ 7–10.

The three defendants in this case all played some role in
assisting Mr. Gallwitz in his efforts to establish ownership
of the property in Walhonding, Ohio. On October 5, 2007,
Mr. Gallwitz brought a quiet title action against Plaintiff
Novel in the Knox County Court of Common Pleas. *Id.* ¶¶
10–11; *See* Doc. No. 3–1, Def. Zapor Mot. To Dismiss,
Exh. A. Defendant Jeffery A. Zapor was legal counsel for
Mr. Gallwitz in the quiet title action. While the litigation
was pending, a temporary restraining order was granted to
restrain Plaintiff Novel from selling or encumbering the
property or from evicting Mr. Gallwitz. Compl. ¶ 20. A
preliminary injunction was granted on November 15,
2007. *Id.* ¶ 21.

Mr. Gallwitz allegedly executed a series of documents on
October 17, 2007, including a will, quit claim deed, living
trust agreement, and power of attorney. *Id.* ¶¶ 23, 41, 46,
49, 50. These documents were allegedly drafted and
notarized by Defendant David Morrison, Esq. *Id.* ¶¶ 43,
47, 51. Defendant Fred Mankins purportedly witnessed
the execution of Mr. Gallwitz's will and power of
attorney. *Id.* ¶¶ 49, 103. Mr. Gallwitz passed away on July
2, 2009. *Id.* ¶ 63. Thereafter, the quiet title action was
dismissed. *Id.* ¶ 71.

**\*2** Plaintiff Novel initiated the present action *pro se* on
August 15, 2012. Plaintiff alleges that Defendant Zapor
engaged in a scheme to defraud Plaintiff Novel during the
period of time between 2007 and 2012. *Id.* ¶ 13. To
further this scheme, Plaintiff alleges that Defendant Zapor
intentionally concealed the will of Carrie Gallwitz, the
prenuptial agreement of Carrie and Glen Gallwitz, and the
quit claim deed, living trust agreement, and power of

attorney executed by Mr. Gallwitz on October 17, 2007. *Id.* ¶¶ 23, 40, 41, 46, 50. Plaintiff Novel alleges that Defendants Zapor, Morrison, and Mankins conspired to deprive Plaintiff of his interest in the property located at 29300 Front Road in Walhonding, Ohio. Plaintiff Novel alleges he has a reasonable belief that Mr. Gallwitz's will was backdated and his power of attorney forged by Defendants in order to carry out this fraud. *Id.* ¶¶ 78, 79, 104. Along with three allegations of fraud (Counts I, II, and III), Plaintiff's claims include abuse of process (Count IV), obstruction of justice (Count V), aiding and abetting (Count VI), civil conspiracy (Count VII), undue influence (Count VIII), and professional misconduct (Count IV).

**B. *Subject Matter Jurisdiction***
The factual allegations and procedural history pertinent to the determination of subject matter jurisdiction are as follows. Defendant Jeffery A. Zapor is a United States citizen residing in Michigan. Compl. ¶ 2. Defendant David C. Morrison and Defendant Fred W. Mankins are United States citizens and residents of Ohio. *Id.* ¶¶ 3–4. Plaintiff's complaint alleges that he is a "US citizen, an overseas resident of Bangkok, Thailand, and a licensed New York attorney." *Id.* ¶ 1.

Defendants Zapor, Morison, and Mankins filed separate motions to dismiss Plaintiff Novel's complaint. *See* Doc. Nos. 3, 7, 9. Relevant to this matter is Defendant Mankins' motion to dismiss. Mankins asserts, as a threshold issue, that the Court is without subject matter jurisdiction to hear this case under 28 U.S.C. § 1332. Mankins contends that Plaintiff is domiciled in Thailand and is "stateless," for purposes of diversity jurisdiction. In the alternative, he asserts that Plaintiff is domiciled in Ohio; therefore, complete diversity is destroyed.

When the time had lapsed under the Court's local rules for Plaintiff to respond to the motion to dismiss, the Court ordered Plaintiff Novel to show cause as to why his action should not be dismissed for lack of subject matter jurisdiction. *See* Doc. No. 10. Plaintiff Novel then responded to the Defendants' motions to dismiss, discussing among other things, the jurisdictional issue and submitting evidentiary materials directed at that issue. *See* Doc. No. 12. Thereafter Plaintiff Novel responded to the Court's order to show cause, submitting additional evidentiary materials directed at the jurisdictional issue. *See* Doc. No. 14.

In Plaintiff Novel's response in opposition to the Defendants' motions to dismiss, Plaintiff first asserts that

he is a resident of Bangkok, Thailand, providing " 'prima facie' evidence" that he is not domiciled in Ohio. *See* Doc. No. 12, p. 10. Plaintiff states that he was last domiciled in Ohio in 2001. Plaintiff attended high school, undergraduate school, and law school in Ohio. *Id.* at 12. His only remaining connection to Ohio is a P.O. Box address. *Id.* at 11. Although Plaintiff Novel's mother remains in Ohio, he insists he has "absolutely no intent whatsoever" to return to live in Ohio. *Id.*

**\*3** Plaintiff Novel moved to New York in May 2001 in order to study and prepare for the New York state bar. *Id.* at 12. At that time, he resided in Forest Hills, New York. Plaintiff Novel was admitted to the New York state bar in April 2002, and immediately thereafter, moved to Thailand. Plaintiff states that he currently has a residence in Brooklyn, New York, where he can receive mail. In addition, he continues to maintain his New York license to practice law. *Id.* at 13. Plaintiff maintains United States bank accounts and submits his federal tax returns annually. Doc. No. 14, Pl.'s Reply to Show Cause Order, p. 8.

Plaintiff Novel currently resides in a rented home with his Thai wife in Bangkok, Thailand, where he works as an immigration attorney. Pl.'s Resp. to Def.'s Mot. To Dismiss, p. 11–12. Plaintiff also owns a company in Bangkok. *Id.* at 12. One of Plaintiff's sisters resides in Bangkok as well. Plaintiff is not a citizen or permanent resident of Thailand, although he qualifies for a permanent residence permit. Pl.'s Reply to Show Cause Order, p. 7. He maintains a business visa and temporary work permit, which he renews annually. Pl.'s Resp. to Def.'s Mot. To Dismiss, p. 14. Although Plaintiff Novel has resided in Thailand for approximately ten years, he states that he intends to return to New York to work as an international corporate attorney. *Id.* at 12.

Plaintiff has remained in Bangkok since April 2002, and has returned to the United States at least two times—once in 2007 and once in 2008. *Id.* at 13. During these trips, Plaintiff visited his father and sister in California, where Plaintiff also stores many of his personal items. Plaintiff asserts that if he is not domiciled in New York, his alternative domicile is California. *Id* . at 14.

In his reply to the Court's order to show case, Plaintiff asserts that he is domiciled in the United States, while temporarily living and working abroad. He cites to the Foreign Affairs Manual ("FAM"), issued by the United States Department of State. The FAM provides guidelines for determining an individual's domicile for purposes of the United States Immigration and Nationality Act ("INA"). Pl.'s Reply to Show Cause Order, p. 3. Under

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    2

the FAM, Plaintiff notes: "A U.S. citizen living abroad whose employment meets the requirements of INA ... is considered to be domiciled in the United States." *Id.* Further, Plaintiff contends that his "employment abroad" meets the requirement of INA because he is employed by a United States corporation engaged in the development of foreign trade and commerce with the United States. *Id.* at 4. Therefore, his argument continues, the Court should find that he is domiciled in the United States for "legal purposes." *Id.* at 4. Plaintiff also cites to the FAM for the proposition that he has established and is maintaining a "US domicile while living abroad temporarily." *Id.* at 6.

Plaintiff argues that establishing domicile for purposes of diversity jurisdiction should involve the same domicile analysis used in the application process for U.S. citizens living abroad seeking U.S. permanent residence cards for relatives. *Id.* at 9. Finally, Plaintiff invokes a due process argument to assert that domicile should not be used as a threshold barrier to deny him access to the United States federal court system. *Id.*

## II. Discussion

### A. *Legal Standard*

**\*4** The district courts may exercise jurisdiction over an action between "citizens of different states" where the matter in controversy exceeds the sum or value of $75,000. 28 U.S.C. § 1332(a)(1). The plaintiff has the burden of proving the court's jurisdiction by a preponderance of the evidence where subject matter jurisdiction is challenged pursuant to a motion under Federal Rule of Civil Procedure 12(b)(1). *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Moir v. Greater Cleveland Regional Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990); *Lexington Supermarket, Inc. v. U.S. Dept. of Agriculture,* 84 F.Supp.2d 886, 888 (S.D.Ohio 1999).

The framework under which the court reviews a Rule 12(b)(1) motion depends on the nature of the challenge to the court's subject matter jurisdiction. *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990); *Wojton v. United States,* 199 F.Supp.2d 722, 725 (S.D.Ohio 2004). Rule 12(b)(1) motions generally come in two varieties: facial attacks and factual attacks. *Ohio Nat'l Life,* 922 F.2d at 325. As the Sixth Circuit has explained, "a facial attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading." *Id.* A district court must take the allegations in the complaint as true when reviewing a facial attack. *Id.* On the other hand, a factual attack on the

court's jurisdiction presents a factual controversy, wherefore the district court must weigh the conflicting evidence to resolve the disputed jurisdictional facts. *Id.* When the district court reviews a factual attack, "no presumptive truthfulness applies to the factual allegations." *Id.* Instead, the court has wide discretion to consider "affidavits, documents and even a limited evidentiary hearing" to determine whether subject matter jurisdiction exists. *Id.*

Defendant Mankins' motion to dismiss for lack of subject matter jurisdiction under 28 U.S.C. § 1332 presents a factual attack. Though Plaintiff alleges in the complaint that he is a United States citizen, Mankins contends that Plaintiff cannot prove he is domiciled in any state other than Ohio, where Mankins resides. Attached to the motion to dismiss are documents filed by Plaintiff in Ohio state court proceedings, and in those documents Plaintiff lists Bangkok, Thailand as his place of residence. *See* Def. Mankins Mot. To Dismiss, Exs. 14, 17, 21. Mankins further argues that there is no evidence, besides the complaint's reference to Plaintiff having being licensed to practice law in New York a decade ago, to establish that Plaintiff is domiciled in New York.

In response to Defendant Mankins' motion to dismiss, Plaintiff offered evidence in support of his argument that he is domiciled in New York. Further, the Plaintiff had a second opportunity to put forth any evidence for the Court's consideration in his response to the Court's show cause order. With both of his responses, Plaintiff Novel submitted evidentiary material to support his purported New York domicile.

**\*5** This presents a factual attack—a factual controversy for which the Court must weigh the evidence to resolve the jurisdictional dispute. The Court has wide discretion to consider any evidence to resolve the disputed facts. *See Hatcher v. U.S.,* 855 F.Supp.2d 728, 731 (E.D.Tenn.2012) ("In resolving the factual conflict to determine whether jurisdiction exists, the court has broad discretion to consider affidavits and documents outside the pleadings in ruling on the motion under Rule 12(b)(1) without converting the motion into one for summary judgment.").

Neither party has requested a hearing and the Court has obtained sufficient evidentiary material from both parties such that the Court determines an evidentiary hearing is not warranted. *See Ohio Nat'l Life,* 922 F.2d at 327 (upholding the district court's decision to deny an evidentiary hearing on the issue of subject matter jurisdiction and holding that a district court in its discretion is under no obligation to hold such a hearing); *Gibbs v. Buck,* 307 U.S. 66, 71–72, 59 S.Ct. 725, 83 L.Ed.

1111 (1939) ("[T]here is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court."). *See also McCann v. Newman Irrevocable Trust,* 458 F.3d 281, 290 (3d Cir.2006) ("A court can evaluate its jurisdiction without an evidentiary hearing 'so long as the court has afforded [the parties] notice and a fair opportunity to be heard.' ") (citing *Tanzymore v. Bethlehem Steel Corp.,* 457 F.2d 1320, 1323–24 (3d Cir.1972)). Thus, the Court now weighs the parties' evidence provided in the form of affidavits and other documents to resolve the factual basis for diversity jurisdiction, while noting that Plaintiff maintains the burden of proof.

**B. *Law & Analysis***

To establish diversity jurisdiction under 28 U.S.C. § 1332(a) (1), Plaintiff Novel must be a citizen of the United States, and a citizen of a particular state, different from that of which Defendants are citizens. *See Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 829, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). Plaintiff is a United States citizen residing in Bangkok, Thailand. Comp. ¶ 1. Plaintiff asserts that he is domiciled in the state of New York. Pl.'s Reply to Def.'s Mot. To Dismiss, p. 14. Defendant Mankins contends that Plaintiff Novel is domiciled in Thailand, and is therefore not a "citizen of a State." Mot. To Dismiss, p. 3. In the alternative, Defendant argues that if Plaintiff is domiciled in the United States, he is domiciled in Ohio. *Id.* at 4.

For purposes of establishing diversity jurisdiction under Section 1332, "citizenship" is synonymous with 'domicile,' and not with 'residence.' *Kaiser v. Loomis,* 391 F.2d 1007, 1009 (6th Cir.1968). An individual's domicile is "his true, fixed, and permanent home and principal establishment." *Eastman v. University of Michigan,* 30 F.3d 670, 672–73 (6th Cir.1994) (quoting Black's Law Dictionary 484 (6th ed.1990)). It is where he returns whenever he is absent. *Id.* The place where an individual resides is properly taken to be his domicile, absent a showing to the contrary. *District of Columbia v. Murphy,* 314 U.S. 441, 445, 62 S.Ct. 303, 86 L.Ed. 329 (1914).

*6 To determine a party's domicile, the court can look to several factors which indicate the "extent of a particular party's ties to the purported domicile." *Persinger v. Extendicare Health Services, Inc.,* 539 F.Supp.2d 995, 997 (S.D.Ohio 2008). These factors include: "[c]urrent residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions; fraternal organizations, churches, clubs and other

associations; place of employment or business; driver's licenses and other automobile registration; [and] payment of taxes." *Id.* (quoting 13B Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3612 (2d ed.1984)). The inquiry focuses not only on the number of contacts an individual has with the purported domicile, but also the substantive nature of the contacts. *Id.*

A citizen of the United States who is not domiciled in a State is "stateless" for purposes of diversity jurisdiction. *Newman–Green,* 490 U.S. at 828; *National Enterprises, Inc. v. Smith,* 114 F.3d 561, 566 (6th Cir.1997). Thus, a plaintiff who is residing abroad must be domiciled in a particular state in order to satisfy the requirements of 28 U.S.C. § 1332(a)(1). *National City Bank v. Aronson,* 474 F.Supp.2d 925, 927–28 (S.D.Ohio 2007).

In *Aronson,* the court held that Defendant Ewbank's presence in the lawsuit destroyed diversity jurisdiction. *Id.* at 933. Ms. Ewbank, a United States citizen, was residing in Russell, New Zealand. *Id.* at 930. She was granted permanent residency in New Zealand and expressed a desire to remain there. *Id.* at 931. Eventually, she intended to become a resident of New Zealand. *Id* . However, Ms. Ewbank also had significant connections with the state of Colorado. She owned a residence, maintained an active bank account, owned two vehicles registered in Colorado, maintained a valid driver's license, paid state and federal income taxes, and served on the board of a community group in Colorado. *Id.* The court found that Ms. Ewbank was not a citizen of Colorado for diversity purposes. *Id.* at 932. Emphasizing her repeated intention to remain in New Zealand permanently and become an active member of the society, the court determined Ms. Ewbank was domiciled in New Zealand and was therefore "stateless" for purposes of diversity jurisdiction. *Id.* at 933.

An individual is only domiciled in one place at a time. *Persinger,* 539 F.Supp.2d at 996. To establish a new domicile, two requirements must be met. *Id.* First, the individual must reside in the new domicile, and second, the individual must intend to remain there. *Id.* (citing *Von Dunser v. Aronoff,* 915 F.2d 1071, 1072 (6th Cir.1990)). Standing alone, "absence from a fixed home, however long continued, cannot work the change." *Kaiser,* 391 F.2d at 1009 (quoting *Mitchell v. United States,* 21 Wall. 350, 88 U.S. 350, 353, 22 L.Ed. 584 (1874)). However, a "floating intention" to return to one's previous domicile is not enough to prevent a new location from eventually becoming one's domicile. *See Gilbert v. David,* 235 U.S. 561, 570, 35 S.Ct. 164, 59 L.Ed. 360 (1915).

**\*7** Intent, alone, is insufficient evidence when coupled with conflicting facts. *Sadat v. Mertes,* 615 F.2d 1176, 1181 (7th Cir.1980) (holding that "although the plaintiff disclaimed any intention of settling [abroad]," expressed intention must be examined in light of the "circumstantial evidence of a person's manifested conduct"). *See also District of Columbia,* 341 U.S. at 456 ("One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted ... [by] inconsistent acts.").

In *Gilbert,* the U.S. Supreme Court considered whether the plaintiff in that case was domiciled in Michigan, where he owned a home and previously resided for many years, or in Connecticut, where he moved after a death in the family and had remained for the past twenty years. 235 U.S. at 569. During these twenty years, the plaintiff returned to Michigan only briefly and infrequently. *Id.* at 569. The Court found that plaintiff was now domiciled in Connecticut. *Id.* He moved his family there, bought a house, and settled in Connecticut. *Id.* at 570. The Court noted that although the plaintiff maintained ownership of his Michigan residence, exercised his right to vote in Michigan, and declared an intention to return, this was insufficient to prevent a change in his domicile. *Id.* The Court cited Judge Story's "domicile" explanation:

> If a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicil [e], it is to be deemed his place of domicil[e], notwithstanding he may entertain a floating intention to return at some future period [to his previous location].

*Id.* at 569 (quoting Conflicts of Laws, 7th ed. § 46, p. 41). Therefore, the plaintiff's "floating intention" to return to Michigan could not save his change in domicile.

Likewise, the court in *Sadat* rejected the defendant's argument that he was domiciled in Pennsylvania. 615 F.2d at 1181. The defendant was born in Egypt. He became a naturalized citizen of the United States, where he was domiciled in Pennsylvania for some time. *Id.* at 1180. For reasons pertaining to work, the defendant moved abroad, taking with him his family and all of his belongings. *Id.* He claimed that he had full intention to move back to Pennsylvania when he was able to financially support the move; therefore, Pennsylvania was

his domicile. *Id.* The court rejected this argument. *Id.* at 1181. The defendant had established a new domicile where he maintained his home, sent his children to school, obtained a driver's license, and operated his business. *Id.* The court determined that the plaintiff was domiciled abroad, "notwithstanding his assertion that he never intended to make [it] his home." *Id.*

In this case, Plaintiff Novel asserts that he is domiciled in New York. Pl.'s Reply to Def.'s Mot. To Dismiss, p. 12. In May 2001, Plaintiff moved from Ohio to New York. *Id.* At the time he relocated to New York, it appears Plaintiff had no intention of returning to Ohio. *Id.* at 11–14. This is further evidenced by Plaintiff's lack of substantive ties to Ohio and want of any evidence that Plaintiff has since returned to Ohio after his move in 2001. After moving to New York, Plaintiff Novel remained there while he studied and sat for the New York state bar exam. *Id.* at 12. Thereafter, Plaintiff moved to Thailand and has resided there since April 2002. *Id.*

**\*8** The Court begins with the presumption that Plaintiff is domiciled in Thailand. He states that he has been living continuously in Bangkok since 2002. *See District of Columbia,* 314 U.S. at 455 ("The place where a man lives is properly taken to be his domicile until facts adduced establish the contrary.").

The extent of Plaintiff's ties to a particular domicile can be examined using the factors articulated in *Persinger.* These factors lead strongly to the conclusion that Plaintiff is domiciled in Thailand. Plaintiff currently resides in Thailand, where he has been employed as an attorney for over ten years. Plaintiff states that he owns a company in Thailand. He is married to a Thai citizen and his sister lives in Thailand as well. Considering Plaintiff has lived in Thailand for more than ten years, he likely has a considerable amount of personal belongings at this residence. Plaintiff does not claim to keep any of his personal belongings in New York. He states that he stores many of his personal items with family members in California. Although Plaintiff maintains a United States bank account and annually submits his federal taxes, Plaintiff does not claim that he pays New York state taxes, directs his banking to a New York account, is registered to vote in New York, or has a New York driver's license. These factors weigh in favor of concluding that Plaintiff Novel is domiciled in Thailand. Plaintiff's contacts in Thailand are of the substantive nature that suggests his domicile is in Thailand. *See Persinger,* 539 F.Supp.2d at 997.

Plaintiff Novel states that he has a "legal residence" in Brooklyn, New York. Plaintiff does not claim to have

ever lived at this residence; instead, he states only that he can receive mail there. Plaintiff admits that he did not return to New York during his only two visits to the United States since 2002. The affidavit of Mr. Don L. Lacknett, Esq. (a college friend of Novel) was offered in support of Plaintiff's reply to the Court's show cause order. Mr. Lacknett states only that he is "aware" of Plaintiff's alleged New York residence, but he fails to establish that he has any personal knowledge of the residence. *See* Doc. No. 16, p. 2–4. For instance, Mr. Lacknett does not state that he has ever seen or visited the residence, or that he has ever directed any of his communications (telephone or mail) with Novel to that residence. *See* Fed.R.Evid. 602 (requiring personal knowledge based on personal perception).

Plaintiff also states that he maintains his license to practice law in New York. Although this is relevant evidence, it is not—standing alone—sufficient to overcome the substantial evidence leading to the conclusion that Plaintiff is not domiciled in New York. *See* Moir, 895 F.2d at 269 (noting that the burden is on the plaintiff to prove the existence of the court's subject matter jurisdiction).

The Court finds that Plaintiff Novel is domiciled in Thailand. Although Plaintiff Novel expresses an intention to return to New York, a "floating intention" to return someday is insufficient. Plaintiff Novel has a present domicile in Thailand. He has resided there for at least ten years, has established a life there, and has expressed no concrete plan to return to New York.

**\*9** In fact, Plaintiff characterizes his aspirations of returning as an "intended return from Thailand in the future." *See* Pl.'s Resp. in Opp. To Def.'s Mot. To Dismiss, p. 13. This is similar to the plaintiff in *Sadat*, who claimed he fully intended to move back to Pennsylvania when his finances could support the move. 615 F.2d at 1180. However, that court determined the plaintiff had established a new domicile abroad where he currently maintained his home, sent his children to school, and operated his business. *Id.* at 1181. *See also* Gilbert, 235 U.S. at 570 (holding that plaintiff's declared intention to return to Michigan after living in Connecticut for

twenty years was insufficient).

It appears Plaintiff intends to remain in Bangkok, Thailand, at least, for the immediately foreseeable future. Although Plaintiff still maintains a mailing address in Ohio, stores his personal belongings in California, claims to have a residence in New York, and keeps his license to practice law in New York, his primary home—the place where he returns after his visits to the United States—is his home in Thailand. The Court finds that Plaintiff Novel is not domiciled in a particular state as required by 28 U.S.C. § 1332(a)(1). Thus, he is "stateless" for diversity purposes.

Plaintiff Novel's argument regarding the domicile analysis adopted by the INA is inapplicable. Plaintiff has pointed to no case law to support his proposition that the domicile analysis as outlined in the FAM has ever been or should be applied in the context of determining domicile for purposes of diversity jurisdiction. Further, the FAM guidelines speak only to whether an individual is domiciled in the *United States*. Diversity jurisdiction requires that an individual is a citizen of the United States *and* is domiciled in a *particular State*. *See* NewmanGreen, Inc., 490 U.S. at 829 (emphasis added). Even if the Court were to adopt Plaintiff's reasoning, only the first half of the diversity requirement is satisfied by the FAM guidelines.

### III. Conclusion

The Court finds that Plaintiff Novel is domiciled in Thailand. Therefore, for purposes of diversity jurisdiction, Plaintiff is "stateless" and the Court lacks subject matter jurisdiction over this action. This action is dismissed without prejudice and the Clerk shall enter judgment in Defendant's favor.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1183331

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 557195
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Eastern Division.

Jerome J. PATE, et al., Plaintiffs,
v.
HUNTINGTON NATIONAL BANK, et al.,
Defendants.

No. 5:12CV1044.
|
Feb. 12, 2013.

**Attorneys and Law Firms**

Daniel G. Morris, Cleveland, OH, for Plaintiffs.

Reem Shalodi Henderson, Thomas L. Anastos, Frances F. Goins, Ulmer & Berne, Cleveland, OH, Brett A. Wall, Karen E. Swanson-Haan, Michael E. Mumford, Baker & Hostetler, Cleveland, OH, James S. Wertheim, Kimberly Y. Smith-Rivera, McGlinchey Stafford, Cleveland, OH, for Defendants.

**MEMORANDUM OPINION & ORDER**

SARA LIOI, District Judge.

*1 Before the Court is plaintiffs' motion to remand this action to the Summit County Court of Common Pleas for want of subject matter jurisdiction, pursuant to 28 U.S.C. § 1447(c). (Doc. No. 54.) Defendants SunTrust Bank ("SunTrust"), Fifth Third Bank ("Fifth Third"), and Huntington National Bank ("Huntington") have filed briefs in opposition to the motion (Doc. Nos.65, 66, 67), to which plaintiffs have filed replies (Doc. Nos.69, 70, 71). This matter is ripe for disposition. For the reasons that follow, plaintiffs' motion is **DENIED**.

**I. BACKGROUND**

On April 27, 2012, Huntington removed this case based on diversity jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). (Doc. No. 1.) Attached to the removal petition is

plaintiffs' original proposed class action complaint, which plaintiffs filed in the state court on March 26, 2012 (Doc. No. 1–1), as well as plaintiffs' amended class action complaint, which was filed in the state court on April 11, 2012 (Doc. No. 1–2). Plaintiffs' action arises out of an alleged Ponzi scheme perpetrated by James P. Carpenter ("Carpenter") and others in 1998–1999.

The amended complaint alleges that plaintiffs, and at least 250 other proposed class members, purchased fraudulent promissory notes from Carpenter and his associates. The notes were purportedly issued by two entities known as Serengeti Diamonds USA, Inc. ("Serengeti") and Lomas de la Barra Development ("Lomas"), who later turned out to be non-existent, sham companies. The amended complaint asserts that Carpenter's scheme fraudulently induced plaintiffs and the class members to write hundreds of checks, the majority of which were made payable in amounts greater than or equal to $10,000.00, and the combined value of which totaled substantially more than $4 million. (Doc. No. 1–2 at 65, 72.) All told, the amended complaint contends that the proposed class "collectively lost more than fifteen million dollars ($15,000,000)" in the Lomas and Serengeti frauds." (*Id.* at 85.)

The amended complaint seeks to recover plaintiffs' losses from the depositary and drawee banks that negotiated plaintiffs' checks. Specifically, plaintiffs allege that they drew checks payable to Lomas and Serengeti on their accounts with the defendant drawee banks, Huntington and Fifth Third. Carpenter then deposited plaintiffs' checks into accounts opened in the name of Lomas and/or Serengeti with the defendant depositary banks, Huntington, Fifth Third, SunTrust and Wells Fargo Bank, N.A. ("Wells Fargo").[1] The depositary banks then presented the checks for payment to the drawee banks, and plaintiffs' accounts were debited. Carpenter then withdrew and/or transferred the money from the fraudulently created accounts and absconded with plaintiffs' funds.

Based on the foregoing, plaintiffs' amended complaint asserts three claims against the defendant banks. Count One alleges the depositary banks are liable for conversion in violation of Ohio Rev.Code § 1303.60. Count Two asserts that the depositary banks aided and abetted Carpenter's tortious conduct and proximately caused "millions of dollars of damages" to plaintiffs and the class members. (*Id.* at 98.) Count Three is against the drawee banks for improperly paying the checks and/or debiting plaintiffs' accounts in violation of Ohio Rev.Code § 1304.30. The amended complaint seeks to hold the banks

Pate v. Huntington Nat. Bank, Not Reported in F.Supp.2d (2013)

2013 WL 557195

liable for the face value of all of plaintiffs' checks, as well as consequential damages, punitive damages, and attorney fees.

**\*2** On July 16, 2012, plaintiffs moved to remand this action, asserting that the removing defendant, Huntington, cannot establish that this Court has jurisdiction under CAFA because it cannot show that the amount in controversy exceeds $5 million. (Doc. Nos. 54; 54–1.) Further, in conjunction with their motion to remand, plaintiffs sought and were granted leave to file a second amended complaint, which drops Counts Two and Three and several defendants and purports to disclaim damages beyond $4,999,999.99. (Doc. Nos. 57; 58; 61.)

## II. LAW AND ANALYSIS

A defendant may remove to federal court only state court actions that originally could have been filed in federal court. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). As a court of limited jurisdiction, a federal district court must proceed cautiously in determining whether it has subject matter jurisdiction. *Musson Theatrical, Inc. v. Fed. Express Corp.,* 89 F.3d 1244, 1252 (6th Cir.1996). The court must give "[d]ue regard" to the power reserved to the states under the Constitution to provide for the determination of controversies in the state courts. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108–09, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). Accordingly, removal statutes must be construed strictly to promote comity and preserve jurisdictional boundaries between state and federal courts. *Alexander v. Elec. Data Sys. Corp.,* 13 F.3d 940, 949 (6th Cir.1994). "[A]ll doubts as to the propriety of removal are resolved in favor of remand." *Coyne v. Am. Tobacco Co.,* 183 F.3d 488, 493 (6th Cir.1999).

The defendant seeking removal bears the burden of establishing federal jurisdiction. *See Rogers v. Wal–Mart Stores, Inc.,* 230 F.3d 868, 871 (6th Cir.2000); *see also, Abrego v. The Dow Chemical Co.,* 443 F.3d 676, 685 (9th Cir.2006) (per curiam) ("under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction"). "Jurisdiction is determined at the time of removal, and subsequent events, 'whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached.' " *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 375 (6th Cir.2007) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 293, 58 S.Ct. 586, 82 L.Ed. 845 (1938)); *see also, Harper v. AutoAlliance Int'l, Inc.,* 392 F.3d 195, 210 (6th Cir.2004) ("The existence of subject matter jurisdiction is determined by examining the complaint as it existed at the

time of removal."). Contrary to plaintiffs' unsupported assertions otherwise, these general jurisdiction principles apply whether jurisdiction is based on the general diversity statute or CAFA. *Metz v. Unizan Bank,* 649 F.3d 492, 500–01 (6th Cir.2011); *see also, Chesner v. Stewart Title Guar. Co.,* No. 1:06CV00476, 2009 WL 585823, at \*11 n. 20 (N.D.Ohio Jan.9, 2009) ("the wellestablished 'time of removal' principle that dictates the amount in controversy for purposes of the general diversity statute also applies to cases under CAFA.") (citing *Levitt v. Fax.com,* No. W MN–05–949, 2007 WL 3169078, at \*7 (D.Md. May 25, 2007) (citing *Davis v. Homecomings Fin.,* No. C05–1466RSL, 2007 WL 905939, at \*1–2 (W.D.Wash. Mar.22, 2007))).

**\*3** Huntington removed plaintiffs' amended complaint to this Court under CAFA. Determining whether the Court has jurisdiction over the class action removed by Huntington pursuant to CAFA involves a two-step process. First, H utni ngton must show that CAFA's basic jurisdictional requirements have been met. *See Smith v. Nationwide Prop. & Cas. Ins. Co.,* 505 F.3d 401, 404–05 (6th Cir.2007). "Second, if [CAFA's] jurisdictional requirements have been met, the plaintiff has the burden to show that the case falls within one of three enumerated exceptions set forth in § 1332(d)." *See Dean v. Draughons Junior Coll., Inc.,* No. 3:12–cv–0157, 2012 WL 2357492, at \*3 n. 5 (M.D.Tenn. Jun.20, 2012) (noting that although the Sixth Circuit has not addressed the issue, the federal circuits have "uniformly concluded" that, after general jurisdiction is established by the removing party, the burden shifts to the party opposing federal jurisdiction to show an exception to CAFA applies) (internal quotation marks and citations omitted).

### A. CAFA's Jurisdictional Requirements

CAFA provides that putative class actions may be removed from state court to a federal district court when three requirements are met: the matter in controversy exceeds the sum or value of $5,000,000; there is minimal diversity (any member of the plaintiff class is a citizen of a different state from any defendant); and the putative plaintiff class numbers 100 or more. 28 U.S.C. §§ 1332(d) and 1453(b). Here, the parties do not dispute that the requisite diversity of citizenship exists under CAFA. Likewise, there is no dispute this case exceeds CAFA's 100 class-member requirement. The issue in this case, therefore, is whether defendants have met their burden of demonstrating CAFA's $5 million amount-in-controversy requirement.

Defendants Huntington, Fifth Third and SunTrust argue that the basis for CAFA jurisdiction is unambiguously

established on the face of plaintiffs' amended complaint (Doc. No. 1–2) and that neither plaintiffs' post-removal amendment or a stipulation limiting damages divests this Court of jurisdiction, which is measured at the time of removal.

Plaintiffs contend that defendants have failed to establish by a preponderance of the evidence that the amount in controversy is greater than $5 million because they have not presented any evidence to show the value of plaintiffs' claims. *See Smith,* 505 F.3d at 401. Further, plaintiffs assert that the damage allegations in the second amended complaint and their stipulation as to damages below the jurisdictional threshold are offered to make "the information in the complaint more accurate, and [to present] a clearer picture of the value of claims a [*sic* ] removal[,]" and are not an impermissible post-removal attempt to reduce the size of their claims. (Doc. No. 69–1 at 1418.)

The Court concludes that removal of this action was proper and that plaintiffs' post-removal amendment and stipulation do not divest this Court of jurisdiction under CAFA.

**\*4** When the underlying complaint *seeks an indeterminate or unspecified amount of damages,* the removing defendant has the burden of demonstrating, by a preponderance of the evidence, that the amount in controversy requirement has been met. *Hayes v. Equitable Energy Res. Co.,* 266 F.3d 560, 572 (6th Cir.2001). Conversely, as is the case here, "[i]n 'a suit instituted in a state court and thence removed,' plaintiffs' claim of damages exceeding the federal amount in controversy is *presumed correct* unless shown to a legal certainty that the amount is actually less than the federal standard. *Freeman v. Blue Ridge Paper Prods., Inc.,* 551 F.3d 405, 409 (6th Cir.2008) (quoting *St. Paul Mercury Indem. Co.,* 303 U.S. at 290–92; and citing *Gafford v. Gen. Electric Co.,* 997 F.2d 150, 157 (6th Cir.1993), *abrogated on other grounds by Hertz Corp. v. Friend,* 559 U.S. 77, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010)). "Thus, once the defendant has pointed to an adequate jurisdictional amount, the situation becomes analogous to the 'typical' circumstances in which the *St. Paul Mercury* 'legal certainty' test is applicable ...." *Id.* (quoting *De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1412 (5th Cir.1995)) (internal quotation marks omitted). Absent such legal certainty, a complaint should not be dismissed for lack of subject matter jurisdiction. *Osamor v. Robinson,* No. 1:09cv694, 2010 WL 5898076, at \*3 (S.D.Ohio Dec.9, 2010) (citing *Mass. Cas. Ins. Co. v. Harmon,* 88 F.3d 415, 416 (6th Cir.1996); *St. Paul Mercury Indem. Co.,* 303 U.S. at 289; *Kovacs v. Chesley,* 406 F.3d 393, 395 (6th Cir.2005)).

Here, the amended complaint expressly and unambiguously states that the victims of the alleged frauds "have collectively lost more than fifteen million dollars[,]" (Doc. No. 1–2 at 85), and that defendants are the proximate cause of those losses. (*Id.* at 98, 107.) This amount vastly exceeds the jurisdictional threshold and is presumed correct unless it is shown to a legal certainty that the claimed amount is actually less than $5 million. *Freeman,* 551 F.3d at 409.

Notwithstanding the unequivocal allegations as to the putative class's claimed damages, plaintiffs assert that defendants are not entitled to rely upon the "inflated numbers [of Pate's claims[,] when [the banks] always knew [these numbers] *were false* [ ]" and knew "exactly how much the potential value of the claims against [the banks] are." (Doc. No. 69–1 at 1418)[2] (emphasis added). Plaintiffs assert their allegations concerning class size and claim values in the *second* amended complaint are "more accurate," and in essence, clarify their earlier representations. (*Id.*) According to plaintiffs, if the Court retains this case based on the amounts alleged in the amended complaint, as opposed to the second amended complaint, it "would be tantamount to allowing collusion to present false valuations to the court." (*Id.*)

Despite what is essentially an admission that plaintiffs' counsel either falsified the amended complaint by inflating the amount of damages recoverable, or is now belatedly trying to manipulate the amount in controversy in a blatant attempt to avoid federal jurisdiction, the Court finds no basis to conclude that defendants were complicit in plaintiffs' duplicity. On the contrary, at the time of removal Huntington had a good faith basis for concluding that the amended complaint implicated the Court's jurisdiction under CAFA. Indeed, the amended complaint, on its face, sought a *determinate and specific* amount of damages well in excess of the jurisdictional threshold. This, coupled with the sheer numbers of potential class members and the type and amount of alleged harm to each, provided more than ample basis for removal. Plaintiffs' unsupported and speculative assertions as to the banks' collective knowledge aside, plaintiffs do not point to a single allegation in the amended complaint that would have suggested to Huntington that the actual amount in controversy fell below CAFA's jurisdictional threshold. As defendants correctly point out, once a case is properly removed, a plaintiff cannot amend the complaint to defeat diversity jurisdiction by lowering the amount in controversy. *St. Paul Mercury Indem. Co.,* 303 U.S. at 294 ("events occurring subsequent to removal which reduce the amount recoverable, whether beyond the plaintiff's control or the result of volition, do not oust the

2013 WL 557195

district court's jurisdiction"). "[T]he status of the case as disclosed by the [plaintiffs'] complaint is controlling in the case of a removal[.] ... And though, as here, the [plaintiffs] after removal, by stipulation, by affidavit, or by amendment of [their] pleadings, [reduce] the claim below the requisite amount, this does not deprive the district court of jurisdiction." *Id.* at 292. Further, "[c]laims present when a suit is removed but subsequently dismissed from the case ... enter into the amount-in-controversy calculation. *Everett v. Verizon Wireless, Inc.,* 460 F.3d 818, 822 (6th Cir.2006) (citing *St. Paul Mercury Indem. Co.,* 303 U.S. at 293). Thus, plaintiffs' post-removal dismissal of certain claims in support of remand also does not deprive this Court of jurisdiction under CAFA.

**\*5** Plaintiffs' reliance on *Smith* to the contrary is misplaced. In that case, the Sixth Circuit, recognizing that a plaintiff is the master of his complaint, upheld a district court's reliance on a damage disclaimer to defeat CAFA jurisdiction that was contained in an amended complaint *filed in the state court prior to removal.* *Smith,* 505 F.3d at 403. Here, by contrast, plaintiffs' amended complaint included no damage disclaimer, but instead *expressly demanded* damages well above the jurisdictional minimum. Plaintiffs' post-removal disclaimer, as a matter of law, does not oust this Court of jurisdiction, as it existed at the time of removal. *See In re Burlington N. Santa Fe Ry. Co.,* 606 F.3d 379, 381 (7th Cir.2010) ("a post removal amendment ... does not destroy CAFA jurisdiction" because "jurisdiction cannot be 'ousted' by later events."); *see also, Metz,* 649 F.3d at 500–01; *Rogers,* 230 F.3d at 872; *Potts v. Zurich, N.A.,* No. 4:11 CV 1470, 2012 WL 946891, at \*3 (N.D.Ohio Mar.20, 2012).

### B. CAFA Exception

Alternatively, plaintiffs argue that, even if subject matter jurisdiction exists, the Court should exercise its discretion to decline to hear this case in light of its "substantial nexus with Ohio[ ]" pursuant to 28 U.S.C. § 1332(d)(3). (Doc. No. 54–1 at 1147.) Specifically, plaintiffs contend that the Court should remand this case because the dispute in this case is over "a cutting edge rule of Ohio UCC law," and because the number of Ohio plaintiffs outnumbers those from other states.

Under § 1332(d)(3), the Court may, subject to consideration of certain factors, decline to exercise jurisdiction in "which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate *and the primary defendants* are citizens of the State in which the action was originally filed[.]" 28

U.S.C. § 1332(d)(3) (emphasis added). Pursuant to the plain language of this provision, the exemption requires that all of the "primary defendants" and a majority of the proposed plaintiff classes be citizens of the state in which the action was filed. *Dean,* 2012 WL 2357492, at \*3 ("the 'consensus among the courts ... that the plural use of 'defendants' means that all primary defendants must be citizens of the state in which the action was originally filed ....' ") (quoting *Adams v. Macon Cnty. Greyhound Park, Inc.,* 829 F.Supp.2d 1127, 1138 n. 13 (M.D.Ala.2011) (collecting cases)). "Stated another way, if at least one primary defendant is diverse from the requisite proportion of the proposed plaintiff class[es] ...," the exemption does not apply "and the court must retain jurisdiction." *Id.*

Here, this action was filed in Ohio, and plaintiffs contend that, although not all of the defendant banks are citizens of Ohio, only the two Ohio banks (Fifth Third and Huntington) are primary defendants because those banks have more claims against them than the foreign banks (Wells Fargo and SunTrust), "by a ratio of about 7–3." (Doc. No. 69–1 at 1419.) By contrast, defendants argue that all four defendant banks are primary defendants, as they have a dominant relation to the subject matter in controversy, as opposed to "secondary defendants," who can only be parties sued under a vicarious liability theory or joined for purposes of contribution or indemnification. *See McClendon v. Challenge Fin. Investors Corp.,* No. 1:08CV1189, 2009 WL 589245, at \*13 (N.D.Ohio Mar.9, 2009). Thus, defendants assert that because two of the four primary defendants are not Ohio residents, § 1332(d)(3) is inapplicable.

**\*6** CAFA does not define the term "primary defendants," nor has the Sixth Circuit addressed the meaning of that term. The courts have developed varying tests determining who is a primary defendant. These tests were recently summarized by another court within this circuit:

> Some courts, construing the term by reference to an analogous provision of the Multiparty, Multiforum, Trial Jurisdiction Act of 2002, 28 U.S.C. § 1369, have defined "primary defendants" as those parties that are allegedly directly liable to the plaintiffs, while 'secondary defendants' are ... those parties sued under theories of vicarious liability or joined for purposes of contribution or indemnification.... Other district courts have adopted different

2013 WL 557195

approaches, holding that a "primary defendant" is one who (1) has the greater liability exposure; (2) is most able to satisfy a potential judgment; (3) is the subject of a significant portion of the claims asserted by plaintiffs; or (4) is the only defendant named in one particular cause of action.

*Dean,* at *4 (internal quotation marks and citations omitted).

Defendants argue the Court should follow those courts that measure "primary" versus "secondary" based on whether a particular defendant faces direct liability, while plaintiffs argue that the Court should determine whether a particular defendant is "primary" by comparing the number of claims asserted against each defendant. Because each of the individually named defendant depositary banks constitutes a "primary defendant" under any reasonable interpretation of that term, the Court need not determine which of the preceding definitions of "primary defendant" is controlling.

With little exception, the amended complaint fails to distinguish between the instate and out-of-state defendant banks' conduct and the extent of their individual liability. The plaintiffs' amended complaint alleges that *each* defendant depositary bank allowed Carpenter to open an account for non-existent business entities; that *each* negotiated the victims' checks; that *all* depositary banks failed in their duty to ensure proper internal security procedures; and that *all* of the depositary banks are liable to plaintiffs for conversion and aiding and abetting Carpenter's tortious conduct. Further, plaintiffs contend that a "significant number of checks Carpenter stole from the Plaintiffs were wrongfully negotiated, and laundered through ... and converted by ..." the foreign defendant banks, SunTrust and/or Wells Fargo (formerly Wachovia

Bank, N.A.) and, therefore, these banks are "liable to many Plaintiffs." (Doc. No. 1–2 at 79.) Assuming, as the amended complaint alleges, that Huntington alone is liable for more than $4 million in improperly negotiated checks, then, at a minimum, the remaining defendant banks are responsible for the outstanding $11 million out of the total $15 million in alleged losses. This is not an insignificant sum. Moreover, plaintiffs seek to hold each of the depositary banks directly liable under the same causes of action for the same conduct, and request the same relief from each. Under these circumstances, SunTrust and Wells Fargo do not amount to "secondary" defendants in any significant way.

**\*7** Accordingly, the Court finds that plaintiffs have not demonstrated that the diverse defendants, SunTrust and Wells Fargo, do not constitute "primary defendants" for purposes of the CAFA exemption in § 1332(d)(3). Because both of these defendants are not Ohio citizens, they are diverse from the putative Ohio plaintiffs and the exemption set forth in § 1332(d)(3) does not apply.  *See Dean, supra; McClendon, supra; see also, Meiman v. Kenton Cnty., Ky.,* No. 10–156–DLB, 2011 WL 350465, at *9 (E.D.Ky. Feb.2, 2011).

### III. CONCLUSION

For all the foregoing reasons, plaintiffs' motion to remand is **DENIED.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 557195

Footnotes

1    The second amended complaint (Doc. No. 61) substitutes Wells Fargo as a defendant for the previously named defendant Wachovia Bank, N.A. Wells Fargo has not filed a brief in opposition to the motion to remand, however, it does not appear from the record that service of the second amended complaint has yet been perfected upon Wells Fargo.

2    Counsel's assertions in his reply brief are cause for concern, particularly his specious allegation that plaintiffs in state civil class actions are routinely "tempted" to overstate their class allegations to ensure class certification and the implication that he may have succumbed to such temptation in this case. (Doc. No. 69–1 at 1418.) Counsel is cautioned that Ohio Civil Rule 11 clearly prohibits such conduct. *See, e.g., Ponder v. Kamienski,* No. 23270, 2007 WL 2781197, at *8 (Ohio Ct.App. Sept. 6, 2007) ("A willful violation involves a party who has willfully signed a pleading which, to the best of his knowledge, information and belief, was not supported by good ground.") (citation omitted); *Lewis v. Celina Fin. Corp.,* 101 Ohio App.3d 464, 471, 655 N.E.2d 1333 (Ohio Ct.App.1995) (affirming sanction of attorney for bad faith in signing complaint without conducting adequate background investigation). Ohio Civ. R. 11,

Pate v. Huntington Nat. Bank, Not Reported in F.Supp.2d (2013)

2013 WL 557195

provides in relevant part, that, "[t]he signature of an attorney ... constitutes a certificate by the attorney or party that ... to the best of the attorney's ... knowledge, information, and belief there is *good ground* to support it[.]" Ohio Civ. R. 11 (emphasis added). It is plain that the manipulation of a damages claim, "for purposes of making class certification more likely," does not constitute good ground. Indeed, such assertions serve only to mislead the parties and the courts and smack of gamesmanship, at the least, and abuse of process, at worst.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---